# **<u>EXHIBIT A</u>**

Pursuant to the eectronic signature authorization I provided for this oan, and after carifying my appication information which is being updated based on additiona information I provided, in the discosures and previousy stated oan terms, I agree to the modification beow/above and authorize the use of my eectronic signature authorization as my signature, acceptance and consent to the modification of the terms as expressed beow/above in connection with the consummation of the oan.

## Application Agreement
## Hummingbird Funds, d/b/a Blue Trust Loans

Borrower's Name:                                                                                     Loan #:
**Joshua Kalkbrenner**                                                                              ████████**13**

████████████████████

**IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT:** To hep the US government fight the funding of terrorism and money aundering activities, the Bank Secrecy Act requires a financia institutions to obtain, verify, and record information that identifies each person who opens an account.

What this means for you: When you open an account, we wi ask for your name, address, date of birth, and other information that wi a ow us to identify you. We may aso ask for a copy of your driver's icense or other identifying documents.

The information in no way wi be used in making the credit decision on your competed appication.

**Notice:** This Loan is not designed as a soution to ong-term financia probems and shoud not be used as such. Customers with credit difficuties shoud seek credit counseing or meet with a nonprofit financia counseing service in their community.

**BANKRUPTCY:** You certify to us, by executing this document, that you are not a debtor in any bankruptcy proceeding and have no intention to fie a petition for reief under any chapter of the United States Bankruptcy Code.

**GOVERNING LAW:** This Loan Agreement is governed by the aws of the Lac Courte Orei es Band of Lake Superior Chippewa Indians ("the Tribe"), and appicabe federa aw, without regard to the aws of any state, incuding the confict of aws ru es of any state. You agree to be bound by Triba aw, and in the event of a bona fide dispute between you and us, Triba aw sha appy to such dispute. You and we agree that any controversies that may arise hereunder sha be reso ved excusive y by Arbitration.

**AGREEMENT TO ARBITRATE ALL DISPUTES:** Arbitration is a means for ega matters between two parties to be reso ved by a neutra arbitrator rather than a court. A caims, demands, disputes or controversies between you and Bue Trust Loans (its empoyees, officers, directors, members, agents or assigns), incuding disputes regarding the scope and vaidity of this Arbitration cause, and any Bue Trust Loans product or service, sha be subject to Arbitration as provided herein. If your appication is approved and you enter into a Loan Agreement with us, this Arbitration Cause is incorporated into the Loan Agreement and made part thereof. You agree that YOU ARE WAIVING YOUR RIGHT TO HAVE A TRIAL BY JURY. This Arbitration Agreement sha appy to a caims, whether under common aw or pursuant to federa, state, Triba or oca statute, reguation or ordinance, or for caims of fraud, misrepresentation or for co ection of the oan, and you specifica y waive your right to bring, join or participate in any cass action awsuit. A Arbitration caims sha be reso ved by binding individua (not joint or cass) arbitration by and fina y sett ed under the ru es of the arbitration organization of your choice: American Arbitration Association (1-800-778-7879) www.adr.org; JAMS (1-800-353-5367) www.jamsadr.com; or an arbitration organization agreed upon by you and the other parties to the dispute. This agreement to arbitrate a disputes sha appy no matter by whom or against whom the caim is fied.

NOTICE: YOU AND WE HAVE AGREED **THERE WILL BE NO RIGHT OR OPPORTUNITY TO LITIGATE DISPUTES THROUGH A COURT** AND HAVE A JUDGE OR JURY DECIDE THE DISPUTES BUT HAVE AGREED INSTEAD TO RESOLVE DISPUTES THROUGH BINDING ARBITRATION.

**AGREEMENT NOT TO BRING, JOIN OR PARTICIPATE IN CLASS ACTIONS:** To the extent permitted by aw, you agree that you wi not bring, join or participate in any cass action as to any caim, dispute or controversy you may have against us, our empoyees, officers, directors, servicer agents and assigns. You agree to the entry of injunctive reief to stop such a awsuit or to remove you as a participant in the suit. You agree to pay the attorney's fees and court costs we incur in seeking such reief. This agreement does not constitute a waiver of any of your rights and remedies to pursue a caim individua y and not as a cass action pursuant to the Arbitration Provision as provided above.

**EQUAL CREDIT OPPORTUNITY ACT (ECOA) NOTICE:**

Notice: The federa Equa Credit Opportunity Act prohibits creditors from discriminating against credit appicants on the basis of race, coor, reigion, nationa origin, sex, marita status, age (provided the appicant has the capacity to enter into a binding contract); because a or part of the appicant's income derives from any pubic assistance program; or because the appicant has in good faith exercised any right under the Consumer Credit Protection Act. The federa agency that administers compiance with this aw concerning this creditor is the Federa Trade Commission, Equa Credit Opportunity, Washington, D.C. 20580.

**CONSENT TO ELECTRONIC COMMUNICATIONS:**

Pease read this information carefu y and print a copy and retain this information eectronica y for future reference.

You must consent to transact business with Hummingbird Funds, LLC d/b/a Bue Trust Loans through eectronic communications in order for us to process your oan request. The fo owing terms and conditions govern eectronic communications in connection with your oan request and other current or future transactions with Hummingbird Funds, LLC d/b/a Bue Trust Loans (this "Consent"). By acknowedging and accepting this Consent, you agree that any notices we are required to make to you may be deivered to you eectronica y. You agree to eectronica y sign any documents requiring a signature. You acknowedge and agree to the fo owing terms and conditions of this Consent.

You agree that:

- Any disclosure, notice, record or other type of information that is provided to you in connection with your transaction with us, including but not limited to, your Loan Agreement, this Consent, the Loan Application, the Truth in Lending disclosures set forth in the Loan Agreement, our Privacy Notice, any change-in-term notices, fee and transaction information, statements, disbursement notices, notices of adverse action, legally mandated brochures and disclosures, and transaction information ("Communications"), may be sent to you electronically by posting the information at our web site www.bluetrustloans.com, or by sending it to you by secure e-mail.
- We will not be obligated to provide any Communication to you in paper form unless you specifically request us to do so. You may obtain a copy of any Communication by contacting us at info@bluetrustloans.com or by calling us at (877) 770 - 2682. We will provide you with paper copies at no charge. You can also withdraw your consent to ongoing electronic communications in the same manner, and ask that they be sent to you in paper or non-electronic form. If you decide to withdraw your Consent, the legal effectiveness, validity, and enforceability of prior electronic disclosures will not be affected.
- You must provide us with your current e-mail address for receipt of Communications. If your e-mail address, telephone number(s), or residence address changes, you must send us a notice of the new e-mail address/telephone number(s) by writing to us or sending us an e-mail, using secure messaging, at least five (5) days before the change to info@bluetrustloans.com.
- If you use a spam filter that blocks or re-routes emails from senders not listed in your email address book, you must add Blue Trust Loans to your email address book so that you will be able to receive the Communications we send to you.
- In order to receive electronic Communications, you will need a working connection to the Internet. Your browser must support the Secure Sockets Layer (SSL) protocol. SSL provides a secure channel to send and receive data over the Internet through HS encryption capabilities. Most current Internet browsers (Chrome, Firefox, Internet Explorer, etc.) support this feature. You will also need a printer connected to your computer to print disclosures/notices or have sufficient hard drive space available to save the information (e.g., 1 MB or greater). We do not provide ISP services. You must have your own Internet Service Provider. You may submit questions regarding hardware and software requirements to info@bluetrustloans.com.
- We may amend (add to, delete or change) the terms of this Consent by providing you with advance notice.
- You are able to view and/or electronically store the information presented at the website www.bluetrustloans.com. You also agree to print and retain a copy of this Consent for your records.

You are free to withdraw your Consent at any time and at no charge. If at any time you wish to withdraw your Consent, you can send us your written request by mail to Attn: Blue Trust Loans, P.O. Box 1754 , Hayward, WI 54843 with the details of such request. If you decide to withdraw your Consent, the legal effectiveness, validity, and enforceability of prior electronic Disclosures will not be affected.

**TELEPHONE CONSUMER PROTECTION ACT DISCLOSURE:** You agree to be contacted by Blue Trust Loans, or our affiliates, at any of the phone numbers you provided in your Loan Application and any other phone numbers you provide directly to us **for the purposes of servicing any account you have with us.** You agree that such contact may include phone calls generated from an automated telephone dialing system or calls made using an artificial or prerecorded voice. If you agreed to be contacted by text message from Blue Trust Loans for the purpose of servicing any account you have with us, you agree that such contact includes text messages generated from an automatic telephone dialing system. See the SMS Statement Notifications Disclosure section for more details. You agree that any consent provided under this paragraph continues to apply for any accounts you have with Blue Trust Loans unless and until you revoke this consent.

If you agreed to be contacted by Blue Trust Loans or our affiliates, at the phone numbers you provided in your Loan Application **for marketing purposes,** you agree that such contact may include phone calls and text messages generated from an automated telephone dialing system or calls made using an artificial or prerecorded voice. You are not required to authorize marketing calls or text messages to obtain credit or other services from us. If you do not wish to receive sales or marketing calls or text messages from us, you should **not** check the "yes" box for contact preferences. You understand that any messages we send you may be accessed by anyone with access to your text messages. You also understand that your mobile phone service provider may charge you fees for text messages that we send you, and you agree that we shall have no liability for the cost of any such text messages. You agree that any consent provided under this paragraph continues to apply unless and until you revoke this consent. See the SMS Statement Notifications Disclosure section for more details.

**BLUE TRUST LOANS SMS STATEMENT NOTIFICATIONS DISCLOSURE:** This SMS Statement Notifications Disclosure (this "Disclosure") applies to each account you have with Blue Trust Loans for which you have elected to receive Short Message Service ("SMS") messages.

As used in this SMS Statement Notifications Disclosure, "SMS Statement Notifications" means any SMS (text message) communications from Blue Trust Loans to you, sent to the phone number(s) designated by you or as listed on your application, including but not limited to payment information, account information, due dates, delinquent accounts, program updates, promotions, coupons and other marketing messages. These messages will originate from 70680, 1-888-403-4874, 1-888-680-5616, 1-888-699-7181, 1-888-618-9265, 1-888-616-1671, 1-888-618-1315, 1-888-639-2308, 1-888-428-0684, 1-888-476-2384, and 1-888-401-5617.

**How to Unsubscribe:** You may withdraw your consent to receive SMS Statement Notifications by changing your account preferences after logging in at www.bluetrustloans.com. Alternatively, you may call us at (877) 770 - 2682. At our option, we may treat your provision of an invalid mobile phone number, or the subsequent malfunction of a previously valid mobile phone number, as a withdrawal of your consent to receive SMS Statement Notifications. We will not impose any fee to process the withdrawal of your consent to receive SMS Statement Notifications. Any withdrawal of your consent to use SMS Statement Notifications will be effective only after we have a reasonable period of time to process your withdrawal. Neither your carrier or Blue Trust Loans is liable for delayed or undelivered messages.

1. **You may also opt-out** and remove your SMS approval for additional messages by sending "STOP", "END", "CANCEL", "UNSUBSCRIBE", "REMOVE", "QUIT", or "STOPALL" to the SMS text message you have received. If you remove your SMS

approva from our database, your number wi no onger be used for secondary purposes, discosed to third parties and used by us for third parties to send promotiona correspondence to you.

2. To app y for our product, use any or our (or our servicers' or agents') services (incuding but not imited to receiving any SMS Statement Notifications), or our website, you must be at east eighteen (18) years of age.

3. To request additiona information, contact us by teephone at (877) 770 - 2682. For hep of additiona information regarding our texting services emai us at info@buetrustoans.com or rep y "HELP" anytime from your mobie device to the message you receive.

4. The services are avaiabe on the fo owing carriers: AT&T, Verizon Wireess, T-Mobie, Sprint, Nexte, Dobson, U.S. Ce uar, and Virgin Mobie. Additiona carriers are added as they become avaiabe.

5. In order to access, view, and retain SMS Statement Notifications that we make avaiabe to you, you must have: (1) an SMS-capabe mobie phone, (2) an active mobie phone account with a communication service provider; and (3) sufficient storage capacity on your mobie phone.

6. A SMS Statement Notifications in eectronic format from us to you wi be considered "in writing."

7. There is no service fee for SMS Statement Notifications but you are responsibe for any and a charges, incuding but not imited to fees associated with text messaging, imposed by your communications service provider. Other charges may app y. Such charges may incude those from your communications service provider. Pease consu t your mobie service carrier's pricing p an to determine the charges for sending and receiving text messages. These charges wi appear on your phone bi .

8. Additiona y, you agree that we may send any SMS Statement Notifications through your communication service provider in order to deiver them to you and that your communication services provider is acting as your agent in this capacity. You further acknowedge and agree that we (or our servicers or agents) wi use a third-party p atform provider to deiver such SMS Statement Notifications and that such third-party p atform provider is acting as our (or our servicers or agents) in this capacity. You agree to provide a vaid mobie phone number for these services that beongs to you and not someone ese so that we may send you certain information about your oan and to provide us with notice as set forth above if you are no onger the primary user of the number provided. Additiona y, you agree to indemnify, defend and ho d us harmess from and against any and a caims, osses, iability, cost and expenses (incuding reasonabe attorneys' fees) arising from your provision of a mobie phone number that is not your own or your vio ation of appicabe federa, state, Triba or oca aw, reguation or ordinance. Your obigation under this paragraph sha survive termination of this Agreement. SMS Statement Notifications are provided for your convenience on y. Receipt of each SMS Statement may be de ayed or impacted by factor(s) pertaining to your communications service provider(s). We wi not be iabe for osses or damages arising from any discosure of account information to third parties, non-deivery, deayed deivery, misdirected deivery or mishanding of, or inaccurate content in, the SMS Statement Notifications sent by us.

9. We may modify or terminate SMS from time to time, for any reason, and without notice, incuding the right to terminate text messaging with or without notice, without iability to you, any other user or a third party. We reserve the right to modify these Terms of Use from time to time without notice. Pease review these Terms of Use from time to time so that you are timey notified of any changes.

10. IF you are opting into SMS messaging through your account preferences page:

    1. You agree that we wi not be obigated to provide any communication to you in paper form uness you specifica y request us to do so. You may obtain a copy of any communication by contacting us at info@buetrustoans.com or by ca ing us at (877) 770 - 2682. We wi provide you with paper copies at no charge.

    2. If your e-mai address, teephone number(s), or residence address changes, you must send us a notice of the new e-mai address/teephone number(s) by writing to us or sending us an e-mai, using secure messaging, at east five (5) days before the change to info@buetrustoans.com.

**CONSUMER REPORTS:** You authorize us to obtain consumer reports about you prior to approving this Appication and at any time that you owe us money under any Loan Agreement. We may report information about your account to credit bureaus. Late payments, missed payments, or other defau ts on your account may be refected in your credit report.

**BY CHECKING THE ACKNOWLEDGEMENT AND CONSENT, YOU ARE AFFIXING YOUR ELECTRONIC SIGNATURE AND SIGNIFYING THAT (1) YOU AGREE TO BE BOUND BY ALL THE TERMS OF THIS APPLICATION; (2) YOUR SYSTEM MEETS THE REQUIREMENTS SET FORTH ABOVE; (3) YOU AGREE TO RECEIVE ALL COMMUNICATIONS ELECTRONICALLY; AND (4) YOU ARE ABLE TO ACCESS AND PRINT OR ELECTRONICALLY STORE INFORMATION PRESENTED AT THIS WEBSITE. PLEASE TAKE NOTICE THAT IF YOU ARE APPROVED FOR A LOAN BY HUMMINGBIRD FUNDS, LLC D/B/A BLUE TRUST LOANS, SUCH LOAN WILL BE MADE IN RELIANCE OF EACH AND EVERY TERM OF A LOAN AGREEMENT AND DISCLOSURE TO WHICH YOUR ELECTRONIC SIGNATURE IS AFFIXED.**

**BORROWER AGREES TO ALL OF THE TERMS OF THIS APPLICATION.** By checking the acknowedgement beow you are (i) supp ying your eectronic signature to certify that a of the information provided above is true, compete and correct and provided to us, Bue Trust Loans, for the purpose of app ying for a Loan, (ii)agreeing to the Agreement to Triba Dispute Resoution Procedures and the Agreement Not To Bring, Join Or Participate in Cass Actions and acknowedge receiving a fu y competed copy of this Appication. **You acknowledge and agree that this Application will be deemed incomplete and will not be**

**processed by us without your Acknowledgement of Consent.**

**Upon receipt of your duly electronically executed disclosure, application and loan agreement package with all required signatures, consents, acknowledgments and elected options, a representative will call you within minutes during business hours to complete your application.**

☑**I Agree, Acknowledge and Consent**

Joshua Kakbrenner

## Consumer Installment Loan Agreement
## Hummingbird Funds, LLC d/b/a Blue Trust Loans

**CONSENT TO ELECTRONIC COMMUNICATIONS:**

Please read this information carefully and print a copy and retain this information electronically for future reference.

You must consent to transact business with **Hummingbird Funds, LLC d/b/a Blue Trust Loans** through electronic communications in order for us to process your loan request. The following terms and conditions govern electronic communications in connection with your loan request and other current or future transactions with Hummingbird Funds, LLC d/b/a Blue Trust Loans (this "Consent"). By electronically signing this Consent, you agree that any notices we are required to make to you may be delivered to you electronically. You agree to electronically sign any documents requiring a signature. You acknowledge and agree to the following terms and conditions of this Consent.

You agree that:

- Any disclosure, notice, record or other type of information that is provided to you in connection with your transaction with us, including but not limited to, your Loan Agreement, this Consent, the Loan Application, the Truth in Lending disclosures set forth in the Loan Agreement, our Privacy Notice, any change-in-term notices, fee and transaction information, statements, disbursement notices, notices of adverse action, legally mandated brochures and disclosures, and transaction information ("Communications"), may be sent to you electronically by posting the information at our web site www.bluetrustloans.com, or by sending it to you by secure e-mail.
- We will not be obligated to provide any Communication to you in paper form unless you specifically request us to do so. You may obtain a copy of any Communication by contacting us at info@bluetrustloans.com or by calling us at (877) 770 - 2682. We will provide you with paper copies at no charge. You can also withdraw your consent to ongoing electronic communications in the same manner, and ask that they be sent to you in paper or non-electronic form. If you decide to withdraw your Consent, the legal effectiveness, validity, and enforceability of prior electronic disclosures will not be affected.
- You must provide us with your current e-mail address for receipt of Communications. If your e-mail address, telephone number(s), or residence address changes, you must send us a notice of the new e-mail address/telephone number(s) by writing to us or sending us an e-mail, using secure messaging, at least five (5) days before the change to info@bluetrustloans.com.
- If you use a spam filter that blocks or re-routes emails from senders not listed in your email address book, you must add Blue Trust Loans to your email address book so that you will be able to receive the Communications we send to you.
- In order to receive electronic communications, you will need a working connection to the Internet. Your browser must support the Secure Sockets Layer (SSL) protocol. SSL provides a secure channel to send and receive data over the Internet through HS encryption capabilities. Most current Internet browsers (Chrome, Firefox, Internet Explorer, etc.) support this feature. You will also need a printer connected to your computer to print disclosures/notices or have sufficient hard drive space available to save the information (e.g., 1 MB or greater). We do not provide ISP services. You must have your own Internet Service Provider. You may submit questions regarding hardware and software requirements to info@bluetrustloans.com.
- We may amend (add to, delete or change) the terms of this Consent by providing you with advance notice.
- You are able to view and/or electronically store the information presented at the website www.bluetrustloans.com. You also agree to print and retain a copy of this Consent for your records.

You are free to withdraw your Consent at any time and at no charge. If at any time you wish to withdraw your Consent, you can send us your written request by mail to Attn: Blue Trust Loans, P.O. Box 1754 , Hayward, WI 54843 with the details of such request. If you decide to withdraw your Consent, the legal effectiveness, validity, and enforceability of prior electronic Disclosures will not be affected.

I consent to electronic communications ☑

### CONSUMER INSTALLMENT LOAN AGREEMENT

| | |
|---|---|
| **Application Date 2/15/2022**<br>**Effective Date 2/16/2022** | Loan No.: ▮▮▮13<br>**Final Maturity Date:**<br>11/17/2022 |
| **Hummingbird Funds, LLC d/b/a Blue Trust Loans**<br>**P.O. Box 1754 , Hayward, WI 54843** | **Borrower Name:**<br>**Joshua Kalkbrenner**<br>**Borrower Address:** |

**IMPORTANT NOTICE: This Loan Agreement (hereinafter the "Agreement") is governed by the laws of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians ("Tribal Law"). It contains important terms and conditions. You should read it carefully before you electronically sign it.**

In this Agreement the words "you", "your" and "I" mean the borrower who has electronically signed it. The words "we", "us", and "our" mean Hummingbird Funds, LLC d/b/a Blue Trust Loans. We are a tribal limited liability company organized under tribal law. We are an economic development arm of, instrumentality of, and wholly-owned and controlled by the Lac Courte Oreilles Band of Lake Superior Chippewa Indians, a federally-recognized sovereign American Indian tribe (the "Tribe"). We are licensed and regulated by the Tribal Financial Services Regulatory Authority (the "Authority") and operate in accordance with the Tribal Consumer Financial Services Regulatory Code.

**PLEASE NOTE: If you prepay this loan in part or in full you may be entitled to a refund of part of the finance charge meaning you will pay less of a finance charge than listed in the Truth-in-Lending disclosures below.**

### TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE<br><br>The cost of your credit as a yearly rate.<br><br>415.67%(e) | FINANCE CHARGE<br><br>The dollar amount the credit will cost you.<br><br>$5,194.30 | Amount Financed<br><br>The amount of credit provided to you or on your behalf.<br><br>$2,250.00 | Total of Payments<br><br>The amount you will have paid after you have made all payments as scheduled.<br><br>$7,444.30 |
|---|---|---|---|

Your Payment Schedule will be:

| Payment Number | Payment Due | Due Date |
|---|---|---|
| 1 | $219.03 | 2/24/2022 |
| 2 | $380.27 | 3/10/2022 |
| 3 | $380.27 | 3/24/2022 |
| 4 | $380.27 | 4/7/2022 |
| 5 | $380.27 | 4/21/2022 |
| 6 | $380.27 | 5/5/2022 |
| 7 | $380.27 | 5/19/2022 |
| 8 | $380.27 | 6/2/2022 |
| 9 | $380.27 | 6/16/2022 |
| 10 | $380.27 | 6/30/2022 |
| 11 | $380.27 | 7/14/2022 |
| 12 | $380.27 | 7/28/2022 |
| 13 | $380.27 | 8/11/2022 |
| 14 | $380.27 | 8/25/2022 |
| 15 | $380.27 | 9/8/2022 |
| 16 | $380.27 | 9/22/2022 |
| 17 | $380.27 | 10/6/2022 |
| 18 | $380.27 | 10/20/2022 |
| 19 | $380.27 | 11/3/2022 |
| 20 | $380.41 | 11/17/2022 |

**Security:** This obligation does not create a security interest.

**Demand Feature:** This obligation has a demand feature in the event of default or breach of this Agreement.

**Prepayment:** If you pay off early you will not have to pay a penalty and you may be entitled to a refund of part of the finance charge.

See the terms of this Agreement for any additional information about nonpayment, default, any required repayment in full before the scheduled due date and prepayment refunds.

(e) means estimated.

**Itemization of Amount Financed**: Amount given to you directly: $2,250.00.

Amount paid on Loan No. ████13 with us: $7,444.30.

**APPROVAL AND OBTAINING LOAN PROCEEDS.** In order to complete your transaction with us, you must electronically sign this Agreement. Once you sign and submit this Agreement to us, we will verify your information and either approve or deny the loan request. If your application is approved, we will use commercially reasonable efforts to initiate an ACH credit entry of the loan proceeds into the Bank Account listed below on or before the Effective Date above. Therefore, you hereby voluntarily authorize us, our successors or assigns, to initiate an automatic credit entry to your banking account: **Account type:** ████; **Bank routing and transit number** ████ **and Account Number:** ████ "Bank Account"). You agree that we will initiate a credit entry to your Bank Account for an amount consistent with this Agreement on or before the Effective Date. If you revoke this authorization before we credit the loan proceeds, then we will not be able to deposit the loan proceeds into your Bank Account. We rely on the representations of you and other parties in determining the Effective Date. Despite our best efforts, unavoidable delays as a result of bank holidays, the processing schedule of your individual bank, delays in verification of your information, inadvertent processing errors, "acts of God", and/or "acts of terror" may extend the time for the deposit.

**PROMISE TO PAY.** You promise to pay to us the Total of Payments stated above, on the dates set forth in the Payment Schedule above and other permitted charges. The finance charge under this Agreement is precomputed. The APR disclosed in the Federal Truth-In-Lending Disclosures is calculated on the assumption that payments will be made when due and that we earn the finance charge on the Effective Date. You promise to timely pay us the amount owing hereunder by making installment payments on the dates listed in the payment schedule set forth above or as modified in accordance with this Agreement ("Due Date(s)"). You agree to make payments in accordance with your selected payment method or as you and we otherwise agree. You understand that if this Agreement is modified (i.e. change in due dates, payment amounts, etc.) any payment authorizations subject to this Agreement will adjust to the modifications. Time is of the essence. If any Due Date falls on a non-business day then you agree to pay us on the next business day, and we will credit such payment as if we received it on the appropriate Due Date.

**PREPAYMENT.** You may prepay in part or in full at any time, with one business day's notice, and you will not incur an additional charge, fee, or penalty. To make arrangements for a prepayment you must contact us, at least one business day prior to the prepayment, by email at info@bluetrustloans.com or phone at (877) 770 - 2682. We will then arrange an authorization to debit funds from your Bank Account or make other arrangements for the prepayment. In the event of prepayment in full, we will apply a refund to your account of the pro-rata finance charge based upon when your prepayment is made. The pro-rata refund of the finance charge will be calculated by dividing the total precomputed finance charge for the current payment period by the total number of days in the payment period, and then multiplying that number by the number of days remaining in the payment period from the date of prepayment. If your payment is received on a non-banking day or after the cut-off for a banking transaction, your payment will be processed on the next banking day. Interest may continue to accrue until your payment is processed on the next banking day. For information on the amount of any refund associated with a prepayment, please contact us at (877) 770 - 2682.

**RIGHT TO RESCIND:** You may rescind this Agreement without cost or further obligation if you do so by 5:00 PM CST on the next business day following the Disbursement Date, which is the day the loan proceeds are deposited into your bank account ((the "Rescission Deadline"). To rescind this Agreement, you must inform us, in writing, by the Rescission Deadline, by either faxing notice to (855) 630 - 9579 or e-mailing info@bluetrustloans.com that you want to rescind this Agreement. In the event that we timely receive your written notice of rescission on or before the Rescission Deadline but before the loan proceeds have been credited to your Bank Account, we will not affect a debit entry to your Bank Account and both our and your obligations under this Agreement will be rescinded. In the event that we timely receive your written notice of rescission on or before the Rescission Deadline but after the loan proceeds have been credited to your Bank Account, we will effect a debit to your Bank Account for the principal amount of your loan. If we receive payment of the principal amount via the debit, ours and your obligations under this Agreement will be rescinded. If we do not receive payment of the principal amount via the debit, then the Agreement will remain in full force and effect until all sums due and owing under this Agreement, including finance charges and/or fees, are repaid in full. NOTE: Rescission of this Agreement does not cancel either party's rights and obligations under the Tribal Dispute Resolution Procedure and Waiver of Jury Trial paragraphs below.

**PAYMENT METHODS:** You are required to make the payments for each installment period on or before the payment Due Dates in your payment schedule and if on the final scheduled payment Due Date you still owe amounts under this Agreement, you are required to pay those amounts in full on that date. During the application process you were provided an option to make payments by either automatic electronic debit authorization (ACH or debit card) automatic charges to your credit card or, Check payment processing. In the event these payment methods are unavailable to you or us, other alternative payment methods as described in this loan agreement or as we otherwise allow, may be used. Your payments plus any fees due to us (if applicable) will be automatically initiated by us in accordance with this Agreement and processed by our servicers or agents. PLEASE NOTE: If we are unable to initiate a payment via ACH, debit card , credit card, or check for any reason, then you authorize us to initiate your scheduled payments by Remotely Created Check as described below, or as otherwise set forth in this Agreement. If you would like to make alternative payment arrangements for a particular scheduled payment you must provide notice to Blue Trust Loans via email info@bluetrustloans.com or call (877) 770 - 2682 three (3) business days prior to the due date. Regardless of the payment method used, a payment must be received by us on or before the scheduled Due Date.

**VERIFICATION:** You certify that the information given in connection with this Agreement is true and correct. You authorize us to verify all of the information that you gave us such as any past and/or present employment history, income and bank account details as may be necessary to process your application for a loan, determine Due Dates, and administer your account with us. You specifically authorize us to use information you provided us, including your social security number and/or bank account number, to

verify information in your Bank Account through telephone or other electronically initiated bank records initiated by us and processed by us or our servicers or agents. You also give us consent to obtain information about you from consumer reporting agencies and/or other sources. You represent that you are not a debtor under any proceeding in bankruptcy and have no intention to file a petition for relief under any chapter of the United States bankruptcy code. You further represent that you have not been discharged from bankruptcy within the last 90 days.

**ELECTRONIC DEBIT AUTHORIZATION:** If you elected to make payments by electronic debit, then you authorize us, and our successors and assigns, to initiate, and our servicers or agents to process automatic debit entries for payments in accordance with this Agreement from your Bank Account as identified above in the "Approval and Obtaining Loan Proceeds" paragraph.

You agree that we will initiate debit entries on each scheduled payment Due Date or thereafter for the scheduled amount, or any lesser amount you owe. You further authorize us to initiate a separate electronic debit entry for any applicable returned payment fee or other charges in the amounts set forth in your Agreement with us. You authorize us to re-initiate any electronic debit entry up to two additional times for the same amount if the debit entry is dishonored.

If you have elected electronic debit authorization as your payment selection we will always initiate the electronic debit entry through the automated clearinghouse (ACH) system unless for some reason we are prohibited from using the ACH system (other than by your revocation) or you have specifically instructed us to initiate the electronic debit through your debit card. In those instances we will initiate the electronic debit entry to your Bank Account through your debit card (if provided).

You may revoke this authorization by contacting us in writing at Attn: Blue Trust Loans, P.O. Box 1754 , Hayward, WI 54843 or by phone at (877) 770 - 2682. You must contact us at least three (3) business days prior to when you wish the authorization to terminate and to arrange for alternative methods of payment. If you revoke the authorization, you authorize us to make your payments by remotely created checks as set forth below.

You have the right to receive notice of all transfers varying in amount. You acknowledge that we elected to offer you a specified range of amounts for the recurring electronic debiting (in lieu of providing the notice of transfers in varying amount). The amount of any debit will range from (i) the payment amount provided in this Agreement (which may be less than a scheduled payment if partial prepayments have been made), to (ii) an amount equal to the scheduled payment plus as applicable, any returned payment charges you may owe under this Agreement. For any recurring electronic debit outside of this specified range, we will send you a notice. Therefore, by agreeing to the terms of this authorization you choose to receive notice only when a recurring electronic debit amount exceeds the range specified. You also authorize us to verify all of the information that you have provided, including past and/or current information. You agree that the debit entries authorized herein are voluntary, and that certain entries will recur at substantially regular intervals. If there is any missing or erroneous information in or with your loan application regarding your Bank Account or debit card (if provided), then you authorize us to verify and correct such information. If any payment cannot be obtained by electronic debit, you remain responsible for such payment and any resulting fees under the Agreement.

**CREDIT CARD AUTHORIZATION:** If you elected to make payments by credit card, then you authorize us, and our successors and assigns, to initiate, and our servicers or agents to process, automatic charges for payments in accordance with this Agreement from the credit card you have provided to us identified below (your "Card"):

You agree that the charge entries authorized herein are voluntary, and that certain charges will recur at substantially regular intervals. If there is any missing or erroneous information in or with your loan application regarding your Card, then you authorize us to verify and correct such information. If any payment cannot be obtained by your Card, you remain responsible for such payment and any resulting fees under the Agreement. You agree that we will initiate charges to your Card on each scheduled payment Due Date or thereafter for the scheduled amount, or any lesser amount you owe. You further authorize us to initiate a separate charge to your Card for any applicable returned payment /fee or other charges in the amounts set forth in your Agreement. If any payment cannot be obtained by your Card, you remain responsible for such payment and any resulting fees under the Agreement.

**PAYMENT VIA CHECK:** If you elected to make payments via check, then you agree to enter into an agreement with our check processing vendor (Check Vendor) for the preparation and delivery on your behalf of a check or a series of checks for your payments. You may be required to authorize the Check Vendor or the Lender as your agent to: (a) prepare your payment checks; (b) place your signature you provide to the Check Vendor via the Check Vendor's website (carrier charges may apply with use of text function on your mobile device) on the checks; (c) print the checks and; (d) deliver the checks to us or our successors, assigns, servicers or agents to process these checks through the banking system. You understand that the Annual Percentage Rate and scheduled payment amounts disclosed in the Federal Truth-in-Lending Disclosure above does not include any incentive or benefit for your electing to use the Check Vendor's check processing process for your payments.

You agree that: (a) you may be required to authorize Check Vendor or the Lender as your agent to prepare your check, (b) place your signature that you provide to Check Vendor on your checks, and (c) print and deliver the checks for you on each scheduled payment Due Date or thereafter for the scheduled amount, or any lesser amount you owe. You further authorize the Check Vendor or the Lender to prepare and place your signature that you provide to Check Vendor on your checks, print and deliver checks for any applicable returned payment fee or other charges in the amounts set forth in your Agreement with us. You understand that checks will be prepared and delivered for payment on each payment Due Date until your loan balance is paid in full. You understand and agree that the balance in your account must be sufficient to pay the check when presented to your Bank or financial institution. You authorize us to re-present any of your checks that are dishonored by your Bank or financial institution for insufficient or uncollected funds. Checks created through Check Vendor are not Remotely Created Checks as described below.

You may revoke this authorization by contacting us in writing at Attn: Blue Trust Loans, P.O. Box 1754 , Hayward, WI 54843, by phone at (877) 770 - 2682, or by e-mail at info@bluetrustloans.com You must contact us at least three (3) days prior to when you wish the authorization to terminate and to arrange for alternative methods of payment. If you revoke payment via Card authorization or check, you authorize us to make your payments by Remotely Created Checks as set forth below.

If you seect the option to make payments via check, you acknowedge that you wi not be eigibe for a payment deferra at any time during the administration of your oan.

**REMOTELY CREATED CHECK AUTHORIZATION:** If (1) you eected to make payments by either Eectronic Debit Authorization, Card Authorization or via Check Vendor payment processing articuated above, and you subsequenty revoke the authorization, (2) we are unabe to process your payments by eectronic debit, Card, or checks for any reason, or (3) you have defauted on a payment, then by eectronica y signing this Agreement you authorize us to create checks bearing your typed name and other information as may be required under appicabe aw, rather than your handwritten signature, drawn on your Bank Account ("Remotey Created Check"), and to submit each Remotey Created Check for payment to the Bank or other financia institution in the amount of each payment owing to us under this Agreement on or after each Due Date. A Remotey Created Check may aso be known as a demand draft, teecheck, preauthorized draft or paper draft. If a Remotey Created Check is returned unpaid by your Bank or other financia institution, then you authorize us to create and submit a Remotey Created Check for any returned payment fee, or other amounts accrued pursuant to this Agreement. You agree that your typed name or other designation mandated by appicabe aw wi constitute your authorized signature fu y refecting your intent to authenticate any such Remotey Created Check. If you beieve we charged your Bank Account in a manner not contempated by this authorization, pease contact us. You authorize us to vary the amount of any preauthorized payment by Remotey Created Check as needed to repay amounts owing, as modified by any partia prepayments. This Remotey Created Check authorization is effective ony if you, origina y seected eectronic debit or credit card as your payment method and then you revoke the authorization, we are unabe to process your payments by either method for any reason, or you defauted on a payment. If you woud ike to dispute a payment reated to a Remotey Created Check, determine whether a payment was genuine, withhod payment of a Remotey Created Check, or obtain re-crediting of amounts we obtained via a Remotey Created Check, contact us by caing (877) 770 - 2682.

**ELECTRONIC CHECK RE-PRESENTMENT POLICY.** In the event a check is returned unpaid for insufficient or unco ected funds, we may re-present the check eectronica y. In the ordinary course of business, the check wi not be provided to you with your bank statement, but a copy can be retrieved by contacting your financia institution.

**CHECK CONVERSION NOTIFICATION.** If we agree to a ow you to directy make your payment with your persona check, you authorize us and our servicers or agents either to use information from your check to make a one-time eectronic fund transfer from your Bank Account or to process mutipe payments as check transactions. When we use information from your persona check to make an eectronic funds transfer, funds may be withdrawn from your Bank Account as soon as the same day we receive your payment, and you wi not receive your check back from your financia institution. For questions, pease contact us at (877) 770 - 2682.

**RETURNED PAYMENT FEE.** You agree we reserve the right to charge you a returned payment fee of $30 if your payment is returned unpaid (un ess the resut of a propery revoked authorization). You authorize us and our agents to make a one-time withdrawa from your Bank Account to co ect this returned payment fee. We may ony impose this fee once per scheduled insta ment payment.

**LATE PAYMENT:** In the event of two consecutivey missed payments, which incudes payments missed due to insufficient or unco ected funds from your Bank Account, or payments missed due to a denias of your Card, the customer provides authorization to us, our successors and assignees, our servicers and our agents to debit the entire outstanding baance of principa and interest due, incuding fees in accordance with this Agreement on the third payment in sequence after the initia two first payments have been missed.

**DEFAULT:** You wi be in defaut under this Agreement if: (a) you provide us fase or miseading information about yoursef, your financia condition (incuding the Bank Account), or any other matter prior to entering this Agreement, (b) any scheduled payment is not received within thirty (30) caendar days of the scheduled payment Due Date, as set forth herein, (c) the debit for your scheduled payment is returned to us unpaid for any reason and a payment is not received from you within thirty (30) caendar days immediatey fo owing that return payment, (d) you agree to make a ternative payment arrangements and fai to make those payment(s), or (e) any of the fo owing things occur: appointment of a committee, receiver, or other custodian of any of your property, or the commencement of a case under the U.S. Federa Bankruptcy Laws by or against you as a debtor.

**CONSEQUENCES OF DEFAULT:** If you are in defaut, you agree that we may take any of the fo owing actions to the extent a owed by appicabe aw: (1) we may acceerate the maturity of the oan and a other amounts due us and demand payment of the same; (2) we may exercise any of our rights described in the paragraph beow entited "Payment Authorization Upon Defaut"; (3) we may exercise any other rights or remedies a owed by this Agreement or at aw, incuding but not imited to seeking payment of reasonabe attorney's fees in the event of a defaut and referra to an attorney (not our reguar y saaried empoyee) or to a third party for co ections, and (4) we may recover a court, dispute reso ution or other co ection costs we actua y incur.

**DEMAND FEATURE:** We may demand payment, at any time, and from time to time, if our abiity to co ect amounts owed under this Agreement are materia y impaired, in our soe and absoute discretion and whether or not a defaut has occurred. If we demand payment, then we wi acceerate your obigation under this Agreement and initiate a debit in accordance with the "Payment Authorization Upon Defaut or Demand" paragraph beow.

**PAYMENT AUTHORIZATION UPON DEFAULT:** In the event of your defaut, you separatey authorize us, and our successors and assigns, to initiate through our servicers or agents a one-time automatic debit entry to your Bank Account in the amount of the entire outstanding baance, incuding finance charges and any fees, under this Agreement. You agree that we wi initiate the singe eectronic debit entry ony for the outstanding amount owing at the time of acceeration. You authorize us to re-initiate the debit entry up to two (2) additiona times if the debit entry is returned unpaid. You authorize us to verify a of the information that you have provided to us reating to your Bank Account. If there is any missing or erroneous information in or with your oan appication regarding your Bank Account, then you authorize us to verify and correct such information. You may revoke this Payment Authorization Upon Defaut by contacting us in writing at Attn: Bue Trust Loans, P.O. Box 1754 , Hayward, WI 54843 or by phone at (877) 770 - 2682. You must contact us at east three (3) business days prior to when you wish the termination to take effect.

**WAIVER:** No faiure to exercise, or deay in exercising, any right, power or priviege under this Agreement sha operate as a waiver thereof, nor sha any singe or partia exercise thereof precude any other or further exercise thereof or the exercise of any other right, power or priviege.

**CONSUMER REPORTS:** You authorize us to obtain consumer reports about you in connection with your request for credit, and at any time that you owe us money under this or any Agreement.

**REPORT OF NEGATIVE PAYMENT INFORMATION:** We may report information about your account to credit bureaus. Late payments, missed payments, or other defauts on your oan may be refected in your credit report.

**ASSIGNMENT AND EXECUTION:** We may assign or transfer this Agreement or any of our rights hereunder in our soe discretion. If this Agreement is consummated, then you agree that the eectronica y signed Agreement we receive from you wi be considered the origina executed Agreement, which is binding and enforceabe as to both parties.

**GOVERNING LAW AND FORUM:** The aws of the Tribe ("Triba aw") wi govern this Loan Agreement, without regard to the aws of any state, incuding the confict of aws rues of any state. You agree to be bound by Triba aw, and in the event of a bona fide dispute between you and us, Triba aw sha app y to such dispute.

**SOVEREIGN IMMUNITY.** You are doing business with a Triba entity that is not subject to suit or service of process. Nor is the Tribe, nor any other Triba entity or person, subject to suit or service of process because of sovereign immunity. The Tribe's government has authorized a imited waiver of on y Bue Trust's sovereign immunity so e y for individua arbitration caims as provided beow, and for no other reason or purpose. A other Triba immunities and priviges are express y preserved.

**WAIVER OF JURY TRIAL AND ARBITRATION PROVISION:** Arbitration is a process in which persons with a dispute: (a) waive any right to fie a awsuit and proceed in a court and to have a jury tria to reso ve the dispute; and (b) agree, instead, to submit their dispute to a neutra third person (an "arbitrator") for a decision. Each party to the dispute has an opportunity to present some evidence to the arbitrator. Pre-arbitration discovery may be imited. Arbitration proceedings are private and ess forma than court trias. The arbitrator wi issue a fina and binding decision reso ving the dispute, which may be enforced as a court judgment. A court rare y overturns an arbitrator's decision. We have a po icy of arbitrating a disputes with customers; incuding the scope and va idity of this Arbitration Provision, and to do so on y with customers who are acting in their individua capacities, and not as representatives of a cass.

**CHOICE OF ARBITRATOR:** Regard ess of who demands arbitration, you sha have the right to se ect any of the fo owing arbitration organizations to administer the arbitration: the American Arbitration Association (1-800-778-7879) www.adr.org; JAMS (1-800-353-5367) www.jamsadr.com; or an arbitration organization agreed upon by you and the other parties to the dispute (as defined beow). The arbitration wi be governed by the chosen arbitration organization's ru es and procedures app icab e to consumer disputes, to the extent that those ru es and procedures do not contradict either the aw of the Tribe or the express terms of this Agreement to Arbitrate, incuding the imitations on the arbitrator.

**THEREFORE, YOU ACKNOWLEDGE AND AGREE AS FOLLOWS:**

1. For purposes of this Waiver of Jury Tria and Arbitration Provision, the words "dispute" and "disputes" are given the broadest possib e meaning and incude, without imitation: **(a)** a caims, disputes, or controversies arising from or re ating direct y or indirect y to the signing of this Arbitration Provision, the va idity and scope of this Arbitration Provision and any caim or attempt to set aside this Arbitration Provision; **(b)** a federa or state or Triba aw caims, disputes or controversies, arising from or re ating direct y or indirect y to the Agreement, the information you gave us before entering into the Agreement, incuding the customer information app ication, and/or any past agreement or agreements between you and us; **(c)** a counterc aims, cross-c aims and third-party c aims; **(d)** a common aw caims, based upon contract, tort, fraud, or other intentiona torts; **(e)** a caims based upon a vio ation of any Triba , state or federa constitution, statute or regu ation; **(f)** a caims asserted by us against you, incuding caims for money damages to co ect any sum we caim you owe us; **(g)** a caims asserted by you individua y against us and/or any of our emp oyees, agents, directors, officers, shareho ders, governors, managers, members, parent company or affi iated entities ("re ated third parties"), incuding caims for money damages and/or equitabe or injunctive reief; **(h)** a caims asserted on your behaf by another person; **(i)** a caims asserted by you as a private attorney genera , as a representative and member of a cass of persons, or in any other representative capacity, against us and/or re ated third parties ("Representative Caims"); and/or **(j)** a caims arising from or re ating direct y or indirect y to the disc osure by us or re ated third parties of any non-pub ic persona information about You.

2. You acknow edge and agree that by entering into this Waiver of Jury Tria Provision:
   A. **YOU ARE GIVING UP YOUR RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES;**
   B. **YOU ARE GIVING UP YOUR RIGHT TO HAVE A COURT RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES; and**
   C. **YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST US AND/OR RELATED THIRD PARTIES.**

3. A disputes incuding any Representative Caims against us and/or re ated third parties sha be reso ved by binding arbitration on y on an individua basis with you. **THEREFORE, THE ARBITRATOR SHALL NOT CONDUCT CLASS ARBITRATION; THAT IS, THE ARBITRATOR SHALL NOT ALLOW YOU TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN THE ARBITRATION.**

4. At your option and in accord with the app icab e ru es of the arbitration organization you se ect, arbitration may be

conducted: (i) online; (ii) telephonically; (iii) or in person at 13394 W. Trepania Road, Hayward, WI 54843 or within 30 miles of your residence, at your choice, provided that this accommodation for you shall not be construed in any way: (a) as a relinquishment of waiver of our or the Tribe's sovereign status or immunity, or (b) to a law for the application of any state law. As an accommodation to you, Lender shall pay all costs associated with any arbitration proceedings.

5. This Waiver of Jury Trial and Arbitration Provision is binding upon and benefits you, your respective heirs, successors and assigns. This Waiver of Jury Trial and Arbitration Provision is binding upon and benefits us, our successors and assigns, and related third parties. This Waiver of Jury Trial and Arbitration Provision continues in full force and effect, even if your obligations have been paid or discharged through bankruptcy. This Waiver of Jury Trial and Arbitration Provision survives any rescission, termination, amendment, expiration or performance of any transaction between you and us and continues in full force and effect unless you and we otherwise agree in writing. If any of this Waiver of Jury Trial and Arbitration Provision is held invalid, the remainder shall remain in effect. **Your right to file suit against us for any claim or dispute arising from or relating to this Agreement is limited by the WAIVER OF JURY TRIAL AND ARRBITRATION Provision.** NOTICE: YOU AND WE HAVE AGREED THAT ANY RIGHT OR OPPORTUNITY TO LITIGATE DISPUTES THROUGH A COURT AND HAVE A JUDGE OR JURY DECIDE THE DISPUTES ARE WAIVED AND HAVE AGREED INSTEAD TO RESOLVE DISPUTES THROUGH BINDING INDIVIDUAL ARBITRATION.

**TELEPHONE CONSUMER PROTECTION ACT DISCLOSURE:** You agree to be contacted by Blue Trust Loans, or our affiliates, at any of the phone numbers you provided in your Loan Application and any other phone numbers you provide directly to us *for the purposes of servicing any account you have with us.* You agree that such contact may include phone calls generated from an automated telephone dialing system or calls made using an artificial or prerecorded voice. If you agreed to be contacted by text message from Blue Trust Loans for the purpose of servicing any account you have with us, you agree that such contact includes text messages generated from an automatic telephone dialing system. See the SMS Statement Notifications Disclosure section for more details. You agree that any consent provided under this paragraph continues to apply for any accounts you have with Blue Trust Loans unless and until you revoke this consent.

If you agreed to be contacted by Blue Trust Loans or our affiliates, at the phone numbers you provided in your Loan Application *for marketing purposes*, you agree that such contact may include phone calls and text messages generated from an automated telephone dialing system or calls made using an artificial or prerecorded voice. You are not required to authorize marketing calls or text messages to obtain credit or other services from us. If you do not wish to receive sales or marketing calls or text messages from us, you should **not** check the "yes" box for contact preferences. You understand that any messages we send you may be accessed by anyone with access to your text messages. You also understand that your mobile phone service provider may charge you fees for text messages that we send you, and you agree that we shall have no liability for the cost of any such text messages. You agree that any consent provided under this paragraph continues to apply unless and until you revoke this consent. See the SMS Statement Notifications Disclosure section for more details.

**BLUE TRUST LOANS SMS STATEMENT NOTIFICATIONS DISCLOSURE:** This SMS Statement Notifications Disclosure (this "Disclosure") applies to each account you have with Blue Trust Loans for which you have elected to receive Short Message Service ("SMS") messages.

As used in this SMS Statement Notifications Disclosure, "SMS Statement Notifications" means any SMS (text message) communications from Blue Trust Loans to you, sent to the phone number(s) designated by you or as listed on your application, including but not limited to payment information, account information, due dates, delinquent accounts, program updates, promotions, coupons and other marketing messages. These messages will originate from 70680, 1-888-403-4874, 1-888-680-5616, 1-888-699-7181, 1-888-618-9265, 1-888-616-1671, 1-888-618-1315, 1-888-639-2308, 1-888-428-0684, 1-888-476-2384, and 1-888-401-5617.

**How to Unsubscribe:** You may withdraw your consent to receive SMS Statement Notifications by changing your account preferences after logging in at www.bluetrustloans.com. Alternatively, you may call us at (877) 770 - 2682. At our option, we may treat your provision of an invalid mobile phone number, or the subsequent malfunction of a previously valid mobile phone number, as a withdrawal of your consent to receive SMS Statement Notifications. We will not impose any fee to process the withdrawal of your consent to receive SMS Statement Notifications. Any withdrawal of your consent to use SMS Statement Notifications will be effective only after we have a reasonable period of time to process your withdrawal. Neither your carrier nor Blue Trust Loans is liable for delayed or undelivered messages.

1. **You may also opt-out** and remove your SMS approval for additional messages by sending "STOP", "END", "CANCEL", "UNSUBSCRIBE", "REMOVE", "QUIT", or "STOPALL" to the SMS text message you have received. If you remove your SMS approval from our database, your number will no longer be used for secondary purposes, disclosed to third parties and used by us for third parties to send promotional correspondence to you.

2. To apply for our product, use any of our (or our servicers' or agents') services (including but not limited to receiving any SMS Statement Notifications), or our website, you must be at least eighteen (18) years of age.

3. To request additional information, contact us by telephone at (877) 770 - 2682. For help of additional information regarding our texting services email us at info@bluetrustloans.com or reply "HELP" anytime from your mobile device to the message you receive.

4. The services are available on the following carriers: AT&T, Verizon Wireless, T-Mobile, Sprint, Nextel, Dobson, U.S. Cellular, and Virgin Mobile. Additional carriers are added as they become available.

5. In order to access, view, and retain SMS Statement Notifications that we make available to you, you must have: (1) an SMS-capable mobile phone, (2) an active mobile phone account with a communication service provider; and (3) sufficient storage capacity on your mobile phone.

6. A SMS Statement Notifications in electronic format from us to you will be considered "in writing."

7. There is no service fee for SMS Statement Notifications but you are responsible for any and all charges, including but not limited to fees associated with text messaging, imposed by your communications service provider. Other charges may apply. Such charges may include those from your communications service provider. Please consult your mobile service carrier's pricing plan to determine the charges for sending and receiving text messages. These charges will appear on your phone bill.

8. Additionally, you agree that we may send any SMS Statement Notifications through your communication service provider in order to deliver them to you and that your communication services provider is acting as your agent in this capacity. You further acknowledge and agree that we (or our servicers or agents) will use a third-party platform provider to deliver such SMS Statement Notifications and that such third-party platform provider is acting as our (or our servicers or agents) in this capacity. You agree to provide a valid mobile phone number for these services that belongs to you and not someone else so that we may send you certain information about your loan and to provide us with notice as set forth above if you are no longer the primary user of the number provided. Additionally, you agree to indemnify, defend and hold us harmless from and against any and all claims, losses, liability, cost and expenses (including reasonable attorneys' fees) arising from your provision of a mobile phone number that is not your own or your violation of applicable federal, state, Tribal or local law, regulation or ordinance. Your obligation under this paragraph shall survive termination of this Agreement. SMS Statement Notifications are provided for your convenience only. Receipt of each SMS Statement may be delayed or impacted by factor(s) pertaining to your communications service provider(s). We will not be liable for losses or damages arising from any disclosure of account information to third parties, non-delivery, delayed delivery, misdirected delivery or mishandling of, or inaccurate content in, the SMS Statement Notifications sent by us.

9. We may modify or terminate SMS from time to time, for any reason, and without notice, including the right to terminate text messaging with or without notice, without liability to you, any other user or a third party. We reserve the right to modify these Terms of Use from time to time without notice. Please review these Terms of Use from time to time so that you are timely notified of any changes.

10. IF you are opting into SMS messaging through your account preferences page:

    1. You agree that we will not be obligated to provide any communication to you in paper form unless you specifically request us to do so. You may obtain a copy of any communication by contacting us at info@bluetrustloans.com or by calling us at (877) 770 - 2682. We will provide you with paper copies at no charge.

    2. If your e-mail address, telephone number(s), or residence address changes, you must send us a notice of the new e-mail address/telephone number(s) by writing to us or sending us an e-mail, using secure messaging, at least five (5) days before the change to info@bluetrustloans.com.

**PRIVACY POLICY**

This Blue Trust Loans privacy policy (the "Privacy Policy") is intended to inform you of our policies and practices regarding the collection, use and disclosure of any information you submit to us through bluetrustloans.com. This includes "Personal Information," which is information about you that is personally identifiable such as your name, e-mail address, full content of your e-mail, user ID number, and other non-public information that is associated with the foregoing.

**User Consent**

By accessing or otherwise using bluetrustloans.com, you agree to this Privacy Policy and expressly consent to the processing of your Personal Information in accordance with this Privacy Policy.

Your Personal Information may be processed by us in the country where it was collected as well as other countries (including the United States) where laws regarding processing of Personal Information may be less stringent than the laws in your country.

| FACTS | WHAT DOES Blue Trust Loans DO WITH YOUR PERSONAL INFORMATION? | | |
|---|---|---|---|
| Why? | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. | | |
| What? | The types of personal information we collect and share depend on the product or service you have with us. In general, we collect Personal Information that you submit to us voluntarily through bluetrustloans.com but we may also request optional information to support your use of bluetrustloans.com. This information can include but is not limited to the following:<br><br>• Social Security number and checking account information<br>• account balances and income<br>• payment history and credit history<br>• text messages and information contained in those messages | | |
| How? | A financial companies need to share customers' personal information to run their everyday business. In the section below, we list reasons financial companies can share their customers' personal information; the reason Blue Trust Loans chooses to share; and whether you can limit this sharing. | | |
| Reasons we can share your personal information | | Does Blue Trust Loans share? | Can you limit this sharing? |
| For our everyday business purposes — such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | | Yes | No |

| | | |
|---|---|---|
| For our marketing purposes - to offer our products and services to you, both during and after the administration of your account(s) | Yes | No |
| For joint marketing with other financia companies | Yes | No |
| For our affiiates' everyday business purposes - information about your transactions and experiences | Yes | No |
| For our affiiates' everyday business purposes - information about your creditworthiness | Yes | Yes |
| For our affiiates to market to you | Yes | Yes |
| For nonaffiiates to market to you | Yes | Yes |

| To limit our sharing | • Ca (877) 770 - 2682 - our menu wi prompt you through your choice(s) or<br>• Visit us on the web at **www.buetrustoans.com**<br>Pease note:<br>If you are a new customer, we can begin sharing your information subject to your abiity to opt-out 30 days from the date you sent this notice. When you are no onger our customer, we continue to share your information as described in this notice. However, you can contact us at any time to imit our sharing. |
|---|---|
| Questions? | Ca (877) 770 - 2682 or go to **www.buetrustoans.com** |

| Who we are | |
|---|---|
| Who is providing this notice? | Bue Trust Loans is providing this privacy poicy and it appies to a oans made by the company and a products and services offered in connection with such oans. |

| What we do | |
|---|---|
| How does Bue Trust Loans protect my persona information? | To protect your persona information from unauthorized access and use, we use security measures that compy with federa aw. These measures incude computer safeguards and secured fies and buidings. Even though we have taken significant steps to protect your Persona Information, no company, incuding us, can fuy eiminate security risks associated with Persona Information. |
| How does Bue Trust Loans coect my persona information? | We coect your persona information, for exampe, when you<br><br>• Appy for a oan<br>• Give us your income information<br>• Te us where to send the money<br>• Provide account information<br>• Provide empoyment information<br>• Provide feedback<br><br>**Personal Information from Other Sources**<br><br>We aso coect your persona information from others, such as credit bureaus, affiiates, companies who we have partnered with (coectivey, "Partners") or other companies. We may associate this information with the other Persona Information we have coected about you.<br><br>**Information Collected Via Technology**<br><br>As you use Bue Trust Loans, certain information may aso be passivey coected from your browser and other ocations and stored on our or our service providers' server ogs, incuding your Internet protoco address, browser type, and operating system. We aso use Cookies and navigationa data ike Uniform Resource Locators (URL) to gather information regarding the date and time of your visit and the soutions and information for which you searched and viewed, or on which of the advertisements dispayed on Bue Trust Loans you cicked. This type of information is coected to make Bue Trust Loans and soutions more usefu to you and to taior the experience with Bue Trust Loans to meet your specia interests and needs.<br><br>We or our service providers, may track your IP Address when you access Bue Trust Loans to assist with ad targeting.<br><br>We may use both session Cookies (which expire once you cose your web browser) and persistent Cookies (which stay on your computer unti you deete them) to provide you with a more persona and interactive experience with Bue Trust Loans. In order to use our services offered through Bue Trust Loans, your web browser must accept Cookies. If you choose to disabe Cookies, some aspects of Bue Trust Loans may not work propery, and you may not be abe to receive our services.<br><br>We may share your content preferences and other information with the socia network from which you have connected to Bue Trust Loans, aong with those companies and persons you have asked us to share your nformation with.<br><br>Additiona y, if you provide feedback to us, we may use and discose such feedback for any purpose, provided we do not associate such feedback with your Persona Information. We wi coect any information contained in such |

| | |
|---|---|
| | feedback and wi treat the Persona Information in it in accordance with this Privacy Policy. You agree that any such comments we receive becomes our property. We may use feedback for marketing purposes or to add to or modify our services without paying any royalties or other compensation to you |
| Why can't I limit a sharing? | Federal aw gives you the right to limit only<br><br>• sharing for affiliates' everyday business purposes - information about your creditworthiness<br>• affiliates from using your information to market to you<br>• sharing for nonaffiliates to market to you |
| What happens when I limit sharing for an account I hold jointly with someone else? | Your choices wi apply to everyone on your account. |

| Definitions | |
|---|---|
| Affiliates | Companies related by common ownership or control.<br><br>Our affiliates include financial companies such as other enders and non-financial companies such as marketing and servicing companies. |
| Nonaffiliates | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br><br>• *Nonaffiliates we share with can include other lenders and direct marketing companies.* |
| Cookies | Small pieces of information that a website sends to your computer's hard drive while you are viewing a website. |
| Internet Protocol Address or "IP Address" | A number that is automatically assigned to your computer when you use the Internet. In some cases, your IP Address stays the same from browser session to browser session; but if you use a consumer internet access provider your IP Address probably varies from session to session. |
| Joint marketing | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br><br>• *Our joint marketing partners can include institutions such as other lenders or marketers .* |

**Other:**

We may provide your Persona Information to third-party service providers who work on behalf of or with us to provide some of the services and features of Bue Trust Loans and to help us communicate with you. We require our third-party service providers to promise not to use such information except as necessary to provide the relevant services to us. If you do not want us to use or disclose Persona Information collected about you in the manner identified in this Privacy Policy, you should not use Bue Trust Loans In the event we go through a business transition such as a merger, acquisition by another company, sale of all or a portion of assets, or other business transition, your Persona Information may be among the assets transferred. You acknowledge that such transfers may occur and are permitted by this Privacy Policy, and that any acquirer of ours may continue to process your Persona Information as set forth in this Privacy Policy.

We may disclose your Persona Information if we believe in good faith that such disclosure is necessary to (a) comply with relevant laws or to respond to subpoenas or warrants served on us; or (b) to protect and defend our rights or property, you, or third parties. You hereby consent to us sharing your Persona Information under the circumstances described herein. Bue Trust Loans may contain links to other websites. Pease be aware that we are not responsible for the privacy practices or the content of such other websites. This Bue Trust Loans privacy policy applies solely to information collected by us through buetrustoans.com and does not apply to these third-party websites. The ability to access information of third-parties from Bue Trust Loans, or links to other websites or locations, is for your convenience and does not signify our endorsement of such third-parties, their products, their services, other websites, locations or their content.

Our third-party platform provider is a third-party beneficiary of our third-party service provider's arbitration, class action, and jury waiver provisions.

*Web browser:* You can opt-out of receiving personalized ads by clicking on the bue icon that typically appears in the corner of the ads we serve and by following the instructions provided by clicking [HERE]. You can opt-out of receiving personalized push notifications by going into your browser and unchecking applications or extensions from which you do not wish to receive notifications.Please note that this "opt-out" function is browser-specific and relies on an "opt-out cookie," thus, if you delete your cookies or upgrade your browser after having opted out, you wi need to opt-out again. If you use a Safari browser, please also see directions regarding our cookie-less technology opt-out below.

*Mobile Device Opt-Out:* To opt-out of receiving targeted ads that are based on your behavior across different mobile applications follow the instructions below for iOS and Android devices:

  iOS 7 or Higher: Go to your Settings> Select Advertising> Enable the "Limit Ad Tracking" setting; and

For Android devices with OS 2.2 or higher and Googe Pay Services version 4.0 or higher: Open your Googe Settings App> Seect Ads> Enabe "Opt-out of interest-based advertising".

*Industry Opt-Out Tools and Self-Regulation:* You may use the NAI opt-out too [HERE] which wi a ow you to opt-out of seeing personaized ads from us and form other NAI approved member companies.

**IMPORTANT NOTICE:** THIS LOAN IS NOT INTENDED TO MEET LONG-TERM FINANCIAL NEEDS. THIS LOAN SHOULD BE USED ONLY TO MEET SHORT-TERM CASH NEEDS. RENEWING THE LOAN RATHER THAN PAYING THE DEBT IN FULL WHEN DUE WILL REQUIRE PAYMENT OF ADDITIONAL FINANCE CHARGES.

**IMPORTANT ACKNOWLEDGEMENTS:**

**YOU AGREE AND ACKNOWLEDGE THAT YOU ARE WAIVING YOUR RIGHT TO INITIATE OR PARTICIPATE IN A CLASS ACTION RELATED TO OR ARISING OUT OF OUR SERVICES, THE SERVICES OF OUR SERVICERS OR AGENTS, AND/OR THIS AGREEMENT.**

BY CLICKING THE ACKNOWLEDGMENT BUTTON BELOW:

- YOU ARE ELECTRONICALLY SIGNING THIS AGREEMENT.
- YOU AGREE THAT THIS ELECTRONIC SIGNATURE HAS THE FULL FORCE AND EFFECT OF YOUR PHYSICAL SIGNATURE AND THAT IT BINDS YOU TO THIS AGREEMENT IN THE SAME MANNER A PHYSICAL SIGNATURE WOULD. YOU CERTIFY THAT THE INFORMATION GIVEN IN CONNECTION WITH THIS AGREEMENT IS TRUE AND CORRECT.
- YOU AUTHORIZE BLUE TRUST LOANS TO VERIFY THE INFORMATION GIVEN IN CONNECTION WITH THIS AGREEMENT AND GIVE BLUE TRUST LOANS CONSENT TO OBTAIN INFORMATION ON YOU FROM CONSUMER REPORTING AGENCIES OR OTHER SOURCES AND SERVICES.
- YOU ACKNOWLEDGE THAT: (A) YOU HAVE READ, UNDERSTAND, AND AGREE TO ALL OF THE TERMS AND CONDITIONS OF THIS AGREEMENT INCLUDING THE JURY TRIAL WAIVER AND PROCEDURE PROVISION AS WELL AS THE PRIVACY NOTICE, (B) THIS AGREEMENT WAS FILLED IN BEFORE YOU SIGNED IT, AND (C) THAT YOU HAVE PRINTED OR DOWNLOADED A COMPLETED COPY OF THIS AGREEMENT FOR YOUR RECORDS. YOU FURTHER ACKNOWLEDGE THAT THIS AGREEMENT IS SUBJECT TO APPROVAL BY BLUE TRUST LOANS.

**Lender: Hummingbird Funds, LLC d/b/a Blue Trust Loans**

**Borrower:**

Joshua Kakbrenner

# **EXHIBIT B**

Robert A. Rosette (admission pending)
Saba Bazzazieh
Nicole St. Germain
Chase Goodnight (admission pending)
ROSETTE, LLP
565 W. Chandler Blvd, Ste. 212
Chandler, AZ 85225
Tel: (480) 889-8990
rosette@rosettelaw.com
sbazzazieh@rosettelaw.com
nstgermain@rosettelaw.com
cgoodnight@rosettelaw.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Lac Courte Oreilles Financial Services, LLC, Hummingbird Funds, LLC, Miinan Funds, LLC<br><br>*Plaintiffs*,<br><br>v.<br><br>Cane Bay Partners VI, LLLP, Dimension Credit (Cayman), L.P., Strategic Link Consulting, LP, Esoteric Ventures, LLC, InfoTel International Ltd, M. Mark High, Ltd., Kirk Chewning, David Johnson, Kim Anderson, Jay Clark, and DOES 1-20,<br><br>*Defendant*. | **Case No.**<br><br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## **COMPLAINT**

Plaintiffs Lac Courte Oreilles Financial Services, LLC ("LCOFS"), a wholly-owned and

operated entity of the Lac Courte Oreille Band of Lake Superior Chippewa Indians ("Tribe"), a

federally-recognized tribe, and its wholly-owned subsidiaries, Hummingbird Funds, LLC

1

("Hummingbird") and Miinan Funds, LLC ("Miinan"), bring this complaint against David Johnson and Kirk Chewning, the co-owners of Cane Bay Partners VI, LLLP ("Cane Bay"), and their co-conspirators Dimension Credit (Cayman), L.P. ("Dimension Credit"), Strategic Link Consulting, LP ("Strategic Link"), Esoteric Ventures, LLC, d/b/a Max Touch Services ("Esoteric"), InfoTel International Ltd., d/b/a Voyse International ("InfoTel"), M. Mark High, Ltd., John Clark, Jay Clark, and Kim Anderson (collectively, "Defendants"). The Court's prompt intervention is required to enjoin and remedy years of Defendants' predatory and collusive business practices against the Tribe and its business entities. Defendants' continued unlawful actions cannot continue and for the reasons stated herein, this Court should find accordingly.

## NATURE OF THE ACTION

1.      This action arises out of Defendants' years-long effort to prevent the Tribe and its employees from taking rightful control over its businesses, converting millions of dollars from Plaintiffs—funds that should have been available to support important tribal governmental services.

2.      Kirk Chewning, through Cane Bay and Dimension Credit, orchestrated a scheme to exercise de facto control over the Tribe's lending businesses to facilitate an illegal lending enterprise and charge consumers up to 730% annual interest for loan. Defendants, playing on the Tribe's desperate desire to diversify its limited economy by creating new opportunities and governmental support for its people, held themselves out as industry experts and successful businessmen willing to consult on the development of, and provide services for, the Tribe's lending venture. However, unbeknownst to the Tribe, Chewning and Cane Bay really sought the framework of a thinly-veiled, carefully structured "rent-a-tribe" scheme — a business that was

2

tribally owned and operated on paper, but in reality, merely a front for non-tribal companies and individuals to continue their illegal offshore operations and skim money from the Tribe.

3.     In 2020, when Plaintiffs sought to exercise greater control over the operations of their own business, and demanded accountability and transparency with the services provided pursuant to the contractual relationship between the parties, Defendant Chewning began a malicious pursuit to first erode the value of the Tribe's portfolios, then  threaten to put Plaintiffs out of business, then refuse to perform services while also refusing to provide Plaintiffs with access to their own asset and intellectual property. Most recently, grasping for leverage, Defendant Chewning then urged Plaintiffs' capital source, Dimension Credit, to concoct an implausible story about interest rate increases, call Plaintiffs' note, and plan an embarrassing legal strategy to maintain a pretense of clean hands.  All of these efforts were geared toward maintaining Defendant Chewning's control and allowing Defendant Chewning to bleed the Tribe's asset dry.

4.     Over the course of the last year, when LCOFS Chief Executive Officer Scott Soli directly confronted Defendant Chewning with incorrect billing, inflated and unsubstantiated expense reimbursement demands, Defendant Chewning initially worked cooperatively with Plaintiffs to remove some entries and correct several material falsities with bills sent to Plaintiffs.   However, when Plaintiffs confronted Defendant Chewning with the scale of Defendants' misrepresentations, Defendant Chewning changed tone, demanded full payment of outstanding expenses and refused to provide access to Plaintiffs' own data to operate its business in violation of the parties' contractual relationship.  Defendants Cane Bay, Strategic Link, InfoTel, Esoteric, and M. Mark High demanded full payment and liquidated damages from Hummingbird and Miinan.

3

5.      At the same time, and in abject bad faith, Defendant Chewning sought to have Dimension Credit call Plaintiffs' loan, which it did in late May 2022.  Dimension Credit, pretending that it is uninvolved and in some fantastical dreamland comes to this action with clean hands, refused to participate in global mediation, claiming it has nothing to do with the dispute with Defendant Chewning and his entities.  In the wake of this continued and egregious conduct, Plaintiffs were forced to initiate the instant action**.**

### THE PARTIES

6.      Plaintiff Lac Courte Oreilles Financial Services, LLC is a limited liability company formed under the laws of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians.  Its wholly-owned subsidiaries, Hummingbird and Miinan, own portfolios of unsecured online consumer loans originated under Tribal law.

7.      Defendant Kirk Chewning is an individual residing in St. Croix in the U.S. Virgin Islands.  He is the co-owner and officer of Defendant Cane Bay Partners VI, LLLP.

8.      Defendant David Johnson is an individual residing in St. Croix in the U.S. Virgin Islands.  He is the co-owner and officer of Defendant Cane Bay Partners VI, LLLP.

9.      Defendant Cane Bay Partners VI, LLLP is a limited liability partnership based in the U.S. Virgin Islands.   Cane Bay is owned and controlled by Defendants Chewning and Johnson.

10.      Defendant Strategic Link Consulting, LP is a limited partnership based in the State of Texas.  It is an affiliate business of Cane Bay under the control of Kirk Chewning.

11.      Defendant Esoteric Ventures, LLC, d/b/a as Max Touch Services is a limited liability company based in the State of Utah.  It is an affiliate business of Cane Bay under the control of Kirk Chewning.

4

12.     Defendant InfoTel International, Ltd., d/b/a Voyse International is an international business company based in Belize.  It is an affiliate business of Cane Bay under the control of Kirk Chewning.

13.     M. Mark High, Ltd. ("M. Mark High"), is an international business company based in Belize.  It is an affiliate business of Cane Bay under the control of Kirk Chewning.

14.     Defendant Dimension Credit (Cayman), LP is a limited partnership based in the Cayman Islands.  Upon information and belief it is owned and controlled, directly or indirectly, by Kirk Chewning.

15.     Defendant Jay Clark is an individual residing in Georgia and serves as Chief of Staff to Cane Bay as well as General Manager and CFO of Defendant Strategic Link.

16.     Defendant Kim Anderson is an individual residing in Georgia and serves as the Chief Executive Officer for several of the co-conspirators' auxiliary loan servicer entities.

## JURISDICTION AND VENUE

17.     The Court has original jurisdiction over this action pursuant to 18 U.S.C. § 1964 because Plaintiffs' raise violations under 18 U.S.C. § 1962.  The Court also has jurisdiction pursuant to 28 U.S.C. § 1331, as this dispute arises under federal law.  The Court has jurisdiction over the remaining causes of actions in this Complaint on the basis of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

18.     This Court may grant the injunctive and declaratory relief sought pursuant to 28 U.S.C. §§ 2201-02.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

5

## FACTUAL ALLEGATIONS

20.     The Lac Courte Oreilles Band of Lake Superior Chippewa Indians ("Tribe") is a federally recognized Indian tribe located in rural Wisconsin. Thousands of the Tribe's membership live on the Reservation.  In addition to government services, the Tribe provides employment for members and the community and is the single largest employer in Sawyer County.  Because the area is without a significant nearby population, the Tribe's gaming endeavors have yielded modest returns.  Consequently, governmental services are limited, and Tribal members have unmet needs in the community.

21.     In hopes of improving their economy and providing comprehensive governmental services, the Tribe became interested in pursuing an online consumer lending venture. Eventually, the Tribe created LCOFS pursuant to Tribal law, a Tribally owned limited liability company charged with developing and managing this new venture.

22.     After LCOFS's creation, the Tribe began searching in earnest for an experienced business partner who could help guide and develop their business.

23.     Around late 2012, the Tribe first met Defendants Chewning and Johnson, who held themselves out as successful businessmen with decades of industry experience. Ultimately, Chewning convinced the Tribe that it was a perfect match with minimal risk – as his business and its affiliates offered comprehensive loan servicing at every level of the enterprise, could train tribal members to take over call center operations, and would even provide financing to launch.

24.     Kirk Chewning is a native of the State of Michigan who has worked in the consumer finance industry for thirty years.  After working in more traditional banking roles, Chewning transitioned to the subprime consumer lending market, and began to launch, manage,

and run unsecured online consumer lending businesses. Chewning often touts his charitable works operated through Cane Bay's affiliate, Cane Bay Cares – a St. Croix non-profit seemingly used to reduce Chewning's income tax liability to negligible levels after benefitting from the significant tax relief already afforded Cane Bay and its principals through the U.S. Virgin Islands Economic Development Commission benefits.

25.     David Johnson is Chewning's business partner.  He is a wealthy investor who chose to move to St. Croix with Chewning to take advantage of income tax breaks associated with business development in the Virgin Islands.  Together, Chewning and Johnson have a history of off-shore online lending management and together have made millions of dollars through the exploitation of impoverished Indian tribes across the country.  As a testament to Johnson's pride in his offshore and unregulated forays in payday lending, he christened one of his yachts the "Renewed Interest."

26.     In 2009, Johnson and Chewning organized Cane Bay in the U.S. Virgin Islands for the purpose of evading state and federal income tax laws, and to facilitate the growth of their consumer lending business ventures.  Johnson and Chewning previously owned and operated Hong Kong Partners, a company organized in Belize, for the purpose of operating offshore consumer lending businesses and funding payday loans to American consumers and charging them in excess of 700% annually.  Lending through a foreign entity afforded Defendants Chewning and Johnson some protection from liability and made it notoriously difficult for consumers to have any kind of meaningful recourse.  Similarly, Defendants asserted that because these businesses were foreign, they were not subject to federal consumer protection laws.  However, as offshore lenders became subject to more significant scrutiny from state and federal regulators, Defendants Chewning and Johnson knew they needed to diversify their

7

holdings.

## THE INITIAL BUSINESS RELATIONSHIP

27.     In 2013, Chewning met with the Tribal Governing Board, the Tribe's governing body, and traveled to Hayward, Wisconsin to present his business operation, his proformas, and his plans for material changes lending could make to the Tribal community.  Following that meeting, the parties negotiated a deal for the servicing and oversight of the Tribe's start-up consumer lending portfolio, Oasis Funds, LLC.  Chewning pitched Cane Bay and its affiliate servicing companies (Strategic Link, Esoteric, InfoTel, M. Mark High, Ltd. – the "Servicing Affiliates") as a full-service suite that would provide everything from underwriting expertise, call center coverage, training for Tribal employees, and, notably, access to credit.  Chewning represented to the Tribe in negotiations that he also had access to credit through his affiliate business, Dimension Credit, a Cayman Islands fund that Chewning represented he owned and controlled.  Concurrently with the negotiation of the transaction documents with Cane Bay and the Servicing Affiliates, the Tribe was also presented onerous loan documents from Dimension Credit.  Chewning represented to the Tribe that Dimension Credit was unwilling to materially alter the template documents provided.

28.     Notably, Chewning reinforced his control over the Tribe's new business enterprise by conditioning financing from Dimension Credit on LCOFS selecting Cane Bay as its servicer.  The Credit Agreement with Dimension Credit required LCOFS and its subsidiary, Hummingbird, to maintain its contractual relationship with Cane Bay and the Servicing Affiliates or be in immediate default of the loan. Worse yet, this arrangement included a sweeping security interest where any default would trigger a transfer of all rights and interests in Hummingbird Funds from LCOFS to Dimension Credit, including a pledge of the equity of

LCOFS – effectively stripping LCOFS and Hummingbird of its status as tribal entities at Dimension Credit's election.

29.     Dimension Credit, Cane Bay, and Defendant Chewning acted in concert to ensure the finalization and signature of the Cane Bay services agreement along with the Dimension Credit loan documents to ensure that Defendant Chewning would be able to exercise control over the Tribe's operation, cash flows, business decisions, and cash distributions. Defendant Chewning represented that the Dimension Credit board of directors showed him great deference, and LCOFS should take heart, because Cane Bay's and the Tribe's interests were aligned.  The Tribal Governing Board relied on his representations and mitigated the Tribe's risk.

30.     Plaintiff LCOFS finally concluded negotiations on servicing documents and LCOFS finalized and signed transaction documents with Cane Bay and the Servicing Affiliates in 2014 for a five-year term.  The resulting lending company's portfolio, Oasis Funds, launched shortly thereafter.  Despite the projections and Chewning's pro forma, the Tribe earned the bare minimum while Cane Bay took a significant cash sweep.

### RENEGOTIATIONS AND RESTRUCTURE

31.     From 2014-2017, the parties operated under the terms of the original 2014 agreements.  In mid-2017, Plaintiffs desired to renegotiate terms with Cane Bay and Dimension, as it believed the Tribe was disadvantaged in the relationship with respect to economics and employment opportunities.  Plaintiffs believed – and communicated to Cane Bay and Chewning personally – that the Tribe had not recognized the benefit of the bargain as represented by Chewning with respect to portfolio growth, earned profits, or increasing employment opportunities on the Reservation.

32.    Plaintiffs were forced to strongarm Defendant Chewning and his companies to the table to renegotiate their relationship.  After a year of negotiating and Plaintiffs communicating that the Tribe was willing to walk away from the relationship entirely, Defendant Chewning, Cane Bay, and the Servicing Affiliates offered to restructure the transaction, train and develop Tribal members to take over more significant business components, and paid the Tribe $1.8 million upfront to fund its elders program, child care, indigent burial services, and a victims of domestic violence shelter as consideration for the longer 9.25 year term Cane Bay demanded in the new transaction.

33.    Notably, the Dimension Credit note was set to mature during this time period. Defendant Chewning had previously taken steps—without the permission of the Plaintiffs—to try to broker an amendment to the Dimension Credit facility in 2016 that increased the interest rate from 15 to 20%.  Plaintiffs never signed because they did not believe it was in their business interest.

34.    However, unbeknownst to Plaintiffs at the time, and without any contractual obligation to do so, Defendant Chewning began to transfer funds from Hummingbird and Miinan bank accounts to make interest payments to Dimension Credit at 20% in September 2016, resulting in years of overpayments that, pursuant to the transaction documents, must be credited toward principal repayment of the facility.

35.    During negotiations for a restructure of the Cane Bay relationship, Plaintiffs looked to Defendant Chewning to negotiate an extension of the note to run concurrent with the new Cane Bay term.  Defendant Chewning represented to Plaintiffs that he would use best efforts, but that the loan was already mature, and he was confident that Dimension Credit trusted Defendant Chewning so much that it would continue to extend credit under the existing

documents whether the loan had technically matured or not. The note matured in 2016, and Dimension Credit did not exercise its right to call the loan.

36. Plaintiffs believed the changes to the relationship, particularly the restructure of the economics to the Tribe, would help ensure the Tribe received both more profit to fund government programs and provide significant gains in Tribal employment opportunities. In November 2018, in reliance on Defendant Chewning's representations that this new structure would drive Tribal economic growth and increase operational control, Plaintiffs signed new transaction documents to restructure the relationship.

37. Unfortunately, instead of beginning the new term with a clean slate, upon information and belief, Defendant Chewning, Cane Bay, and the Servicing Affiliates secretly overhauled the manner in which the companies expensed Plaintiffs to back-into the service fees and revenue numbers Cane Bay and the Servicing Affiliates made under the prior contractual relationship. Though the plain language of the agreements said otherwise, the impact of this accounting change effectively maintained the economic status quo for Defendant Chewning, Cane Bay, and the Servicing Affiliates.

38. To minimize the profits available to Plaintiffs for distribution, and to increase alleged operating expenses of Hummingbird and Miinan, Defendant Chewning, controlling Cane Bay and the Servicing Affiliates, billed the costs of Servicing Affiliates' fixed assets to Hummingbird and Miinan. Chewning also began attempting to pass impermissible expenses on to Plaintiffs, most egregiously, the costs associated with defending a Servicing Affiliates' lawsuit brought by an aggrieved Belizean call center employee, in excess of $35,000. It became apparent to Plaintiffs that Defendant Chewning regarded himself as de facto CEO of Hummingbird and Miinan with the authority to use Tribal assets to pay his own expenses at his

sole discretion.

39.     In February 2020, Plaintiffs hired Scott Soli as the Chief Executive Officer of LCOFS, giving him direct oversight and control over Hummingbird and Miinan.  Upon performing an internal audit of business operations, Mr. Soli immediately identified several irregularities in financial statements and performance metrics.  He noted that the negotiated employment training meant to bolster the on-Reservation call center had been a financial boon for Cane Bay's affiliates – because LCOFS paid the entirety of their costs – while it resulted in zero additional jobs and no further development of the Tribe's call center authority.

40.     Mr. Soli asked Defendant Chewning why this training had proven so ineffective when it was so costly.  Defendant Chewning claimed the Tribal members were untrainable.  Mr. Soli also inquired as to why Tribal employees were being trained on the most difficult aspects of in-house collections.  Mr. Soli believed it was because Defendant Chewning had simply created a ruse to pacify the Tribe by including Tribal members in a non-material aspect of the business, with collection efforts that set the on-Reservation call center up for failure.

41.     Meanwhile, throughout the course of the relationship, Cane Bay oversaw cash management for Plaintiffs in a way that materially disadvantaged Plaintiffs and maximized profit distributions to Cane Bay.  For example, prior to Mr. Soli's hiring, and under the guise of providing long term cash management and portfolio growth projections for Plaintiffs, Defendant Chewning deferred $10 million in accounts payable owed by Hummingbird and Miinan.  Deferring such payments allowed Cane Bay to take a larger cut of portfolio revenues on a monthly basis as a "success fee."  However, when the deferred payment balance ballooned to $10 million, Defendant Chewning approached Plaintiffs and advised them that they must draw additional revenue down from the expired Dimension Credit facility to satisfy the outstanding

12

payables. Despite having cash on hand to pay expenses in the ordinary course, Defendant Chewning purposely deferred due and owing payments so as to sweep more cash for himself and to weaken Plaintiff's equity and cash position.

42.     Notably, this served Defendant Chewning in two ways – it increased profits derived by and paid to Cane Bay and it increased his return on investment through additional interest owed to Dimension Credit, in which he held a financial interest. Plaintiffs were forced to draw down on the Dimension Credit facility to sustain Hummingbird and Miinan. Despite Defendant Chewning's representations, deferring accounts payable to supposedly grow the size of the portfolio proved unsuccessful and neither Hummingbird nor Miinan saw a material change in profits from this business decision.

43.     After his hire, Mr. Soli began to require Defendant Chewning to communicate directly with Mr. Soli, not individual Tribal members, because Defendant Chewning sought to poison the Tribe's opinion of Mr. Soli and his efforts. Mr. Soli made multiple communication attempts to understand and remediate the strategic and financial problems Plaintiffs were suffering. Mr. Soli was rebuffed and belittled. However, with persistent follow up, Defendant Chewning was forced to admit that Cane Bay and the Servicing Affiliates had made mistakes on the way they charged certain costs to Hummingbird and Miinan.

44.     Over the course of the next year, Mr. Soli worked diligently to wrest control over call center operations and credit decisioning back to the Tribe as set forth in the transaction documents. The parties negotiated multiple amendments to the Service Level Agreements between Hummingbird and Miinan and the Servicing Affiliates to right certain wrongs Mr. Soli had uncovered and articulated. Yet, at every turn, Defendant Chewning deliberately acted to prevent meaningful advancements for the Tribe. Over time, it has become apparent that the

Defendants never intended to aid the Tribe in its economic pursuits in any meaningful way. It simply wanted nearly a decade of revenues derived in the Tribe's name by continuing their "rent-a-tribe" scheme.

45.     However, upon Mr. Soli's insistence, the Tribe hired more on-Reservation call center employees and took over verification and funding calls, along with soft collections for Hummingbird and Miinan's customers. Despite Defendant Chewning's beliefs about the Tribal call center's abilities, on-Reservation employees have facilitated the collection of over $5 million in active loans since Mr. Soli's hiring. Based on this success, Plaintiffs concluded that Defendant Chewning's efforts to prevent the Tribe from gaining experience or expertise in this aspect of the lending business were solely to preserve his profits from Plaintiffs' businesses.

46.     Defendant Chewning would threaten Mr. Soli (and later individual Tribal leaders when Mr. Soli ignored Mr. Chewning's theatrics) with moving Cane Bay's expertise to its other tribal relationships. Defendant Chewning routinely told Plaintiffs that the Tribe would do well to remember that it would have nothing without Cane Bay's generosity. He represented that without Cane Bay, the Tribe would have nothing.

47.     Defendant Chewning had the wherewithal to make good on such a threat discretely. As is well-documented in multiple class action lawsuits, Cane Bay has a contractual relationship with other tribes, including the Three Affiliated Tribes, whose lending portfolios charge consumers in excess of 700% interest annually. Upon information and belief, Defendant Chewning acted to route quality purchased consumer applications ("leads") away from Plaintiffs and to its other tribal portfolios where Cane Bay and the Servicing Affiliates enjoyed better economics and less oversight. The foreseeable and actual result of this bad faith behavior was to degrade the quality of consumer loans comprising Plaintiffs' portfolios and leading to

14

the gradual decline in value of the portfolios through loan defaults and charge-offs. These actions directly and proximately caused the devaluation of Plaintiffs' portfolios and the gradual wind-down of both portfolios. Defendants' conduct resulted in the material decrease in profits available for distribution to the Tribe while it maintained the fixed fees earned by Cane Bay and the Servicing Affiliates.

48. Conflict between Mr. Soli and Defendant Chewning reached a fever pitch in early 2022 when Mr. Soli expressed Plaintiffs' desire to operate without Cane Bay, the Servicing Affiliates, and their bad faith conduct. He proposed, in writing, that Defendant Chewning make an offer for the buyout of the contracts. Defendant Chewning agreed he would put together a proposal.

49. In May 2022, growing frustrated with Mr. Soli's demand for expense justification and operational autonomy, Cane Bay and the Servicing Affiliates, through counsel, notified Plaintiffs formally of a dispute and their intent to mediate as set forth in the parties' transaction documents. The comically one-sided rendition of the facts did not mention the parties' months-long negotiation related to improper expenses or Defendant Chewning's representations that he would present a number for a buy-out of the contracts. Instead, counsel noted that the contracts contemplate an early termination liquidated damages clause. All in all, counsel for Cane Bay and the Servicing Affiliates made a multi-million dollar demand not based in reality.

50. Following receipt of Cane Bay's letter, Plaintiffs employees required portfolio data held and controlled by Strategic Link. Specifically, LCOFS sought past financials, bank statements, and aggregate bad debt write-off calculations. Strategic Link refused to cooperate with any requests and noted that it would not act under the terms of the contracts until all

outstanding expenses and invoices were paid.  Strategic Link also informed Hummingbird and Miinan that it had ceased purchasing leads for the portfolios, meaning the Servicing Affiliates would not assist in underwriting or funding any new loans for either portfolio.

51.     In an effort to create leverage for Cane Bay and the Servicing Affiliates, upon information and belief, Defendant Chewning then used his leverage with Dimension Credit to push Dimension Credit to call Plaintiffs' loan on or about May 23, 2022.  However, this too is convoluted by Defendant Chewning's malfeasance.  When Defendant Chewning demanded that Plaintiffs draw down an additional $10 million from the Dimension Credit facility to pay deferred payables in 2019, he also sought to negotiate (or potentially broker) another extension of the facility.  Dimension Credit and Plaintiffs were never able to come to terms, and no amendment was signed.

52.     Defendant Chewning represented to Mr. Soli on or about December 2021 that a change of control had occurred at Dimension Credit, and somehow Defendant Chewning (or his businesses) owed indemnification obligations to Dimension Credit.  Mr. Soli was unable to discern more information on how this could impact Plaintiffs, but did question Defendant Chewning about why Plaintiffs never received any notice of the change in ownership. However, the implication was that Defendant Chewning was personally motivated to get Plaintiffs to sign amended documents with Dimension Credit to limit his indemnification obligations he may owe to Dimension Credit.

53.     Despite the fact that the Dimension Credit transaction documents explicitly say that any amendment must be in writing, Dimension Credit alleges that there was an implied contract increasing the interest rate.  And now that Dimension Credit is calling the loan (because it can, not because of an actual default), supposedly Plaintiffs are obligated to the

interest rate Dimension Credit wishes it would have finalized.

54.     Goaded by Defendant Chewning, Dimension Credit now seeks to exercise its right under *some* version of the credit agreement and demands satisfaction of the loan. Plaintiffs provided Defendant Chewning with an executed copy of Dimension Credit's satisfaction and release of lien to remind his of the history between the parties. Dimension Credit still believes it is entitled to millions and has threatened to pursue all rights and remedies to which it is entitled.

## COUNT ONE

**EMBEZZLEMENT AND THEFT FROM A TRIBAL ORGANIZATION**
**18 U.S.C. § 1163**
**[Against Defendants Cane Bay, Kirk Chewning, and David Johnson]**

55.     Plaintiffs reallege and incorporate each of the allegations in the preceding paragraphs as if set forth at length herein.

56.     It is undisputed that the Tribe is a federally-recognized Indian tribe and LCOFS is a wholly owned entity of the Tribe, as are its subsidiaries Hummingbird and Miinan.

57.     Defendants Chewning, Johnson, and Cane Bay each arranged for and/or participated in the creation of the relationship between the parties to provide a mechanism for Defendants to extract profits that should have otherwise been available or Tribal distribution, to instead enrich themselves by collecting on loans whereby they charged consumers up to 730% interest annually.

58.     Defendants have violated 18 U.S.C. § 1163 by embezzling, stealing, knowingly converting, and/or otherwise misappropriating the Tribe's economic benefit from Plaintiffs.

59.     Defendants' fraudulent actions made each of them individually liable as alter egos of their respective corporate entities. Defendant Chewning acted directly, on behalf of

himself and Cane Bay, to misrepresent the nature of the restructured transaction and the way expenses would be billed, and to deny and restrict Plaintiffs from access to their assets, intellectual property, and regular business operations. Cane Bay acted to prioritize the payment of Cane Bay "success fees" instead of Plaintiffs' due and owing accounts payable.

60.    Defendants are also jointly and severally liable to Plaintiffs due to their collusive actions and role in defrauding the Plaintiffs.

61.    Defendants caused to be stolen from Plaintiffs an amount to be determined at trial. Given the nature and scope of control and bad acts over the course of the relationship, Plaintiffs estimate this amount to be in excess of $250 million. In 2019 alone, Hummingbird paid Cane Bay and the Servicing Affiliates over $57.5 million.

## COUNT TWO

### AIDING AND ABETTING EMBEZZLEMENT AND THEFT FROM TRIBAL ORGANIZATION
### [Against All Defendants]

62.    Plaintiff realleges and incorporates each of the allegations in the preceding paragraphs as if set forth at length herein.

63.    Defendants each played a key role in causing the embezzlement, theft, conversion, and/or misappropriation of assets from Plaintiffs, including by providing material business and logistical support. As co-owners of Cane Bay, Defendants Chewning and Johnson, both individually and personally benefited from the theft of Tribal assets.

64.    In aiding and abetting the embezzlement, theft, conversion, and misappropriation of Plaintiffs' assets, Defendants knowingly and willingly intended to direct the assets and property of a federally-recognized Indian tribe to their own possession and use.

65.    Defendants' fraudulent actions made each of them individually liable as alter

egos of their respective corporate entities.

66. Defendants are also jointly and severally liable to Plaintiffs due to their collusive actions and role in defrauding the Plaintiffs.

**COUNT THREE**

**VIOLATIONS OF RICO**
**18 U.S.C. § 1962**
**(WIRE FRAUD)**
**[Against Defendants Cane Bay, Kirk Chewning, David Johnson, Kim Anderson, and Does 1-20]**

67. Plaintiffs reallege and incorporate each of the allegations in the preceding paragraphs as if set forth at length herein.

68. Defendants Cane Bay, Kirk Chewning, and David Johnson are each a "person" as that term is defined in 18 U.S.C. § 1964(3).

69. Defendants Cane Bay, Kirk Chewning, David Johnson, and Kim Anderson comprised an "enterprise" as that term is defined in18 U.S.C. § 1964(3), associated for the common purpose of profiting off of the collection of unlawful debt, without control of the Plaintiffs, through loans made to borrowers throughout the United States.

70. In association with this enterprise, Defendants Cane Bay, Kirk Chewning, David Johnson, Kim Anderson, along with other participants not yet known to Plaintiffs, violated 18 U.S.C. § 1962 by engaging in a pattern of "racketeering activity" including through wire fraud as defined in 18 U.S.C. § 1343.

71. Defendants Cane Bay, Kirk Chewning, David Johnson and Kim Anderson have engaged in wire fraud by devising and implementing a scheme to defraud Plaintiffs and obtain money from Plaintiffs' accounts by means of false and fraudulent pretenses.

72. In furtherance of their rent-a-tribe scheme, Defendants Cane Bay, Kirk Chewning, David Johnson, and Kim Anderson transmitted, or caused to be transmitted, by

means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to, the following:

    a.  Interstate communications via email, telephone, facsimile, and/or other means.

    b.  Interstate transfers of funds to and from Plaintiffs' customers, with the overall intent of furthering the rent-a-tribe scheme and thus enriching themselves.

    c.  Interstate and international transfers of funds in the ordinary course of business to further the ongoing unlawful lending enterprise.

73.    Defendants' fraudulent actions made each of them individually liable as alter egos of their respective corporate entities.

74.    Defendants are also jointly and severally liable to Plaintiffs for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

75.    As a direct and proximate result of Defendants' wire fraud in violation of RICO, Plaintiffs have been injured in its business and property in an amount to be determined at trial.

## COUNT FOUR

**VIOLATIONS OF RICO**
**18 U.S.C. § 1962**
**(MONEY LAUNDERING)**
**[Against Defendants Cane Bay, Kirk Chewning, David Johnson, Jay Clark, Dimension Credit, and Does 1-20]**

76.    Plaintiffs reallege and incorporate each of the allegations in the preceding paragraphs as if set forth at length herein.

77.    Defendants Cane Bay, Kirk Chewning, David Johnson, and Dimension are each

a "person" as that term is defined in 18 U.S.C. § 1964(3).

78.  Defendants Cane Bay, Kirk Chewning, David Johnson, and Dimension Credit comprised an "enterprise" as that term is defined in 18 U.S.C. § 1964(3), associated for the common purpose of profiting off of the collection of unlawful debt, without control of the Plaintiffs, through loans made to borrowers throughout the United States.

79.  Defendants, through their enterprise, violated 18 U.S.C. § 1962 by engaging in a pattern of "racketeering activity" including through money laundering as defined in 18 U.S.C. § 1956.

80.  In furtherance of the RICO enterprise described herein, Defendants, knowing that funds involved represented the proceeds of unlawful racketeering activity, conducted, or attempted to conduct financial transactions which in fact involved the proceeds of their unlawful racketeering activity, including by concealing or attempting to conceal the nature, location, source, ownership, or control over the proceeds of the unlawful racketeering activity.

81.  Such financial transactions included disguising payments made to Defendants as payment of servicer and "consulting" services and expenses, facilitating and receiving the payment of interest in excess of the transaction documents between the parties without legal basis and without Plaintiffs' knowledge, and other compensation that effectively attempted to "rent" the Tribe's sovereignty for their own financial gain.

82.  Defendants' fraudulent actions made each of them individually liable as alter egos of their respective corporate entities.

83.  Defendants are also jointly and severally liable to Plaintiffs for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

84.  As a direct and proximate result of Defendants' money laundering, Plaintiffs

have been injured in its business and property in an amount to be determined at trial.

## COUNT FIVE

### BREACH OF CONTRACT
**[Against Defendants Cane Bay, Kirk Chewning, David Johnson, Strategic Link, Esoteric, InfoTel, and M. Mark High]**

85.     Plaintiffs reallege and incorporate each of the allegations in the preceding paragraphs as if set forth at length herein.

86.     It is undisputed that on our around 2018, Plaintiffs entered into contracts with Defendants Cane Bay, Strategic Link, Esoteric, InfoTel, and M. Mark High to provide Plaintiffs' with services relating to its online lending portfolios.

87.     Upon information and belief, Defendants Cane Bay, Chewning, Johnson, Strategic Link, Esoteric, InfoTel, and M. Hark High, individually and collectively, took knowingly, willfully, and deliberately, took actions in breach of the contracts with the Plaintiffs, despite good faith efforts on the part of the Plaintiffs to adhere to the plain terms, as well as with the spirit and intent of the agreements.

88.     Defendants' actions, individually, and collectively constitute gross negligence, thereby resulting in breach of the contracts between the Plaintiffs and Defendants. Such negligent acts include (but are not limited to):  negligence in servicing activities; dilution of the value of the Plaintiffs' asset; mismanagement of funds belonging to Plaintiffs; and failure to appropriately report revenue from Plaintiffs' operations to the Internal Revenue Service and other relevant agencies.

89.     As a result of Defendants' breach, Plaintiffs have suffered damages in the millions – representing prior, current, and future proceeds of Plaintiffs' business operations, as well as the diminished value of Plaintiffs' asset.

## COUNT SIX

**BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**
**[Against Defendants Cane Bay, Kirk Chewning, David Johnson, Strategic Link, Esoteric, InfoTel, and M. Mark High]**

90.     Plaintiffs reallege and incorporate each of the allegations in the preceding paragraphs as if set forth at length herein.

91.     The contracts entered into between Plaintiffs and Defendants all require that each party act in good faith toward the other party and to deal fairly with that party when performing the express terms of the contract.

92.     Defendants Cane Bay, Kirk Chewning, David Johnson and Strategic Link each had an obligation to use good faith in the execution of their duties as service providers to the Plaintiffs.

93.     Indeed, in negotiating and entering into the various agreements in 2018, Plaintiffs reasonably expected that the restructured relationship between the parties would result in the Plaintiffs realizing greater economic advantages from and control of business operations to ensure the Tribe received both more profit to fund government programs and provide significant gains in Tribal employment opportunities.

94.     In acting to improperly bill Plaintiffs for expenses and costs to which it was not obligated to pay, Defendants Cane Bay, Kirk Chewning and David Johnson acted in violation of their duty of good faith.

95.     In purposely deferring due and owing accounts payable so as to distribute success fees to Cane Bay to the detriment of Plaintiffs, Defendants Cane Bay, Kirk Chewning and David Johnson violated their duty of good faith.

96.     In refusing to comply with requests for access to Plaintiffs' own assets, including

23

intellectual property and systems, Defendants Cane Bay, Chewning, and Johnson violated their duty of good faith by seeking to hold hostage Hummingbird and Miinan in exchange for payment of invoices disputed in good faith.

97.     In acting to route leads away from Hummingbird and Miinan and to its other tribal portfolios, Defendants Cane Bay, Kirk Chewning and David Johnson violated their duty of good faith by degrading the quality of loans comprising Plaintiffs' portfolios and leading to the gradual decline in value of the portfolios.

98.     As a result, Plaintiffs have suffered significant damages - representing prior, current, and future proceeds of Plaintiffs' business operations, as well as the diminished value of Plaintiffs' asset.

## COUNT SEVEN

### TORTIOUS INTERFERENCE WITH CONTRACT
### [Against Defendants Cane Bay, Kirk Chewning, David Johnson]

99.     Plaintiffs reallege and incorporate each of the allegations in the preceding paragraphs as if set forth at length herein.

100.    To facilitate their operation of their business, Plaintiffs' had various third party agreements, including the agreement with Dimension Credit to provide capital to the portfolios.

101.    Through their improper and wrongful conduct, Defendants Cane Bay, Kirk Chewning and David Johnson, directly interfered with Plaintiffs' contractual relationship with Dimension Credit by forcing them to call Plaintiffs' loan on or about May 2022.

102.    Defendants' contractual interference is documented and it was intentional.

103.    There was a direct causal connection between Defendants' interference and the damages that Plaintiffs suffer and continue to suffer as a result of its multi-million dollar note suddenly being called for payment.

104.   Defendants had no right, privilege, or ability to interfere with this contractual relationship.

## COUNT EIGHT

### CONVERSION
**[Against Defendants Cane Bay, Kirk Chewning, David Johnson, Kim Anderson, Strategic Link, Esoteric, InfoTel, and M. Mark High]**

105.   Plaintiffs reallege and incorporate each of the allegations in the preceding paragraphs as if set forth at length herein.

106.   In acting to divert assets, data, and intellectual property belonging to the Plaintiffs, Defendants Cane Bay, Kirk Chewning, David Johnson, Kim Anderson, Strategic Link, Esoteric, and InfoTel have knowingly and deliberately attempted to control or take Plaintiffs' property.

107.   Defendants' have acted in this manner without the Plaintiffs' consent and, indeed, in spite of Plaintiffs' adamant protests.

108.   Defendants' taking of Plaintiffs' assets have resulted in significant and serious interference with Plaintiffs' ability to control, possess, operate, and manage its business operations.

## COUNT NINE

### UNJUST ENRICHMENT
**Against Defendants Cane Bay, Kirk Chewning, David Johnson, Strategic Link, Esoteric, InfoTel, and M. Mark High]**

109.   Plaintiffs reallege and incorporate each of the allegations in the preceding paragraphs as if set forth at length herein.

110.   Defendants Cane Bay, Kirk Chewning, David Johnson, Strategic Link, Esoteric,

25

and InfoTel knowingly and deliberately took action to retrieve funds from Plaintiffs through fraudulent expense reports, improper cash management and oversight, and unjustified interest payments to Dimension Credit.

111.    Such improper revenue collection has resulted in an inequitable and unjust retention of funds that rightfully belonging to the Plaintiffs.  Defendants cannot and should not retain this benefit without compensating Plaintiffs for the value received to date.

## COUNT TEN

### INJUNCTIVE RELIEF
### [As to all Defendants]

112.    Plaintiffs have already suffered and will continue to suffer immediate and irreparable harm as a result of Defendants' wrongful actions

113.    There is no adequate legal remedy to compensate Plaintiffs for Defendants' actions.

114.    Defendants have no legal basis for its continued attempt to control and divert Plaintiffs' property.  Accordingly, Plaintiffs have a substantial likelihood of success on the merits.

## COUNT TWELVE

### DECLARATORY JUDGMENT
### [As to all Defendants]

115.    Plaintiffs reallege and incorporate each of the allegations in the preceding paragraphs as if set forth at length herein.

116.    An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning their respective rights and duties.

117.    Pursuant to 28 U.S.C. §§ 2201 and 2202, a judicial determination of the respective rights of the parties with respect to the actions of the Defendants and the contracts at issue is both necessary and appropriate under the circumstances.

118.    Plaintiffs have no equally plain, speedy, or adequate remedy to prevent Defendants' actions other than seeking declaratory relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

1.  Declaratory judgment that Defendants have violated RICO;

2.  An order obligating Defendants to disgorge all revenues and profits derived from their scheme;

3.  Injunctive relief prohibiting Defendants from continuing their wrongful conduct;

4.  Compensatory damages, in an amount to be determined at trial;

5.  Treble, multiple, punitive, and/or exemplary damages, in an amount to be determined at trial;

6.  Pre-judgment and post-judgment interest;

7.  An order awarding Plaintiffs the costs of suit, including reasonable attorneys' fees as provided by law; and

8.  Any other relief the Court, in its discretion, finds necessary and/or appropriate.

Respectfully submitted,

Dated: June 22, 2022

     */s/ Nicole St. Germain*

     _____

Robert A. Rosette (admission pending)
Saba Bazzazieh
Nicole St. Germain
Chase Goodnight (admission pending)
ROSETTE, LLP
565 W. Chandler Blvd, Ste. 212
Chandler, AZ 85225
Tel: (480) 889-8990
rosette@rosettelaw.com
sbazzazieh@rosettelaw.com
nstgermain@rosettelaw.com
cgoodnight@rosettelaw.com

*Attorneys for Plaintiffs*

# **EXHIBIT C**

CREDIT AGREEMENT

DATED AS OF SEPTEMBER 2, 2014

BY AND AMONG

HUMMINGBIRD FUNDS, LLC, AS BORROWER,

LAC COURTE OREILLES FINANCIAL SERVICES, LLC, AS GUARANTOR

AND

DIMENSION CREDIT (CAYMAN), L.P., AS LENDER

# TABLE OF CONTENTS

**Page**

SECTION 1.    THE CREDIT FACILITIES. .................................................................1

Section 1.1.    Commitments .........................................................................1
Section 1.2.    Applicable Interest Rates ......................................................1
Section 1.3.    Minimum and Maximum Borrowing Amounts; Maximum Loans .................................................................................2
Section 1.4.    Manner of Borrowing Loans ...................................................2
Section 1.5.    Maturity of Loans; Extension of Maturity ..............................3
Section 1.6.    Prepayments; Commitments Reductions and Terminations.........3
Section 1.7.    Default Rate ...........................................................................5
Section 1.8.    Evidence of Indebtedness .......................................................6

SECTION 2.    MULTI-PARTY CREDIT FACILITY. ......................................................6

Section 2.1.    Borrower Acknowledgments. ...................................................6

SECTION 3.    PLACE AND APPLICATION OF PAYMENTS. ..........................................7

Section 3.1.    Place and Application of Payments ........................................7
Section 3.2.    Account Debit ........................................................................7

SECTION 4.    COLLATERAL. ..........................................................................8

Section 4.1.    Guaranty ...............................................................................8
Section 4.2.    Collateral ..............................................................................8
Section 4.3.    Liens on Real Property ..........................................................9
Section 4.4.    Further Assurances ...............................................................10

SECTION 5.    DEFINITIONS; INTERPRETATION. .....................................................10

Section 5.1.    Definitions ...........................................................................10
Section 5.2.    Interpretation .......................................................................26
Section 5.3.    Change in Accounting Principles ..........................................27

SECTION 6.    REPRESENTATIONS AND WARRANTIES. ..............................................28

Section 6.1.    Organization and Qualification .............................................28
Section 6.2.    The Borrower and Subsidiaries .............................................28
Section 6.3.    Authority and Validity of Obligations ....................................28
Section 6.4.    Use of Proceeds; Margin Stock .............................................29
Section 6.5.    Financial Reports .................................................................29
Section 6.6.    No Material Adverse Change ................................................30
Section 6.7.    Full Disclosure .....................................................................30
Section 6.8.    Trademarks and Licenses .....................................................30
Section 6.9.    Governmental Authority and Licensing ..................................30
Section 6.10.    Good Title............................................................................31

-i-

| | | |
|---|---|---|
| Section 6.11. | Litigation and Other Controversies | 31 |
| Section 6.12. | Taxes | 31 |
| Section 6.13. | Approvals | 31 |
| Section 6.14. | Affiliate Transactions | 32 |
| Section 6.15. | Investment Company | 32 |
| Section 6.16. | ERISA | 32 |
| Section 6.17. | Compliance with Laws | 32 |
| Section 6.18. | OFAC | 33 |
| Section 6.19. | Other Agreements | 34 |
| Section 6.20. | Solvency | 34 |
| Section 6.21. | No Default | 34 |
| Section 6.22. | No Broker Fees | 34 |
| Section 6.23. | Holdco | 34 |
| Section 6.24. | Labor Matters | 34 |
| Section 6.25. | Insurance | 35 |
| Section 6.26. | Entity Records | 35 |
| Section 6.27. | Accounts and Contract Rights | 35 |
| Section 6.28. | Third Parties | 36 |
| Section 6.29. | Patriot Act | 36 |

| | | |
|---|---|---|
| SECTION 7. | CONDITIONS PRECEDENT. | 36 |
| Section 7.1. | All Credit Events Conditions Precedent | 36 |
| Section 7.2. | Closing Date Conditions Precedent | 37 |
| Section 7.3. | Representations and Warranties Regarding the Conditions | 40 |

| | | |
|---|---|---|
| SECTION 8. | COVENANTS. | 40 |
| Section 8.1. | Maintenance of Business | 40 |
| Section 8.2. | Maintenance of Properties | 40 |
| Section 8.3. | Taxes and Assessments | 40 |
| Section 8.4. | Insurance | 41 |
| Section 8.5. | Financial and Collateral Reports; Other Notices | 41 |
| Section 8.6. | Inspections; Commercial Finance Examinations; Appraisals | 44 |
| Section 8.7. | Borrowings and Guaranties | 45 |
| Section 8.8. | Liens | 45 |
| Section 8.9. | Investments, Acquisitions, Loans and Advances | 45 |
| Section 8.10. | Mergers, Consolidations and Sales | 46 |
| Section 8.11. | Notice of Account Debtors | 46 |
| Section 8.12. | Dividends and Certain Other Restricted Payments | 46 |
| Section 8.13. | ERISA | 47 |
| Section 8.14. | Compliance with Laws | 47 |
| Section 8.15. | Compliance with OFAC Sanctions Programs | 48 |
| Section 8.16. | Burdensome Contracts With Affiliates | 49 |
| Section 8.17. | No Changes in Fiscal Year | 49 |
| Section 8.18. | Formation of Subsidiaries | 49 |
| Section 8.19. | Change in the Nature of Business | 49 |
| Section 8.20. | Use of Proceeds | 49 |

| | | |
|---|---|---|
| Section 8.21. | No Restrictions | 49 |
| Section 8.22. | Prepayments of Indebtedness | 50 |
| Section 8.23. | Modification of Material Documents | 50 |
| Section 8.24. | Payment and Performance of Obligations | 50 |
| Section 8.25. | Deposit Accounts, Securities Accounts and Commodities Accounts | 51 |
| Section 8.26. | Capital Expenditures | 52 |
| Section 8.27. | Change of Name or in Location | 52 |
| Section 8.28. | Borrower Balance Sheet Test | 52 |
| Section 8.29. | Post-Closing Obligations | 53 |
| Section 8.30. | Servicing Agreements. | 53 |
| Section 8.31. | Operating Covenants. | 53 |

| | | |
|---|---|---|
| SECTION 9. | EVENTS OF DEFAULT AND REMEDIES. | 54 |
| Section 9.1. | Events of Default | 54 |
| Section 9.2. | Non-Bankruptcy Defaults | 58 |
| Section 9.3. | Bankruptcy Defaults | 58 |
| Section 9.4. | Remedies Cumulative | 58 |

| | | |
|---|---|---|
| SECTION 10. | CHANGE IN CIRCUMSTANCES. | 59 |
| Section 10.1. | [Intentionally Omitted] | 59 |
| Section 10.2. | Lending Offices | 59 |
| Section 10.3. | Discretion of Lender as to Manner of Funding | 59 |
| Section 10.4. | Mitigation | 59 |

| | | |
|---|---|---|
| SECTION 11. | [RESERVED]. | 59 |

| | | |
|---|---|---|
| SECTION 12. | THE GUARANTEES. | 59 |
| Section 12.1. | The Guarantees | 59 |
| Section 12.2. | Guarantee Unconditional | 60 |
| Section 12.3. | Discharge Only upon Payment in Full; Reinstatement in Certain Circumstances | 61 |
| Section 12.4. | Subrogation | 61 |
| Section 12.5. | Waivers | 61 |
| Section 12.6. | Limit on Recovery | 62 |
| Section 12.7. | Stay of Acceleration | 62 |
| Section 12.8. | Benefit to Guarantor | 62 |
| Section 12.9. | Guarantor Covenants | 62 |

| | | |
|---|---|---|
| SECTION 13. | MISCELLANEOUS. | 62 |
| Section 13.1. | Withholding Taxes | 62 |
| Section 13.2. | No Waiver, Cumulative Remedies | 63 |
| Section 13.3. | Non-Business Days | 63 |
| Section 13.4. | Documentary Taxes | 63 |
| Section 13.5. | Survival of Representations | 63 |

00980522

Section 13.6.    Survival of Indemnities ..................................................................64
Section 13.7.    [Intentionally Omitted] .............................................................64
Section 13.8.    Notices .........................................................................................64
Section 13.9.    Counterparts; Electronic Execution...........................................66
Section 13.10.   Successors and Assigns ...............................................................66
Section 13.11.   Participants ...................................................................................66
Section 13.12.   Assignments .................................................................................66
Section 13.13.   Amendments .................................................................................68
Section 13.14.   Headings .......................................................................................68
Section 13.15.   Costs and Expenses; Indemnification .........................................68
Section 13.16.   Set-off...........................................................................................69
Section 13.17.   Entire Agreement..........................................................................70
Section 13.18.   Governing Law..............................................................................70
Section 13.19.   The Loan Parties' Limited Waiver of Sovereign Immunity......70
Section 13.20.   Severability of Provisions............................................................72
Section 13.21.   Excess Interest. .............................................................................72
Section 13.22.   Construction ..................................................................................73
Section 13.23.   Submission to Jurisdiction; Waiver of Jury Trial ......................73
Section 13.24.   Arbitration ....................................................................................73
Section 13.25.   USA Patriot Act............................................................................77
Section 13.26.   Confidentiality ..............................................................................77
Section 13.27.   Servicer as Agent for Borrower and Guarantor..........................78

00980522

EXHIBIT A        —    Form of Notice of Borrowing of Loans
EXHIBIT B        —    Form of Loan Note
EXHIBIT C        —    Form of Compliance Certificate
EXHIBIT D        —    Form of Borrowing Base Certificate


SCHEDULE 3.1(a) —    Wire Transfer Instructions of the Lender
SCHEDULE 4.4     —    Chief Executive Offices
SCHEDULE 6.2     —    Information regarding Borrower
SCHEDULE 6.9     —    Governmental Authority and Licensing
SCHEDULE 6.14    —    Affiliate Transactions
SCHEDULE 6.17    —    Compliance with Laws
SCHEDULE 6.22    —    Broker's Fees
SCHEDULE 6.25    —    Insurance
SCHEDULE 8.8     —    Liens
SCHEDULE 8.9     —    Investments
SCHEDULE 8.29    —    Post-Closing Obligations
SCHEDULE 13.24   —    Pre-Approved Arbitrators

00980522

# CREDIT AGREEMENT

This Credit Agreement is entered into as of September 2, 2014, by and among Hummingbird Funds, LLC ("Borrower"), a wholly-owned limited liability company of Lac Courte Oreilles Financial Services LLC, a tribally chartered limited liability company formed under the laws of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians, Lac Courte Oreilles Financial Services LLC (the "Guarantor" or "Holdco"), a wholly-owned limited liability company of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe organized pursuant to Section 16 of the act of June 18, 1934 (48 Stat. 987)(25 U.S.C. § 476), as amended, and Dimension Credit (Cayman), L.P., a Cayman Islands exempted limited partnership, as the lender (in such capacity as a lender, the "Lender"). All capitalized terms used herein without definition shall have the same meanings herein as such terms are defined in <u>Section 5.1</u> hereof.

## PRELIMINARY STATEMENT

The Borrower has requested, and the Lender has agreed to extend, certain credit facilities on the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1. <u>THE CREDIT FACILITIES</u>.

Section 1.1. <u>Commitments.</u>

(a) Subject to the terms and conditions of this Agreement, and during the term of this Agreement, the Lender agrees to make revolving loans (the "Loans") to the Borrower in an amount at any one time outstanding not to exceed the Maximum Revolver Amount.

(b) Amounts borrowed pursuant to this <u>Section 1.1</u> may be repaid and, subject to the terms and conditions of this Agreement, reborrowed at any time during the term of this Agreement. The outstanding principal amount of the Loans, together with interest accrued and unpaid thereon, shall constitute Obligations and shall be due and payable on the Termination Date or, if earlier, on the date on which they are declared due and payable pursuant to the terms of this Agreement.

Section 1.2. <u>Applicable Interest Rates.</u>

Each Loan made or maintained by the Lender shall bear interest (computed on the basis of a year of three hundred sixty-five (365) or three hundred sixty-six (366) days, as the case may be, and the actual days elapsed) on the unpaid principal amount thereof from the date such Loan is advanced until maturity (whether by acceleration or otherwise) at a rate per annum equal to the Interest Rate, payable by the Borrower on each Interest Payment Date and at maturity (whether by acceleration or otherwise).

-1-

(a) <u>Rate Determinations</u>.  The Lender shall calculate the interest rate applicable to the Loans hereunder, and its determination thereof shall be conclusive and binding except in the case of manifest error.

Section 1.3.        <u>Minimum and Maximum Borrowing Amounts; Maximum Loans.</u>

Each Borrowing of Loans advanced under the Loan Documents shall be in an amount not less than $100,000 and shall be in an integral multiple of $100,000.  Each Borrowing of Loans advanced under the Credit shall be in an amount not to exceed $1,000,000, unless agreed to in writing by the Lender.  Without the Lender's written consent, Borrowings of Loans shall only be advanced on the first Tuesday of the calendar month (or if not a Business Day, the next Business Day thereafter).

Section 1.4.        <u>Manner of Borrowing Loans.</u>

(a) <u>Notice to the Applicable Representative</u>.  Unless the Lender otherwise agrees in writing, the Servicer, as agent for the Borrower, shall give notice to the Lender by no later than 12:00 noon (New York time) with respect to Loans, at least twenty (20) days before the date on which the Servicer, as agent for the Borrower, requests the Lender to advance a Borrowing of Loans.  The Loans included in each Borrowing shall bear interest at the Interest Rate.  The Servicer, as agent for the Borrower, shall give all such notices requesting the advance of a Borrowing with respect to any Loan to the Lender by telephone, telecopy, or other telecommunication device reasonably acceptable to the Lender (which notice shall be irrevocable once given and, if by telephone, shall be promptly confirmed in writing), substantially in the form attached hereto as Exhibit A (Notice of Borrowing of Loans) or in such other form reasonably acceptable to the Lender.  All such notices concerning the advance of a Borrowing shall specify the date of the requested advance of such Borrowing (which shall be a Business Day) and the amount of the requested Borrowing to be advanced.  The Lender may rely on any such telephonic, telecopy or other telecommunication notice given by any Person the Lender in good faith believes is an Authorized Representative of the Servicer, acting as agent for the Borrower, without the necessity of independent investigation, and in the event any such notice by telephone conflicts with any written confirmation such telephonic notice shall govern if the Lender has acted in reliance thereon.

00980522

(b) <u>Disbursement of Loans</u>. Not later than 2:00 p.m. (New York time) on the date of any requested advance of a new Borrowing of Loans, subject to <u>Section 7</u> hereof, the Lender shall make available the Loans comprising the Borrowing in immediately available funds to the Borrower by depositing or wire transferring such proceeds to the Borrower's Designated Disbursement Account or as the Servicer, as agent for the Borrower, and the Lender may otherwise agree in writing.

Section 1.5.          <u>Maturity of Loans; Extension of Maturity.</u>

(a) <u>Maturity of Loans</u>.  Each Loan, both for principal and interest not sooner paid, shall mature and be immediately due and payable by the Borrower on the Termination Date.

(b) <u>Extension of Maturity</u>.  The Termination Date with respect to the Loans may be extended by 90 days from time to time at the election of the Borrower by written notice from the Servicer, as agent for the Borrower, to the Lender no later than fifteen (15) days prior to the then current Termination Date so long as no Event of Default has occurred and is continuing prior to the date (i) written notice of such extension is required to be delivered by the Servicer, as agent for the Borrower pursuant to this <u>Section 1.5(b)</u> or (ii) of the current Termination Date prior to giving effect to any such extension; <u>provided</u> that, notwithstanding anything to the contrary, in no instance shall the Termination Date (y) extend past November 30, 2017 (z) be extended after the Commitments have been terminated pursuant to Section 1.6(d), 9.2 or 9.3.

Section 1.6.          <u>Prepayments; Commitments Reductions and Terminations.</u>

(a) <u>Optional Prepayments</u>.

The Borrower may prepay the Loans in whole or in part (but, (y) if in part, then in an amount not less than $100,000 and (z) in each case, in an amount such that the minimum amount required for a Borrowing pursuant to <u>Section 1.3</u> hereof remains outstanding), without premium or penalty, up to (i) for the months of February, March and April of each year, four (4) times in such month and (ii) for all months other than February, March and April of each year, two (2) times in such month, in the case of (i) and (ii), upon three (3) days (or, in the case of any prepayment of the Loans in connection with any reductions of the Commitments, upon thirty (30) days) irrevocable prior written notice (or such shorter period of time then agreed to by the Lender, in its sole discretion) by the Servicer, as agent for the Borrower, to the Lender, such prepayment to be made by the payment of the principal amount to be prepaid and, in connection with any termination of any Commitments, accrued interest thereon to the date fixed for prepayment.

(b) <u>Mandatory Prepayments</u>.

(i)          If the Borrower shall at any time or from time to time make or agree to make a Disposition (other than sales or other dispositions expressly permitted under Sections 8.10(b)(i), (ii) and (iv) hereof) or shall suffer an Event of Loss, then the Borrower shall promptly (but, in any event, within one (1) Business Day) notify in writing the Lender of such proposed Disposition or Event of Loss (including the amount of the estimated Net Cash Proceeds

-3-

to be received by the Borrower in respect thereof). Promptly (but, in any event, within one (1) Business Day) upon receipt by the Borrower of the Net Cash Proceeds of any Disposition or Event of Loss, the Borrower shall prepay the Obligations in accordance with <u>Section 1.6(b)(vi)</u> hereof in an aggregate amount equal to 100% of the amount of all such Net Cash Proceeds; <u>provided</u> that (A) this subsection shall not require any such prepayment with respect to Net Cash Proceeds received on account of a Disposition or an Event of Loss not exceeding $100,000 for any such Disposition or Event of Loss (or series of related Dispositions or Events of Loss) or $300,000 in the aggregate during the term of this Agreement so long as no Default is in existence at the time such Net Cash Proceeds are received by the Borrower or such Subsidiary, and (B) in the case of any Disposition or Event of Loss not covered by clause (A) above, so long as no Default or Event of Default then exists, if the Borrower states in its notice of such event that the Borrower or the relevant Subsidiary intends to reinvest, within one hundred eighty (180) days of the receipt of the Net Cash Proceeds thereof, in assets that are used or useful in the business of the Borrower and its Subsidiaries, then the Borrower shall not be required to make a mandatory prepayment under this subsection in respect of such Net Cash Proceeds to the extent such Net Cash Proceeds are actually reinvested in such assets within such 180-day period. Promptly (but, in any event, within three (3) Business Days) after the end of such 180-day period, as applicable, to the extent such Net Cash Proceeds have not been so reinvested, the Borrower shall promptly prepay the Obligations in the amount of such Net Cash Proceeds in excess of the $100,000 per event (or related events) basket or $300,000 aggregate basket described above not so reinvested.

(ii) If after the Closing Date, the Borrower or any of its Subsidiaries shall issue new Equity Interests (whether common or preferred Equity Interests or otherwise), the Borrower shall promptly (but, in any event, within one (1) Business Day) notify in writing the Lender of the estimated Net Cash Proceeds of such issuance to be received by or for the account of the Borrower or any of its Subsidiaries in respect thereof. Promptly (but, in any event, within one (1) Business Day) upon receipt by the Borrower or any of its Subsidiaries of Net Cash Proceeds of such issuance of Equity Interests, the Borrower shall prepay the Obligations in accordance with <u>Section 1.6(b)(vi)</u> hereof in an aggregate amount equal to 50% of the amount of such Net Cash Proceeds. The Borrower acknowledges that its performance hereunder shall not limit the rights and remedies of the Lender for any breach of any other terms or covenants of the Loan Documents.

(iii) If, after the Closing Date, the Borrower shall issue any Indebtedness for Borrowed Money, other than Indebtedness for Borrowed Money permitted by <u>Section 8.7</u> hereof, the Borrower shall promptly (but, in any event, within one (1) Business Day) notify in writing the Lender of the estimated Net Cash Proceeds of such issuance to be received by or for the account of the Borrower in respect thereof. Promptly (but, in any event, within one (1) Business Day) upon receipt by the Borrower of Net Cash Proceeds of such issuance, the Borrower shall prepay the Obligations in accordance with <u>Section 1.6(b)(vi)</u> hereof in an aggregate amount equal to 100% of the amount of such Net Cash Proceeds. The Borrower acknowledges that its performance hereunder shall not limit the rights and remedies of the Lender for any breach of <u>Section 8.7</u> hereof or any other terms or covenants of the Loan Documents.

(iv)     If, at any time, (A) the outstanding principal amount of the Loans on such date exceeds (B) the Maximum Revolver Amount, then the Borrower shall immediately prepay the Loans in an aggregate amount equal to the amount of such excess to the Lender.

(v)     If, at any time an Other Event of Default exists and the Lender delivers a notice to the Borrower stating a prepayment in a specific amount is due with respect to reducing the effects of such Other Event of Default, then the Borrower shall immediately prepay the outstanding Loans in the amount set forth on such notice.  It is understood and agreed that any such prepayment will not cure any such Other Event of Default that occurred due to such noncompliance.

(vi)     Prepayments of Obligations under Sections 1.6(b)(i) - (iii) shall be made to the Lender for Borrowings of Loans.  Each prepayment of Loans under this Section 1.6(b) shall be made by the payment of the principal amount to be prepaid.

(vii)     The Borrower shall, on each date the Commitments are reduced pursuant to Section 1.6(d) hereof, prepay to the Lender the Loans by the amount, if any, necessary to reduce the sum of the aggregate principal amount of the Loans then outstanding to the amount to which the Commitments have been so reduced.

(c)     Revolving Nature of Loans.  Any amount of Loans paid or prepaid before the Termination Date may, subject to the terms and conditions of this Agreement, be borrowed, repaid and borrowed again.

(d)     Commitment Reductions or Termination.  The Commitments shall terminate on the Termination Date without further action or notice by the Lender.  The Servicer, acting as agent for the Borrower, shall have the right at any time, upon thirty (30) days prior irrevocable written notice by the Servicer, acting as agent for the Borrower, to the Lender (or such shorter period of time agreed to in writing by the Lender in its sole discretion), to reduce the Commitments without premium or penalty so long as (i) after giving effect to such reduction, the aggregate amount of the Commitments shall not be less than $1,000,000 (unless Commitments are being reduced to $0), (ii) each such reduction is in an amount not less than $500,000 (unless the Commitments are being reduced to $0 and the amount of the Commitments in effect immediately prior to such reduction are less than $500,000), and (iii) the Commitments may not be reduced to an amount less than the sum of the aggregate principal amount of Loans then outstanding.  Any reduction or termination of the Commitments pursuant to this Section 1.6(d) may not be reinstated or increased.

Section 1.7.     Default Rate.

Notwithstanding anything to the contrary contained herein, while any Event of Default has occurred and is continuing or after acceleration of all or any Obligation, the Borrower shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the principal amount of all Loans outstanding at a rate per annum equal to the sum of 5.0% plus the Interest Rate from time to time in effect; provided, however, that in the absence of acceleration or an Event of Default under Section 9.1(j) or 9.1(k) hereof,

any adjustments pursuant to this <u>Section 1.7(a)</u> shall be made at the election of the Lender (and which may apply, at the election of the Lender, retroactively to the date of the occurrence of the first Event of Default existing at such time.

Section 1.8.        <u>Evidence of Indebtedness.</u>

(a) The Lender may maintain an account or accounts evidencing the indebtedness of the Borrower to the Lender resulting from each Loan made by the Lender from time to time, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder; provided that the Lender shall not be liable with respect to any failure to maintain such accounts.

(b) The entries maintained in the accounts maintained pursuant to <u>Section 1.8(a)</u> above shall be conclusive evidence, absent manifest error, of the existence and amounts of the Obligations therein recorded; provided, however, that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Obligations in accordance with the terms under the Loan Documents.

(c) The Lender may request that the Loans be evidenced by a promissory note or notes substantially in the form of Exhibit B (referred to collectively as the "Loan Notes" and individually as a "Loan Note"). In such event, the Borrower shall prepare, execute and deliver to the Lender a Note payable to the Lender or its registered assigns in the amount of the relevant Loan. Thereafter, the Loans evidenced by such Note or Notes and interest thereon shall at all times (including after any assignment pursuant to <u>Section 13.12</u>) be represented by one or more Notes payable to the order of the payee named therein or any assignee pursuant to <u>Section 13.12</u>, except to the extent that the Lender or assignee subsequently returns any such Note for cancellation and requests that such Loans once again be evidenced as described in <u>Section 1.8(a)</u>.

SECTION 2.    <u>MULTI-PARTY CREDIT FACILITY.</u>

Section 2.1.        <u>Borrower Acknowledgments.</u>

(a) The Borrower acknowledges and agrees that the aggregate credit facilities made available under this Agreement are part of a multi-party credit facility having aggregate available loan proceeds to all parties of up to the Commitment. Eligible borrowers pursuant to the credit facilities meet the following criteria: (i) they are engaged in the Business; (ii) they have entered into one or more Servicing Agreement with the Servicer and its Affiliates in form and substance acceptable to the Lender; (iii) they have been accepted by the Lender as a borrower pursuant to the credit facilities; and (iv) they have entered into a credit agreement and other loan documents on terms and conditions substantially similar to the terms and conditions contained in this Agreement and the Loan Documents.

(b) The Borrower further acknowledges and agrees that the Lender has absolute non-reviewable discretion (i) to determine the amount of the aggregate credit facilities of up to the Commitment, if any, to make available at any time to any borrower, including the Borrower, pursuant to the credit facilities and (ii) to accept or reject any request for Loans pursuant to this

-6-

Agreement, including a rejection because any such request exceeds the allocation of the credit facilities determined by the Lender to then be available to the Borrower.

SECTION 3.  PLACE AND APPLICATION OF PAYMENTS.

Section 3.1.  Place and Application of Payments.

(a) Payments with respect to the Loans. All payments of principal of and interest on the Loans and of all other Obligations payable by the Borrower to the Lender under this Agreement and the other Loan Documents, shall be made by the Borrower to the Lender by no later than 1:00 p.m. (New York time) on the due date thereof by wire transfer of immediately available funds pursuant to the wire transfer instructions of the Lender listed on Schedule 3.1(a) or pursuant to such other instructions or directions as the Lender may from time to time designate to the Borrower in writing. Any payments received after such time shall be deemed to have been received by the Lender on the next Business Day. All such payments shall be made in U.S. Dollars, in immediately available funds at the place of payment, in each case without set-off or counterclaim.

(b) Anything contained herein or in any other Loan Document to the contrary notwithstanding (including, without limitation, Section 1.6(b) hereof), all payments and collections received in respect of the Obligations and all proceeds of the Collateral received, in each instance, by the Lender after acceleration or the final maturity of the Obligations or termination of the Commitments as a result of an Event of Default shall be remitted to the Lender and distributed as follows:

(i)  first, to the payment of all costs and expenses (including, without limitation, reasonable attorney's fees) of a character which the Borrower has agreed to pay the Lender under Section 13.15 hereof;

(ii)  second, to the payment of any outstanding interest and fees due on the Loans to the Lender under the Loan Documents;

(iii)  third, to the payment of principal on the Loans;

(iv)  fourth, to the payment of all other unpaid Obligations of the Lender and the other Credit Parties and all other indebtedness, obligations, and liabilities of the Borrower and its Subsidiaries owed to the Lender and the other Credit Parties that are secured by the Liens granted under the Loan Documents to be allocated pro rata in accordance with the aggregate unpaid amounts owing to each Credit Party; and

(v)  finally, to the Borrower or whoever else may be lawfully entitled thereto.

Section 3.2.  Account Debit.

The Borrower hereby authorizes the Lender, and shall use commercially reasonable efforts to assist the Lender, to charge any of the Borrower's deposit accounts

-7-

(other than payroll, tax and trust accounts) maintained with any depository institution for the amounts from time to time necessary to pay (i) principal and interest on the Loans and fees and charges payable to the Lender consisting of the fees and charges owed pursuant to the Loan Documents, and (ii) other outstanding Obligations then due and payable to the extent that the Borrower has been provided with three (3) Business Days' prior notice thereof; provided that the Borrower acknowledges and agrees that the Lender shall not be under an obligation to do so and the Lender shall not incur any liability to the Borrower or any other Person (including, without limitation, any other Loan Party) for the Lender's failure to do so.

SECTION 4.   <u>COLLATERAL</u>.

Section 4.1.    <u>Guaranty.</u>

The payment and performance of the Obligations shall at all times be guaranteed by Holdco, pursuant to <u>Section 12</u> hereof or pursuant to a guaranty agreement in form and substance reasonably acceptable to the Lender, as the same may be amended, restated, supplemented or otherwise modified from time to time (the "Guaranty").

Section 4.2.    <u>Collateral.</u>

The Obligations shall be secured by valid, first-priority (subject only to Liens permitted by <u>Section 8.8</u> hereof which are non-consensual permitted Liens by operation of law, permitted purchase money Liens, or the permitted interests of lessors under Capitalized Lease Obligations), perfected, and enforceable Liens on all right, title, and interest of Borrower in all of its assets, including, without limitation, its accounts, books and records, chattel paper, instruments, documents, general intangibles, letters of credit, letter-of-credit rights, supporting obligations, deposit accounts, investment property, equity securities owned, inventory, equipment, fixtures, commercial tort claims, money, cash equivalents, real estate and certain other Property, whether now owned or hereafter acquired or arising, and all proceeds and products thereof; provided, however, that:   (i) leasehold interests shall be excluded from the Collateral, (ii) Liens shall not be required on any rights or interest in any contract, lease, permit, license, or license agreement covering real or personal property of Borrower or any of its Subsidiaries if under the terms of such contract, lease, permit, license, or license agreement, or applicable law with respect thereto, the grant of a security interest or Lien therein is prohibited as a matter of law or under the terms of such contract, lease, permit, license, or license agreement and such prohibition or restriction has not been waived or the consent of the other party to such contract, lease, permit, license, or license agreement has not been obtained (provided, that, (A) the foregoing exclusions of this clause (ii) shall in no way be construed (1) to apply to the extent that any described prohibition or restriction is ineffective under Section 9-406, 9-407, 9-408, or 9-409 of the UCC or other applicable law, or (2) to apply to the extent that any consent or waiver has been obtained that would permit the Lender's security interest or Lien to attach notwithstanding the prohibition or restriction on the pledge of such contract, lease, permit, license, or license agreement and (B) the foregoing exclusions of clause (ii) shall in no way be construed to limit, impair, or otherwise affect any

-8-

of the Lender's continuing security interests in and Liens upon any rights or interests of Borrower or any of its Subsidiaries in or to (1) monies due or to become due under or in connection with any described contract, lease, permit, license or license agreement (including any accounts), or (2) any proceeds from the sale, license, lease, or other dispositions of any such contract, lease, permit, license or license agreement), (iii) Liens shall not be granted on any Property which is subject to a purchase money Lien or a Capital Lease permitted by the Credit Agreement, but only to the extent that the agreements governing such purchase money Lien or Capital Lease prohibit the granting of other Liens in such Property; provided, however, that such Lien shall attach immediately at such time as the restriction preventing such Lien to exist is removed or waived, and (iv) Liens shall not be granted on any "intent to use" trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable federal law, provided that upon submission and acceptance by the U.S. Patent and Trademark Office of an amendment to allege use pursuant to 15 U.S.C. Section 1060(a) (or any successor provision), such "intent to use" trademark application shall be considered Collateral. The Obligations shall be secured by valid, first priority (subject only to Liens permitted by <u>Section 8.8</u> hereof which are non-consensual permitted Liens by operation of law, permitted purchase money Liens, or the permitted interests of lessors under Capitalized Lease Obligations), perfected, and enforceable Liens on all right, titled and interest in all of the Equity Interests in Borrower that are owned or held by HoldCo. The Borrower acknowledges and agrees that the Liens on the Collateral shall be granted to the Lender and shall be valid and perfected first priority Liens (subject only to Liens permitted by <u>Section 8.8</u> hereof which are non-consensual permitted Liens by operation of law, permitted purchase money Liens, or the permitted interests of lessors under Capitalized Lease Obligations), in each case, pursuant to one or more Collateral Documents from the Borrower, each in form and substance reasonably satisfactory to the Lender.

Section 4.3. <u>Liens on Real Property.</u>

In the event that the Borrower owns or hereafter acquires any fee interest in real property with a fair market value in excess of $100,000, the Borrower shall execute and deliver to the Lender a Mortgage reasonably acceptable in form and substance to the Lender for the purpose of granting to the Lender (or a security trustee therefor) a Lien on such real property to secure the Obligations, shall pay all taxes and reasonable out-of-pocket costs and expenses incurred by the Lender in recording such Mortgage, and shall supply to the Lender at the Borrower's cost and expense a survey, environmental report (if deemed necessary by the Lender in its reasonable judgment), hazard insurance policy, appraisal report, and a mortgagee's policy of title insurance from a title insurer reasonably acceptable to the Lender insuring the validity of such mortgage or deed of trust and its status as a first-priority Lien (subject only to Liens permitted by <u>Section 8.8</u> hereof which are non-consensual permitted Liens by operation of law) on the real property encumbered thereby and such other instruments, documents, certificates, and opinions reasonably required by the Lender in connection therewith. Each Loan party understands that the real property owned by the

-9-

Borrower is trust land owned by the Borrower but held in Trust by the United States Government.

Section 4.4. Further Assurances.

Each Loan Party agrees that it shall, from time to time at the reasonable request of the Lender, execute and deliver such documents and do such acts and things as the Lender may reasonably request in order to provide for or perfect or protect such Liens on the Collateral, subject to the limitation set forth herein and in the Collateral Documents; provided, however, that landlord, sublessor, bailee and similar waivers shall not be required to be delivered, except that the Loan Parties shall use commercially reasonable efforts to obtain a landlord waiver with respect to each Loan Party's chief executive office location, which are currently located at the addresses set forth on Schedule 4.4.

SECTION 5. DEFINITIONS; INTERPRETATION.

Section 5.1. Definitions.

The following terms when used herein shall have the following meanings:

"Acquisition" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person, (b) the acquisition of in excess of 50% of the capital stock, partnership interests, membership interests or other Equity Interests of any Person, or otherwise causing any Person to become a Subsidiary or (c) a merger or consolidation or any other combination with another Person (other than a Person that is the Borrower), provided that the Borrower is the surviving entity.

"Affiliate" means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, another Person. A Person shall be deemed to control another Person for purposes of this definition if such Person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of the other Person, whether through the ownership of voting securities, common directors, trustees or officers, by contract or otherwise; provided that, in any event for purposes of this definition, any Person that owns, directly or indirectly, 10% or more of the securities having the ordinary voting power for the election of directors or governing body of a corporation or 10% or more of the partnership or other ownership interest of any other Person (other than as a limited partner of such other Person) will be deemed to control such corporation or other Person.

"Agreement" means this Credit Agreement, as the same may be amended, modified, restated or supplemented from time to time pursuant to the terms hereof.

"Approved Fund" means any Fund that is administered, advised or managed by (a) the Lender, (b) an Affiliate of the Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages the Lender.

"Arbitration Proceeding" is defined in Section 13.24 hereto

"Assignment and Acceptance" means an assignment and acceptance entered into by the Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 13.12 hereof).

"Authorized Representative" means those Persons who are officers or authorized persons of the Servicer, acting as agent for the Borrower, or HoldCo, as applicable, and shown on the list of officers or authorized persons provided by the Servicer, acting as agent for the Borrower or HoldCo, as applicable, pursuant to Section 7.2 hereof or on any update of any such list provided by the Borrower to the Lender, or any further or different officers or authorized persons of the Borrower or any other Loan Party so named by any Authorized Representative of the Servicer, acting as agent for the Borrower or HoldCo, as applicable, in a written notice delivered by the Servicer, acting as agent for the Borrower, or HoldCo, as applicable, to the Lender, which, in each case, (a) such officers shall be the chief executive officer, president, chief financial officer, any vice-president, treasurer, assistant treasurer, secretary, assistant secretary or managing director of the Servicer or HoldCo, as applicable, and (b) such authorized person shall be authorized by resolution of the board of directors (or comparable governing body) authorizing such person to act on behalf of the Servicer, acting as agent for the Borrower, or HoldCo, as applicable, in form and substance reasonably satisfactory to the Lender, provided however, that the Lender acknowledges that the Servicer shall at no time have the authority to waive the sovereign immunity of the Borrower.

"Bankruptcy Code" means title 11 of the United States Code, as in effect from time to time.

"Borrower" is defined in the introductory paragraph of this Agreement.

"Borrower Balance Sheet Test" means, as of the last day of any fiscal month of the Borrower, the ratio of (a) Total Funded Debt to (b)(i) the Total Good Outstanding Principal *plus* (ii) the sum of (y) unrestricted cash in deposit accounts of the Borrower and (z) cash of the Borrower held by its automated clearing house providers or providers of similar services or debit or credit card services, all as of the last day of such fiscal month, and all determined for the Borrower in accordance with GAAP. For example, if (1) Total Funded Debt was $10,000,000, (2) Total Good Outstanding Principal was $17,000,000, (3) unrestricted cash in deposit accounts of the Borrower was $5,000,000 and (4) cash of the Borrower held by its payment and funding providers was $2,000,000, the Borrower Balance Sheet Test ratio would be $10,000,000 to $24,000,000.

-11-

00980522

"Borrowing" means the total of Loans of a single type advanced under a Credit on a single date. A Borrowing is "advanced" on the day the Lender advances funds comprising such Borrowing to the Borrower, as determined pursuant to Section 1.4 hereof.

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit D hereto (with such changes therein as may be required by Lender to reflect the components of the Total Funded Debt/Three Month Run-Rate Net Income Ratio, the Total Funded Debt/Total Good Outstanding Principal + Cash Ratio and the Borrower Balance Sheet Test) or such other reporting mechanism mutually agreed upon by the Borrower and the Lender (including, without limitation, electronic reports), executed, delivered and certified as true, correct and complete by an Authorized Representative of the Servicer, acting as agent for the Borrower (solely in his or her capacity as an officer or an authorized representative of the Servicer, acting as agent for the Borrower, and not in his or her individual capacity) which shall include appropriate exhibits, schedules, supporting documentation, and additional reports as reasonably requested by the Lender, in each case in form and substance reasonably satisfactory to the Lender.

"Business" means the Consumer Loan business operated from time to time by Borrower or its Subsidiaries (A) operated as "Blue Trust Loans", "Sonicpayday.com", "247Greenstreet.com", "Greenpicket.com", "CashTransfercenters.com", "PRLDirect.com", "Zip19.com", "CashTaxi.com", PayDayAvenue.com" and "Holapayday.com", and (B) any other Borrower business approved and made subject to this Agreement in the sole discretion of Lender.

"Business Day" means any day (other than a Saturday or Sunday) on which banks are not authorized or required to close in San Francisco, California or New York, New York.

"Capital Lease" means any lease of Property which in accordance with GAAP is required to be capitalized on the balance sheet of the lessee.

"Capitalized Lease Obligation" means, for any Person, the amount of the liability shown on the balance sheet of such Person in respect of a Capital Lease determined in accordance with GAAP.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§9601 et seq., and any future amendments.

"Change of Control" means, with respect to the Borrower, any transaction or series of related transactions providing for any of the following (in each case solely to the extent constituting a "Change of Control Event" within the meaning of section 409A(A)(2)(A)(v) of the Code, or any successor provision thereto, and the regulations promulgated thereunder):

-12-

(i)     a consolidation, merger or reorganization of the Borrower with or into any other Person or group of Persons acting in concert, unless a Majority Stake (as defined below) of the entity resulting from such transaction is beneficially owned (as defined in Rule 13d-3 promulgated under the Securities Exchange Act of 1934, as amended) by Persons who (together with their Family Members and Affiliates) beneficially owned a Majority Stake of such Company immediately prior to such transaction;

(ii)     the acquisition of all or substantially all of the assets of the Borrower by any other Person or group of Persons acting in concert, other than by Persons who (together with their Family Members and Affiliates) beneficially owned a Majority Stake of the Borrower immediately prior to such transaction or transactions;

(iii)     the acquisition of beneficial ownership of a Majority Stake of the Borrower or any direct or indirect parent of the Borrower by any other Person or group of Persons acting in concert, other than by Persons who (together with their Family Members and Affiliates) beneficially owned a Majority Stake of the Borrower immediately prior to such transaction or transactions;

(iv)     the Borrower ceases to own, legally and beneficially, 100% of the Equity Interest of any of its Subsidiaries (other than as a result of transactions permitted by Section 8.10 of this Agreement); or

(v)     a "change of control" or any comparable event shall have occurred under, and as defined in any agreement evidencing indebtedness of the Borrower or any of its Subsidiaries (individually or in the aggregate) in excess of $500,000.

"Closing Date" means the date of this Agreement or such later Business Day upon which each condition described in Sections 7.1 and 7.2 shall be satisfied or waived in a manner reasonably acceptable to the Lender.

"Code" means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

"Collateral" means all properties, rights, interests, and privileges from time to time subject to the Liens granted to the Lender, or any security trustee therefor, by the Collateral Documents or any other Loan Document.

"Collateral Documents" means the Mortgages, if any, the Security Agreement, the Pledge Agreement and all other mortgages, deeds of trust, security agreements, pledge agreements, assignments, financing statements and other documents as shall from time to time secure or relate to the Obligations or any part thereof.

"Commitment" means the Lender's commitment to make Loans to the Borrower in U.S. Dollars in an amount not to exceed $20,000,000.

-13-

"Complaining Party" is defined in <u>Section 13.24</u> hereto.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C hereto (with such changes therein as may be required by Lender) or such other reporting mechanism mutually agreed upon by the Borrower and the Lender (including, without limitation, electronic reports), executed, delivered and certified as true, correct and complete by an Authorized Representative of the Servicer, acting as agent for the Borrower (solely in his or her capacity as an officer or an authorized representative of the Servicer, acting as agent for the Borrower, and not in his or her individual capacity) which shall include appropriate exhibits, schedules, supporting documentation, and additional reports as reasonably requested by the Lender, in each case in form and substance reasonably satisfactory to the Lender.

"Consumer Loan" shall mean an online, small amount, short-term, unsecured consumer loan provided by the Borrower through the Business to a consumer.

"Contingent Obligation" means any agreement, undertaking or arrangement by which any Person guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to or otherwise to invest in a debtor, or otherwise to assure a creditor against loss) any indebtedness, obligation or other liability of any other Person (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon the shares of any other Person.  The amount of any Person's obligation in respect of any Contingent Obligation shall (subject to any limitation set forth therein) be deemed to be the stated amount of the debt, obligation or other liability supported thereby or, if such amount is not so stated, the maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith and upon reasonable request demonstrated by the Borrower to the Lender.

"Controlled Group" means all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with the Borrower, are treated as a single employer under Section 414 of the Code.

"Control Investment Affiliate" means as to any Person, any other Person that (a) directly or indirectly, is in control of is controlled by, or is under common control with, such Person and (b) is organized primarily for the purpose of making equity or debt investments in one or more companies. For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Corrective Action" is defined in <u>Section 13.24</u> hereto. "Credit" means the credit facilities for the Loans described in <u>Section 1.1</u> hereof.

"Credit Event" means the advancing of any Loan.

-14-

00980522

"Credit Parties" means the Lender, each beneficiary of each indemnification obligation undertaken by the Borrower under any Loan Document, any other Person to whom Obligations under this Agreement and other Loan Documents are owing and each of their respective successors and assigns, and "Credit Party" means any one or more of them.

"Decider Arbitrator" is defined in Section 13.24(b)(iii) hereto.

"Decisions" is defined in Section 13.24(b)(iii) hereto.

"Default" means any event or condition the occurrence of which would, with the passage of time or the giving of notice, or both, constitute an Event of Default.

"Designated Disbursement Account" means the deposit account of the Borrower identified by the account numbers 638114 and 638197 maintained with Chippewa Valley Bank at the address of 607 Main Street, Bruce, Wisconsin 54819 (or such other deposit account as the Borrower and the Lender may otherwise agree in writing).

"Disposition" means the sale, lease, conveyance or other disposition of Property.

"Dispute" is defined in Section 13.24 hereto.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (i) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, (ii) is redeemable at the option of the holder thereof, in whole or in part, (iii) provides for scheduled mandatory payments or dividends in cash or (iv) is or becomes convertible into or exchangeable for Indebtedness for Borrowed Money or any other Equity Interests that could constitute Disqualified Stock, in the case of each of clauses (i) through (iv) on or prior to the date that is one (1) year after the latest maturity date of any Loan.

"Domestic Subsidiary" means a Subsidiary that is not a Foreign Subsidiary.

"Eligible Assignee" means (a) the Lender, (b) an Affiliate of the Lender, (c) an Approved Fund, and (d) any other Person (other than a natural person), unless a Default or an Event of Default has occurred and is continuing, approved by the Borrower (each such approval in clause (d) of this definition not to be unreasonably withheld, delayed or conditioned); provided that notwithstanding the foregoing, "Eligible Assignee" shall not include any Loan Party or any Affiliate of a Loan Party (other than the Lender and its Affiliates).

"Eligible Consumer Loan" shall mean any Consumer Loan other than a Consumer Loan which (i) the Borrower has Re-Issued for a second time following the date on which a Loan Party receives (or should have received) an NSF Notice with respect to such

-15-

Consumer Loan, (ii) any Person has defaulted in payment of principal, (iii) has been sent for collection, or (iv) has been written off by a Loan Party.

"Environmental Claim" means any investigation, notice, violation, demand, allegation, action, suit, injunction, judgment, order, consent decree, penalty, fine, lien, proceeding or claim (whether administrative, judicial or private in nature) arising (a) pursuant to, or in connection with an actual or alleged violation of, any Environmental Law, (b) in connection with any Hazardous Material, (c) from any abatement, removal, remedial, corrective or response action in connection with a Hazardous Material, Environmental Law or order of a Governmental Authority or (d) from any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"Environmental Law" means any current or future Legal Requirement pertaining to (a) the protection of health, safety and the indoor or outdoor environment, (b) the conservation, management or use of natural resources and wildlife, (c) the protection or use of surface water or groundwater, (d) the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation or handling of, or exposure to, any Hazardous Material or (e) pollution (including any Release to air, land, surface water or groundwater), and any amendment, rule, regulation, order or directive issued thereunder.

"Equity Interest" means, with respect to a Person, all of the shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in such Person, whether voting or nonvoting, including capital stock (or other ownership or profit interests or units), preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the United States of America Securities and Exchange Commission under the Securities Exchange Act of 1934, as in effect from time to time).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, or any successor statute thereto.

"Event of Default" means (a) any Other Event of Default or (b) any event or condition identified as such in Section 9.1 hereof.

"Event of Loss" means, with respect to any Property, any of the following: (a) any loss, destruction or damage of such Property or (b) any condemnation, seizure, or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property.

"Excess Interest" is defined in Section 13.21 hereof.

"Excluded Accounts" is defined in Section 8.25 hereof.

"Excluded Securities" is defined in Section 1.6(b)(ii) hereof.

00980522

"Excluded Taxes" means, with respect to any recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder, (a) net income or franchise taxes imposed on (or measured by) such recipient's net income by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of the Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which such recipient is located (other than a location solely arising for tax purposes as a result of entering the Loan Documents, receiving payments under the Loan Documents or enforcing rights under the Loan Documents), and (c) any taxes imposed on amounts payable by the Borrower under Sections 1471 through 1474 of the Code and regulations promulgated thereunder ("FATCA").

"FATCA" is defined in the definition of "Excluded Taxes".

"Foreign Subsidiary" means each Subsidiary which is organized under the laws of a jurisdiction other than the United States of America or any state thereof or the District of Columbia.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination.

"Governmental Authority" means any federal, state, Tribal, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Guarantor" is defined in the introductory paragraph of this Agreement.

"Guaranty" is defined in Section 4.1 hereof.

"Hazardous Material" means any substance, chemical, compound, product, solid, gas, liquid, waste, byproduct, pollutant, contaminant or material, in each case, which is hazardous or toxic, which is classified or regulated as "hazardous" or "toxic" or words of similar meaning and regulatory effect pursuant to an Environmental Law.

-17-

"Hazardous Material Activity" means any activity, event or occurrence involving a Hazardous Material, including, without limitation, the manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation, handling of or corrective or response action to any Hazardous Material.

"Indebtedness for Borrowed Money" means for any Person (without duplication), (a) all indebtedness created, assumed or incurred in any manner by such Person representing money borrowed (including by the issuance of debt securities), (b) all indebtedness for the deferred purchase price of property or services due more than six (6) months after the date such obligations arise (including, without limitation, all earn-out obligations; the amount of Indebtedness for Borrowed Money with respect to any earn-out obligations or similar deferred payment obligation shall be the reasonably anticipated potential amount of such earn-out obligations or similar deferred payment obligation), other than (i) trade accounts payable and other accrued expenses arising in the ordinary course of business, and (ii) amounts owing in respect of employee benefits, (iii) amounts owing in respect of deferred compensation, (c) all indebtedness secured by any Lien upon Property of such Person, whether or not such Person has assumed or become liable for the payment of such indebtedness, (d) all Capitalized Lease Obligations of such Person, (e) all obligations of such Person on or with respect to letters of credit, bankers' acceptances and other extensions of credit whether or not representing obligations for borrowed money, (f) all liability in respect of any interest rate, foreign currency, and/or commodity swap, exchange, cap, collar, floor, forward, future or option agreement, or any other similar interest rate, currency or commodity hedging arrangement (including, without limitation, any Swap Contract) of such Person, (g) all obligations of such Person under any synthetic lease transaction, where such obligations are considered borrowed money indebtedness for tax purposes but the transaction is classified as an operating lease in accordance with GAAP and (h) all Contingent Obligations of such Person in respect of indebtedness or obligations of others of the kinds referred to in the other clauses of this definition. The amount of Indebtedness for Borrowed Money of any Person at any date shall be without duplication (i) in the case of Indebtedness for Borrowed Money in which the holder of such Indebtedness for Borrowed Money has contractually agreed to limit its repayment to a particular asset or assets, the lesser of the fair market value of such asset or assets as of such date and the aggregate principal amount of such Indebtedness for Borrowed Money and (ii) in the case of Indebtedness for Borrowed Money of others secured by a Lien to which the property or assets owned or held by such Person is subject, the lesser of fair market value at such date of any asset subject to a Lien securing the Indebtedness for Borrowed Money of others and the amount of the Indebtedness for Borrowed Money secured. Notwithstanding any changes in GAAP, operating leases shall not be construed as Indebtedness for Borrowed Money at any time under this Agreement or any other Loan Document.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal

-18-

moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Intellectual Property" has the meaning specified in the Security Agreement.

"Intercreditor Agreement" means that certain Intercreditor Agreement dated as of the date of this Agreement among the Borrower, the Lender and Red Stone Investment, LLC, as the same may be amended, modified, supplemented or restated from time to time.

"Interest Payment Date" means the last day of each calendar month (or, if the last day of such calendar month is not a Business Day, then the last Business Day of such calendar month) and on the maturity date.

"Interest Rate" means 15.00% per annum, which is to be paid, in cash, as set forth in Section 1.2 hereof.

"IP Acquisition" investments consisting of the purchase of source code, Intellectual Property and other intangibles, in a transaction that is not an Acquisition.

"Judicial Proceeding" is defined in Section 13.19(b) hereto.

"Legal Requirement" means any treaty, convention, statute, law, regulation, ordinance, license, permit, governmental approval, injunction, judgment, order, consent decree or other requirement of any Governmental Authority with jurisdiction over the parties, whether federal, state, Tribal, foreign or local.

"Lender" is defined in the introductory paragraph of this Agreement.

"Lien" means any mortgage, lien, security interest, pledge, charge or encumbrance of any kind in respect of any Property, including the interests of a vendor or lessor under any conditional sale, Capital Lease or other title retention arrangement.

"Loans" is defined in Section 1.1(a) hereof.

"Loan Documents" means this Agreement, the Notes (if any), the Collateral Documents, the Guaranty, the Intercreditor Agreement (except with respect to Section 13.13) and each other instrument, agreement or document executed and delivered by any Loan Party or any other Person hereunder or thereunder or otherwise in connection herewith or therewith.

"Majority Stake" means, with respect to the Borrower, ownership interests representing more than 50% of the fair market value and voting power of the then-outstanding equity ownership interests of the Borrower (or, if applicable, of the resulting entity in a consolidation, merger or reorganization of the Borrower).

"Maximum Rate" is defined in Section 13.21(d) hereof.

00980522

"Material Adverse Effect" means (a) a material adverse change in, or material adverse effect upon, the operations, business, Property or financial condition of each Loan Party and its Subsidiaries taken as a whole, (b) a material impairment of the ability of any Loan Party and its Subsidiaries taken as a whole to perform its material obligations under any Loan Document or (c) a material adverse effect upon (i) the legality, validity, binding effect or enforceability against any Loan Party or any of its Subsidiaries of any Loan Document or the rights and remedies of the Lender hereunder and thereunder or (ii) the perfection or priority of any Lien on a material portion of the Collateral granted under any Collateral Document.

"Material Contract" means, with respect to any Person, each contract to which such Person is a party involving aggregate consideration payable to or by such Person of $500,000 or more in any fiscal year of the Borrower or otherwise material to the business, condition (financial or otherwise), operations, performance, properties or prospects of such Person.

"Material Indebtedness" means (a) Indebtedness for Borrowed Money (other than the Obligations) of the Loan Parties or their Subsidiaries in an aggregate principal amount exceeding $50,000 and (b) any indebtedness (including, without limitation, Indebtedness for Borrowed Money) owed by Borrower or its Subsidiaries to Red Stone Investment, LLC or its Affiliates. For purposes of determining the amount of Material Indebtedness at any time, (a) the amount of the obligations in respect of any Swap Contract at such time shall be calculated at the Swap Termination Value thereof, (b) undrawn committed or available amounts shall be included, and (c) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included.

"Maximum Revolver Amount" means $20,000,000, decreased by the amount of reductions in the Commitments made in accordance with Section 1.6(d) of this Agreement, and further subject to Section 2 of this Agreement.

"Moody's" means Moody's Investors Service, Inc.

"Mortgages" means, collectively, any mortgages or deeds of trust delivered to the Lender pursuant to Section 4.3 hereof, if any, as the same may be amended, modified, supplemented or restated from time to time.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which a member of the Controlled Group is obligated to contribute.

"Net Cash Proceeds" means, as applicable, (a) with respect to any Disposition by a Person, cash and cash equivalent proceeds received by or for such Person's account, net of (i) reasonable direct costs relating to such Disposition, (ii) sale, use or other transactional taxes paid or payable by such Person as a direct result of such Disposition, (iii) amounts required to be applied to the repayment of Indebtedness for Borrowed Money or other

-20-

liabilities secured by a Lien on the asset or that were the subject of such Dispositions, and (iv) until released to any Loan Party or any of its Subsidiaries, all amounts that are set aside as a reserve (1) for adjustments in respect of the sale price of such assets and (2) in accordance with GAAP against any liabilities associated with such Disposition, (b) with respect to any Event of Loss of a Person, cash and cash equivalent proceeds received by or for such Person's account (whether as a result of payments made under any applicable insurance policy therefor or in connection with condemnation proceedings or otherwise), net of (i) reasonable direct costs incurred in connection with the collection of such proceeds, awards or other payments and (ii) taxes paid or payable by such Person as a direct result of such Disposition, and (c) with respect to any offering of Equity Interests of a Person or the issuance of any Indebtedness for Borrowed Money by a Person, cash and cash equivalent proceeds received by or for such Person's account, net of reasonable legal, underwriting, and other fees and expenses incurred as a direct result thereof.

"Net Income" means, with reference to any period, net income (or net loss) for such period, determined for the Business on a consolidated basis and in accordance with GAAP; provided that there shall be excluded from Net Income, (a) the net income (or net loss) of any Person accrued prior to the date it becomes a Subsidiary of, or has merged into or consolidated with, the Borrower or another Subsidiary of the Borrower, and (b) the net income (or net loss) of any Person (other than a Subsidiary) in which the Borrower or any of its Subsidiaries has an equity interest in, except to the extent, (i) with respect to any such net income, of the amount of dividends or other distributions actually paid to the Borrower or any of its Subsidiaries during such period and (ii) with respect to any such net loss, of the amount used by the Borrower or any of its Subsidiaries to fund such Person during such period

"Note" and "Notes" each is respectively defined in Section 1.8(c) hereof.

"Notice of Dispute" is defined in Section 13.24 hereto.

"Notice of Intent to Arbitrate" is defined in Section 13.24(b)(i) hereto.

"NSF Notice" shall mean a notification received by a Loan Party from its Automated Clearing House service provider that funds could not be transferred to a deposit account of a Loan Party from the deposit account of a Consumer Loan customer of such Loan Party for any reason including, without limitation, there being insufficient funds in such customer's deposit account to effectuate such automated funds transfer.

"Obligations" means all obligations of the Loan Parties and their Affiliates to pay principal and interest on the Loans (including, without limitation, the Existing Loans), all fees and charges payable hereunder, and all other payment obligations of any Loan Party or any of its Affiliates arising under or in relation to any Loan Document, in each case whether now existing or hereafter arising, due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired (including, without limitation, any

00980522

fees or expenses that accrue after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in such Insolvency Proceeding).

"OFAC" means the United States Department of Treasury Office of Foreign Assets Control.

"OFAC Event" means the event specified in Section 8.15 hereof.

"OFAC Sanctions Programs" means all laws, regulations, and Executive Orders administered by OFAC, including without limitation, the Bank Secrecy Act, anti-money laundering laws (including, without limitation, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56 (a/k/a the USA Patriot Act)), and all economic and trade sanction programs administered by OFAC, any and all similar United States federal laws, regulations or Executive Orders, and any similar laws, regulators or orders adopted by any State within the United States.

"OFAC SDN List" means the list of the Specially Designated Nationals and Blocked Persons maintained by OFAC.

"Other Event of Default" has the meaning specified for "Credit Agreement Default" in the Related Agreement.

"Patriot Act" is defined in Section 6.29 hereof.

"PBGC" means the Pension Benefit Guaranty Corporation or any Person succeeding to any or all of its functions under ERISA.

"Person" means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization or any other entity or organization, including a government or agency or political subdivision thereof.

"Plan" means any employee pension benefit plan covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code, other than a Multiemployer Plan, that is maintained by a member of the Controlled Group for employees of a member of the Controlled Group.

"Pledge Agreement" means that certain Pledge Agreement dated as of the date of this Agreement, by and among the Loan Parties and the Lender, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Pre-Approved Arbitrator" is defined in Section 13.24(b)(i) hereto.

-22-

"Premises" means the real property owned or leased by the Borrower or any of its Subsidiaries, including without limitation the real property and improvements thereon owned by the Borrower or any of its Subsidiaries subject to the Lien of the Mortgages, if any, or any other Collateral Documents.

"Property" means, as to any Person, all types of real, personal, tangible, intangible or mixed property owned by such Person whether or not included in the most recent balance sheet of such Person and its Subsidiaries under GAAP.

"RCRA" means the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§6901 et seq., and any future amendments.

"Re-Issued" shall mean, with respect to any Consumer Loan, that the outstanding principal balance of such Consumer Loan shall have been re-advanced to a Consumer Loan customer of the Borrower, thereby repaying the otherwise outstanding principal balance of the original underlying Consumer Loan, whether or not a fee is collected by the Borrower from the underlying Consumer Loan customer in connection with such readvance.

"Related Agreement" means any agreement to which the Servicer and/or its Affiliates and the Lender are a party, as in effect on the date hereof, and which references this Agreement and which contains certain agreements and provisions related to this Agreement. Each party to this Agreement understands the agreement which the term "Related Agreement" refers to and acknowledges that the Lender would not have entered into this Agreement or the other Loan Documents without the agreements and provisions set forth in the Related Agreement applying to, and being enforceable under, this Agreement and the other Loan Documents.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migration, dumping, or disposing into the indoor or outdoor environment, including, without limitation, the abandonment or discarding of barrels, drums, containers, tanks or other receptacles containing or previously containing any Hazardous Material.

"Responding Party" is defined in Section 13.24 hereto.

"Response" is defined in Section 13.24(b)(ii) hereto.

"Restricted Payment" is defined in Section 8.12 hereof.

"RP Conditions" means, at the time of determination with respect to any specified Restricted Payment, that (a) no Default or Event of Default then exists or would immediately arise, at such time, as a result of the making of such Restricted Payment, (b) no default or event of default shall exist under any Servicing Agreement, (c) the RP Condition is

-23-

satisfied under the Related Agreement; and (d) the Borrower has delivered to Lender a certificate, in form and substance reasonably satisfactory to Lender, demonstrating compliance with the conditions contained in clauses (a), (b) and (c) of this definition.

"S&P" means Standard & Poor's Ratings Services Group, a division of The McGraw-Hill Companies, Inc.

"Security Agreement" means that certain Security Agreement dated as of the date of this Agreement by and between the Borrower and the Lender, as the same may be amended, modified, supplemented or restated from time to time.

"Servicing Agreement" shall mean one or more agreements to which the Servicer and/or its Affiliates or Lender approved third parties and the Borrower are a party and pursuant to which the Servicer and its Affiliates or Lender approved third parties provide consulting, risk management, analytics and other services related to the Business to the Borrower, as the same may be amended, modified, supplemented or restated from time to time.

"Servicer" means Cane Bay Partners VI, LLLP.

"Subordinated Debt" means Indebtedness for Borrowed Money which is subordinated in right of payment to the prior payment of the Obligations pursuant to subordination provisions reasonably satisfactory to the Lender and is otherwise pursuant to documentation that is, which is in an amount that is, and which contains interest rates, payment terms, maturities, amortization schedules, covenants, defaults, remedies and other material terms that are in form and substance, in each case reasonably satisfactory to the Lender.

"Subsidiary" means, as to any particular parent corporation or organization, any other corporation or organization more than 50% of the outstanding Voting Stock of which is at the time directly or indirectly owned by such parent corporation or organization or by any one or more other entities which are themselves subsidiaries of such parent corporation or organization. Unless otherwise expressly noted herein, the term "Subsidiary" means a Subsidiary of a Loan Party or of any of its direct or indirect Subsidiaries. Notwithstanding anything to the contrary, no Loan Party shall not be deemed to be a Subsidiary of any Person that is a Lender as of the Closing Date.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing),

-24-

whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts.

"Termination Date" means November 30, 2015, or such earlier date on which all of the Commitments are terminated in whole pursuant to Section 1.6(d), 9.2 or 9.3 hereof, or such later date on which the Commitments are extended pursuant to Section 1.5 hereof.

"Time Limit" is defined in Section 13.24 hereto.

"Total Funded Debt" means, at any time the same is to be determined, the sum (but without duplication) of (a) all Indebtedness for Borrowed Money of the Borrower at such time, and (b) all Indebtedness for Borrowed Money of any other Person which is directly or indirectly guaranteed by the Borrower or which the Borrower has agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which the Borrower has otherwise assured a creditor against loss, all determined for the Borrower in accordance with GAAP.

"Total Funded Debt/Total Good Outstanding Principal + Cash Ratio" means, as of the last day of any fiscal month of the Borrower, the ratio of (a) Total Funded Debt of the last day of such fiscal month to (b)(i) the Total Good Outstanding Principal *plus* (ii) the sum of (y) unrestricted cash in deposit accounts of the Borrower and (z) cash of the Borrower held by its automated clearing house providers or providers of similar services or debit or credit card services, all as of the last day of such fiscal month, and all determined for the Borrower on a consolidated basis and in accordance with GAAP. For example, if (1) Total Funded Debt was $10,000,000, (2) Total Good Outstanding Principal was $17,000,000, (3) unrestricted cash in deposit accounts of the Borrower was $5,000,000 and (4) cash of the Borrower held by its payment and funding providers was $2,000,000, the ratio of Total Funded Debt to Total Good Outstanding Principal + Cash would be $10,000,000 to $24,000,000.

-25-

"Total Funded Debt/Three Month Run-Rate Net Income Ratio" means, as of the last day of any fiscal month of the Borrower, the ratio of (a) Total Funded Debt as of the last day of such fiscal month to (b) the result of (i) the aggregate Net Income for the most recent three fiscal months of the Borrower then ended *multiplied by* (ii) 4, all determined for the Borrower on a consolidated basis and in accordance with GAAP. For example, if (x) Total Funded Debt was $10,000,000, and (y) the aggregate Net Income for the most recent three fiscal months was $12,000,000, the ratio of Total Funded Debt to Three Month Run-Rate Net Income would be $10,000,000 to $48,000,000.

"Total Good Outstanding Principal" means Eligible Consumer Loans provided by the Borrower to consumers that are not past due, not categorized as non-sufficient funds, not charged off and the charge attempts on which have been successful; net of any allowances.

"Tribe" means the Lac Courte Oreilles Band of Lake Superior Chippewa Indians.

"UCC" means the New York Uniform Commercial Code, as in effect from time to time, and such equivalent Tribal law.

"Unfunded Vested Liabilities" means, for any Plan at any time, the amount (if any) by which the present value of all vested non-forfeitable accrued benefits under such Plan exceeds the fair market value of all Plan assets allocable to such benefits, all determined as of the then most recent valuation date for such Plan, but only to the extent that such excess represents a potential liability of a member of the Controlled Group to the PBGC or the Plan under Title IV of ERISA.

"U.S. Dollars" and "$" each means the lawful currency of the United States of America.

"Voting Stock" of any Person means Equity Interests of any class or classes (however designated) having ordinary power for the election of directors or other similar governing body of such Person, other than Equity Interests having such power only by reason of the happening of a contingency.

"Welfare Plan" means a "welfare plan" as defined in Section 3(1) of ERISA.

Section 5.2.    Interpretation.

The foregoing definitions are equally applicable to both the singular and plural forms of the terms defined. The words "hereof", "herein", and "hereunder" and words of like import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning

-26-

represented by the phrase "and/or". The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties. Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). All references to time of day herein are references to Hayward, Wisconsin time unless otherwise specifically provided. Where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purposes of this Agreement, it shall be done in accordance with GAAP except where such principles are inconsistent with the specific provisions of this Agreement. Notwithstanding anything to the contrary contained herein, all financial statements delivered hereunder shall be prepared, and all financial covenants contained herein shall be calculated, without giving effect to any election under the Statement of Financial Accounting Standards No. 159 (or any similar accounting principle) permitted a Person to value its financial liabilities or indebtedness at the fair value thereof. Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

Section 5.3.      Change in Accounting Principles.

If, after the date of this Agreement, there shall occur any change in GAAP from those used in the preparation of the financial statements referred to in this Agreement and such change shall result in a change in the method of calculation of any financial covenant or related definition found in this Agreement, either the Borrower or the Lender may by notice to the Lender and the Borrower, respectively, require that the Lender and the Borrower negotiate in good faith to amend such covenants, standards, and terms so as to equitably reflect such change in accounting principles, with the desired result being that the criteria for evaluating the financial condition of the Persons assessed under such financial covenants or related definitions shall be the same as if such change had not been made. No delay by the Borrower or the Lender in requiring such negotiation shall limit their right to so require such a negotiation at any time after such a change in accounting principles. Until any such covenant or related definition is amended in accordance with this Section 5.3, financial covenants shall be computed and determined in accordance with GAAP in effect prior to such change in accounting principles. Without limiting the generality of the foregoing, the Borrower shall neither be deemed to be in compliance with any financial covenant nor out of compliance with any financial covenant if such state of compliance or noncompliance, as the case may be, would not exist but for the occurrence of a change in GAAP after the date hereof.

-27-

SECTION 6.    REPRESENTATIONS AND WARRANTIES.

        The Loan Parties hereby represent and warrant to the Lender, as follows:

        Section 6.1.        Organization and Qualification.

        Each Loan Party is duly organized, validly existing and in good standing under the laws of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians.  Each Loan Party has full and adequate power to own its material Property and conduct its business as now conducted, and is duly licensed or qualified and in good standing with the Tribal Consumer Financial Services Regulatory Authority.

        Section 6.2.        The Borrower and Subsidiaries.

        The Borrower does not have any Subsidiaries or own any Equity Interest in any other Person, and the Borrower has not ever consolidated or merged with any Person or acquired any Equity Interests or all or substantially all of the assets of any Person.  Schedule 6.2 hereto identifies, as of the Closing Date, each Loan Party, the jurisdiction of its organization, the percentage of issued and outstanding shares of each class of its Equity Interests owned by another Loan Party and, if such percentage is not 100% (excluding directors' qualifying shares as required by law), a description of each class of its authorized Equity Interests and the number of shares of each class issued and outstanding.  As of the Closing Date, all of the outstanding shares of Equity Interests of each Loan Party owned by another Loan Party are validly issued and outstanding and fully paid and nonassessable and, as of the Closing Date, all such shares and other Equity Interests indicated on Schedule 6.2 as owned by a Loan Party are owned, beneficially and of record, by such Loan Party free and clear of all Liens other than the Liens granted in favor of the Lender pursuant to the Collateral Documents.  As of the Closing Date, except as set forth on Schedule 6.2, there are no outstanding material commitments or other obligations of the Borrower to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of Equity Interests of the Borrower.

        Section 6.3.        Authority and Validity of Obligations.

        The Borrower has full right and authority to enter into this Agreement and the other Loan Documents executed by it, to make the borrowings herein provided for, to grant to the Lender the Liens described in the Collateral Documents executed by the Borrower, and to perform all of its obligations hereunder and under the other Loan Documents executed by it.  Guarantor has full right and authority to enter into the Loan Documents executed by it, to guarantee the Obligations, to grant the Lender the Liens described in the Collateral Documents executed by such Guarantor, and to perform all of its obligations under the Loan Documents executed by it.  The Loan Documents delivered by each Loan Party have been duly authorized, executed, and delivered by such Persons and constitute valid and binding obligations of such Loan Party enforceable against them in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or

-28-

similar laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at law); and this Agreement and the other Loan Documents do not, nor does the performance or observance by any Loan Party of any of the matters and things herein or therein provided for, (a) contravene or constitute a default under any provision of law or any judgment, injunction, order or decree binding upon any Loan Party where such default, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, or any provision of the organizational documents (e.g., charter, certificate or articles of incorporation and by-laws, certificate or articles of association and operating agreement, partnership agreement, or other similar organizational documents) of any Loan Party, (b) constitute a default under any covenant, indenture or agreement of or affecting any Loan Party or any of their Property, in each case where such default, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, or (c) result in the creation or imposition of any Lien on any Property of any Loan Party other than the Liens granted in favor of the Lender pursuant to the Collateral Documents or Liens permitted under Section 8.8 hereof.

Section 6.4.      Use of Proceeds; Margin Stock.

The Borrower shall use the proceeds of the Loans for its general working capital needs and for other general corporate purposes.  None of Loan Parties is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System), and no part of the proceeds of any Loan or any other extension of credit made hereunder will be used (a) to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock or (b) for primarily personal, family or household purposes.  Margin stock (as hereinabove defined) constitutes 0% of the assets of the Loan Parties and their Subsidiaries which are subject to any limitation on sale, pledge or other restriction hereunder.

Section 6.5.      Financial Reports.

The unaudited balance sheet of the Borrower as at the day immediately prior to the Closing Date, heretofore furnished to the Lender, fairly present in all material respects the financial condition of the Borrower as at said dates and the results of its operations for the periods then ended in conformity with GAAP (except for the absence of footnotes and year-end adjustments in the case of unaudited balance sheets) applied on a consistent basis, it being acknowledged by the Lender that the Borrower is a newly formed entity with no material operations prior to the Closing Date.  As of the Closing Date, the Borrower has no contingent liabilities which are material to it and which are required in accordance with GAAP to be disclosed in the Closing Date balance sheet other than as indicated on such balance sheet or, with respect to future periods, on the balance sheet furnished pursuant to Section 8.5 hereof.

-29-

Section 6.6.       No Material Adverse Change.

Since the date the Borrower was formed, there has been no change in the financial condition or business prospects of the Borrower except those occurring in the ordinary course of business, none of which individually or in the aggregate would reasonably be expected to have a Material Adverse Effect.

Section 6.7.       Full Disclosure.

The statements and information (other than projections or other forward looking statements) furnished to the Lender in connection with the negotiation of this Agreement and the other Loan Documents and the commitments by the Lender to provide all or part of the financing contemplated hereby do not, taken as a whole, contain any untrue statements of a material fact or omit a material fact necessary to make the material statements contained herein or therein, taken as a whole, not misleading in any material respect at such time in light of the circumstances when made, the Lender acknowledging that (i) as to any projections furnished to the Lender, the Loan Parties and their Subsidiaries only represent that the same were prepared on the basis of information and estimates the Loan Parties and their Affiliates believed to be reasonable at the time made, (ii) such projections are subject to significant uncertainties and contingences, which may be beyond the control of the Loan Parties and their Affiliates, and (iii) no assurance is given by the Loan Parties or any of their Affiliates that the results forecast in any such projections will be realized and the actual results may differ from the forecast results set forth in such projections and such differences may be material.

Section 6.8.       Trademarks and Licenses.

The Loan Parties own, possess, or have the right to use, except as would not reasonably be expected to have a Material Adverse Effect, all necessary patents, licenses, franchises, trademarks, trade names, trade styles, copyrights, trade secrets, know how, and confidential commercial and proprietary information to conduct their businesses as now conducted, without known conflict with any patent, intellectual property license, trademark, trade name, trade style, copyright or other proprietary right of any other Person.

Section 6.9.       Governmental Authority and Licensing.

Except as set forth on Schedule 6.9, the Loan Parties have received all licenses, permits, and approvals of all federal, state, Tribal and local governmental authorities, if any, necessary to conduct their businesses, in each case where the failure to obtain or maintain the same would reasonably be expected to have a Material Adverse Effect; provided that the items set forth on Schedule 6.9 shall only be applicable to the representations and warranties set forth in this sentence that are being made on the Closing Date and only as the circumstances appear on and as of the Closing Date but shall not apply with respect to such representations and warranties set forth in this sentence that are made after the Closing Date.  No investigation or proceeding which, if adversely determined,

-30-

would reasonably be expected to result in revocation or denial of any material license, permit or approval which would reasonably be expected to have a Material Adverse Effect, is pending or, to the knowledge of the Loan Parties, threatened.

Section 6.10.    Good Title.

The Loan Parties have good and defensible title (or valid leasehold interests) to their assets (except for sales permitted under Section 8.10), subject to no Liens other than such thereof as are permitted by Section 8.8 hereof.  The Collateral is and will be valid and genuine in all respects. All accounts arise out of legally enforceable and existing contracts in accordance with their tenor, and no part of the Collateral (or the validity or enforceability by the Lender thereof) is or shall be contingent upon the fulfillment of any agreement or condition whatsoever and the Eligible Consumer Loans shall represent unconditional and undisputed bona fide indebtedness by the customers of the Loan Parties, and is not and will not be subject to any discount (except such cash or trade discount as may be shown on any invoice, contract or other writing delivered to the Lender). The Loan Parties will warrant and defend the Lender's right to and interest in the Collateral against all Liens, claims and demands of all Persons whatsoever, subject to the Intercreditor Agreement.

Section 6.11.    Litigation and Other Controversies.

There is no litigation or governmental or arbitration proceeding or labor controversy pending, nor, to the knowledge of the Loan Parties, threatened, against the Loan Parties or any of their Property which if adversely determined, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

Section 6.12.    Taxes.

All federal and all other tax returns involving taxes in excess of $50,000 required to be filed by the Borrower in any jurisdiction have, in fact, been filed (or request for extensions have been timely filed), and all taxes, assessments, fees, and other governmental charges upon the Loan Parties or upon any of their Property, income or franchises, which are shown to be due and payable in such returns and any material taxes otherwise owing, have been paid, except such taxes, assessments, fees and governmental charges, if any, as are being contested in good faith and by appropriate proceedings and as to which adequate reserves established in accordance with GAAP have been provided.  The Loan Parties do not know of any additional tax assessment against the Loan Parties for which adequate provisions in accordance with GAAP have not been made on their accounts. Adequate provisions in accordance with GAAP for taxes on the books of the Loan Parties have been made for all open years, and for its current fiscal period.

Section 6.13.    Approvals.

No material authorization, consent, license or exemption from, or filing or registration with, any court or governmental department, agency or instrumentality, nor any

-31-

approval or consent of any other Person, is or will be necessary for the valid execution, delivery or performance by the Loan Parties of any Loan Document, except for such approvals which have been obtained prior to the date of this Agreement and remain in full force and effect and filings made under the Loan Documents.

Section 6.14.  Affiliate Transactions.

Except as set forth on Schedule 6.14 or as permitted by Section 8.16, none of the Loan Parties is a party to any contracts or agreements with any of its Affiliates on terms and conditions which are less favorable to such Loan Party than would be usual and customary in similar contracts or agreements between Persons not affiliated with each other.

Section 6.15.  Investment Company.

None of the Loan Parties is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Section 6.16.  ERISA.

Except as would not reasonably be expected to result in a Material Adverse Effect, each Loan Party, and, to the knowledge of each Loan Party, each other member of the Controlled Group has fulfilled its obligations under the minimum funding standards of and is in compliance in all material respects with ERISA and the Code to the extent applicable to it with respect to any Plan or Multiemployer Plan, and has not incurred any liability to the PBGC or a Plan or a Multiemployer Plan under Title IV of ERISA other than a liability to the PBGC for premiums under Section 4007 of ERISA. None of the Loan Parties nor any of their Subsidiaries has any contingent liabilities with respect to any post-retirement benefits under a Welfare Plan, other than liability for continuation coverage described in Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code, that would reasonably be expected to result in a Material Adverse Effect.

Section 6.17.  Compliance with Laws.

(a) Except as set forth on Schedule 6.17, each of the Loan Parties are in compliance with the requirements of all applicable federal, state, Tribal and local laws, rules and regulations applicable to or pertaining to their Property or business operations (including, without limitation, the Occupational Safety and Health Act of 1970 and the Americans with Disabilities Act of 1990), where any such non-compliance, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect; provided that the items set forth on Schedule 6.17 shall only be applicable to the representations and warranties set forth in this sentence that are being made on the Closing Date and only as the circumstances appear on and as of the Closing Date but shall not apply with respect to such representations and warranties set forth in this sentence that are made after the Closing Date.

-32-

(b) Without limiting the representations and warranties set forth in Section 6.17(a) above, except for such matters, that individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, each of the Loan Parties represents and warrants that: (i) the Loan Parties and each of the Premises, comply in all material respects with all applicable Environmental Laws; (ii) the Loan Parties have obtained all governmental approvals required for their operations and each of the Premises by any applicable Environmental Law; (iii) the Loan Parties have not, and the Loan Parties have no knowledge of any other Person who has, caused any Release, threatened Release or disposal of any Hazardous Material at, on, about, or off any of the Premises in any material quantity and, to the knowledge of the Loan Parties, none of the Premises are adversely affected by any Release, threatened Release or disposal of a Hazardous Material originating or emanating from any other property; (iv) none of the Premises contain and have contained any:   (1) underground storage tank, (2) material amounts of asbestos containing building material, (3) landfills or dumps, (4) hazardous waste management facility as defined pursuant to RCRA or any comparable state law, or (5) site on or nominated for the National Priority List promulgated pursuant to CERCLA or any state remedial priority list promulgated or published pursuant to any comparable state law; (v) the Loan Parties have not used or Released a material quantity of any Hazardous Material and have conducted no Hazardous Material Activity at any of the Premises; (vi) the Loan Parties have no material liability for response or corrective action, natural resource damage or other harm pursuant to CERCLA, RCRA or any comparable state law; (vii) the Loan Parties are not subject to, have no notice or knowledge of and are not required to give any notice of any Environmental Claim involving the Loan Parties or any of the Premises, and there are no conditions or occurrences at any of the Premises which would reasonably be anticipated to form the basis for an Environmental Claim against the Loan Parties or the Premises; (viii) none of the Premises are subject to any, and the Loan Parties have no knowledge of any imminent restriction on the ownership, occupancy, use or transferability of the Premises in connection with any (1) Environmental Law or (2) Release, threatened Release or disposal of a Hazardous Material; (ix) there are no conditions or circumstances at any of the Premises which pose an unreasonable risk to the environment or the health or safety of any Person; and (x) the Loan Parties have not received notice to the effect that its operations are not in compliance with any of the requirements of applicable Environmental Law or is the subject of any governmental investigation evaluating whether any remedial action is needed to respond to a Release of any Hazardous Material into the environment.

Section 6.18.    OFAC.

(a) Each of the Loan Parties and each of their Subsidiaries are in compliance with the requirements of all OFAC Sanctions Programs applicable to it, (b) the Loan Parties have provided to the Lender all material information regarding the Loan Parties and their Affiliates and Subsidiaries requested by them and necessary for the Lender to comply with all applicable OFAC Sanctions Programs, and (c) to the best of the Loan Parties' knowledge, none of the Loan Parties nor any of their Affiliates or Subsidiaries is, as of the date hereof, named on the current OFAC SDN List.

-33-

Section 6.19.    Other Agreements.

None of the Loan Parties is in default under the terms of any covenant, indenture or agreement of or affecting such Person or any of its Property, which default if uncured would reasonably be expected to have a Material Adverse Effect.

Section 6.20.    Solvency.

The Loan Parties, on a consolidated basis, are solvent on a going concern basis, able to pay its debts as they become due in the ordinary course of business, and have sufficient capital to carry on their business and all businesses in which they are about to engage.

Section 6.21.    No Default.

No Default or Event of Default has occurred and is continuing.

Section 6.22.    No Broker Fees.

Except as set forth on Schedule 6.22, no broker's or finder's fee or commission will be payable with respect hereto or any of the transactions contemplated hereby to be consummated on the Closing Date.

Section 6.23.    Holdco.

HoldCo does not conduct any business (other than incident to its status as a holding company for the Borrower or related to the management of its investment in the Borrower), own any material assets (other than its ownership in the Borrower, cash and cash equivalents, notes of officers, directors and employees, and all other assets incident to its ownership of the Equity Interests of the Borrower or related to the management of its investment in the Borrower) or have material liabilities (other than as set forth in the Loan Documents, obligations under the Acquisition Documents, audit, legal and other advisor expenses, guaranties of payment under employment agreements of its officers or officers of the Borrower and other ordinary liabilities related to management of its investment in the Borrower).

Section 6.24.    Labor Matters.

As of the Closing Date, except as would not individually, or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) there are no strikes or other labor disputes pending or, to each Loan Party's knowledge, threatened against the Loan Parties, and (ii) hours worked and payments made to the employees of the Loan Parties have not been in violation of applicable provisions of the Fair Labor Standards Act or any other applicable law dealing with such matters.  Except as would not reasonably be expected to have a Material Adverse Effect, all payments due from the Loan Parties, or for which any claim that may be made against any of them, on account of wages and employee and retiree health and welfare insurance and other benefits have been paid or accrued as a liability on

-34-

their books, as the case may be, except for any unpaid amounts which are being contested in good faith by appropriate proceedings diligently conducted and for which appropriate reserves have been taken in accordance with GAAP.

Section 6.25.    Insurance.

The Loan Parties and their Properties are insured with financially sound and reputable insurance companies which are not Affiliates of any Loan Party, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties operate. A true and complete listing of such insurance as of the Closing Date, including issuers, coverages and deductibles, is set forth on Schedule 6.25.

Section 6.26.    Entity Records.

Each Loan Party's organizational documents (e.g., charter, certificate or articles of incorporation and by-laws, certificate or articles of association and operating agreement, partnership agreement, or other similar organizational documents) and all amendments thereto have been duly filed (to the extent required by law) and are in proper order. All outstanding ownership evidence issued by any Loan Party was and is properly issued and all books and records of the Loan Parties, including but not limited to its minute books, organizational documents, and books of account, are accurate and up to date and will be so maintained.

Section 6.27.    Accounts and Contract Rights.

All accounts arise out of legally enforceable and existing contracts, and represent unconditional and undisputed bona fide indebtedness by a customer of a Loan Party, and are not and will not be subject to any discount. No contract right, account, general intangible or chattel paper is or will be represented by any note or other instrument.

-35-

Section 6.28.     Third Parties.

The Lender shall not be deemed to have assumed any liability or responsibility to any Loan Party or any other Person for the correctness, validity or genuineness of any instruments or documents that may be released or endorsed to the Loan Parties by the Lender (which shall automatically be deemed to be without recourse to the Lender in any event) or for the existence, character, quantity, quality, condition, value or delivery of any goods purporting to be represented by any such documents; and the Lender, by accepting a security interest in the Collateral, or by releasing any Collateral to the Loan Parties, shall not be deemed to have assumed any obligation or liability to any supplier or customer of the Loan Parties or to any other Person, and the Loan Parties agree to indemnify and defend the Lender and hold it harmless in respect to any claim or proceeding arising out of any matter referred to in this paragraph.

Section 6.29.     Patriot Act.

To the extent applicable, each Loan Party is in compliance, in all material respects, with the (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001) (the "Patriot Act"). No part of the proceeds of the loans made hereunder will be used by any Loan Party or any of their Affiliates, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

SECTION 7.   CONDITIONS PRECEDENT.

Section 7.1.     All Credit Events Conditions Precedent.  Prior or concurrently with the making of each Credit Event hereunder, each of the following conditions shall have been satisfied (pursuant to documentation in form and substance reasonably satisfactory to the Lender) or waived in writing by the Lender:

(a) each of the representations and warranties set forth herein and in the other Loan Documents and any related documents thereto shall be and remain true and correct in all material respects (but without duplication of any existing materiality qualifiers) as of said time, except to the extent the same expressly relate to an earlier date (in which case they shall be true and correct in all material respects (but without duplication of any existing materiality qualifiers)as of such earlier date);

(b) no Default or Event of Default shall have occurred and be continuing or would occur immediately thereafter as a result of such Credit Event;

-36-

(c) the Lender shall have received the notice required by <u>Section 1.4</u> hereof;

(d) such Credit Event shall not violate any order, judgment or decree of any court or other authority or any provision of law or regulation applicable to the Lender (including, without limitation, Regulation U of the Board of Governors of the Federal Reserve System) as then in effect;

(e) the request for such Loan pursuant to the notice delivered in accordance with <u>Section 1.4</u> hereof shall be for an amount not to exceed $1,000,000 except for the initial request for a Loan on the date of this Agreement, which shall be for an amount as may be agreed between the Lender and the Borrower;

(f) the written notice delivered in accordance with <u>Section 1.4</u> for such request of the Loan shall have been delivered to the Lender at least twenty (20) days in advance of the making of such Loan;

(g) the requested date for the making of such Loan shall be the first Tuesday of the calendar month (or if not a Business Day, the next Business Day thereafter);

(h) the Lender shall have received a certificate, in form and substance reasonably satisfactory to the Lender, from an Authorized Representative of the Borrower certifying that as of the date such Loan is to be made (i) the Total Funded Debt/Three Month Run-Rate Net Income Ratio shall not exceed 1.0:1.0, (ii) the Total Funded Debt/Total Good Outstanding Principal + Cash Ratio shall be less than 1.0:1.0, and (iii) the Borrower Balance Sheet Test shall be less than 1.0:1.0, in each case, calculated on a pro forma basis after giving effect to the making of such Loan;

(i) each Servicing Agreement shall remain in full force and effect to the satisfaction of the Lender and no default or event of default shall then exist thereunder;

(j) after giving effect to such Loan, the aggregate outstanding amount of Loans does not exceed the Maximum Revolver Amount; and

(k) the applicable conditions set forth in <u>Section 1</u> of this Agreement have been satisfied.

Section 7.2. <u>Closing Date Conditions Precedent</u>. In addition to the conditions set forth in Section 7.1 hereof (to the extent any Loans are being made on the Closing Date), prior to or concurrently with this Agreement becoming effective and being enforceable and in full force on the Closing Date, each of the following conditions shall have been satisfied or waived in writing by the Lender:

(a) the Lender shall have received the following, each in form and substance reasonably satisfactory to the Lender:

(i) this Agreement duly executed by each of the Loan Parties and the Lender;

-37-

(ii)    copies of each Loan Party's articles of incorporation and bylaws (or comparable organizational documents) and any amendments thereto, certified in each instance by its secretary or assistant secretary (or if such Loan Party does not have a secretary or assistant secretary, such other Authorized Representative);

(iii)    copies of resolutions of each Loan Party's board of directors (or similar governing body) authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby, together with specimen signatures of the persons authorized to execute such documents on such Loan Party's behalf, all certified in each instance by its secretary or assistant secretary (or if such Loan Party does not have a secretary or assistant secretary, such other Authorized Representative);

(iv)    copies of the certificates of good standing for each Loan Party from the office of the secretary of (i) the state (or comparable office) of its incorporation or organization (dated no earlier than fifteen (15) days prior to the date hereof) and (ii) each state in which it is qualified to do business as a foreign corporation or organization and where the failure to so qualify could reasonably be expected to result in a Material Adverse Effect (dated no earlier than thirty (30) days prior to the date hereof);

(v)    each Servicing Agreement, duly executed by the Borrower and the Servicer;

(vi)    the Intercreditor Agreement, duly executed by the Borrower,  Red Stone Investment, LLC and the Lender; and

(vii)    a list of the Authorized Representatives of the Servicer, in its capacity as agent for the Borrower;

(b) if requested by the Lender, the Lender shall have received duly executed Notes of the Borrower dated the date hereof and otherwise in compliance with the provisions of Section 1.8 hereof, in form and substance reasonably satisfactory to the Lender;

(c) the Lender shall have received (which shall each be in form and substance reasonably satisfactory to the Lender) the Security Agreement and the Pledge Agreement duly executed by the Loan Parties and the Lender, together with (i) the delivery to the Lender of original "certificated securities" (as defined in Article 8 of the UCC) for all the Equity Interest of the Persons being pledged under the Security Agreement and/or Pledge Agreement whose Equity Interests constitute "securities" under Article 8 of the UCC as of the Closing Date and (ii) delivery to the Lender of corresponding, undated Equity Interest powers each executed in blank and duly executed by the applicable Loan Parties;

(d) the Lender shall have received evidence of insurance required to be maintained under Section 8.4 of this Agreement, naming the Lender as mortgagee and lender's loss payee with respect to property insurance and business interruption insurance and additional

insured with respect to all other insurance, in form and substance reasonably satisfactory to the Lender;

(e) the Loan Parties shall have paid to the Lender all reasonable fees and invoiced expenses (including reasonable attorney's fees) payable by the Loan Parties pursuant to the terms of the Loan Documents to the Lender as of the Closing Date;

(f) the Lender shall have received financing statement, tax, suit and judgment lien search results against the Property of the each Loan Party evidencing the absence of Liens on its Property except as permitted by Section 8.8 hereof or as such results are otherwise reasonably acceptable to the Lender;

(g) the Lender shall have received payoff and Lien release letters from secured creditors of each Loan Party that is not permitted to remain outstanding after the Closing Date pursuant to Sections 8.8 and 8.9 hereof setting forth, among other things, the total amount of indebtedness outstanding and owing to them (or outstanding letters of credit issued for the account of any Loan Party) and containing an undertaking to cause to be delivered to the Lender Uniform Commercial Code termination statements and any other Lien release instruments or agreements necessary to release their Liens on the assets of each Loan Party, which payoff and Lien release letters shall be in form and substance reasonably acceptable to the Lender;

(h) the Lender shall have received the favorable written opinion of counsel to each Loan Party (including, without limitation, from local counsel and tribal counsel to the Loan Parties to the extent reasonably requested by the Lender), in form and substance reasonably satisfactory to the Lender;

(i) the Lender shall have received a fully executed Internal Revenue Service Form W-9 for each Loan Party;

(j) [intentionally omitted];

(k) [intentionally omitted];

(l) there shall be no injunction, temporary restraining order or other legal action in effect that would prohibit or materially adversely affect this Agreement;

(m) the Lender shall have received a certificate of an Authorized Representative of the Borrower certifying to the solvency of the Borrower on a consolidated basis and as a going concern, after giving effect to the transactions contemplated to occur on the Closing Date hereunder (including, without limitation, the making of any Loans hereunder);

(n) automatic debit of the Borrower's deposit accounts authorization form with each depository institution where the Borrower's deposit accounts are maintained duly executed by each party thereto and each in form and substance reasonably satisfactory to the Lender;

(o) [intentionally omitted]; and

-39-

      (p) the Lender shall have received a copy of the consolidated operating budget for the 2014 fiscal year, such operating budget to show projected consolidated revenues, expenses and balance sheet on a month-by-month basis, such operating budget to be in reasonable detail prepared by the Borrower and in form and substance reasonably satisfactory to the Lender (which shall include a summary of all assumptions made in preparing such operating budget).

      Section 7.3.    <u>Representations and Warranties Regarding the Conditions.</u> Each request for a Borrowing hereunder submitted by the Borrower shall be deemed to be a representation and warranty by all the Loan Parties that all applicable conditions specified in this Section 7 have been satisfied in full on and as of the date of the making of the applicable Borrowing.

## SECTION 8.  <u>COVENANTS</u>.

      Each Loan Party agrees that, so long as any credit is available to or in use by the Borrower hereunder or all of the Commitments have not been terminated or any of the Obligations remain unsatisfied or due and payable, except to the extent compliance in any case or cases is waived in writing pursuant to the terms of <u>Section 13.13</u> hereof:

      Section 8.1.    <u>Maintenance of Business.</u>

      Each Loan Party shall preserve and maintain its existence, except as otherwise expressly permitted by <u>Section 8.10</u> hereof.  Each Loan Party shall preserve and keep in force and effect all licenses, permits, franchises, approvals, patents, trademarks, trade names, trade styles, copyrights, and other proprietary rights necessary to the proper conduct of its business where the failure to do so would reasonably be expected to have a Material Adverse Effect.

      Section 8.2.    <u>Maintenance of Properties.</u>

      Each Loan Party shall maintain, preserve, and keep its property, plant, and equipment in good repair, working order and condition (ordinary wear and tear, casualty and condemnation excepted), except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

      Section 8.3.    <u>Taxes and Assessments.</u>

      Each Loan Party shall duly pay all applicable real and personal property taxes, assessments and charges and all franchise, income, unemployment, old age benefits, withholding, sales and other taxes assessed against it or payable by it before delinquent and before penalties accrue thereon, unless and to the extent that the same are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves are provided therefor.  The Lender may, at its option, from time to time, discharge any taxes resulting in a Lien or encumbrance on the Collateral, or other charges resulting in Liens or other encumbrances on any of the Collateral, and the

-40-

Borrower will pay to the Lender on demand or the Lender in its sole discretion may charge to the Borrower all amounts so paid or incurred by it.

Section 8.4.    Insurance.

Each Loan Party shall insure and keep insured with good and responsible insurance companies, all insurable Property owned by it which is of a character usually insured by Persons similarly situated and operating like Properties against loss or damage from such hazards and risks, and in such amounts, as are insured by Persons similarly situated and operating like Properties; and each Loan Party shall insure such other hazards and risks (including, without limitation, business interruption, employers' and public liability risks) with good and responsible insurance companies as and to the extent usually insured by Persons similarly situated and conducting similar businesses.  The Borrower shall, upon the reasonable request of the Lender, furnish to the Lender a certificate setting forth in summary form the nature and extent of the insurance maintained pursuant to this Section.

To the extent applicable, all property insurance policies covering the Collateral are to be made payable to the Lender, as its interests may appear, in case of loss, pursuant to a standard loss payable endorsement with a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as the Lender may reasonably require to fully protect the Lender's interest in the Collateral and to any payments to be made under such policies.   To the extent applicable, all certificates of property and general liability insurance are to be delivered to the Lender, with the loss payable (but only in respect of Collateral) and additional insured endorsements in favor of the Lender and shall provide for not less than 30 days (10 days in the case of non-payment) prior written notice to the Lender of the exercise of any right of cancellation or any amendment thereto.  The Loan Parties shall give the Lender prompt written notice of any loss exceeding $100,000 covered by the Loan Parties' casualty or business interruption insurance.   Upon the occurrence and during the continuance of an Event of Default, the Lender shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

In the event that the Loan Parties fail to provide evidence reasonably satisfactory to the Lender of the insurance required pursuant to this Section 8.4, the Lender may, at is option, secure such insurance and charge the cost thereof to the Loan Parties.

Section 8.5.    Financial and Collateral Reports; Other Notices.

Each Loan Party shall maintain a standard system of accounting in accordance with GAAP and shall furnish to the Lender and each of their duly authorized agents or representatives such information respecting the business and financial condition of each

-41-

Loan Party as the Lender may reasonably request; and without any request, shall furnish to the Lender:

(a) promptly after receipt thereof, a copy of any notice of any noncompliance with any material applicable law, regulation or guideline relating to any Loan Party, or its business;

(b) within five (5) Business Days after knowledge thereof shall have come to the attention of any officer of any Loan Party, written notice of (i) any threatened in writing or pending litigation or governmental or arbitration proceeding or labor controversy against any Loan Party or any of their Property which, if adversely determined, would reasonably be expected to have a Material Adverse Effect or in which the amount in controversy exceeds $100,000, (ii) the occurrence of any Default or Event of Default hereunder known to any Loan Party, or (iii) the occurrence of any other event that would reasonably be expected to have a Material Adverse Effect;

(c) promptly upon entering into any such agreement or document or upon receipt thereof, copies of all agreements and documents evidencing Material Indebtedness;

(d) promptly (but in any event within two (2) Business Days) after knowledge thereof shall have come to the attention of any officer of any Loan Party or after any notice is received, notice of any breach or non-performance of, any default under, or termination of Material Indebtedness of any Loan Party, and to the extent any documentation is provided in connection therewith, copies of such documents;

(e) prior to or at the time of any entering into such agreements or documents, notice of any amendment, supplement, modification, waiver or consent to any agreement or document related to Material Indebtedness and any notice or other correspondence received from or delivered to any party to the agreements or documents related to Material Indebtedness and related documentation and, in each instance, copies thereof;

(f) within five (5) Business Days after knowledge thereof shall have come to the attention of any officer of any Loan Party, the filing of any Lien for unpaid taxes against any Loan Party;

(g) immediate written notification of any loss or damage to, or material diminution in or any occurrence that would adversely affect the value of inventory, equipment or other Collateral;

(h) promptly and in no event later than two (2) Business Days after obtaining knowledge thereof, written notification that written information, exhibit, or report furnished to the Lender contained, at the time it was furnished, an untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made. The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such

-42-

notification have the effect of amending or modifying this Agreement, the Loan Documents or any of the schedules hereto or thereto;

(i)  within thirty (30) days after the end of each monthly accounting period in each fiscal year other than December, which shall be forty-five (45) days, unaudited balance sheets of the Borrower as of the end of such monthly period prepared in a manner consistent with the Borrower's past practice and in accordance with GAAP (subject to the absence of footnote disclosures and year-end audit adjustments) and certified by Servicer on behalf of the Borrower as an Authorized Representative of the Borrower (solely in his or her capacity as an officer or authorized representative of the Borrower and not in his or her individual capacity), in each case, in form and substance reasonably satisfactory to the Lender, and fairly reflecting the financial condition and results of operations of the Borrower, in all material respects;

(j)  on the fifteenth (15) day of each fiscal month of the Borrower (or, if such day is not a Business Day, on the next succeeding Business Day), a Borrowing Base Certificate showing (i) the Total Good Outstanding Principal, (ii) the Total Funded Debt/Three Month Run-Rate Net Income Ratio, (iii) the Total Funded Debt/Total Good Outstanding Principal + Cash Ratio, in each of (i), (ii) and (iii), as of the close of business as of the last day of the immediately preceding fiscal month of Borrower and (iv) the Borrower Balance Sheet Test, in each case, as of the close of business as of the last day of the immediately preceding fiscal month of the Borrower, each Borrowing Base Certificate to be certified as true, complete and correct by the Servicer on behalf of the Borrower as an Authorized Representative of the Borrower (solely in his or her capacity as an officer or authorized representative of the Borrower and not in his or her individual capacity), in form and substance reasonably satisfactory to the Lender;

(k)  within one hundred twenty (120) days after the end of each fiscal year, audited consolidated statements of income or operations, equityholders' equity (or the equivalent) and cash flows of the Borrower and its Subsidiaries for such fiscal year, and audited consolidated balance sheets of the Borrower and its Subsidiaries as of the end of such fiscal year, all prepared in accordance with the Borrower's past practice, and accompanied by (x) a copy of the accounting firm's annual management letter to the Borrower and its Subsidiaries, and (y) an opinion of the accounting firm without any "going concern" or like qualification or exception as to the scope of such audit (provided that it shall not be a violation of this clause (y) if the report and opinion accompanying the financial statements for the fiscal year ending immediately prior to the stated final maturity date of the Loans is subject to a "going concern" or other qualification solely as a result of the maturity date of the Loans being scheduled to occur within twelve months from the date of such audit and opinion), to the effect that the consolidated financial statements have been prepared and present fairly, in all material respects, in accordance with GAAP, the consolidated financial condition of the Borrower and its Subsidiaries as of the close of such fiscal year and the results of their operations and cash flows for the fiscal year then ended and that an examination of such accounts in connection with such financial statements has been made in accordance with generally accepted auditing standards and, accordingly, such examination included such tests of the accounting records and such other auditing procedures as were considered necessary in the circumstances;

(l) promptly (but in any event within five (5) business days) after the discovery or receipt of notice of any default under any material agreement to which the Borrower or any of its Subsidiaries is a party, any condition or event that is reasonably likely to result in any material liability under any foreign, federal, state, Tribal or local statute or under any regulation relating to public health and safety, worker health and safety or pollution or protection of the environment or any other material adverse change, event or circumstance affecting the Borrower or any of its Subsidiaries (including, without limitation, the filing of any material litigation against the Borrower or any of its Subsidiaries or the existence of any dispute with any Person which involves a reasonable likelihood of such litigation being commenced) written notice specifying the nature and period of the existence thereof and what actions the Borrower and its Subsidiaries have taken and propose to take with respect thereto;

(m) with each of the financial statements delivered pursuant to this <u>Section 8.5</u>, and, to the extent that the computations would differ from those contained in the similar certificate delivered with the monthly financial statements for the last fiscal month of any fiscal year, with the financial statements delivered pursuant to <u>Section 8.5(k)</u> above, a Compliance Certificate signed by the chief financial officer, general partner, manager, other authorized officer or Servicer of the Borrower (in each case, solely in his or her capacity as an officer of such Persons and not in his or her individual capacity) to the effect that to the best of such officer's knowledge and belief no Default or Event of Default has occurred during the period covered by such statements or, if any such Default or Event of Default has occurred during such period, setting forth a description of such Default or Event of Default and specifying the action, if any, taken by the Borrower or any of the Borrower's Subsidiaries to remedy the same; and

(n) prior to the date of such change, written notification of any material change in accounting policies or financial reporting practices by the Borrower.

Section 8.6.     <u>Inspections; Commercial Finance Examinations; Appraisals.</u>

(a) Each Loan Party shall permit the Lender, and each of its duly authorized representatives and agents to visit and inspect any of its Property, corporate books, and financial records, to examine and make copies of its books of accounts and other financial records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers, employees, authorized representatives and independent public accountants, so long as the Borrower is notified of and permitted to be present at any such discussions with such accountants (and by this provision the Loan Parties hereby authorize such accountants to discuss with the Lender the finances and affairs of the Loan Parties and their Affiliates) upon reasonable prior notice at such reasonable times and intervals as the Lender may designate, in each case with respect to the foregoing, (i) prior to the existence of a Default or an Event of Default, at the reasonable expense of the Loan Parties for up to two (2) appraisals per calendar year, and thereafter at the sole expense of the Lender, and (ii) upon the existence of a Default or an Event of Default, at the reasonable expense of the Loan Parties.  When an Event of Default exists, the Lender (or any of its representatives or independent contractors) may do any of the foregoing at the reasonable out-of-pocket expense of the Loan Parties at any time during normal business hours and without advance notice.

(b) Upon the request of the Lender, in each case, after reasonable prior notice, permit the Lender or professionals (including appraisers) retained by the Lender to conduct appraisals of the Collateral (subject to the expense limitations below). The Loan Parties shall pay the fees and expenses of the Lender and such professionals with respect to such appraisals that occur after the existence of a Default or an Event of Default. Without limiting the foregoing, the Loan Parties acknowledge that the Lender may, in its discretion, undertake or cause appraisals to be undertaken (i) as it, in its discretion, deems necessary or appropriate, with the first two (2) appraisals per calendar year at the reasonable expense of the Loan Parties, and thereafter at the Lender's own expense or, (ii) if required by law or if a Default or Event of Default shall have occurred and be continuing, at the expense of the Loan Parties.

(c) The Loan Parties shall, during the term of this Agreement, keep the Lender currently and accurately informed in writing of each location where the Loan Parties' records relating to their accounts and contract rights are kept, and shall not remove such records to another location without giving the Lender at least thirty (30) days prior written notice thereof.

Section 8.7.    Borrowings and Guaranties.

No Loan Party shall issue any evidence of Indebtedness for Borrowed Money, any Disqualified Stock, or create, assume, incur, have outstanding, guarantee, become contingently liable for, or suffer to exist, Indebtedness for Borrowed Money, except for (a) the Obligations, (b) Indebtedness for Borrowed Money incurred or arising in the ordinary course of business, Capitalized Lease Obligations and purchase money indebtedness of the Borrower in an aggregate amount, when combined with all other Indebtedness for Borrowed Money under this clause (c), not to exceed $100,000, (d) unsecured Indebtedness for Borrowed Money of the Borrower owing to any of its Affiliates in an aggregate amount not to exceed $500,000; and (e) Indebtedness for Borrowed Money owing to Red Stone Investment, LLC, provided that the Intercreditor Agreement shall be in full force and effect at all times that any such Indebtedness for Borrowed Money shall remain outstanding.

Section 8.8.    Liens.

No Loan Party shall grant, incur, create or permit to exist any security interest in, Lien on, or mortgage of, any of the Collateral, other than (a) Liens granted under the Loan Documents in favor of the Lender, (b) the mortgages, deeds of trust and security interests as set forth on Schedule 8.8, all of which shall be subordinated to the Lien granted to the Lender herein pursuant to the terms of the Intercreditor Agreement, and (c) the leases of personal property as set forth on Schedule 8.8, if any.

Section 8.9.    Investments, Acquisitions, Loans and Advances.

No Loan Party shall, (a) directly or indirectly, make, retain or have outstanding any investments in, or loans or advances to, any Person other than the making of online, short-term and unsecured Consumer Loans in the ordinary course of business consistent with past practices in an amount not to exceed $2,000 in principal (excluding any

-45-

interest or fees thereon) outstanding at any one time to any Person and their Affiliates in the aggregate, (b) make an Acquisition or an IP Acquisition, or (c) purchase or otherwise invest in or hold Equity Interests, real estate or other assets or purchase all or substantially all the assets of any Person, other than, in each case, (y) those set forth on Schedule 8.9 and (z) those approved by the Lender in writing.

Section 8.10.    Mergers, Consolidations and Sales.

(a) No Loan Party shall (i) merge or consolidate or be merged or consolidated with or into any other Person or (ii) dissolve or liquidate, other than, in each case, the Lender is paid in full for all Obligations in connection with such action.

(b) No Loan Party shall  sell, lease, transfer or otherwise dispose of any of the Collateral (including, without limitation, any Equity Interests in Subsidiaries that is Collateral), except (i) the sale, license or lease of inventory and the sale or other disposition of cash or cash equivalents, in each case, in the ordinary course of business, (ii) the sale, forgiveness or discount of delinquent notes or accounts receivable in the ordinary course of business for purposes of collection or compromise only (and not for the purpose of any bulk sale or securitization transaction), (iii) if the Lender is paid in full for all Obligations, (iv) except for the purpose of replacing machinery, equipment or other personal property which, as a consequence of wear, duplication or obsolescence, is no longer used or necessary in such Loan Party's business, provided that fair market value consideration is received therefor; provided, however, in no event shall the Borrower sell, lease or otherwise dispose of any equipment purchased with the proceeds of any Loans or other extensions of credit made by the Lender unless such transaction is commercially reasonable and is made at arm's length to an unaffiliated third Person, (v) the monthly payments made pursuant to the Servicing Agreement (provided that no Event of Default then exists) and (vi) as expressly permitted by Section 8.9(a).

Section 8.11.    Notice of Account Debtors.

Each Loan Party agrees, upon the occurrence and during the continuance of an Event of Default, at the request of the Lender, to notify all or any of its Consumer Loan customers in writing of the Lender's Lien in the Collateral in whatever manner the Lender requests and, hereby authorizes the Lender to notify all or any of its Consumer Loan customers of the Lender's Liens in such Loan Party's accounts at the Loan Party's reasonable expense.

Section 8.12.    Dividends and Certain Other Restricted Payments.

The Borrower shall not (a) declare or pay any dividends on or make any other distributions in respect of any class or series of its Equity Interests (other than dividends or distributions payable solely in its Equity Interests), (b) directly or indirectly purchase, redeem, or otherwise acquire or retire any of its Equity Interests or any warrants, options, or similar instruments to acquire the same, or (c) directly or indirectly pay management fees or consulting fees or directors' fees to its Affiliates or to executive officers of any Loan Party or any of its Subsidiaries (collectively, clauses (a) – (c) referred to herein as "Restricted Payments");

-46-

provided, however, that this Section shall not apply to or operate to prevent the payment of dividends or distributions to the sole member of the Borrower on a monthly basis in an amount not in excess of the net amount retained by the Borrower after payment of all fees and any interest and principal payments under this Agreement or any other debt obligations of the Borrower to Red Stone Investment, LLC, in each case, as may have been approved in writing by the Lender.

Section 8.13.    ERISA.

Each Loan Party shall, and shall cause each of its Subsidiaries to, promptly pay and discharge when due all obligations and liabilities arising under ERISA of a character which if unpaid or unperformed would reasonably be expected to result in the imposition of a Lien against any of the Collateral. Each Loan Party shall promptly notify the Lender of: (a) the occurrence of any reportable event (as defined in ERISA) with respect to which a reporting obligation is not waived under regulations in effect as of the date hereof), with respect to a Plan or a Multiemployer Plan which has resulted or would reasonably be expected to result in a Material Adverse Effect, (b) receipt of any notice from the PBGC of its intention to seek termination of any Plan or appointment of a trustee therefor, (c) its filing of a notice of intent to terminate any Plan or its withdrawal from any Multiemployer Plan, which, in any case, has resulted or would be reasonably expected to result in a material liability to any Loan Party and (d) the occurrence of any event with respect to any Plan or Multiemployer Plan which would reasonably be expected to result in the incurrence by any Loan Party of any material liability, fine or penalty, or any material increase in the contingent liability of any Loan Party with respect to any post-retirement Welfare Plan benefit.

Section 8.14.    Compliance with Laws.

(a) Each Loan Party shall, and shall cause each of its Subsidiaries to, comply in all respects with the requirements of all applicable federal, state, Tribal and local laws, rules, regulations, ordinances and orders applicable to or pertaining to its Property or business operations, where any such non-compliance, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect or result in a Lien upon any of its Property.

(b) Without limiting the agreements set forth in Section 8.14(a) above, each Loan Party shall, at all times, do the following to the extent the failure to do so, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect:  (i) comply in all material respects with, and maintain each of the Premises in compliance in all material respects with, all applicable Environmental Laws; (ii) require that each tenant and subtenant, if any, of any of the Premises or any part thereof comply in all material respects with all applicable Environmental Laws; (iii) obtain and maintain in full force and effect all material governmental approvals required by any applicable Environmental Law for operations at each of the Premises; (iv) cure any material violation by it or at any of the Premises of applicable Environmental Laws; (v) not allow the presence or operation at any of the Premises of any (1) landfill or dump or (2) hazardous waste management facility or solid waste disposal facility as defined pursuant to

RCRA or any comparable state law; (vi) not manufacture, use, generate, transport, treat, store, release, dispose or handle any Hazardous Material at any of the Premises except in the ordinary course of its business; (vii) within ten (10) Business Days notify the Lender in writing of and provide any reasonably requested documents upon learning of any of the following in connection with each Loan Party or any of the Premises: (1) any liability for response or corrective action, natural resource damage or other harm pursuant to CERCLA, RCRA or any comparable state law; (2) any Environmental Claim; (3) any violation of an Environmental Law or Release, threatened Release or disposal of a Hazardous Material; (4) any restriction on the ownership, occupancy, use or transferability of the Premises arising pursuant to any (x) Release, threatened Release or disposal of a Hazardous Material or (y) Environmental Law; or (5) any environmental, natural resource, health or safety condition which, in each case described in clauses (l) through (5) above, would reasonably be expected to have a Material Adverse Effect; (viii) conduct at its expense any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any material Release, threatened Release or disposal of a Hazardous Material as required by any applicable Environmental Law; (ix) abide by and observe any restrictions on the use of the Premises imposed by any Governmental Authority as set forth in a deed or other instrument affecting each Loan Party's interest therein; (x) promptly provide or otherwise make available to the Lender any reasonably requested environmental record concerning a material environmental matter at the Premises which any Loan Party possesses; and (xi) perform, satisfy, and implement any operation or maintenance actions required by any Governmental Authority or Environmental Law, or included in any no further action letter or covenant not to sue issued by any Governmental Authority under any Environmental Law.

Section 8.15.     Compliance with OFAC Sanctions Programs.

(a) Each Loan Party shall, at all times, comply with the requirements of all OFAC Sanctions Programs applicable to each Loan Party and each of its Subsidiaries.

(b) Each Loan Party shall provide the Lender any information reasonably requested by such Persons regarding each Loan Party, its Affiliates, and its Subsidiaries necessary for the Lender to comply with all applicable OFAC Sanctions Programs; subject however, in the case of Affiliates, to the Loan Parties' ability to provide information applicable to them.

(c) If any Loan Party obtains actual knowledge or receives any written notice that any of the Loan Parties, any of their Affiliates or any of their Subsidiaries is named on the then current OFAC SDN List (such occurrence, an "OFAC Event"), such Loan Party shall promptly (i) give written notice to the Lender of such OFAC Event, and (ii) comply with all applicable laws with respect to such OFAC Event (regardless of whether the party included on the OFAC SDN List is located within the jurisdiction of the United States of America), including the OFAC Sanctions Programs, and each Loan Party hereby authorizes and consents (and authorized and consents on behalf of each of its Subsidiaries) to the Lender taking any and all steps the Lender deem necessary, in their sole but reasonable discretion, to avoid violation of all applicable laws with respect to any such OFAC Event, including, without limitation, the requirements of the

-48-

OFAC Sanctions Programs (including, without limitation, the freezing and/or blocking of assets and reporting such action to OFAC).

Section 8.16. <u>Burdensome Contracts With Affiliates.</u>

No Loan Party shall enter into any contract, agreement or business arrangement with any of its Affiliates (other than the Borrower) on terms and conditions which are less favorable to any Loan Party than would be usual and customary in similar contracts, agreements or business arrangements between Persons not affiliated with each other, other than (a) transactions expressly permitted under this Agreement and (b) as set forth on Schedule 6.14. The Borrower and the Lender each acknowledge and agree that the Servicer is not and shall not be deemed to be an Affiliate of the Borrower.

Section 8.17. <u>No Changes in Fiscal Year.</u>

The fiscal year of the Loan Parties ends on December 31 of each year; and the Loan Parties shall not permit their fiscal year to change from its present basis.

Section 8.18. <u>Formation of Subsidiaries.</u>

Neither the Borrower nor any other Loan Party owned or controlled by HoldCo shall form or acquire any Person.

Section 8.19. <u>Change in the Nature of Business.</u>

No Loan Party shall engage in any business or activity other than the business and activities in which it engages in on the Closing Date.

Section 8.20. <u>Use of Proceeds.</u>

The Borrower shall use the credit extended under this Agreement solely for the purposes set forth in, or otherwise permitted by, <u>Sections 6.4</u> and <u>6.29</u> hereof.

Section 8.21. <u>No Restrictions.</u>

Except as provided herein or in the other Loan Documents, no Loan Party shall create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Loan Parties (other than any HoldCo) (or any HoldCo with respect to clause (e)) to: (a) pay dividends or make any other distribution on any capital stock or other equity interests, and (b) pay any indebtedness (including, without limitation, any Indebtedness for Borrowed Money) owed to it, (c) make loans or advances to the Loan Parties (other than any HoldCo), (d) transfer any of its Property to the Loan Parties (other than HoldCo), except for restrictions on the transfer of specific Property contained in agreements relating to such Property, such as Capital Leases, purchase money contracts on intellectual property licenses or (e) guarantee the Obligations and/or grant Liens on the Collateral to the Lender as required by the Loan Documents.

00980522

Section 8.22.     Prepayments of Indebtedness.

The Borrower shall not prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any indebtedness (including, without limitation, Indebtedness for Borrowed Money), or make any payment in violation of any subordination terms of any Subordinated Debt, except as long as no Default or Event of Default then exists or would immediately arise therefrom, regularly scheduled repayments, repurchases, redemptions or defeasances of principal and interest and mandatory prepayments of principal, interest and premium on account of (a) indebtedness permitted pursuant to Section 8.8 hereof (other than Subordinated Debt), and (b) Subordinated Debt in accordance with the subordination terms thereof or the applicable subordination agreement relating thereto.

Section 8.23.     Modification of Material Documents.

(a) Modification of Organizational Documents.  No Loan Party shall amend or otherwise modify (or waive any of their rights with respect to) their articles of incorporation or bylaws (or any other comparable organizational documents), except, in each case, for such amendments or modifications that would not be materially adverse to the Lender.  The Loan Parties shall (and shall cause their Subsidiaries to) promptly (but, in any event, within five (5) days thereof) provide the Lender with a copy of each such amendment or modification.

(b) Modification of Subordinated Debt Documents and other Material Indebtedness Documents and Material Contracts.  No Loan Party shall (a) waive any of the Loan Parties' rights, or amend or modify any of the terms or conditions, relating to any Subordinated Debt, except as expressly permitted by the subordination agreement or subordination provisions related thereto, unless (i) no cash fee is payable to the lenders under or holders of such documents and (ii) the sole purpose of any such amendment, supplement or other modification is one or more of the following:  (A) to extend the date or reduce the amount of any required repayment, prepayment or redemption of the principal of the Subordinated Debt, (B) to reduce the rate or extend the date for payment of interest, premium (if any) or fees payable on the Subordinated Debt or (C) to make the covenants, events of default or remedies in the documents evidencing Subordinated Debt less restrictive on the borrower and the guarantors party thereto, or (b) waive any of the Loan Parties' rights, or amend or modify any of the terms or conditions, relating to any Material Contract or Material Indebtedness (other than with respect to the Subordinated Debt) other than if such waiver, amendment or modification would not be materially adverse to the Lender.

Section 8.24.     Payment and Performance of Obligations.

Each Loan Party shall (i) pay and discharge, at or before maturity, all of their respective obligations and liabilities, including tax liabilities, except for such obligations and/or liabilities constituting tax liabilities that pursuant to Section 8.3 hereof are expressly permitted not to be paid and discharged, (ii) maintain, in accordance with GAAP, appropriate reserves for the accrual of all of their respective material obligations and material liabilities

-50-

and (iii) not breach or permit to exist any default by it under, the terms of any lease, commitment, contract, instrument or obligation to which it is a party, or by which its Properties are bound, except for such breaches or defaults which would not reasonably be expected to have a Material Adverse Effect.

Section 8.25.     Deposit Accounts, Securities Accounts and Commodities Accounts.

(a) The Loan Parties shall as of the date of this Agreement (the "Applicable Account Control Date") and at all times thereafter, (i) with respect to all deposit accounts of Borrower existing as of the Applicable Account Control Date, (ii) thirty (30) days (or, in each case, such later date as may be specified by the Lender from time to time in its sole discretion) after the date of acquisition with respect to any deposit account acquired by Borrower in any transaction, and (iii) with respect to any deposit account created by Borrower after the Applicable Account Control Date, ten (10) days after the date any deposit account is created (or, in each case, such later date as may be specified by the Lender from time to time in its sole discretion), in each case, maintained with banks or other depository institutions (other than (A) payroll accounts, benefit accounts, trust accounts, escrow accounts and tax payment accounts maintained by the Borrower and used exclusively for such purposes need not be perfected (provided that with respect to payroll accounts, the total amount on deposit at any time does not exceed the current amount of the payroll obligations), (B) deposit accounts, if any, maintained in the jurisdiction of organization of the Borrower maintained solely for purposes of meeting any minimum capital deposits required by the law of such jurisdiction; provided that the amounts in such deposit accounts shall not exceed the amount required by law to be maintained in such deposit accounts, and (C) local petty cash accounts maintained by the Borrower in proximity to their operations need not be perfected provided that the total, aggregate amount on deposit at any one time not so perfected shall not exceed $20,000 (the accounts discussed in these clauses (A), (B) and (C) are collectively referred to as "Excluded Accounts")) shall be covered by a deposit account control agreement entered into among the Borrower, the Lender and the bank or other depository institution at which such deposit account is maintained pursuant to which such bank or other depository institution acknowledges the Lien of Lender in such deposit account, agrees to comply with instructions originated by the Lender directing disposition of the funds or other amounts or items in such deposit account without further consent from the Borrower after the occurrence and during the continuance of an Event of Default, and agrees to subordinate and limit any Lien such bank or other depository institution may have in such account, in each case, on terms reasonably satisfactory to the Lender.

At all times from and after the date which is (i) sixty (60) days (or, in each case, such later date as may be specified by the Lender from time to time in its sole discretion) after the Closing Date with respect to all securities accounts and commodities accounts of the Borrower and existing on the date hereof, (ii) thirty (30) days (or, in each case, such later date as may be specified by the Lender from time to time in its sole discretion) after the date of acquisition with respect to any securities account or commodities account acquired by the Borrower in any transaction, and (iii) with respect to any security account or commodities account created by the Borrower after the Closing Date, ten (10) days after the date such securities account or commodities account is

-51-

created (or, in each case, such later date as may be specified by the Lender from time to time in its sole discretion), any securities account and commodities account of the Borrower maintained with securities intermediaries or commodities intermediaries shall be covered by a control agreement entered into among the Borrower, the Lender and the securities intermediary, commodities intermediary or other institution at which such account is maintained pursuant to which such securities intermediary, commodities intermediary or other institution acknowledges the Lien of the Lender in such account, agrees to comply with instructions originated by the Lender directing disposition of the securities, commodities or other amounts or items in such account without further consent from the Borrower after the occurrence and during the continuance of an Event of Default, and agrees to subordinate and limit any Lien such securities intermediary, commodities intermediary or other institution may have in such account, in each case, on terms reasonably satisfactory to the Lender.

Section 8.26.     Capital Expenditures.

The Borrower shall not, directly or indirectly, make or commit to make capital expenditures by lease, purchase, or otherwise, except in the ordinary and usual course of business consistent with past practices for the purpose of replacing machinery, equipment or other personal property which, as a consequence of wear, duplication or obsolescence, is no longer used or necessary in the Borrower's business.

Section 8.27.     Change of Name or in Location.

(a) No Loan Party shall change its legal name or the jurisdiction of its organization, without giving the Lender at least thirty (30) days prior written notice thereof and without providing the Lender such information and documents necessary for the Lender to continue to have a first-priority perfected Lien in the Collateral.

(b) The Loan Parties shall keep the Lender currently and accurately informed in writing of each of its places of business, and shall not change the location of its chief executive office or open or close, move or change any existing or new place of business without giving the Lender at least thirty (30) days prior written notice thereof and without providing the Lender such information and documents necessary for the Lender to continue to have a first-priority perfected Lien in the Collateral.

Section 8.28.     Borrower Balance Sheet Test.

As of the last day of each month of the Borrower, the Borrower shall not permit the Borrower Balance Sheet Test to be equal to or greater than 1.0:1.0; provided, however, that if the Borrower is newly formed, as of the last day of each month of the Borrower, the Borrower shall not permit the Borrower Balance Sheet Test to be equal to or greater than the ratio listed directly behind the applicable period below:  (a) the last day of the first month following the Closing Date in which the Borrower was formed until the last day of the third full month following the Closing Date:  1.0:0.1, (b) the last day of the fourth full month following the Closing Date:  1.0:0.2, (c) the last day of the fifth full month following the Closing Date:  1.0:0.3, (d) the last day of the sixth full month following the Closing Date:  1.0:0.4, (e) the last

-52-

day of the seventh full month following the Closing Date: 1.0:0.5, (f) the last day of the eighth full month following the Closing Date: 1.0.0.6, (g) the last day of the ninth full month following the Closing Date: 1.0:0.7, (h) the last day of the tenth full month following the Closing Date: 1.0:0.8, (i) the last day of the eleventh full month following the Closing Date: 1.0:0.9, (j) the last day of the twelfth full month following the Closing Date and the last day of each month thereafter: 1.0:1.0; provided further that, the Lender acknowledges that the Borrower is a newly formed Borrower but shall be subject to the foregoing proviso in this <u>Section 8.28</u>.

Section 8.29.    <u>Post-Closing Obligations.</u>

The Loan Parties shall execute and deliver the documents and complete the tasks set forth on Schedule 8.29, in each case, (a) in form, substance and manner reasonably satisfactory to Lender and (b) within the time limits specified on such Schedule (with any such time frame permitted to be extended by the Lender in its sole discretion).

Section 8.30.    <u>Servicing Agreements.</u>

The Borrower shall at all times have in effect the Servicing Agreements on such terms and conditions as are acceptable to the Lender, and no default or event of default shall exist pursuant to such Servicing Agreements.

Section 8.31.    <u>Operating Covenants.</u>

The Borrower shall, and shall cause each of its Subsidiaries to:

(i)    cause to be done all things reasonably necessary to maintain, preserve and renew all material licenses, authorizations and permits necessary to the conduct of its businesses;

(ii)    pay and discharge when payable all applicable material taxes, assessments and governmental charges imposed upon its properties or upon the income or profits therefrom (in each case before the same becomes delinquent and before penalties accrue thereon) and all material claims for labor, materials or supplies which if unpaid would by law become a Lien upon any of its property, unless and to the extent that either the same are being contested in good faith and by appropriate proceedings and adequate reserves have been established on its books with respect thereto or after consultation with legal counsel, it is determined that any such taxes, assessments, charges or claims are not properly levied or are not enforceable against the Borrower or its Subsidiaries;

(iii)    maintain proper books of record and account which present fairly in all material respects its financial condition and results of operations and make provisions on its respective financial statements for all such proper reserves as in each case may be reasonable and appropriate for the the Borrower at such time;

(iv)    comply with all other obligations which it incurs pursuant to any material contract or agreement as such obligations become due, unless and to the extent that the

-53-

same are being contested in good faith and by appropriate proceedings and adequate reserves have been established on its books with respect thereto, and comply in all material respects with laws, rules and regulations of governmental authorities that are determined, following consultation with legal counsel for the Borrower, to be applicable to and enforceable against the Borrower or Subsidiary, the violation of which could have a material adverse effect upon the financial condition, operating results, assets, operations of business of the Borrower and its Subsidiaries, taken as a whole;

        (v)     enforce the provisions of any agreement entered into between the Borrower or any of its Subsidiaries and any of their executive officers or key employees and exercise all of their rights and remedies thereunder;

        (vi)    have its fiscal year end on December 31 of each year and not permit its fiscal year to change from such end date, except as required to comply with changes in GAAP;

        (vii)   not to make any change in its accounting policies or financial reporting practices;

        (viii)  continue to manage and monitor the loans of the Borrower and its Subsidiaries to consumers consistently with past practices in addition to following sound business practices and using commercially reasonable and prudent business judgment all as may be applicable for the Business and taking into consideration the specific loan product and business model then being utilized; and

        (ix)    not change (i) any procedure for determining whether a loan of the Borrower and its Subsidiaries to consumers (or any component thereof) constitutes Total Good Outstanding Principal or the characterizations or categorizations made in connection therewith, (ii) any process for determining what allowances there are and how they should be subtracted from the amount of Total Good Outstanding Principal, (iii) any classification of loans of the Borrower and its Subsidiaries to consumers (or any component thereof) as Total Good Outstanding Principal, or (iv) any terms, conditions or collection procedures of any loan of the Borrower or any of its Subsidiaries to consumers in a manner that would be adverse to the interests of the Borrower, any Subsidiary of the Borrower or the Lender.

SECTION 9.   <u>EVENTS OF DEFAULT AND REMEDIES</u>.

      Section 9.1.    <u>Events of Default</u>.

      Any one or more of the following shall constitute an "Event of Default" hereunder:

      (a) (i) default in the payment when due of all or any part of the principal of any Loan (whether at the stated maturity thereof or at any other time provided for in this Agreement) or (ii) default for a period of three (3) Business Days in the payment when due of any interest, fee or other Obligation payable hereunder or under any other Loan Document;

-54-

(b) (i) default in the observance or performance of any covenant set forth in <u>Sections 8.1</u> (solely if the Borrower is not in good standing in its jurisdiction of organization), <u>8.4</u>, <u>8.7</u>, <u>8.8</u>, <u>8.9</u>, <u>8.10</u>, <u>8.12</u>, <u>8.15</u>, <u>8.18</u>, <u>8.20</u>, <u>8.21</u>, <u>8.22</u>, <u>8.23</u>, <u>8.26</u>, <u>8.27</u>, <u>8.29</u>,<u>8.30</u> or <u>8.31</u> hereof, Sections 4, 6, 7 or 8 of the Security Agreement, or (ii) the occurrence of any Other Event of Default (subject to any applicable cure period in the Related Agreement);

(c) (i) Default in the observance or performance of any covenant set forth in <u>Section 8.1</u> (that is not covered in <u>Section 9.1(b)</u> above), <u>8.2</u>, <u>8.3</u>, <u>8.5</u>, <u>8.6</u>, <u>8.11</u>, <u>8.13</u>, <u>8.14</u>, <u>8.16</u>, <u>8.17</u>, <u>8.19</u>, <u>8.24</u>, <u>8.25</u> or <u>8.28</u> hereof or Section 5 of the Security Agreement or Sections 5(a) or (b) of the Pledge Agreement which is not remedied or waived within ten (10) days after the occurrence thereof, or (ii) default in the observance or performance of any other provision hereof or of any other Loan Document which is not remedied or waived within twenty (20) days after the earlier of (A) the date on which such failure shall first become known to any officer of any Loan Party or (B) written notice thereof is given to the Borrower by the Lender;

(d) any representation or warranty made herein or in any other Loan Document or in any certificate furnished to the Lender pursuant hereto or thereto or in connection with any transaction contemplated hereby or thereby proves untrue in any material respect (without duplication of other materiality qualifiers) as of the date of the issuance or making or deemed making thereof;

(e) any event occurs or condition exists (other than those described in subsections (a) through (d) above) which is specified as an Event of Default under any of the other Loan Documents, or any of the Loan Documents shall for any reason not be or shall cease to be in full force and effect or is declared to be null and void, or any of the Collateral Documents shall for any reason fail to create a valid and perfected first priority Lien in favor of the Lender in any Collateral purported to be covered thereby except as expressly permitted by the terms thereof, or any Loan Party or any of its Affiliates or Subsidiaries takes any action for the purpose of terminating, repudiating, rescinding or contesting the validity of any Loan Document (including any provision or any Lien granted therein) executed by it or any of its obligations thereunder;

(f) any Loan Party (i) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Material Indebtedness (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement), or (ii) fails to observe or perform any other agreement or condition relating to any Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of any Material Indebtedness or the beneficiary or beneficiaries of any guarantee thereof (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such indebtedness to be made, prior to its stated maturity, or such guarantee to become payable or cash collateral in respect thereof to be demanded;

(g) any judgment or judgments, writ or writs or warrant or warrants of attachment, or any similar process or processes, shall be entered or filed against any Loan Party, or against any of its Property, in an aggregate amount in excess of $100,000 (except to the extent fully covered by insurance pursuant to which the insurer has not denied liability therefor from entry thereof), and which remains undischarged, unvacated, unbonded or unstayed for a period of thirty (30) days;

(h) (i) any Loan Party shall fail to pay when due an amount or amounts aggregating in excess of $100,000 which it shall have become liable to pay to the PBGC or to a Plan or a Multiemployer Plan under Title IV of ERISA; (ii) notice of intent to terminate a Plan or Plans having aggregate Unfunded Vested Liabilities in excess of $100,000 (collectively, a "Material Plan") shall be filed under Title IV of ERISA by any Loan Party; or (iii) any plan administrator or any combination of the foregoing; or the PBGC shall institute proceedings under Title IV of ERISA to terminate or to cause a trustee to be appointed to administer any Material Plan or a proceeding shall be instituted by a fiduciary of any Material Plan against any Loan Party, to enforce Section 515 or 4219(c)(5) of ERISA and such proceeding shall not have been dismissed within thirty (30) days thereafter; or a condition shall exist by reason of which the PBGC would be entitled to obtain a decree adjudicating that any Material Plan must be terminated, where the occurrence of any of the foregoing would reasonably be expected to result in a liability in excess of $100,000 to any Loan Party;

(i) any Change of Control shall occur;

(j) any Loan Party shall (i) have entered involuntarily against it an order for relief under the United States Bankruptcy Code, as amended, for which the petition commencing the proceeding thereof is not dismissed within sixty (60) calendar days of the date of the filing thereof, (ii) not pay, or admit in writing its inability to pay, its debts generally as they become due, (iii) make an assignment for the benefit of creditors, (iv) apply for, seek, consent to or acquiesce in, the appointment of a receiver, custodian, trustee, examiner, liquidator or similar official for it or any substantial part of its Property, (v) institute any proceeding seeking to have entered against it an order for relief under the United States Bankruptcy Code, as amended, to adjudicate it insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it, or (vi) take any corporate, limited liability company or other organizational action authorizing any matter described in parts (i) through (v) above;

(k) a custodian, receiver, trustee, examiner, liquidator or similar official shall be appointed for any Loan Party, or any substantial part of any of its Property, or a proceeding described in Section 9.1(j)(v) shall be instituted against any Loan Party, and such appointment continues undischarged or such proceeding continues undismissed or unstayed for a period of sixty (60) days;

(l) (i) any material loss, damage or destruction of any portion of the Collateral (other than loss, damage or destruction in connection with building renovations) having a fair

-56-

market value of $100,000, in the aggregate (except to the extent covered by insurance as to which the insurer has not disputed liability therefor) or (ii) the seizure or taking of any deposit account or securities account having an aggregate value of greater than $100,000 of any Loan Party or any Collateral by any Governmental Authority;

(m) the filing under any criminal statute, or commencement of criminal proceedings against, any Loan Party, or any of their respective employees, officers or directors, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture of (i) any of the Collateral having a fair market value in excess of $100,000 in the aggregate or (ii) any other Property of any which is necessary or material to the conduct of the business of any Loan Party;

(n) if the obligation of the Guarantor under the guaranty contained in this Agreement is limited or terminated by operation of law or by the Guarantor (other than in accordance with the terms of this Agreement);

(o) (i) The intercreditor provisions of the Intercreditor Agreement (the "Intercreditor Provisions") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against Red Stone Investment, LLC or any holder of indebtedness covered by the Intercreditor Agreement; or (ii) the Borrower or any of its Affiliates shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Intercreditor Provisions, (B) that the Intercreditor Provisions exist for the benefit of the Administrative Agent and the Lenders or (C) that all Liens granted to Red Stone Investment, LLC or the holders (or the designated agent for such holders) of the indebtedness (other than the Obligations) covered by the Intercreditor Agreement shall be subject to any of the Intercreditor Provisions.

(p) (i) the subordination provisions of the documents evidencing or governing any Subordinated Debt (the "Subordinated Provisions") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Debt; or (ii) any Loan Party shall, directly or indirectly, (A) make any payment on account of any Subordinated Debt that has been contractually subordinated in right of payment to the payment of the Obligations, except to the extent that such payment is permitted by the terms of the Subordinated Provisions applicable to such Subordinated Debt or (B) disavow or contest in any manner (x) the effectiveness, validity or enforceability of any of the Subordinated Provisions, (y) that the Subordinated Provisions exist for the benefit of the Lender, or (z) that all payments of principal of or premium and interest on the applicable Subordinated Debt, or realized from the liquidation of any property of the Borrower or any of its Subsidiaries, shall be subject to any of the Subordinated Provisions;

(q) any Loan Party shall become subject to or a party of any action (including, without limitation, any regulatory action), ruling, proceeding or judgment of a Governmental Authority that has a material adverse impact on the operations, business, Property or financial condition of the Loan Parties taken as a whole or could reasonably be expected to have a Material Adverse Effect;

-57-

00980522

(r) the Borrower fails to perform or observe any covenant or agreement contained in the Servicing Agreements on its part to be performed or observed (subject to any applicable cure period in the Related Agreements); or

(s) the liquidation, termination or dissolution of any Loan Party, or the merger or consolidation of such Loan Party into another Person, or its ceasing to carry on actively its present business or the appointment of a receiver for such Loan Party's Property.

Section 9.2.    Non-Bankruptcy Defaults.

When any Event of Default (other than those described in Section 9.1(j) or (k) hereof) has occurred and is continuing, the Lender may, in addition to any other rights or remedies provided for hereunder or under any other Loan Document or by applicable law, do any one or more of the following:

(a) declare the Obligations, whether evidenced by this Agreement or by any of the other Loan Documents immediately due and payable, whereupon the same shall become and be immediately due and payable and the Loan Parties shall be obligated to repay all of such Obligations in full, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by the Loan Parties;

(b) declare the Commitments terminated, whereupon the Commitments shall immediately be terminated together with any obligation of the Lender to make Loans or other extensions of credit hereunder; and

(c) exercise all other rights and remedies available to the Lender under the Loan Documents, any other applicable document or applicable law.

Section 9.3.    Bankruptcy Defaults.

Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of any Event of Default described in Section 9.1(j) or (k), in addition to the remedies set forth above in this Section 9, without any notice to any Loan Party, any of its Affiliates or Subsidiaries or any other Person or without any act by the Lender, the Commitments shall automatically terminate and the Obligations, inclusive of all accrued and unpaid interest thereon and all fees and all other amounts owing under this Agreement or under any of the other Loan Documents, shall automatically and immediately become due and payable and the Loan Parties shall be obligated to repay all of such Obligations in full, without presentment, demand, protest, or notice of any kind, all of which are expressly waived by the Loan Parties.

Section 9.4.    Remedies Cumulative.

The rights and remedies of the Lender under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. The Lender shall have all other rights and remedies not inconsistent herewith as provided under the UCC, by law, or in

-58-

equity. No exercise by the Lender of one right or remedy shall be deemed an election, and no waiver by the Lender of any Event of Default shall be deemed a continuing waiver. No delay by the Lender shall constitute a waiver, election, or acquiescence by it.

SECTION 10. <u>CHANGE IN CIRCUMSTANCES.</u>

Section 10.1.  [Intentionally Omitted].

Section 10.2.  <u>Lending Offices.</u>

The Lender may, at its option, elect to make its Loans hereunder at a branch, office or affiliate for each type of Loan available hereunder or at such other of its branches, offices or affiliates as it may from time to time elect and designate in a written notice to the Borrower and the Lender.

Section 10.3.  <u>Discretion of Lender as to Manner of Funding.</u>

Notwithstanding any other provision of this Agreement, the Lender shall be entitled to fund and maintain its funding of all or any part of its Loans in any manner it sees fit.

Section 10.4.  <u>Mitigation.</u>

If the Lender is claiming any additional amounts payable pursuant to <u>Section 10.1</u>, <u>Section 13.1</u> or <u>Section 13.15</u>, the Lender shall use reasonable efforts (consistent with legal and regulatory restrictions) to file any certificate or document reasonably requested by the Borrower or to change the jurisdiction of its applicable lending office if the making of such filing or change would avoid the need for or reduce the amount of any such additional amounts that may thereafter accrue or avoid the circumstances giving rise to such exercise and would not, in the sole determination of the Lender, result in any additional costs, expenses or risks or be otherwise disadvantageous to it.

SECTION 11. [RESERVED].

SECTION 12. <u>THE GUARANTEES</u>

Section 12.1.  <u>The Guarantees.</u>

To induce the Lender to provide the credits described herein and in consideration of benefits expected to accrue to the Borrower by reason of the Commitments and for other good and valuable consideration, receipt of which is hereby acknowledged, each Loan Party hereby unconditionally and irrevocably guarantees jointly and severally to the Lender and its Affiliates, the due and punctual payment of all present and future Obligations, including, but not limited to, the due and punctual payment of principal of and interest on the Loans and the due and punctual payment of all other Obligations now or hereafter owed by the Borrower, in each case, as and when the same shall become due and

-59-

payable, whether at stated maturity, by acceleration, or otherwise, according to the terms hereof and thereof (including all interest, costs, fees, and charges after the entry of an order for relief against the Borrower or such other obligor in a case under the United States Bankruptcy Code or any similar proceeding, whether or not such interest, costs, fees and charges would be an allowed claim against the Borrower or any such obligor in any such proceeding). In case of failure by the Borrower or other obligors punctually to pay any Obligations guaranteed hereby, Guarantor's liability hereunder is limited to the Equity Interests pledged by Guarantor pursuant to the Pledge Agreement.

Section 12.2.    Guarantee Unconditional.

The obligations of the Guarantor under this Section 12 shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged, or otherwise affected by:

(a) any extension, renewal, settlement, compromise, waiver, or release in respect of any obligation of the Borrower or any other obligor or of any other guarantor under this Agreement, any other Loan Document or any other document or agreement or by operation of law or otherwise;

(b) any modification or amendment of or supplement to this Agreement, any other Loan Document or any other document or agreement;

(c) any change in the corporate existence, structure, or ownership of, or any insolvency, bankruptcy, reorganization, or other similar proceeding affecting, the Borrower or other obligor, any other guarantor, or any of their respective assets, or any resulting release or discharge of any obligation of the Borrower or any other obligor or of any other guarantor contained in any Loan Document or in any other document or agreement;

(d) the existence of any claim, set-off, or other rights which the Borrower or any other obligor or any other guarantor may have at any time against the Lender or any other Person, whether or not arising in connection herewith;

(e) any failure to assert, or any assertion of, any claim or demand or any exercise of, or failure to exercise, any rights or remedies against the Borrower or any other obligor, any other guarantor, or any other Person or Property;

(f) any application of any sums by whomsoever paid or howsoever realized to any obligation of the Borrower or other obligor, regardless of what obligations of the Borrower or any other obligor remain unpaid;

(g) any invalidity or unenforceability relating to or against the Borrower or any other obligor or any other guarantor for any reason of this Agreement, any other Loan Document or any other document or agreement or any provision of applicable law or regulation purporting to prohibit the payment by the Borrower or other obligor or any other guarantor of the principal

-60-

of or interest on any Loan or any other amount payable under the Loan Documents or any other document or agreement; or

(h) any other act or omission to act or delay of any kind by the Lender or any other Person or any other circumstance whatsoever that might, but for the provisions of this paragraph, constitute a legal or equitable discharge of the obligations of the Guarantor under this Section 12, other than payment in full in cash of the Obligations.

Section 12.3. <u>Discharge Only upon Payment in Full; Reinstatement in Certain Circumstances.</u>

The Guarantor's obligations under this <u>Section 12</u> shall remain in full force and effect until the Commitments are terminated and the principal of and interest on the Loans and all other Obligations and amounts payable by the Loan Parties under this Agreement, all other Loan Documents and any related document or agreement have been paid in full in cash. If at any time any payment of the principal of or interest on any Loan or any other Obligations or amount payable by the Borrower or other obligor or the Guarantor under the Loan Documents or any related document or agreement is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy, or reorganization of the Borrower or other obligor or of any guarantor (including the Guarantor), or otherwise, the Guarantor's obligations under this Section 12 with respect to such payment shall be automatically reinstated at such time as though such payment had become due but had not been made at such time.

Section 12.4. <u>Subrogation.</u>

The Guarantor agrees it will not exercise any rights which it may acquire by way of subrogation by any payment made hereunder, or otherwise, until all the Obligations shall have been paid in full subsequent to the termination of all the Commitments. If any amount shall be paid to the Guarantor on account of such subrogation rights at any time prior to the later of (x) the payment in full of the Obligations and all other amounts payable by the Borrower hereunder, the other Loan Documents and the related documents and agreements and (y) the termination of the Commitments, such amount shall be held in trust for the benefit of the Lender (and their Affiliates) and shall forthwith be paid to the Lender or be credited and applied upon the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement.

Section 12.5. <u>Waivers.</u>

The Guarantor irrevocably waives acceptance hereof, presentment, demand, protest, and any notice not provided for herein, as well as any requirement that at any time any action be taken by the Lender or any other Person against the Borrower or other obligor, another guarantor, or any other Person.

Section 12.6.    Limit on Recovery.

Notwithstanding any other provision hereof, the right of recovery against the Guarantor under this Section 12 shall not exceed $1.00 less than the lowest amount which would render the Guarantor's obligations under this Section 12 void or voidable under applicable law, including, without limitation, fraudulent conveyance law.

Section 12.7.    Stay of Acceleration.

If acceleration of the time for payment of any amount payable by the Borrower or other obligor under this Agreement or any other Loan Document is stayed upon the insolvency, bankruptcy or reorganization of the Borrower or such obligor, all such amounts otherwise subject to acceleration under the terms of this Agreement, the other Loan Documents or the related documents and agreements shall nonetheless be payable by the Guarantor hereunder forthwith on demand by the Lender.

Section 12.8.    Benefit to Guarantor.

The Borrower and the Guarantor are engaged in related businesses and integrated to such an extent that the financial strength and flexibility of the Borrower has a direct impact on the success of the Guarantor.  The Guarantor will derive substantial direct and indirect benefit from the extensions of credit hereunder.

Section 12.9.    Guarantor Covenants.

The Guarantor shall take such action as the Borrower is required by this Agreement, the other Loan Documents or the related documents or agreements to cause the Guarantor to take, and shall refrain from taking such action as the Borrower is required by this Agreement, the other Loan Documents or the related documents or agreements to prohibit the Guarantor from taking.

SECTION 13. MISCELLANEOUS.

Section 13.1.    Withholding Taxes.

Each payment by the Loan Parties under this Agreement or the other Loan Documents shall be made without withholding for or on account of any present or future taxes (other than Excluded Taxes) imposed by or within the jurisdiction in which such Loan Party is domiciled, any jurisdiction from which such Loan Party makes any payment, or (in each case) any political subdivision or taxing authority thereof or therein.  If any such withholding is so required, such Loan Party shall make the withholding, pay the amount withheld to the appropriate Governmental Authority before penalties attach thereto or interest accrues thereon, and forthwith pay such additional amount as may be necessary to ensure that the net amount actually received by the Lender clear of such taxes is equal to the amount which the Lender would have received had such withholding not been made.  If the Lender pays any amount in respect of any such taxes, penalties or interest, such Loan Party shall reimburse the Lender for

-62-

that payment on demand in the currency in which such payment was made, so long as such demand has been made within two hundred seventy (270) days after the Lender has made such payment. If such Loan Party pays any such taxes, penalties or interest, it shall deliver official tax receipts evidencing that payment or certified copies thereof to the Lender on whose account such withholding was made on or before the thirtieth (30th) day after payment.

Section 13.2.    No Waiver, Cumulative Remedies.

No delay or failure on the part of the Lender or on the part of the holder or holders of any of the Obligations, in the exercise of any power or right under any Loan Document or any related document or agreement shall operate as a waiver thereof or as an acquiescence in any default, nor shall any single or partial exercise of any power or right preclude any other or further exercise thereof or the exercise of any other power or right. The rights and remedies hereunder of the Lender and of the holder or holders of any of the Obligations are cumulative to, and not exclusive of, any rights or remedies which any of them would otherwise have.

Section 13.3.    Non-Business Days.

If any payment hereunder becomes due and payable on a day which is not a Business Day, the due date of such payment shall be extended to the next succeeding Business Day on which date such payment shall be due and payable. In the case of any payment of principal falling due on a day which is not a Business Day, interest on such principal amount shall continue to accrue during such extension at the rate per annum then in effect, which accrued amount shall be due and payable on the next scheduled date for the payment of interest.

Section 13.4.    Documentary Taxes.

The Borrower agrees to pay on demand any documentary, stamp or similar taxes payable in respect of this Agreement or any other Loan Document, including interest and penalties, in the event any such taxes are assessed, irrespective of when such assessment is made and whether or not any credit is then in use or available hereunder.

Section 13.5.    Survival of Representations.

All representations and warranties made herein or in any other Loan Document or any related document or agreement or in certificates given pursuant hereto or thereto shall survive the execution and delivery of this Agreement and the other Loan Documents, and shall continue in full force and effect with respect to the date as of which they were made as long as any credit is in use or available hereunder.

-63-

Section 13.6.    Survival of Indemnities.

All indemnities and reimbursement provisions and all other provisions relative to reimbursement to the Lender of amounts sufficient to protect the yield of the Lender with respect to the Loans, including, but not limited to, Sections 10.1 and 13.15 hereof, shall survive the termination of this Agreement and the other Loan Documents and the payment of the Obligations.

Section 13.7.    [Intentionally Omitted].

Section 13.8.    Notices.

Except as otherwise specified herein, all notices hereunder and under the other Loan Documents shall be in writing (including, without limitation, notice by telecopy or electronic mail) and shall be given to the relevant party at its address, telecopier number or e-mail address set forth below, or such other address, telecopier number or e-mail address as such party may hereafter specify by notice to the Lender and the Borrower given by courier, by United States certified or registered mail, by telecopy or by other telecommunication device capable of creating a written record of such notice and its receipt:

to any Loan Party:

Lac Courte Oreilles Financial Services, LLC
9790 N. County Road K
Suite 1010
LCO PO Box 1506
Hayward, Wisconsin 54843
Attention:  Lee Harden or Dulcie Wolf
Telephone: Telephone for Lee: 715-699-0240
              Telephone for Dulcie: 715-699-6375
Telecopy:   (715) 634-8110
E-mail address:  lee.harden@lcocasino.com
              dulcie.wolf@lcocasino.com

-64-

00980522

With a copy to (which shall not constitute notice hereunder):

Lac Courte Oreilles Financial Services, LLC
9790 N. County Road K
Suite 1010
LCO PO Box 1506
Hayward, Wisconsin 54843
Attention:     James Schlender, Esq.
Telephone:   (715) 634-8934
Telecopy:    (715) 634-0302
E-mail address:  james.schlender@lco-nsn.gov

to the Lender:

Dimension Credit (Cayman), L.P.
c/o Vector Capital Corporation
One Market Street
Steuart Tower, 23rd Floor
San Francisco, CA 94105
Attention:     Roy Kelvin
Telephone:   (415) 293-5009
Telecopy:    (415) 293-5100
E-mail address:  rkelvin@vectorcapital.com

With a copy to (which shall not constitute notice hereunder):

Kirkland & Ellis, LLP
555 California Street
San Francisco, CA 94104
Attention:     Francesco Penati, Esq.
Telephone:   (415) 439-1924
Telecopy:    (415) 277-6154
E-mail address:  fpenati@kirkland.com

Each such notice, request or other communication shall be effective (i) if given by telecopier, when such telecopy is transmitted to the telecopier number specified in this Section and a confirmation of such telecopy has been received by the sender, (ii) if given by mail, five (5) days after such communication is deposited in the mail, certified or registered with return receipt requested, addressed as aforesaid or (iii) if given by any other means, when delivered at the addresses specified in this Section; provided that any notice given pursuant to Section 1 hereof shall be effective only upon receipt.

-65-

Section 13.9. <u>Counterparts; Electronic Execution.</u>

This Agreement may be executed in any number of counterparts, and by the different parties hereto on separate counterpart signature pages, and all such counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

Section 13.10. <u>Successors and Assigns.</u>

This Agreement shall be binding upon the Loan Parties and their successors and assigns, and shall inure to the benefit of the Lender, and the benefit of their respective successors and assigns, including any subsequent holder of any of the Obligations; <u>provided</u> that, notwithstanding anything to the contrary, no Loan Party may assign any of their rights or obligations under any Loan Document without the prior written consent of the Lender and any such prohibited assignment shall be absolutely void *ab initio*.

Section 13.11. <u>Participants.</u>

The Lender shall have the right at its own cost to grant participations (to be evidenced by one or more agreements or certificates of participation) in the Loans made and/or Commitments held by the Lender at any time and from time to time to one or more other Persons; <u>provided</u> that no such participation shall relieve the Lender of any of its obligations under this Agreement, and, <u>provided</u>, <u>further</u> that no such participant shall have any rights under this Agreement except as provided in this Section, and the Lender shall have no obligation or responsibility to such participant. Any agreement pursuant to which such participation is granted shall provide that the granting Lender shall retain the sole right and responsibility to enforce the obligations of the Loan Parties under this Agreement and the other Loan Documents including, without limitation, the right to approve any amendment, modification or waiver of any provision of the Loan Documents except that such agreement may provide that the Lender will not agree to any modification, amendment or waiver of the Loan Documents that would reduce the amount of or postpone any fixed date for payment of any Obligation in which such participant has an interest.

Section 13.12. <u>Assignments.</u>

(a) The Lender may at any time assign to one or more Eligible Assignees all or a portion of the Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

-66-

(i)    Required Consents.    No consent shall be required for any assignment except the consent of the Borrower (such consent not to be unreasonably withheld, delayed or conditioned) unless (x) a Default or an Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund;

(ii)    Assignment and Acceptance.    The parties to each assignment shall execute an Assignment and Acceptance.

(iii)    No Assignment to Certain Periods.    No such assignment shall be made to any Loan Party or any Loan Party's Affiliates (other than the Lender on the Closing Date and any of their respective Affiliates) or Subsidiaries.

(iv)    No Assignment to Natural Persons.    No such assignment shall be made to a natural person.

From and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of the Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 13.6 and 13.15 with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by the Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 13.11 hereof. In no event shall any assignment of rights and obligations hereunder pursuant to an Assignment and Acceptance create any duplicative liability on the part of the Borrower to more than one Lender in respect of the same claim or event.

(b) The Lender may at any time pledge or grant a security interest in all or any portion of its rights under this Agreement to secure obligations of the Lender, including any such pledge or grant to a Federal Reserve Bank, and this Section shall not apply to any such pledge or grant of a security interest; provided that no such pledge or grant of a security interest shall release the Lender from any of its obligations hereunder or substitute any such pledgee or secured party for the Lender as a party hereto; provided further, however, the right of any such pledgee or grantee (other than any Federal Reserve Bank) to further transfer all or any portion of the rights pledged or granted to it, whether by means of foreclosure or otherwise, shall be at all times subject to the terms of this Agreement.

Section 13.13.  Amendments.

Any provision of this Agreement or the other Loan Documents may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the Borrower and the Lender.

Section 13.14.  Headings.

Section headings used in this Agreement are for reference only and shall not affect the construction of this Agreement.

Section 13.15.  Costs and Expenses; Indemnification.

(a) With respect to costs and expenses incurred after the Closing Date, each Loan Party jointly and severally agrees to pay all reasonable costs and expenses of the Lender in connection with the preparation, due diligence, negotiation, and administration (which administration costs and expenses shall be limited to wiring fees, photocopying, notarization, mailings, couriers and messengers, telecommunication, publication, fees associated with the dishonor of checks payable to the Lender and electronic reporting) of any Loan Document entered into after the Closing Date and the related documents and agreements (including, without limitation, mutually agreed upon fees and disbursements of counsel to the Lender) in connection with the preparation and execution of any Loan Documents executed after the Closing Date and the related documents and agreements, and any amendment, waiver or consent related thereto, whether or not the transactions contemplated herein are consummated, together with any reasonable fees and charges suffered or incurred by the Lender in connection with fixed asset appraisals (subject to the limitations set forth in Section 8.6), collateral filing fees and lien searches and any claim, demand or liability for any broker's or finder's fees alleged to have been incurred in connection herewith.  Each Loan Party jointly and severally agrees to pay to the Lender and any other holder of any Obligations outstanding hereunder all costs and expenses incurred or paid by the Lender, such other Credit Party or any such holder, including reasonable attorneys' fees, and disbursements and court costs, in connection with any Default or Event of Default hereunder or in connection with defending or the enforcement of any of the Loan Documents and the related documents and agreements (including all such costs and expenses incurred in connection with any proceeding under the United States Bankruptcy Code involving any Loan Party as a debtor thereunder) and in connection with gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated.  Each Loan Party further jointly and severally agrees to indemnify the Lender, each other Credit Party and any security trustee therefor, and their respective directors, officers, employees, agents, financial advisors, and consultants (each such Person being called an "Indemnitee") against all losses, claims, damages, penalties, judgments, liabilities and reasonable expenses (including, without limitation, all reasonable fees and disbursements of counsel for any such Indemnitee and all reasonable expenses of litigation or preparation therefor, whether or not the Indemnitee is a party thereto, or any settlement arrangement arising from or relating to any such litigation) which any of them may pay or incur arising out of or relating to any Loan Document or any related documents or agreements or any of the transactions contemplated thereby or the direct or indirect

-68-

application or proposed application of the proceeds of any Loan, other than those which have been found by a final and non-appealable judgment of a court of competent jurisdiction to have resulted directly, primarily and actually from the gross negligence or willful misconduct of the party claiming indemnification. The Loan Parties, upon demand by a Credit Party or other Indemnitee at any time, shall reimburse such Credit Party or Indemnitee for any reasonable legal or other expenses incurred in connection with investigating or defending against any of the foregoing (including any settlement costs relating to the foregoing) except if the same is found by a final and non-appealable judgment of a court of competent jurisdiction to have resulted directly, primarily and actually from the gross negligence or willful misconduct of the party to be indemnified. To the extent permitted by applicable law, none of the parties hereto shall assert, and each such Person hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or the other Loan Documents or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. The obligations of the Loan Parties under this Section shall survive the termination of this Agreement.

(b) Each Loan Party unconditionally and irrevocably agrees to forever indemnify, defend and hold harmless, and covenants not to sue for any claim for contribution against, each Indemnitee for any damages, costs, loss or expense, including without limitation, response, remedial or removal costs and all fees and disbursements of counsel for any such Indemnitee, arising out of any of the following: (i) any presence, Release, threatened release or disposal of any Hazardous Materials by any Loan Party or any of its Subsidiaries or otherwise occurring on or with respect to its Property (whether owned or leased), (ii) the operation or violation of any Environmental Law, whether federal, state, or local, and any regulations promulgated thereunder, by any Loan Party or any of its Subsidiaries or otherwise occurring on or with respect to its Property (whether owned or leased), (iii) any claim for personal injury or property damage in connection with any Loan Party or any of its Subsidiaries or otherwise occurring on or with respect to its Property (whether owned or leased), and (iv) the inaccuracy or breach of any environmental representation, warranty or covenant by any Loan Party or any of its Subsidiaries made herein or in any other Loan Document evidencing or securing any Obligations or setting forth terms and conditions applicable thereto or otherwise relating thereto, except for damages found by a final and non-appealable judgment of a court of competent jurisdiction to have resulted directly, primarily and actually from the willful misconduct or gross negligence of the party claiming indemnification. This indemnification shall survive the payment and satisfaction of all Obligations in full, the termination of all the Commitments and the termination of this Agreement, and shall remain in force beyond the expiration of any applicable statute of limitations and payment or satisfaction in full of any single claim under this indemnification. This indemnification shall be binding upon the successors and assigns of the Loan Parties and shall inure to the benefit of each Indemnitee and its successors and assigns.

Section 13.16.   Set-off.

In addition to any rights now or hereafter granted under the Loan Documents or applicable law and not by way of limitation of any such rights, upon the occurrence and

00980522

during the continuance of any Event of Default, the Lender, each subsequent holder of any Obligation, and each of their respective Affiliates, is hereby authorized by each Loan Party at any time or from time to time, without notice to any Loan Party or to any other Person, any such notice being hereby expressly waived to the extent permitted by applicable law, to set-off and to appropriate and to apply any and all deposits (general or special, including, but not limited to, indebtedness evidenced by certificates of deposit, whether matured or unmatured, and in whatever currency denominated, but not including trust accounts, tax accounts, and payroll accounts) and any other indebtedness at any time held or owing by the Lender, such subsequent holder or Affiliate to or for the credit or the account of such Loan Party, whether or not matured, against and on account of the Obligations of such Loan Party to the Lender, such subsequent holder or Affiliate under the Loan Documents, including, but not limited to, all claims of any nature or description arising out of or connected with the Loan Documents.

Section 13.17.    Entire Agreement.

The Loan Documents constitute the entire understanding of the parties thereto with respect to the subject matter thereof and any prior agreements, whether written or oral, with respect thereto are superseded hereby.

Section 13.18.    Governing Law.

This Agreement and the other Loan Documents (except as otherwise specified therein) and the definition of "Credit Agreement Default" and all components thereof in the Related Agreement and any other provision in the Related Agreement that involves any rights of the Lender, and the rights and duties of the parties hereto and thereto, shall be construed and determined in accordance with the laws of the State of New York.

Section 13.19.    The Loan Parties' Limited Waiver of Sovereign Immunity. Subject to the provisions hereof, each Loan Party, to the extent that such Loan Party can avail itself of the sovereign immunity of the Tribe, grants a limited waiver of sovereign immunity to the extent set forth in Section 13.24 below and limited herein, from suits, actions or arbitration proceedings and consents to suits, actions or arbitration proceedings arising under this Agreement, all in accordance with the terms and limitations herein. Each Loan Party hereby makes this limited waiver of sovereign immunity as follows:

(a)    For the purpose of allowing Cane Bay to take action necessary to enforce the provisions of this Agreement pursuant to the alternative dispute resolution procedures set forth in Section 13.24 below and to effect enforcement of any remedy granted herein. This limited waiver of sovereign immunity shall survive any attempt by a later Tribal government to revoke such Loan Party's waiver of sovereign immunity or consents herein. Each Loan Party waives its sovereign immunity, if applicable, from a judgment or order and post judgment proceedings supplemental thereto consistent with the terms and provisions hereof.

(b)     Subject to this <u>Section 13.19</u>, pursuant to its limited waiver, each Loan Party expressly waives its immunity from suit and consents to be hailed into arbitration as provided and limited herein and/or to be sued in any of the following subject to the dispute resolution provisions of <u>Section 13.24</u> herein and for the purpose of compelling arbitration or enforcing a Final Decision (in either instance, a "Judicial Proceeding"): the Lac Courte Oreilles Band of Lake Superior Chippewa Indians Tribal Court, the Wisconsin state court in closest geographic proximity to the Tribe, and the United States District Court for the Western District of Wisconsin and appellate courts therefrom for all three (3) jurisdictions. This waiver is granted solely as to each Loan Party and to no other governmental or economic entity of the Tribe, and solely to the Lender or its successors or assigns relating to claims arising under any of the Loan Documents.

(c)     Each Loan Party agrees that it shall not plead or raise as a defense to any action brought by the Lender or its successors or assigns any right or claim of right to the requirement of exhaustion of Tribal court remedies, as the parties have expressly agreed, subject to <u>Section 13.19(b)</u> above. Each Loan Party hereby expressly waives any requirement which may exist for exhaustion of any remedies available in any Tribal forum prior to the commencement of any dispute, controversy, suit, action proceeding in any state or federal court even if any such Tribal forum would have concurrent jurisdiction over any such dispute, controversy, suit, action or proceeding but for such waiver, and any application of the abstention doctrine and any other law or interpretation thereof that might otherwise require, as a matter of law or comity, that resolution of any claim, controversy or dispute be heard first in a Tribal forum, whether such Tribal forum now exists or is hereinafter created.

(d)     The limited waiver of each Loan Party's sovereign immunity granted herein does not include any waiver, either express or implied, to any third party, or constitute a waiver of any other governmental or economic entity of the Tribe.

(e)     Each Loan Party covenants and agrees that the clear, express and unequivocal limited waiver of sovereign immunity and other waivers contained herein are irrevocable for the duration of the waiver set forth in <u>Section 13.19(f)</u> below and agrees not to revoke or limit, in whole or in part, such waiver of sovereign immunity or other waivers contained herein or in any way attempt to revoke or limit, in whole or in part, such waiver of sovereign immunity or other waivers, as the case may be. In the event that any Loan Party (i) revokes, limits, or attempts to revoke or limit the waivers granted herein, (ii) takes any action that is inconsistent with the waivers granted herein, or (iii) fails to submit to the jurisdiction of the Tribal, state or federal courts or arbitration tribunals as provided herein, the parties expressly recognize and agree that there remains no adequate remedy at law available to the parties and that they will be injured. In any such event, this waiver is limited to each Loan Party's consent to arbitration proceedings and actions to compel arbitration and/or to enforce any awards or orders issuing from such arbitration proceedings that are sought solely in the forums set forth in <u>Section 13.19(b)</u> above.

(f)     The limited waiver of sovereign immunity of the Loan Parties as provided for in this <u>Section 13.19</u> shall expire at the conclusion of the longer of (i) one (1) year after the

-71-

payment in full of all Obligations hereunder, or (ii) at the conclusion of any arbitration or litigation matter with respect to this Agreement pending upon the payment in full of all Obligations hereunder.

Section 13.20.    Severability of Provisions.

Any provision of any Loan Document or any related document or agreement which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. All rights, remedies and powers provided in this Agreement and the other Loan Documents may be exercised only to the extent that the exercise thereof does not violate any applicable mandatory provisions of law, and all the provisions of this Agreement and other Loan Documents are intended to be subject to all applicable mandatory provisions of law which may be controlling and to be limited to the extent necessary so that they will not render this Agreement or the other Loan Documents invalid or unenforceable.

Section 13.21.    Excess Interest.

Notwithstanding any provision to the contrary contained herein or in any other Loan Document, no such provision shall require the payment or permit the collection of any amount of interest in excess of the maximum amount of interest permitted by applicable law to be charged for the use or detention, or the forbearance in the collection, of all or any portion of the Loans or other Obligations outstanding under this Agreement or any other Loan Document ("Excess Interest"). If any Excess Interest is provided for, or is adjudicated to be provided for, herein or in any other Loan Document, then in such event (a) the provisions of this Section shall govern and control, (b) no Loan Party shall be obligated to pay any Excess Interest, (c) any Excess Interest that the Lender may have received hereunder shall, at the option of the Lender, be (i) applied as a credit against the then outstanding principal amount of Obligations hereunder and accrued and unpaid interest thereon (not to exceed the maximum amount permitted by applicable law), (ii) refunded to the Borrower, or (iii) any combination of the foregoing, (d) the interest rate payable hereunder or under any other Loan Document shall be automatically subject to reduction to the maximum lawful contract rate allowed under applicable usury laws (the "Maximum Rate"), and this Agreement and the other Loan Documents shall be deemed to have been, and shall be, reformed and modified to reflect such reduction in the relevant interest rate, and (e) no Loan Party shall have any action against the Lender for any damages whatsoever arising out of the payment or collection of any Excess Interest. Notwithstanding the foregoing, if for any period of time interest on any of the Obligations is calculated at the Maximum Rate rather than the applicable rate under this Agreement, and thereafter such applicable rate becomes less than the Maximum Rate, the rate of interest payable on the Obligations shall remain at the Maximum Rate until the Lender has received the amount of interest which the Lender would have received during such period on the Obligations had the rate of interest not been limited to the Maximum Rate during such period.

-72-

Section 13.22.     Construction.

The parties acknowledge and agree that the Loan Documents and any related documents or agreements shall not be construed more favorably in favor of any party hereto based upon which party drafted the same, it being acknowledged that all parties hereto contributed substantially to the negotiation of such documents.   The provisions of this Agreement relating to Subsidiaries shall only apply during such times as the Loan Parties have one or more Subsidiaries.  NOTHING CONTAINED HEREIN SHALL BE DEEMED OR CONSTRUED TO PERMIT ANY ACT OR OMISSION WHICH IS PROHIBITED BY THE TERMS OF ANY OTHER LOAN DOCUMENT OR THE RELATED DOCUMENTS OR AGREEMENTS, THE COVENANTS AND AGREEMENTS CONTAINED HEREIN BEING IN ADDITION TO AND NOT IN SUBSTITUTION FOR THE COVENANTS AND AGREEMENTS CONTAINED IN THE OTHER LOAN DOCUMENTS AND THE OTHER RELATED DOCUMENTS AND AGREEMENTS.

Section 13.23.     Submission to Jurisdiction; Waiver of Jury Trial.

(a) The Loan Parties hereby submits to the exclusive jurisdiction of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians Tribal Court, the Wisconsin state court in closest geographic proximity to the Tribe, and the United States District Court for the Western District of Wisconsin and appellate courts therefrom for all three (3) jurisdictions for purposes of all legal proceedings arising out of or relating to this Agreement, the other Loan Documents, the definition of "Credit Agreement Default" and the components thereof in the Related Agreement, any other provision in the Related Agreement that involves any rights of the Lender, or the transactions contemplated hereby or thereby.  Nothing in this Agreement shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Agreement or any of the other Loan Documents in the courts of any jurisdiction.   Each Loan Party irrevocably waives, to the fullest extent permitted by law, any objection which they may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.

(b) THE     LOAN     PARTIES     AND     THE     LENDER     HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT, ANY RELATED DOCUMENT OR AGREEMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY.  Each party hereto (A) certifies that no other party or Person has represented, expressly or otherwise, that such other party or parties would not, in the event of litigation, seek to enforce the foregoing waiver and (B) acknowledges that it and the other parties hereto have been induced to enter into the Loan Documents and to agree to provisions in any related document or agreement, as applicable, by the mutual waivers and certifications in this Section 13.23(b)

Section 13.24.     Arbitration.  All disputes, controversies or claims between the parties arising out of or relating to this Agreement, including without limitation any dispute,

-73-

controversy or claim between the parties regarding the rights, duties, adequacy of performance, breach, or liabilities of a party under any provision of this Agreement or the validity or enforceability of this Agreement ("Dispute"), shall be resolved by binding arbitration conducted in accordance with the provisions of this Section ("Arbitration Proceedings") and per each Loan Party's limited waiver of sovereign immunity contained in <u>Section 13.19</u> above. If a party ("Complaining Party") concludes that the other party ("Responding Party") has failed to comply with, or is proposing to take action which is inconsistent or will breach any term or condition of this Agreement, and the informal efforts to resolve the Dispute as set forth in <u>Section 13.24(a)</u> below have been unsuccessful, the Complaining Party must give written notice to the Responding Party ("Notice of Dispute"), which specifies: (i) the nature of the Dispute; (ii) the corrective action which must be taken to remove, or, where appropriate, to commence removal of, the Dispute, if the Dispute is susceptible to cure ("Corrective Action"); (iii) a reasonable time limit within which the Corrective Action must be taken, but in no instance less than thirty (30) days ("Time Limit"); and (iv) the amount of damages or losses asserted to have arisen from the Dispute. Except in the case of emergencies, no Arbitration Proceedings on a Dispute may be commenced by a party unless prior Notice of Dispute and opportunity to take Corrective Action have been given as provided in this Section. If, within the Time Limit, the Responding Party fails in the reasonable judgment of the Complaining Party to take substantial steps to make the Corrective Action provided for in the Notice of Dispute then, with respect to the Dispute, either party may initiate Arbitration Proceedings under <u>Section 13.24(b)</u> with respect to the asserted Dispute. Each party hereby agrees that this arbitration provision is valid and enforceable and therefore waives any defense or assertion to the contrary. Notwithstanding the foregoing, this <u>Section 13.24</u> shall not apply to suits seeking injunctive relief or specific performance or any impleader action arising from any proceeding commenced by a third party that is related to this Agreement and nothing contained in this <u>Section 13.24</u> shall prevent any party hereto from resorting to judicial process if injunctive or other equitable relief from a court is necessary to prevent injury to such party or its Affiliates.  The use of arbitration procedures will not be construed under the doctrine of laches, waiver or estoppels to affect adversely the rights of any party hereto to assert any claim or defense.

(a)     <u>Negotiations/Mediation</u>. Before Arbitration Proceedings are commenced, the parties shall use their best efforts to settle the Dispute by negotiating with each other in good faith and, recognizing their mutual interests, attempting to reach a just and equitable solution satisfactory to both parties. Should the parties' good faith efforts to resolve a Dispute be unsuccessful, the parties agree that prior to resorting to arbitral avenues of relief, they may agree to engage a mutually-acceptable mediator to assist them in resolving the Dispute. If the parties do not reach a solution within a period of thirty (30) days from the date on which the Dispute was first asserted in writing, then the provisions in <u>Section 13.24(b)</u> below shall apply.

(b)     <u>Binding Arbitration</u>. Subject to the requirements and limitations of <u>Section 13.24(a)</u>, either party shall have the right to have the Dispute decided by Arbitration Proceedings in the manner provided in this <u>Section 13.24(b)</u>.

(i)     <u>Notice of Intent</u>. A party intending to demand arbitration shall first serve written notice of that intent ("Notice of Intent to Arbitrate") on the other party and shall

promptly thereafter file the Notice of Intent to Arbitrate with the American Arbitration Association in accordance with the that organization's rules and pay any required fees. A Notice of Intent to Arbitrate shall specify: (A) the matters to be submitted to arbitration; (B) the nature of the relief to be sought in the arbitration; and (C) the name of the "Pre-Approved Arbitrator" desired to be selected by the party. The parties have established a list of pre-approved, mutually acceptable arbitrators, "Pre-Approved Arbitrators," whom either party may identify as the decider for any Dispute under any arbitration organization's rules. The list of Pre-Approved Arbitrators is contained at Schedule 13.24 hereto.

        (ii)   <u>Response</u>. Within ten (10) days after the service of a Notice of Intent to Arbitrate, the other party shall serve a written response ("Response") specifying (A) any additional matters it intends to submit to arbitration relating to the Dispute, and (B) the nature of any relief it intends to seek in the arbitration. The responding party shall promptly thereafter file the Response with the arbitration organization that received the Notice of Intent and pay any required fees. In the event that the Pre-Approved Arbitrator identified by the party initiating a Notice of Intent to Arbitrate is unavailable to serve for whatever reason, the responding party shall in its Response identify an alternate Pre-Approved Arbitrator from Schedule 13.24 to hear the Dispute. The parties shall alternate identification of Pre-Approved Arbitrators no longer than each ten (10) days until a Pre-Approved Arbitrator who is able to serve in the timeframes provided in this Agreement is identified.

        (iii)   <u>Arbitrators</u>. The Pre-Approved Arbitrators identified from Schedule 13.24 shall be the "Decider Arbitrator." Any Arbitration Proceedings shall take place exclusively before the single Decider Arbitrator. Any Decider Arbitrator shall be competent and professionally experienced in the matter being arbitrated. The parties further agree that no arbitrator shall be an officer, agent, employee, stockholder or contractor of any party or its affiliates, and nor shall any arbitrator be a member or descendent or spouse of a member or descendent of the Tribe. If no Pre-Approved Arbitrator can serve then the Decider Arbitrator to be appointed shall be selected by the arbitration organization that received the Notice of Intent. All arbitrators, no matter how designated or appointed, shall act as neutral arbitrators. All decisions, awards, orders and other rulings of the arbitrators, relief awarded, or other substantive or procedural matters ("Decisions") shall be made by only the duly-appointed Decider Arbitrator, shall be in writing signed by the Decider Arbitrator, and shall include the findings of fact and conclusions of law on which the Decision is based.

        (iv)   <u>Conduct of Arbitration</u>. After the Notice of Intent to Arbitrate has been delivered, arbitration shall be considered commenced as to all matters properly submitted under the foregoing provisions, and shall thereafter be prosecuted with diligence in accordance with the following provisions, unless the parties agree otherwise. The Decider Arbitrator shall apply the governing law specified herein, and shall follow such rules of discovery and evidence as the United States District Court for the Western District of Wisconsin would apply. Within sixty (60) days of commencement of the arbitration actions, and after receiving evidence and hearing witnesses, if any, the Decider Arbitrator shall render his or her award, accompanied by findings of fact and a statement of reasons for the decision.

00980522

(v)    Standard of Review. All Decisions rendered by the Decider Arbitrator shall be determined in light of the nature of the Dispute, the circumstances surrounding the Dispute, applicable laws, and the rights and interests of the parties, so as to do substantial justice to the parties. No order in Arbitration Proceedings may terminate this Agreement except upon (A) a determination that the Dispute on which the order is based constitutes a material breach of this Agreement, or (B) upon a determination of repeated defaults sufficient to indicate callous indifference to a party's obligations under this Agreement.

(vi)    Place of Arbitration. All hearings and other proceedings in the arbitration shall be held at Superior, Wisconsin or Duluth, Minnesota, unless otherwise mutually agreed in writing by the parties.

(vii)    Relief Available. With respect to the matters submitted to Arbitration Proceedings, the Decider Arbitrator shall have authority to:

1.    issue appropriate interlocutory orders to mitigate damage or prevent irreparable injury to a party; and

2.    render a final decision which:

a.    determines or declares the rights, duties, adequacy of performance, breach or liabilities of a party under the Agreement;

b.    orders a party to specifically perform its obligations under the Agreement to the extent allowable by applicable law;

c.    awards appropriate injunctive, declaratory or compensatory monetary relief for the benefit of a party; and/or

d.    contains such further relief and provisions as the arbitrators have jurisdiction and authority to grant.

The Decider Arbitrator shall not have jurisdiction or authority to assess special, consequential or punitive damages against either party. Except as inconsistent with the provisions of this Section 13.24, the arbitration shall be conducted in accord with the Commercial Rules of the American Arbitration Association then in effect.

(viii)    Decision Binding; Enforcement. The Decision of the Decider Arbitrator shall become a "Final Decision" at the time rendered. All Final Decisions shall be conclusive and binding on the parties with respect to the matters decided, and shall be complied with by the parties. A party may enter a Final Decision and institute Judicial Proceedings for the sole purpose of enforcing a Final Decision in any tribunal specified in Section 13.19(b) above. In such Judicial Proceedings, neither party, without consent of the other party, shall be entitled to contend that the Final Decision should be vacated, modified or corrected and the parties hereby

-76-

expressly waive all other rights and remedies that might otherwise be available in the Judicial Proceeding.

        (ix)    <u>Costs of Arbitration</u>. All costs of arbitration, including the fees and expenses of the Decider Arbitrator, shall initially be borne equally by the parties, but ultimate responsibility for such costs shall be determined by the Decider Arbitrator in the course of his or her decision and/or award according to the extent to which each party prevailed on the issues subject to the arbitration. Each party shall bear the costs and expenses for the presentation of its case, including the fees of its attorneys and experts.

        (x)    <u>Survival of Remedy</u>. Subsequent to any expiration or termination of this Agreement, this Section shall remain available to the parties with respect to Disputes arising out of or relating to this Agreement, whether such Dispute arose prior to the expiration or termination of the Agreement, for the longer of (i) one (1) year, or (ii) the conclusion of any proceedings timely initiated pursuant to this <u>Section 13.24(b)</u>.

        Section 13.25.    <u>USA Patriot Act.</u>

        To the extent the Lender is subject to the requirements of the Patriot Act, the Lender hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify, and record information that identifies the Loan Parties, which information includes the name and address of the Loan Parties and other information that will allow the Lender to identify the Loan Parties in accordance with the Patriot Act.

        Section 13.26.    <u>Confidentiality.</u>

        The Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees, representatives and agents, including accountants, legal counsel and other advisors to the extent any such Person has a need to know such Information (it being understood that the Persons to whom such disclosure is made will first be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any related document or agreement or any suit, action or proceeding relating to this Agreement, any other Loan Document or any related document or agreement or the enforcement of rights hereunder or thereunder, (f) subject to such Person being informed of the confidential nature of such Information and to the extent such Person is instructed to keep such Information confidential, to (A) any assignee of or participant in, or any prospective assignee of or participant in, any of its rights or obligations under this Agreement or (B) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Loan Party

-77-

or any of its Subsidiaries and its obligations, (g) with the prior written consent of any Loan Party, (h) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Section or (B) becomes available to the Lender on a non-confidential basis from a source other than any Loan Party or any of its Subsidiaries or any of their directors, officers, employees or agents, including accountants, legal counsel and other advisors, (i) to rating agencies if requested or required by such agencies in connection with a rating relating to the Loans or Commitments hereunder, or (j) to entities which compile and publish information about the syndicated loan market, provided that only basic information about the pricing and structure of the transaction evidenced hereby may be disclosed pursuant to this subsection (j). For purposes of this Section, "Information" means all information received from the Borrower or any of its Subsidiaries or from any other Person on behalf of any Loan Party or any of its Subsidiaries relating to any Loan Party or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Lender on a non-confidential basis prior to disclosure by any Loan Party or any of its Subsidiaries or from any other Person on behalf of any Loan Party or any of its Subsidiaries.

Section 13.27.    Servicer as Agent for Borrower and Guarantor.

The Borrower and the Guarantor hereby appoints Servicer as the borrowing agent and attorney-in-fact for the Borrower and the Guarantor which appointment shall remain in full force and effect unless and until Lender shall have received prior written notice signed by Servicer that such appointment has been revoked. The Borrower and the Guarantor hereby appoints and authorizes the Servicer (a) to provide Lender with all notices with respect to Loans obtained for the benefit of the Borrower and all other notices and instructions under this Agreement, (b) to execute and deliver Borrowing Base Certificates, Compliance Certificates, certain other Loan Documents and other certificates and documents on the Borrower's and the Guarantor's behalf that the Borrower and the Guarantor shall be liable for any information, representations, warranties and other agreements set forth therein and (c) to take such action as Servicer deems appropriate on the Borrower's and the Guarantor's behalf to obtain Loans and to exercise such other powers as are reasonably incidental to the foregoing to carry out the purposes of this Agreement. It is understood that accepting Loan Documents, notices with respect to Loans and other documents and agreements from Servicer on behalf of the Borrower and the Guarantor is done solely as an accommodation to the Borrower and the Guarantor in order to utilize the powers of the Borrower and the Guarantor in the most efficient and economical manner and at their request, and that the Lender shall not incur liability to the Borrower or the Guarantor as a result hereof. The Borrower and the Guarantor expects to derive benefit, directly or indirectly, from the handling of the actions, obligations and liabilities of the Borrower and the Guarantor through the Servicer and the Borrower and the Guarantor each agrees to be responsible and held accountable under the Loan Documents for any actions taken by Servicer and any Defaults or Events of Default caused by Servicer. To induce the Lender to do so, and in consideration thereof, the Borrower and the Guarantor hereby jointly and severally agree to indemnify the Lender and hold the Lender harmless against any and all liability, expense, loss or claim of damage or injury, made against the Lender by Servicer,

-78-

the Borrower, the Guarantor or by any third party whosoever, arising from or incurred by reason of (a) the actions taken by Servicer on behalf of the Borrower or the Guarantor pursuant to this paragraph, or (b) the Lender's relying on any instructions of Servicer.

[signature pages follow]

00980522

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

"BORROWER"

**HUMMINGBIRD FUNDS, LLC,**
a wholly-owned limited liability company of Lac
Courte Oreilles Financial Services LLC, a tribally
chartered limited liability company formed under the
laws of the Lac Courte Oreilles Band of Lake Superior
Chippewa Indians

By: ████████████████████████
Name: Dulcie Wolf
Title: Chair/Manager

"GUARANTOR"

**LAC COURTE OREILLES FINANCIAL
SERVICES LLC,**
a wholly-owned limited liability company of the Lac
Courte Oreilles Band of Lake Superior Chippewa
Indians, a federally recognized Indian tribe organized
pursuant to Section 16 of the act of June 18, 1934 (48
Stat. 987)(25 U.S.C. § 476), as amended

By: ████████████████████████
Name: Lee Harden
Title: Chairman

"LENDER"

**DIMENSION CREDIT (CAYMAN), L.P.,**
a Cayman Islands Exempted Limited Partnership

By: Dimension Credit GP (Cayman), Ltd.,
    its general partner

By: 
Name: David Baylor
Title:  Director

# **<u>EXHIBIT D</u>**

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms hereof, this "Agreement") is dated as of September 2, 2014, by and between, Hummingbird Funds, LLC ("Debtor"), a sovereign instrumentality and tribal limited liability company of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians ("Tribe") and Dimension Credit (Cayman), L.P., an exempted limited partnership under the laws of the Cayman Islands (the "Lender").

## PRELIMINARY STATEMENTS

A.      Debtor, as Borrower, Lac Courte Oreilles Financial Services, LLC, a sovereign instrumentality and tribal limited liability company of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians, as Guarantor and the Lender, as lender, are parties to a Credit Agreement dated as of the date hereof (such Credit Agreement, as amended, restated, supplemented or otherwise modified from time to time, including amendments and restatements thereof in its entirety, being hereinafter referred to as the "Credit Agreement"), pursuant to which the Lender has agreed, subject to certain terms and conditions, to extend credit and make certain other financial accommodations available to the Debtor.

B.      As a condition to the execution and delivery of the Credit Agreement, the Lender has required, among other things, that Debtor grant to the Lender a lien on and security interest in the personal property of Debtor described herein, subject to the terms and conditions hereof.

NOW, THEREFORE, for good and valuable consideration, receipt whereof is hereby acknowledged, the parties hereto hereby agree as follows:

**Section 1.      Terms defined in Credit Agreement**.  All capitalized terms used herein without definition, and defined in the Credit Agreement, shall have the same meanings herein as such terms have in the Credit Agreement.   Subject to the preceding sentence, all capitalized terms used herein without definitions, and defined in the Uniform Commercial Code as in effect from time to time in the State of New York (the "UCC"), shall have the same meanings herein as such terms have in the UCC.  In addition to those terms defined in the Credit Agreement and the UCC, as used in this Agreement, the following terms shall have the following meanings:

(a)      "Copyrights" means any and all rights in any works of authorship, including (i) copyrights and moral rights, (ii) copyright registrations and recordings thereof and all applications in connection therewith, (iii) income, license fees, royalties, damages, and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (iv) the right to sue for past, present, and future infringements thereof, and (v) all of Debtor's rights corresponding thereto throughout the world.

(b)      "Intellectual Property" means any and all Patents, Copyrights, Trademarks, trade secrets, know-how, inventions (whether or not patentable), algorithms, software programs (including source code and object code), processes, product designs, industrial designs, blueprints, drawings, data, customer lists, URLs and domain names, specifications,

documentations, reports, catalogs, literature, and any other forms of technology or proprietary information of any kind, including all rights therein and all applications for registration or registrations thereof.

(c)    "Intellectual Property Licenses" means, with respect to any Person (the "Specified Party"), (i) any licenses or other similar rights provided to the Specified Party in or with respect to Intellectual Property owned or controlled by any other Person, and (ii) any licenses or other similar rights provided to any other Person in or with respect to Intellectual Property owned or controlled by the Specified Party, in each case, including (A) any software license agreements (other than license agreements for commercially available off-the-shelf software that is generally available to the public which have been licensed to Debtor pursuant to end-user licenses), and (B) the right to use any of the licenses or other similar rights described in this definition in connection with the enforcement of the Lender's rights under the Loan Documents.

(d)    "Patents" means patents and patent applications, including (i) all continuations, divisionals, continuations-in-part, re-examinations, reissues, and renewals thereof and improvements thereon, (ii) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (iii) the right to sue for past, present, and future infringements thereof, and (iv) all of Debtor's rights corresponding thereto throughout the world.

(e)    "Trademarks" means any and all trademarks, trade names, registered trademarks, trademark applications, service marks, registered service marks and service mark applications, including (i) all renewals thereof, (ii) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (iii) the right to sue for past, present and future infringements and dilutions thereof, (iv) the goodwill of Debtor's business symbolized by the foregoing or connected therewith, and (v) all of Debtor's rights corresponding thereto throughout the world.

(f)    "URL" means "uniform resource locator," an internet web address.

**Section 2.**    **Grant of Security Interest in the Collateral**.    Debtor hereby unconditionally grants, assigns and pledges to the Lender, a lien on and security interest in, and right of setoff against, and acknowledges and agrees that the Lender has and shall continue to have a continuing lien on and security interest in, and right of set-off against, all right, title and interest, whether now owned or existing or hereafter created, acquired or arising, in and to all personal property and fixtures of Debtor, including all of Debtor's:

(a)    Accounts;

(b)    Chattel Paper;

(c)    Instruments (including Promissory Notes);

(d)    Documents;

00980540

(e)     General Intangibles (including Payment Intangibles, software, patents, trademarks, copyrights, and other intellectual property rights, and all applications and registrations therefor, and tax refunds);

(f)     Letter-of-Credit Rights;

(g)     Deposit Accounts;

(h)     Investment Property (including certificated and uncertificated Securities, Securities Accounts, Security Entitlements, Commodity Accounts, and Commodity Contracts);

(i)     Inventory, Equipment, Fixtures and other Goods (including all software, whether or not the same constitutes embedded software, used in the operation thereof);

(j)     Commercial Tort Claims (as described on <u>Schedule E</u> hereto or on one or more supplements to this Agreement);

(k)     All rights to merchandise and other Goods (including rights to returned or repossessed Goods and rights of stoppage in transit) which is represented by, arises from, or relates to any of the foregoing;

(l)     All other personal property and interests in personal property of Debtor of any kind or description now held by the Lender or at any time hereafter transferred or delivered to, or coming into the possession, custody, or control of, the Lender, or any agent or affiliate of the Lender, whether expressly as collateral security or for any other purpose (whether for safekeeping, custody, collection or otherwise), and all dividends and distributions on or other rights in connection with any such property;

(m)     All supporting evidence and documents relating to any of the above-described property, including, without limitation, computer programs, disks, tapes and related electronic data processing media, and all rights of Debtor to retrieve the same from third parties, written applications, credit information, account cards, payment records, correspondence, delivery and installation certificates, invoice copies, delivery receipts, notes, and other evidences of indebtedness, insurance certificates and the like, together with all books of account, ledgers, and cabinets in which the same are reflected or maintained;

(n)     All Accessions and additions to, and substitutions and replacements of, any and all of the foregoing; and

(o)     All Proceeds and products, and all Supporting Obligations in respect of, of the foregoing, and all insurance of the foregoing and proceeds thereof;

all of the foregoing, with respect to Debtor, being herein sometimes referred to as the "Collateral." For purposes of this Agreement, the term "Receivables" means all rights to the payment of a monetary obligation, whether or not earned by performance, and whether evidenced by an Account, Chattel Paper, Instrument, General Intangible, or otherwise.

Notwithstanding anything to the contrary in clauses (a)-(o) above, the security interest created by this Agreement shall not extend to, and the term "Collateral" shall not include

00980540

(i) Liens on (A) payroll accounts, benefit accounts, trust accounts, escrow accounts and tax payment accounts maintained by Debtor and used exclusively for such purposes need not be perfected (provided that with respect to payroll accounts, the total amount on deposit at any time does not exceed the current amount of the payroll obligations), (ii) leasehold interests, (iii) any item of general intangibles, license, permit, lease, contract, governmental approval or franchise that is now or hereafter held by Debtor to the extent that such item of general intangibles (or any agreement evidencing such item of general intangibles), license, permit, lease, contract, governmental approval or franchise contains a term or is subject to a rule of law, statute or regulation that restricts, prohibits, or requires a consent (that has not been obtained) of a Person (other than the Borrower or any of its Subsidiaries) to, the creation, attachment or perfection of the security interest granted herein, and any such restriction, prohibition and/or requirement of consent is effective and enforceable under applicable law and is not rendered ineffective by applicable law (including, without limitation, pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code); provided, however, that (x) this exclusion contained in clause (iii) shall not include any proceeds of any item of general intangibles, and (y) any item of general intangibles that at any time ceases to satisfy the criteria set forth in this clause (iii) (whether as a result of the applicable Person obtaining any necessary consent, any change in any rule of law, statute or regulation, or otherwise), shall (without any action) no longer be subject to the exclusion set forth in this clause (iii), (iv) any Property which is subject to a purchase money Lien or a Capital Lease permitted by the Credit Agreement, but only to the extent that the agreements governing such purchase money Lien or Capital Lease prohibit the granting of other Liens in such Property, provided that (A) such prohibition was not added in contemplation of entering into this Agreement and (B) upon the removal of such prohibition or the termination of such purchase money Lien or Capital Lease, such Property shall automatically and immediately constitute Collateral and (v) any "intent to use" Trademark applications for which a statement of use has not been filed and accepted with the U.S. Patent and Trademark Office or any Intellectual Property if the grant of a Lien on or security interest in such Intellectual Property would result in the cancellation or voiding of such Intellectual Property; provided that upon submission and acceptance by the U.S. Patent and Trademark Office of an amendment to allege use pursuant to 15 U.S.C. Section 1060(a) (or any successor provision), such intent-to-use trademark application shall automatically and immediately constitute Collateral.

Section 3.    **Obligations Secured**.  This Agreement is made and given to secure, and shall secure, the prompt payment and performance when due of all Obligations, in each case whether now existing or hereafter arising (and whether arising before or after the filing of a petition in bankruptcy and including all interest accrued after the petition date), due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired (all of the indebtedness, obligations, liabilities, expenses and charges set forth in this Section 3 being referred to herein collectively as the "Secured Obligations").

Section 4.    **Covenants, Agreements, Representations and Warranties**.  Debtor hereby covenants and agrees with, and represents and warrants to, the Lender that:

(a)    Debtor is duly organized and validly existing in good standing under the laws of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians, as set forth under Column 1 on Schedule A to this Agreement.  Debtor is the sole and lawful owner (or authorized lessee or licensee, as the case may be) of the Collateral in which Debtor has any interest, and has full right, power, and authority to enter into this Agreement and to perform each and all of the matters and

00980540

things herein provided for. The execution and delivery of this Agreement, and the observance and performance of each of the conditions and agreements set forth in this Agreement, will not (i) contravene or constitute a default under any provision of law or any judgment, injunction, order, or decree binding upon Debtor, except to the extent such contravention or default could reasonably be expected to result in a Material Adverse Effect, or any provision of Debtor's certificate or articles of incorporation or other publicly filed organizational document or by-laws or any covenant, indenture, or agreement of or affecting Debtor or any of its property or (ii) result in the creation or imposition of any Lien on any property of Debtor except for the lien and security interest granted to the Lender hereunder and Permitted Liens.

(b)      As of the Closing Date, Debtor's chief executive office is at the location listed under Column 2 on Schedule A to this Agreement and, as of the Closing Date, Debtor has no other executive offices or places of business other than those listed under Column 3 on Schedule A. All of the Collateral owned or leased by Debtor is and shall remain in Debtor's possession or control at the locations listed under Columns 2 and 3 on Schedule A (collectively, the "Permitted Collateral Locations"), except for (i) Collateral which in the ordinary course of Debtor's business is in transit between Permitted Collateral Locations, (ii) Equipment being repaired or refurbished or which consists of laptops, calculators or other such Equipment that is used by an employee of Debtor in the ordinary course of business of Debtor and is in the possession of such employee, and (iii) Collateral with an aggregate value of $25,000 or less. If for any reason any Collateral is at any time kept or located at a location other than a Permitted Collateral Location, the Lender shall nevertheless have and retain a lien on and security interest therein. Debtor does not own or lease any real property except as disclosed under Columns 2 and 3 on Schedule A. Debtor shall not move its chief executive office or maintain a place of business at a location other than those specified on Schedule A or permit any Collateral to be located at a location other than a Permitted Collateral Location (except for (i) Collateral which in the ordinary course of Debtor's business is in transit between Permitted Collateral Locations, (ii) Equipment being repaired or refurbished or which consists of laptops, calculators or other such Equipment that is used by an employee of Debtor in the ordinary course of business of Debtor and is in the possession of such employee, and (iii) Collateral with an aggregate value of $25,000 or less), in each case, without first providing the Lender at least ten (10) days' prior written notice of Debtor's intent to do so; provided, Debtor shall have taken all action reasonably requested by the Lender to maintain the Lien of the Lender in the Collateral at all times fully perfected and in full force and effect (after which any such new location shall be deemed a Permitted Collateral Location hereunder); provided further, that Debtor shall only be required to obtain landlord lien waivers to the extent required by Section 4(i) hereof.

(c)      As of the Closing Date, Debtor's legal name, jurisdiction of organization and organizational number (or its jurisdictional equivalent) are correctly set forth under Column 1 on Schedule A of this Agreement. As of the Closing Date, Debtor has not transacted business at any time during the immediately preceding five-year period, and does not currently transact business, under any other legal names or trade names other than the prior legal names and trade names (if any) set forth on Schedule B to this Agreement. Debtor shall not change its legal name or jurisdiction of organization without first providing the Lender at least fifteen (15) days' prior written notice thereof.

(d)      The Collateral and every part thereof is and shall be free and clear of all Liens, except for the Liens permitted by Section 8.8 of the Credit Agreement. Debtor shall defend the

00980540

Collateral in which Debtor has any interest against any claims and demands of all Persons at any time claiming the same or any interest in the Collateral materially adverse to the Lender.

(e)     Debtor agrees it shall not waste or destroy the Collateral or any part thereof and shall not be negligent in the care or use of any Collateral.  Debtor agrees it will not use, manufacture, sell or distribute any Collateral in violation of any statute, ordinance or other governmental requirement.  Debtor will perform in all material respects its obligations under any contract or other agreement to which it is a party constituting part of the Collateral, or by which its Properties are bound, except for such breaches or defaults which would not reasonably be expected to have a Material Adverse Effect, it being understood and agreed that the Lender has no responsibility to perform any obligations of Debtor under any such contracts or other agreements. Debtor shall promptly notify the Lender of any material loss, damage or destruction of any portion of the Collateral (other than loss, damage or destruction in connection with building renovations) having a fair market value of $25,000, in the aggregate (except to the extent covered by insurance as to which the insurer has not disputed liability therefor).

(f)     Subject to the terms hereof and the terms of the Credit Agreement, Debtor agrees it will not sell, assign, mortgage, lease, or otherwise dispose of the Collateral or any interest therein except to the extent permitted by the Credit Agreement.

(g)     Debtor will insure the Collateral in accordance with the terms of Section 8.4 of the Credit Agreement.  In the event Debtor shall receive any proceeds of such insurance, Debtor shall promptly pay over such proceeds of insurance to the Lender to the extent required by Section 1.6(b)(i) of the Credit Agreement.  Debtor hereby authorizes the Lender, at the Lender's option, to adjust, compromise and settle any losses under any insurance afforded at any time after the occurrence and during the continuation of any Event of Default, and Debtor does hereby irrevocably constitute the Lender, its officers, agents and attorneys, as Debtor's attorneys-in-fact, with full power and authority after the occurrence and during the continuation of any Event of Default to effect such adjustment, compromise and/or settlement and to endorse any drafts drawn by an insurer of the Collateral or any part thereof and to do everything necessary to carry out such purposes and to receive and receipt for any unearned premiums due under policies of such insurance.  Unless the Lender elects to adjust, compromise or settle losses as aforesaid after the occurrence and during the continuation of any Event of Default, and at all times that no Event of Default has occurred and is continuing, any adjustment, compromise and/or settlement of any losses under any insurance shall be made by Debtor.  All insurance proceeds (other than proceeds of directors and officers insurance policies) shall be subject to the Lien of the Lender hereunder

UNLESS DEBTOR PROVIDES THE LENDER WITH EVIDENCE OF THE INSURANCE COVERAGE REQUIRED BY THIS AGREEMENT PROMPTLY AFTER WRITTEN REQUEST THEREFOR BY THE LENDER, THE LENDER MAY PURCHASE INSURANCE AT DEBTOR'S EXPENSE TO PROTECT THE LENDER'S INTERESTS IN THE COLLATERAL.  THIS INSURANCE MAY, BUT NEED NOT, PROTECT DEBTOR'S INTERESTS IN THE COLLATERAL. THE COVERAGE PURCHASED BY THE LENDER MAY NOT PAY ANY CLAIMS THAT DEBTOR MAKES OR ANY CLAIM THAT IS MADE AGAINST DEBTOR IN CONNECTION WITH THE COLLATERAL. DEBTOR MAY LATER CANCEL ANY SUCH INSURANCE PURCHASED BY THE LENDER, BUT ONLY AFTER PROVIDING THE LENDER WITH EVIDENCE THAT DEBTOR HAS OBTAINED INSURANCE AS REQUIRED BY THE CREDIT AGREEMENT. IF THE LENDER

00980540

PURCHASES INSURANCE FOR THE COLLATERAL, DEBTOR WILL BE RESPONSIBLE FOR THE COSTS OF THAT INSURANCE, AND ANY OTHER CUSTOMARY CHARGES THAT THE LENDER MAY IMPOSE IN CONNECTION WITH THE PLACEMENT OF THE INSURANCE, UNTIL THE EFFECTIVE DATE OF THE CANCELLATION OR EXPIRATION OF THE INSURANCE. THE COSTS OF THE INSURANCE MAY BE ADDED TO THE OBLIGATIONS SECURED HEREBY. THE COSTS OF THE INSURANCE MAY BE MORE THAN THE COST OF INSURANCE DEBTOR MAY BE ABLE TO OBTAIN ON ITS OWN.

(h)     Debtor shall allow the Lender and its representatives access to and right of inspection of the Collateral as provided in, and subject to the terms of, the Credit Agreement, and in the absence of any existing Event of Default, with reasonable prior written notice to the Debtor.

(i)     If any Collateral is in the possession or control of any agents or processors of Debtor and the Lender so requests, Debtor shall, upon the request of the Lender, authorize and instruct all bailees and any other parties, if any, at any time processing, labeling, packaging, holding, storing, shipping or transferring all or any part of the Collateral to permit the Lender and its representatives to examine and inspect any of the Collateral then in such party's possession and to verify from such party's own books and records any information concerning the Collateral or any part thereof which the Lender or its representatives may seek to verify.

(j)     Upon the Lender's reasonable written request, Debtor agrees from time to time to deliver to the Lender such evidence of the existence, identity and location of its Collateral, in each case as the Lender may reasonably request. Without limitation of the provisions of Section 8.6 of the Credit Agreement, the Lender shall have the right to verify all or any part of the Collateral in any manner, and through any medium, which the Lender considers appropriate and reasonable, and Debtor agrees to furnish all assistance and information, and perform any commercially reasonable acts, which the Lender may reasonably require in connection therewith, including without limitation the right, after the occurrence and during the continuance of an Event of Default, in the Lender's name or in the name of a nominee of the Lender or in the name of Debtor, to verify, in accordance with the Lender's normal lending practices, the validity, amount or any other matter relating to any Accounts, by mail, telephone, telegraph or otherwise.

(k)     Debtor will (i) comply in all material respects with the terms and conditions of any and all leases, easements, right-of-way agreements and other agreements to which Debtor is a party, or by which its Properties are bound, except for such failure to comply which would not reasonably be expected to have a Material Adverse Effect, in each case which cover the premises wherein the Collateral is located, and (ii) comply with any orders, ordinances, laws or statutes of any city, state or other governmental entity, department or agency having jurisdiction over the parties with respect to such premises or the conduct of business thereon, except for such failure to comply which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(l)     Intellectual Property.

(i)     As of the Closing Date and at and as of the date of the advancing of any Loan after the Closing Date, (A) Debtor does not own any registered Copyrights or applications for registration of Copyrights; (B) Debtor is not a party to any material

Intellectual Property Licenses pursuant to which (1) Debtor has provided any license or other rights in Intellectual Property owned or controlled by Debtor to any other Person other than non-exclusive software licenses granted in the ordinary course of business or (2) any Person has granted to Debtor any license or other rights in Intellectual Property owned or controlled by such Person that is material to the business of Debtor, including any Intellectual Property that is incorporated in any Inventory, software, or other product marketed, sold, licensed, or distributed by Debtor; (C) Debtor does not own any Patents or applications for Patents; and (D) Debtor does not own any registered Trademarks or applications for registration of Trademarks;

(ii)      (A) Debtor owns exclusively or holds licenses in all material Intellectual Property that is necessary to the conduct of its business and (B) all employees and contractors of Debtor in the twelve (12) month period prior to the Closing Date who were involved in the creation or development of any material Intellectual Property for Debtor that is necessary to the business of Debtor have signed agreements containing assignment of Intellectual Property rights to Debtor and obligations of confidentiality;

(iii)      to Debtor's knowledge, no Person has infringed or misappropriated or is currently infringing or misappropriating any Intellectual Property rights owned by Debtor, in each case, that either individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect;

(iv)      (A) to Debtor's knowledge, (1) Debtor has never infringed or misappropriated and is not currently infringing or misappropriating any Intellectual Property rights of any Person, and (2) no product manufactured, used, distributed, licensed, or sold by or service provided by Debtor has ever infringed or misappropriated or is currently infringing or misappropriating any Intellectual Property rights of any Person, in each case, except where such infringement either individually or in the aggregate could not reasonably be expected to result in a Material Adverse Effect, and (B) there are no pending, or to Debtor's knowledge, threatened infringement or misappropriation claims or proceedings pending against Debtor, and Debtor has not received any notice or other communication of any actual or alleged infringement or misappropriation of any Intellectual Property rights of any Person, in each case, except where such infringement either individually or in the aggregate could not reasonably be expected to result in a Material Adverse Effect;

(v)      to Debtor's knowledge, all registered Copyrights, registered Trademarks, and issued Patents that are owned by Debtor and necessary in the to the conduct of its business are valid, subsisting and enforceable and in compliance with all legal requirements, filings, and payments and other actions that are required to maintain such Intellectual Property in full force and effect;

(vi)      Debtor has taken reasonable steps to maintain the confidentiality of and otherwise protect and enforce its rights in all trade secrets owned by Debtor that are necessary in the business of Debtor, and in particular, no portion of any material source code has been disclosed or licensed to any Person, other than its contractors, end user customers and escrow agents pursuant to Debtor's standard form of escrow agreement;

(vii)    no material Copyrights that are licensed or distributed by Debtor are subject to any "copyleft" or other obligation or condition (including any obligation or condition under any "open source" license such as the GNU Public License, Lesser GNU Public License, or Mozilla Public License) that would require, or condition the use or distribution of such software, on the disclosure, licensing or distribution of any source code for any portion of the material Copyrights that are licensed or distributed by Debtor;

(viii)    [Intentionally Omitted]; and

(ix)    No material Intellectual Property License of Debtor that is necessary to the conduct of Debtor's business requires any consent of any other Person in order for Debtor to grant the security interest granted hereunder in Debtor's right, title or interest in or to such Intellectual Property License.

(m)    Schedule E to this Agreement contains a true, complete and current listing of all Commercial Tort Claims in an amount in excess of $25,000 held or maintained by Debtor as of the date hereof, each described by reference to the specific incident given rise to the claim. Debtor agrees to execute and deliver to the Lender a supplement to this Agreement in the form attached hereto as Schedule G, or in such other form reasonably acceptable to the Lender, promptly after a responsible officer of Debtor becomes aware of any other Commercial Tort Claim in an amount in excess of $25,000 held or maintained by Debtor arising after the date hereof (provided Debtor's failure to do so shall not impair the Lender's Lien thereon).

(n)    With respect to Debtor's Receivables scheduled, listed or referred to in any reports delivered to the Lender pursuant to the Credit Agreement (if any), (i) Debtor is the lawful owner of the Receivables and has the right to subject the Receivables to a Lien in favor of the Lender; (ii) the Receivables are genuine and are in all respects what they purport to be; (iii) the Receivables represent undisputed, bona fide transactions completed substantially in accordance with the material terms and provisions contained in the documents delivered to the Lender with respect thereto; and (iv) from and after the date hereof the services furnished and/or goods sold giving rise to the Receivables were not, at the time of sale by Debtor to any Account Debtor, subject to any Lien except as permitted by Section 8.8 of the Credit Agreement.

(o)    With respect to Debtor's Inventory scheduled, listed or referred to in any reports delivered to the Lender pursuant to the Credit Agreement (if any), except to the extent that Debtor has otherwise notified the Lender in writing, (i) Debtor is the lawful owner of such Inventory and has the right to subject such Inventory to a Lien in favor of the Lender; (ii) it is located at a Permitted Collateral Location (except for (A) Inventory which in the ordinary course of Debtor's business is in transit between Permitted Collateral Locations, and (B) Inventory with an aggregate value of $25,000 or less) and (iii) it is not subject to any Lien whatsoever except as permitted by Section 8.8 of the Credit Agreement.

(p)    With respect to Debtor's Equipment, Debtor represents and warrants that, except (i) as disclosed on Schedule F, (ii) for immaterial Equipment subject to an operating lease, or (iii) as indicated by written notice from Debtor to the Lender, (A) it is owned by Debtor and is located on one of the premises listed on Schedule A (except for Equipment (1) which in the ordinary course of Debtor's business is in transit between Permitted Collateral Locations or (2) being repaired or refurbished or which consists of laptops, calculators or other such

00980540

Equipment that is used by an employee of Debtor in the ordinary course of business of Debtor and is in the possession of such employee), (B) it is subject only to Liens permitted by Section 8.8 of the Credit Agreement, and (C) it is in working condition and repair consistent with the condition of such assets as of the Closing Date (ordinary wear and tear, casualty and condemnation excepted).

(q)     Debtor agrees to execute and deliver to the Lender such further agreements, assignments, instruments and documents, and to do all such other things, as the Lender may reasonably deem necessary or appropriate to assure the Lender its Lien hereunder, including without limitation, (i) subject to the limitations set forth in Section 4.2 of the Credit Agreement, executing such instruments and documents as the Lender may from time to time reasonably require to comply with the UCC and any other applicable law, and (ii) executing such control agreements with respect to all Deposit Accounts, and Securities Accounts, Letter-of-Credit Rights with respect to amounts in excess of $25,000, and electronic Chattel Paper in an amount in excess of $25,000, and to use commercially reasonable efforts to cause the relevant depository institutions, financial intermediaries, and letter of credit issuers with respect thereto to execute and deliver such control agreements, as the Lender may from time to time reasonably require. The Lender may order lien searches from time to time against Debtor and the Collateral, provided that such searches shall be at Lender's cost and expense; provided, however, Debtor shall promptly reimburse the Lender for such reasonable costs and expenses incurred in connection with such lien searches if such lien searches provide evidence that the Collateral or any part thereof is encumbered by any Lien, other than Liens permitted by Section 8.8 of the Credit Agreement.  In the event for any reason the law of any jurisdiction other than  becomes or is applicable to the Collateral or any part thereof, or to any of the Obligations, Debtor agrees to execute and deliver all such instruments and documents and to do all such other things as the Lender reasonably deems necessary or appropriate to preserve, protect and enforce the security interest of the Lender under the law of such other jurisdiction.

(r)     On failure of Debtor to perform any of the covenants and agreements herein contained, upon the existence and during the continuance of an Event of Default, upon written demand to Debtor the Lender may, at its option, perform the same and in so doing may expend such sums as the Lender deems advisable in the performance thereof, including, without limitation, the payment of any insurance premiums, the payment of any taxes, Liens, expenditures made in defending against any adverse claims, and all other expenditures which the Lender may be compelled to make by operation of law or which the Lender may make by agreement or otherwise for the protection of the security hereof.  All such sums and amounts so expended shall be repayable by Debtor immediately upon written demand, shall constitute additional Obligations secured hereunder, and shall bear interest from the date said amounts are expended at the rate per annum set forth in Section 1.7(b) of the Credit Agreement.  No such performance of any covenant or agreement by the Lender on behalf of Debtor, and no such advancement or expenditure therefor, shall relieve Debtor of any default under the terms of this Agreement or in any way obligate the Lender to take any further or future action with respect thereto.  The Lender in making any payment hereby authorized may do so according to any bill, statement or estimate procured from the appropriate public office or holder of the claim to be discharged without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax assessment, sale, forfeiture, tax lien or title or claim.  The Lender is hereby authorized to add the amount of such sums and amounts so expended to the principal balance of the Loans and the

Lender shall use commercially reasonable efforts to provide written notice to Debtor of any amount so expended.

**Section 5.  [Intentionally Omitted.]**

**Section 6.  Special Provisions Re: Receivables.**

(a)  As of the time any Receivable becomes subject to the security interest provided for hereby and at all times thereafter, Debtor shall be deemed to have warranted as to each such Receivable that all warranties of Debtor set forth in this Agreement are true and correct in all material respects with respect to such Receivable; that such Receivable and all papers and documents relating thereto are genuine and in all respects what they purport to be; and that such Receivable is valid and subsisting.

(b)  To the extent any Receivable or other item of Collateral in an amount in excess of $10,000 individually or $100,000 in the aggregate is evidenced by an Instrument or tangible Chattel Paper, in each case, with a maturity date equal to or greater than 6 months, Debtor shall promptly notify in writing the Lender thereof and cause such Instrument or tangible Chattel Paper to be pledged and delivered to the Lender.  Following the reasonable written request of the Lender, all tangible Chattel Paper and Instruments not so delivered to the Lender or its agent, shall contain a legend acceptable to the Lender indicating that such Chattel Paper or Instrument is subject to the Lien of the Lender contemplated by this Agreement.

(c)  Any merchandise or other goods which are returned to Debtor by a customer or Account Debtor or otherwise recovered may be resold by Debtor in the ordinary course of its business.  Debtor may settle and adjust disputes and claims with its customers and Account Debtors, handle returns and recoveries, and grant discounts, credits, and allowances in the ordinary course of its business as presently conducted for amounts and on terms which Debtor in good faith considers advisable.  After the occurrence and during the continuation of any Event of Default, no material discount, credit, or allowance other than on normal trade terms in the ordinary course of business as presently conducted shall be granted to any customer or Account Debtor without the Lender's consent. The Lender may, at all times after the occurrence of and during the continuation of any Event of Default, settle or adjust disputes and claims directly with customers or Account Debtors for amounts and upon terms which the Lender reasonably considers advisable.

**Section 7.  Collection of Receivables.**

(a)  Debtor shall make collection of all of its Receivables and may use the same to carry on its business in accordance with sound business practice and otherwise subject to the terms hereof.

(b)  Debtor agrees that all Instruments and Chattel Paper with a maturity date equal to or greater than 6 months and in an amount in excess of $10,000 individually or $100,000 in the aggregate at any time constituting part of the Receivables shall, upon receipt by Debtor, be promptly endorsed to and deposited with the Lender.

(c)  After the occurrence and during the continuation of any Event of Default, whether or not the Lender has exercised any or all of its rights under the provisions of this Section 7, the

00980540

-11-

Lender or its designee may notify Debtor's customers and Account Debtors at any time that Receivables have been assigned to the Lender or of the Lender's Lien thereon, and either in its own name, or Debtor's name, or both, demand, collect (including, without limitation, through a lockbox), receive, receipt for, sue for, compound and give acquittance for any or all amounts due or to become due on Receivables, and in the Lender's discretion file any claim or take any other action or proceeding which the Lender may deem necessary or appropriate to protect and realize upon the Lien of the Lender in the Receivables or any other Collateral.

(d)     Any proceeds of Receivables or other Collateral transmitted to or otherwise received by the Lender pursuant to any of the provisions of Section 7(c) hereof may be handled and administered by the Lender in and through a remittance account or accounts maintained by the Lender at a commercial bank or banks selected by the Lender (collectively the "Depositary Banks" and individually a "Depositary Bank"), and Debtor acknowledges that the maintenance of such remittance accounts by the Lender is solely for the Lender's convenience. The proceeds of Receivables or such other Collateral received by the Lender from any source after the occurrence and during the continuation of an Event of Default shall be applied to the payment of the Obligations (whether or not then due and payable), or otherwise held as security therefor, in accordance with the Credit Agreement. The Lender need not apply or give credit for any item included in proceeds of Receivables or other Collateral until the Depositary Bank has received final payment therefor at its office in cash or final solvent credits current at the site of deposit acceptable to the Lender and the Depositary Bank as such. However, if the Lender does permit credit to be given for any item prior to a Depositary Bank receiving final payment therefor and such Depositary Bank fails to receive such final payment or an item is charged back to the Lender or any Depositary Bank for any reason, the Lender may at its election in either instance charge the amount of such item back against any such remittance accounts or accounts maintained by the Lender at a Depositary Bank, together with interest thereon at the rate per annum then payable under the Credit Agreement with respect to any then unpaid Loans. Concurrently with transmission of any proceeds of Receivables or other Collateral to any such remittance account, upon the Lender's reasonable request, Debtor shall identify the particular Receivable or such other Collateral from which the same arises or relates. Unless and until an Event of Default has occurred and is continuing, the Lender shall release proceeds of Collateral which the Lender has not applied to the Obligations as provided above from the remittance account from time to time after receipt thereof. Debtor hereby indemnifies the Lender from and against all losses, claims, damages, penalties, judgments, liabilities and reasonable, documented out-of-pocket expenses (including without limitation, all reasonable, documented out-of-pocket fees and disbursements of counsel for the Lender and all reasonable, documented out-of-pocket expenses of litigation or preparation therefor, whether or not the Lender is a party thereto, or any settlement arrangement arising from or relating to any such litigation) suffered or incurred by the Lender because of the maintenance of the foregoing arrangements; provided, however, that no Debtor shall be required to indemnify the Lender for any of the foregoing to the extent they have been determined by a final, non-appealable judgment of a court of competent jurisdiction to arise solely and directly from the gross negligence or willful misconduct of the Lender. The Lender shall have no liability or responsibility to Debtor for the Lender or any other Depositary Bank accepting any check, draft or other order for payment of money bearing the legend "payment in full" or words of similar import or any other restrictive legend or endorsement whatsoever or be responsible for determining the correctness of any remittance.

**Section 8.     Special Provisions Re: Inventory and Equipment.**

00980540

(a)     Debtor shall maintain, preserve and keep all of its material Property, plant and equipment in good repair, working order and condition (ordinary wear and tear excepted) and shall from time to time make all needful and proper repairs, renewals, replacements, additions and betterments thereto so that at all times the efficiency thereof shall be fully preserved and maintained in all material respects; provided, that, this Section 8(a) shall not restrict Debtor from consummating any disposition of Property permitted pursuant to Section 8.10 of the Credit Agreement.

(b)     [Intentionally Omitted.]

(c)     Except for Equipment from time to time located on the real estate described on Schedule C to this Agreement (if any) or as otherwise hereafter disclosed to the Lender in writing, none of the Equipment is or will be attached to real estate in such a manner that the same may become a fixture.

(d)     If any of the Inventory valued in excess of $25,000 is at any time evidenced by a document of title, Debtor shall promptly notify the Lender thereof and, at the reasonable request of the Lender, such document shall be promptly delivered by Debtor to the Lender.

(e)     Lender shall not be responsible for:  (a) the safekeeping of the Equipment or Inventory of Debtor; (b) any loss or damage to the Equipment or Inventory of Debtor; (c) any diminution in the value of the Equipment or Inventory of Debtor; or (d) any act or default of any repairman, bailee or any other Person with respect to the Equipment or Inventory of Debtor, except to the extent required by applicable law.  All risk of loss, damage, destruction or diminution in value of the Equipment or Inventory of Debtor shall be borne by Debtor.

**Section 9.     Special Provisions Re: Investment Property and Deposits.**

(a)     Unless an Event of Default has occurred and is continuing and thereafter until notified to the contrary by the Lender pursuant to Section 11(f) hereof:

(i)     Debtor shall be entitled to exercise all voting and/or consensual powers pertaining to its Investment Property or any part thereof, for all purposes not inconsistent with the terms of this Agreement, the Credit Agreement or any other Loan Document; and

(ii)     Debtor shall be entitled to receive and retain all cash dividends paid upon or in respect of its Investment Property.

(b)     All Investment Property maintained by Debtor (including all securities, certificated or uncertificated, securities accounts, and commodity accounts) as of the date hereof is listed and identified on Schedule D to this Agreement.  Debtor shall promptly notify the Lender of any other Investment Property acquired or maintained by Debtor after the date hereof, and shall submit to the Lender a supplement to Schedule D to reflect such additional rights (provided Debtor's failure to do so shall not impair the Lender's Lien thereon).  Certificates for all certificated securities now or at any time constituting Investment Property and part of the Collateral hereunder shall be promptly delivered by Debtor to the Lender duly endorsed in blank for transfer or accompanied by an appropriate assignment or assignments or an appropriate undated stock power or powers, in every case sufficient to transfer title thereto, including, without limitation, all stock received in

00980540

-13-

respect of a stock dividend or resulting from a split-up, revision or reclassification of the Investment Property or any part thereof or received in addition to, in substitution of or in exchange for the Investment Property or any part thereof as a result of a merger, consolidation or otherwise. With respect to any uncertificated securities or any Investment Property held by a securities intermediary, commodity intermediary, or other financial intermediary of any kind (other than in any Excluded Account), at the Lender's request, Debtor shall execute and deliver, and shall use commercially reasonable efforts to cause any such issuer or intermediary to execute and deliver, an agreement among Debtor, the Lender, and such issuer or intermediary in form and substance reasonably satisfactory to the Lender which provides, among other things, for the issuer's or intermediary's agreement that it will comply with such entitlement orders, and apply any value distributed on account of any Investment Property, as directed by the Lender without further consent by Debtor. The Lender may, at any time after the occurrence and during the continuation of a Default or an Event of Default, cause to be transferred into its name or the name of its nominee or nominees any and all of the Investment Property hereunder.

(c)    Debtor may sell or otherwise dispose of any of its Investment Property to the extent permitted by the Credit Agreement, provided that, except to the extent permitted by the Credit Agreement, no Debtor shall sell or otherwise dispose of any capital stock or other Equity Interest in any direct or indirect Subsidiary without the prior written consent of the Lender.

(d)    Debtor represents that on the date of this Agreement, none of its Investment Property consists of margin stock (as such term is defined in Regulation U of the Board of Governors of the Federal Reserve System). If at any time the Investment Property or any part thereof consists of margin stock, Debtor shall promptly so notify the Lender and deliver to the Lender a duly executed and completed Form U-1 and such other instruments and documents reasonably requested by the Lender in form and substance satisfactory to the Lender.

(e)    Notwithstanding anything to the contrary contained herein, in the event any Investment Property is subject to the terms of a separate security agreement in favor of the Lender (including the Pledge Agreement), the terms of such separate security agreement shall govern and control unless otherwise agreed to in writing by the Lender.

(f)    (i) All Deposit Accounts maintained by Debtor on the date hereof are listed and identified (by account number and depository institution) on Schedule D to this Agreement. Debtor shall promptly notify the Lender of any other Deposit Account opened or maintained by Debtor after the date hereof, and shall submit to the Lender a supplement to Schedule D to reflect such additional accounts (provided Debtor's failure to do so shall not impair the Lender's security interest therein). Debtor shall, as of the date of this Agreement or such later date as may be agreed by the Lender (the "Applicable Account Control Date") and at all times thereafter, (i) with respect to all Deposit Accounts of Debtor existing on the date hereof, as of the Applicable Account Control Date, (ii) thirty (30) days (or, in each case, such later date as may be specified by the Lender from time to time in its sole discretion) after the date of acquisition with respect to any Deposit Account acquired by Debtor in any transaction, and (iii) with respect to any Deposit Account created by Debtor after the Applicable Account Control Date, ten (10) days after the date any Deposit Account is created (or, in each case, such later date as may be specified by the Lender from time to time in its sole discretion), in each case, all Deposit Accounts of Debtor maintained with banks or other depository institutions (other than Excluded Accounts) shall be covered by a Deposit Account control agreement entered into among Debtor, the Lender and the

00980540

bank or other depository institution at which such Deposit Account is maintained pursuant to which such bank or other depository institution acknowledges the Lien of Lender in such Deposit Account, agrees to comply with instructions originated by the Lender directing disposition of the funds or other amounts or items in such Deposit Account without further consent from Debtor after the occurrence and during the continuance of an Event of Default, and agrees to subordinate and limit any Lien such bank or other depository institution may have in such account, in each case, on terms reasonably satisfactory to the Lender.

(ii) All securities accounts and commodities accounts maintained by Debtor on the date hereof are listed and identified (by account number and securities intermediary or commodities intermediary) on Schedule D to this Agreement. Debtor shall promptly notify the Lender of any other securities account or commodities account opened or maintained by Debtor after the date hereof, and shall submit to the Lender a supplement to Schedule D to reflect such additional accounts (provided Debtor's failure to do so shall not impair the Lender's security interest therein). At all times from and after the date which is (i) sixty (60) days (or, in each case, such later date as may be specified by the Lender from time to time in its sole discretion) after the Closing Date with respect to all securities accounts and commodities accounts of Debtor existing on the date hereof, (ii) thirty (30) days (or, in each case, such later date as may be specified by the Lender from time to time in its sole discretion) after the date of acquisition with respect to any securities account or commodities account acquired by Debtor in any transaction, and (iii) with respect to any security account or commodities account created by Debtor after the Closing Date, ten (10) days after the date such security account or commodities account is created (or, in each case, such later date as may be specified by the Lender from time to time in its sole discretion), any securities account and commodities account of Debtor maintained with securities intermediaries or commodities intermediaries shall be covered by a control agreement entered into among Debtor, the Lender and the securities intermediary, commodities intermediary or other institution at which such account is maintained pursuant to which such securities intermediary, commodities intermediary or other institution acknowledges the Lien of the Lender in such account, agrees to comply with instructions originated by the Lender directing disposition of the securities, commodities or other amounts or items in such account without further consent from Debtor after the occurrence and during the continuance of an Event of Default, and agrees to subordinate and limit any Lien such securities intermediary, commodities intermediary or other institution may have in such account, in each case, on terms reasonably satisfactory to the Lender.

**Section 10. Power of Attorney**. In addition to any other powers of attorney contained herein, Debtor hereby irrevocably appoints the Lender, its nominee, or any other Person whom the Lender may designate as Debtor's attorney-in-fact, with full power and authority to, after the occurrence and during the continuation of any Event of Default, (i) sign Debtor's name on verifications of Receivables and other Collateral; (ii) send requests for verification of Collateral to Debtor's customers, Account Debtors and other obligors; (iii) endorse Debtor's name on any checks, notes, acceptances, money orders, drafts and any other forms of payment or security that may come into the Lender's possession; (iv) take control in any manner of any item of payment on or proceeds of any Account of Debtor and apply such item of payment or proceeds to the Obligations; (v) endorse the Collateral in blank or to the order of the Lender or its nominee; (vi) sign Debtor's name on any invoice or bill of lading relating to any Collateral, on claims to enforce collection of any Collateral, on notices to and drafts against customers and Account Debtors and other obligors, on schedules and assignments of Collateral, on notices of assignment and on public records; (vii) notify the post office authorities to change the address for delivery of

00980540

-15-

Debtor's mail to an address designated by the Lender; (viii) receive, open and dispose of all mail addressed to Debtor; (ix) to use any Intellectual Property or Intellectual Property Licenses of Debtor, including but not limited to any labels, Patents, Trademarks, trade names, URLs, domain names, industrial designs, Copyrights, or advertising matter, in preparing for sale, advertising for sale, or selling Inventory or other Collateral; (x) bring suit in its own name to enforce the Intellectual Property and Intellectual Property Licenses and, if Lender shall commence any such suit, Debtor shall, at the request of Lender, do any and all lawful acts and execute any and all proper documents reasonably required by Lender in aid of such enforcement; and (xi) do all things necessary to carry out this Agreement. Debtor hereby ratifies and approves all acts of any such attorney acting pursuant to this Section 10 and agrees that neither the Lender nor any such attorney will be liable for any acts or omissions nor for any error of judgment or mistake of fact or law other than as determined by final, non-appealable judgment of a court of competent jurisdiction to be solely and directly caused by the Lender's gross negligence or willful misconduct. The foregoing powers of attorney, being coupled with an interest, are irrevocable until all of the Obligations have been fully paid in cash and satisfied and the commitment of the Lender to extend credit (including, without limitation, the Commitments) to or for the account of the Borrower under the Credit Agreement have expired or otherwise terminated. Previous sections notwithstanding the Power of Attorney does not grant authority to the Lender, or any other successors or assigns, to waive the Tribe's immunity from suit whether express or implied, nor does the Power of Attorney grant any authority over any other tribal entity or limited liability company created under the laws of the tribe.

### Section 11. Defaults and Remedies.

(a)     For the avoidance of doubt, the occurrence of any event or the existence of any condition which is specified as an "Event of Default" under the Credit Agreement shall constitute an "Event of Default" hereunder.

(b)     Upon the occurrence and during the continuation of any Event of Default, the Lender shall have, in addition to all other rights provided herein or by law, the rights and remedies of a secured party under the UCC (regardless of whether the UCC is the law of the jurisdiction where the rights or remedies are asserted and regardless of whether the UCC applies to the affected Collateral), and further the Lender may, without demand and, to the extent permitted by applicable law, without advertisement, notice, hearing or process of law, all of which Debtor hereby waives to the extent permitted by applicable law, at any time or times, sell and deliver any or all Collateral held by or for it at public or private sale, at any securities exchange or broker's board or at the Lender's office or elsewhere, for cash, upon credit or otherwise, at such prices and upon such terms as the Lender deems advisable, in its sole discretion. Upon the occurrence and during the continuation of any Event of Default, in addition to any other right or remedies set forth herein or by applicable law, the Lender may by written demand direct any securities intermediary, commodities intermediary, or other financial intermediary at any time holding any Investment Property, or any issuer thereof, to deliver such Collateral, or any part thereof, to the Lender and/or liquidate such Collateral, or any part thereof, and deliver the proceeds thereof to the Lender. In the exercise of any such remedies, the Lender may sell the Collateral as a unit even though the sales price thereof may be in excess of the amount remaining unpaid on the Obligations. Also, if less than all the Collateral is sold, the Lender shall have no duty to marshal or apportion any part of the Collateral, except as required by the Intercreditor Agreement. In addition to all other sums due the Lender hereunder, Debtor shall

00980540

-16-

pay the Lender all costs and expenses incurred by the Lender, including reasonable attorneys' fees and court costs, in obtaining, liquidating or enforcing payment of Collateral or the Obligations or in the prosecution or defense of any action or proceeding by or against the Lender or Debtor concerning any matter arising out of or connected with this Agreement or the Collateral or the Obligations, including, without limitation, any of the foregoing arising in, arising under or related to a case under the United States Bankruptcy Code (or any successor statute). Any requirement of reasonable notice shall be met if such notice is personally served on or mailed, postage prepaid, to Debtor in accordance with Section 19(b) hereof at least ten (10) days before the time of sale or other event giving rise to the requirement of such notice; provided, however, no notification need be given to Debtor if Debtor has signed, after an Event of Default hereunder has occurred and is continuing, a statement renouncing any right to notification of sale or other intended disposition. The Lender shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given. The Lender may be the purchaser at any such sale. Debtor hereby irrevocably and unconditionally waives all of its rights of redemption from any such sale. The Lender may postpone or cause the postponement of the sale of all or any portion of the Collateral by announcement at the time and place of such sale, and such sale may, without further notice, be made at the time and place to which the sale was postponed or the Lender may further postpone such sale by announcement made at such time and place. The Lender has no obligation to prepare the Collateral for sale. The Lender may sell or otherwise dispose of the Collateral without giving any warranties as to the Collateral or any part thereof, including disclaimers of any warranties of title or the like, and Debtor acknowledges and agrees that the absence of such warranties shall not render the disposition commercially unreasonable.

(c) Without in any way limiting the foregoing, upon the occurrence and during the continuation of any Event of Default hereunder, the Lender shall have the right, in addition to all other rights provided herein or by law, to take physical possession of any and all of the Collateral and anything found therein, the right for that purpose to enter without legal process any premises where the Collateral may be found (provided such entry be done lawfully), and the right to maintain such possession on Debtor's premises (Debtor hereby agreeing, to the extent it may lawfully do so, to lease such premises without cost or expense to the Lender or its designee if the Lender so requests) or to remove the Collateral or any part thereof to such other places as the Lender may desire. Upon the occurrence and during the continuation of any Event of Default hereunder, the Lender shall have the right to exercise any and all rights with respect to all Deposit Accounts of Debtor (subject to Section 4.2(i) of the Credit Agreement), including, without limitation, the right to direct the disposition of the funds in each Deposit Account and to collect, withdraw and receive all amounts due or to become due or payable under each such Deposit Account. Upon the occurrence and during the continuation of any Event of Default hereunder, Debtor shall, upon the Lender's demand, promptly assemble the Collateral and make it available to the Lender at a place reasonably designated by the Lender. If the Lender exercises its right to take possession of the Collateral, Debtor shall also at its expense perform any and all other steps requested by the Lender to preserve and protect the Lien hereby granted in the Collateral, such as placing and maintaining signs indicating the security interest of the Lender, appointing overseers for the Collateral and maintaining Collateral records.

(d) Without in any way limiting the foregoing, upon the occurrence and during the continuation of an Event of Default, the Lender shall have the right to obtain access to the data processing equipment, computer hardware and software of Debtor relating to the Collateral and to

00980540

use all of the foregoing and the information contained therein in any manner the Lender deems appropriate.

(e)     Without in any way limiting the foregoing, upon the occurrence and during the continuation of an Event of Default, Lender is hereby granted a license or other right to use, without liability for royalties or any other charge, Debtor's Intellectual Property, including but not limited to, any labels, Patents, Trademarks, trade names, URLs, domain names, industrial designs, Copyrights, and advertising matter, whether owned by Debtor or with respect to which Debtor has rights under license, sublicense, or other agreements (including any Intellectual Property License) to the extent allowable by license and vendor agreements, as it pertains to the Collateral, in preparing for sale, advertising for sale and selling any Collateral, and Debtor's rights under all licenses and all franchise agreements shall inure to the benefit of Lender.

(f)     Without in any way limiting the foregoing, upon the occurrence and during the continuation of any Event of Default, all rights of Debtor to exercise the voting and/or consensual powers which it is entitled to exercise pursuant to Section 9(a)(i) hereof and/or to receive and retain the distributions which it is entitled to receive and retain pursuant to Section 9(a)(ii) hereof, shall cease and thereupon become vested in the Lender, which, in addition to all other rights provided herein or by law, shall then be entitled solely and exclusively to exercise all voting and other consensual powers pertaining to the Investment Property (including, without limitation, the right to deliver notice of control with respect to any Investment Property held in a securities account or commodity account and deliver all entitlement orders with respect thereto) and/or to receive and retain the distributions which Debtor would otherwise have been authorized to retain pursuant to Section 9(a)(ii) hereof and shall then be entitled solely and exclusively to exercise any and all rights of conversion, exchange or subscription or any other rights, privileges or options pertaining to any Investment Property as if the Lender were the absolute owner thereof including, without limitation, the rights to exchange, at its discretion, any and all of the Investment Property upon the merger, consolidation, reorganization, recapitalization or other readjustment of the respective issuer thereof or upon the exercise by or on behalf of any such issuer or the Lender of any right, privilege or option pertaining to any Investment Property and, in connection therewith, to deposit and deliver any and all of the Investment Property with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Lender may determine.  In the event the Lender in good faith believes any of the Collateral constitutes restricted securities within the meaning of any applicable securities laws, any disposition thereof in compliance with such laws shall not render the disposition commercially unreasonable.

(g)     The powers conferred upon the Lender hereunder are solely to protect its interest in the Collateral and shall not impose on it any duty to exercise such powers.  This Agreement constitutes an assignment of rights only and not an assignment of any duties or obligations of Debtor in any way related to the Collateral, and the Lender shall have no duty or obligation to discharge any such duty or obligation.  The Lender shall have no responsibility for taking any necessary steps to preserve rights against any parties with respect to any Collateral or initiating any action to protect the Collateral against the possibility of a decline in market value.  The Lender shall have no responsibility for ascertaining or taking any action with respect to calls, conversions, exchanges, maturities, tenders, or other matters relating to any Collateral, whether or not the Lender has or is deemed to have knowledge of such matters.  Neither the Lender nor any party acting as attorney for the Lender shall be liable for any acts or omissions or for any error of judgment or mistake of fact or law other than as determined by final, non-appealable judgment of

00980540

-18-

a court of competent jurisdiction to be caused solely and directly by the Lender's gross negligence or willful misconduct.

(h)     Failure by the Lender to exercise any right, remedy or option under this Agreement, any other Loan Document or any other agreement relating to the Loan Documents or referencing obligations to exist under the Loan Documents or provided by law, or delay by the Lender in exercising the same, shall not operate as a waiver; and no waiver shall be effective unless it is in writing, signed by the party against whom such waiver is sought to be enforced and then only to the extent specifically stated. Neither the Lender nor any party acting as attorney for the Lender shall be liable for any acts or omissions or for any error of judgment or mistake of fact or law other than as determined by final, non-appealable judgment of a court of competent jurisdiction to be caused solely and directly by the Lender's gross negligence or willful misconduct. The rights and remedies of the Lender under this Agreement shall be cumulative and not exclusive of any other right or remedy which the Lender may have.

**Section 12.    Application of Proceeds**.  The proceeds and avails of the Collateral at any time received by the Lender upon the occurrence and during the continuation of any Event of Default shall, when received by the Lender in cash or its equivalent, be applied by the Lender in reduction of, or held as collateral security for, the Obligations in accordance with the terms of the Credit Agreement. Debtor shall remain liable to the Lender for any deficiency.  Any surplus remaining after the full payment in cash and satisfaction of all of the Obligations shall be returned to Debtor, or to whomsoever is lawfully entitled thereto.

**Section 13.    Credit Inquiries.**  Debtor hereby authorizes and permits the Lender to respond to usual and customary credit inquiries from third parties concerning Debtor.

**Section 14.    Continuing Agreement**.  This Agreement shall be a continuing agreement in every respect and shall remain in full force and effect until all of the Obligations, both for principal and interest, have been fully paid in cash and satisfied and the commitment of the Lender to extend credit (including, without limitation, the Commitments) to or for the account of the Borrower under the Credit Agreement have expired or otherwise terminated. Subject to Section 20 of this Agreement, upon such termination of this Agreement, the Lender shall, upon the request and at the expense of Debtor, forthwith release its Lien hereunder and provide documentation reasonably requested by Debtor to evidence such termination.  Upon the sale, transfer or other disposition of any Collateral in accordance with the terms and conditions of the Credit Agreement (including a sale, transfer or disposition permitted by the terms of the Credit Agreement or which has otherwise been consented to in writing by the Lender in accordance with the terms of the Credit Agreement), the Lender's Lien in such Collateral shall be automatically released and the Lender shall, upon the request and at the expense of Debtor, release its Lien hereunder and provide documentation reasonably requested by Debtor to evidence such termination.

**Section 15.    [Reserved]**.

**Section 16.    Custody and Preservation of Collateral**.  The Lender shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral in its possession or under its control if such Collateral is accorded treatment substantially equivalent to that which the Lender accords its own property, consisting of similar type assets; provided, that

00980540

failure by the Lender to take the actions set forth in this Section 16, or failure to preserve or protect any right with respect to such Collateral against prior parties, or to do any act with respect to the preservation of such Collateral not so requested by Debtor, in each case shall not of itself be deemed a failure to exercise reasonable care in the custody or preservation of such Collateral.

**Section 17.    Waiver of Demand**.    Demand, presentment, protest and notice of nonpayment are hereby irrevocably waived by Debtor.   Debtor also irrevocably waives the benefit of all valuation, appraisal and exemption laws.

**Section 18.    Waiver of Notice**. UPON THE OCCURRENCE AND DURING THE CONTINUATION OF AN EVENT OF DEFAULT, DEBTOR HEREBY WAIVES TO THE EXTENT PERMITTED BY LAW ALL RIGHTS TO NOTICE AND HEARING OF ANY KIND PRIOR TO THE EXERCISE BY THE LENDER OF ITS RIGHTS TO REPOSSESS THE COLLATERAL WITHOUT JUDICIAL PROCESS OR TO REPLEVY, ATTACH OR LEVY UPON THE COLLATERAL WITHOUT PRIOR NOTICE OR HEARING.

**Section 19.    Miscellaneous.**

(a)    This Agreement cannot be changed or terminated orally.  Any provision of this Agreement or the other Loan Documents may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by Debtor and the Lender.  This Agreement shall create a continuing Lien on the Collateral and shall be binding upon Debtor and its successors and assigns and shall inure to the benefit of the Lender and its successors and permitted assigns; provided, however, that Debtor may not assign its rights or delegate its duties hereunder without the Lender's prior written consent and any such prohibited assignments shall be absolutely void *ab initio*.

(b)    Except as otherwise specified herein, all notices hereunder shall be in writing (including, without limitation, notice by telecopy or electronic mail) and shall be given to the relevant party as set forth in Section 13.8 of the Credit Agreement.

(c)    In the event and to the extent that any provision hereof shall be deemed to be invalid or unenforceable by reason of the operation of any law or by reason of the interpretation placed thereon by any court, this Agreement shall to such extent be construed as not containing such provision, but only as to such locations where such law or interpretation is operative, and the invalidity or unenforceability of such provision shall not affect the validity of any remaining provisions hereof, and any and all other provisions hereof which are otherwise lawful and valid shall remain in full force and effect.

(d)    This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterpart signature pages, each constituting an original, but all together one and the same instrument. Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

00980540

-20-

Debtor acknowledges that this Agreement is and shall be effective upon its execution and delivery by Debtor to the Lender, and it shall not be necessary for the Lender to execute this Agreement or any other acceptance hereof or otherwise to signify or express its acceptance hereof.

(e)    This Agreement, and the rights and duties of the parties hereto, shall be construed and determined in accordance with the laws of New York.  The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning of any provision hereof.

(f)    Subject to the provisions hereof, Debtor, to the extent that Debtor can avail itself of the sovereign immunity of the Tribe, grants a limited waiver of sovereign immunity to the extent set forth in Section 19(f) and limited herein, from suits, actions or arbitration proceedings and consents to suits, actions or arbitration proceedings arising under this Agreement, all in accordance with the terms and limitations herein. Debtor hereby makes this limited waiver of sovereign immunity as follows:

(i)    For the purpose of allowing the Lender to take action necessary to enforce the provisions of this Agreement pursuant to the alternative dispute resolution procedures set forth in Section 19(g) below and to effect enforcement of any remedy granted herein. This limited waiver of sovereign immunity shall survive any attempt by a later Tribal government to revoke Debtor's waiver of sovereign immunity or consents herein. Debtor waives its sovereign immunity, if applicable, from a judgment or order and post judgment proceedings supplemental thereto consistent with the terms and provisions hereof.

(ii)    Subject to this Section 19(f), pursuant to its limited waiver, Debtor expressly waives its immunity from suit and consents to be hailed into arbitration as provided and limited herein and/or to be sued in any of the following subject to the dispute resolution provisions of Section 19(g) herein and for the purpose of compelling arbitration or enforcing a Final Decision (in either instance, a "Judicial Proceeding"): the Lac Courte Oreilles Band of Lake Superior Chippewa Indians Tribal Court, the Wisconsin state court in closest geographic proximity to the Tribe, and the United States District Court for the Western District of Wisconsin and appellate courts therefrom for all three (3) jurisdictions. This waiver is granted solely as to Debtor and to no other governmental or economic entity of the Tribe, and solely to the Lender or its successors or assigns relating to claims arising under this Agreement.

(iii)    Debtor agrees that it shall not plead or raise as a defense to any action brought by the Lender or its successors or assigns any right or claim of right to the requirement of exhaustion of Tribal court remedies, as the parties have expressly agreed, subject to Section 19(f)(ii) above. Each Loan Party hereby expressly waives any requirement which may exist for exhaustion of any remedies available in any Tribal forum prior to the commencement of any dispute, controversy, suit, action proceeding in any state or federal court even if any such Tribal forum would have concurrent jurisdiction over any such dispute, controversy, suit, action or proceeding but for such waiver, and any application of the abstention doctrine and any other law or interpretation thereof that might otherwise require, as a matter of law or comity, that resolution of any claim, controversy or dispute be heard first in a Tribal forum, whether such Tribal forum now exists or is hereinafter created.

(iv)     The limited waiver of Debtor's sovereign immunity granted herein does not include any waiver, either express or implied, to any third party, or constitute a waiver of any other governmental or economic entity of the Tribe.

(v)     Debtor covenants and agrees that the clear, express and unequivocal limited waiver of sovereign immunity and other waivers contained herein are irrevocable for the duration of the waiver set forth in Section 19(f)(vi) below and agrees not to revoke or limit, in whole or in part, such waiver of sovereign immunity or other waivers contained herein or in any way attempt to revoke or limit, in whole or in part, such waiver of sovereign immunity or other waivers, as the case may be. In the event that Debtor (A) revokes, limits, or attempts to revoke or limit the waivers granted herein, (B) takes any action that is inconsistent with the waivers granted herein, or (C) fails to submit to the jurisdiction of the Tribal, state or federal courts or arbitration tribunals as provided herein, the parties expressly recognize and agree that there remains no adequate remedy at law available to the parties and that they will be injured. In any such event, this waiver is limited to Debtor's consent to arbitration proceedings and actions to compel arbitration and/or to enforce any awards or orders issuing from such arbitration proceedings that are sought solely in the forums set forth in Section 19(f)(ii) above.

(vi)     The limited waiver of sovereign immunity of the Debtor as provided for in this Section 19(f) shall expire at the conclusion of the longer of (i) one (1) year after the termination or expiration of this Agreement, or (ii) at the conclusion of any arbitration or litigation matter with respect to this Agreement pending at the termination or expiration of this Agreement.

(g)     All disputes, controversies or claims between the parties arising out of or relating to this Agreement, including without limitation any dispute, controversy or claim between the parties regarding the rights, duties, adequacy of performance, breach, or liabilities of a party under any provision of this Agreement or the validity or enforceability of this Agreement ("Dispute"), shall be resolved by binding arbitration conducted in accordance with the provisions of this Section ("Arbitration Proceedings") and per Debtor's limited waiver of sovereign immunity contained in Section 19(f) above. If a party ("Complaining Party") concludes that the other party ("Responding Party") has failed to comply with, or is proposing to take action which is inconsistent or will breach any term or condition of this Agreement, and the informal efforts to resolve the Dispute as set forth in Section 19(g)(i) below have been unsuccessful, the Complaining Party must give written notice to the Responding Party ("Notice of Dispute"), which specifies: (w) the nature of the Dispute; (x) the corrective action which must be taken to remove, or, where appropriate, to commence removal of, the Dispute, if the Dispute is susceptible to cure ("Corrective Action"); (y) a reasonable time limit within which the Corrective Action must be taken, but in no instance less than thirty (30) days ("Time Limit"); and (z) the amount of damages or losses asserted to have arisen from the Dispute. Except in the case of emergencies, no Arbitration Proceedings on a Dispute may be commenced by a party unless prior Notice of Dispute and opportunity to take Corrective Action have been given as provided in this Section. If, within the Time Limit, the Responding Party fails in the reasonable judgment of the Complaining Party to take substantial steps to make the Corrective Action provided for in the Notice of Dispute then, with respect to the Dispute, either party may initiate Arbitration Proceedings under Section 30 with respect to the asserted Dispute. Each party hereby agrees that this arbitration provision is valid and enforceable and therefore waives any defense or assertion to the contrary. Notwithstanding the foregoing, this Section 19(g) shall not apply to suits seeking injunctive relief

00980540

or specific performance or any impleader action arising from any proceeding commenced by a third party that is related to this Agreement and nothing contained in this Section 19(g) shall prevent any party hereto from resorting to judicial process if injunctive or other equitable relief from a court is necessary to prevent injury to such party or its Affiliates. The use of arbitration procedures will not be construed under the doctrine of laches, waiver or estoppels to affect adversely the rights of any party hereto to assert any claim or defense. Notwithstanding the foregoing, this Section 19(g) shall not apply to suits seeking injunctive relief or specific performance or any impleader action arising from any proceeding commenced by a third party that is related to this Agreement and nothing contained in this Section 19(g) shall prevent any party hereto from resorting to judicial process if injunctive or other equitable relief from a court is necessary to prevent injury to such party or its Affiliates. The use of arbitration procedures will not be construed under the doctrine of laches, waiver or estoppels to affect adversely the rights of any party hereto to assert any claim or defense.

(i) <u>Negotiations/Mediation</u>. Before Arbitration Proceedings are commenced, the parties shall use their best efforts to settle the Dispute by negotiating with each other in good faith and, recognizing their mutual interests, attempting to reach a just and equitable solution satisfactory to both parties. Should the parties' good faith efforts to resolve a Dispute be unsuccessful, the parties agree that prior to resorting to arbitral avenues of relief, they may agree to engage a mutually-acceptable mediator to assist them in resolving the Dispute. If the parties do not reach a solution within a period of thirty (30) days from the date on which the Dispute was first asserted in writing, then the provisions in Section 19(g)(ii) below shall apply.

(ii) <u>Binding Arbitration</u>. Subject to the requirements and limitations of Section 19(g)(i), either party shall have the right to have the Dispute decided by Arbitration Proceedings in the manner provided in this Section 19(g)(ii).

(A) <u>Notice of Intent</u>. A party intending to demand arbitration shall first serve written notice of that intent ("Notice of Intent to Arbitrate") on the other party and shall promptly thereafter file the Notice of Intent to Arbitrate with the American Arbitration Association in accordance with the that organization's rules and pay any required fees. A Notice of Intent to Arbitrate shall specify: (1) the matters to be submitted to arbitration; (2) the nature of the relief to be sought in the arbitration; and (3) the name of the "Pre-Approved Arbitrator" desired to be selected by the party. The parties have established a list of pre-approved, mutually acceptable arbitrators, "Pre-Approved Arbitrators," whom either party may identify as the decider for any Dispute under any arbitration organization's rules. The list of Pre-Approved Arbitrators is contained at <u>Schedule H</u> hereto.

(B) <u>Response</u>. Within ten (10) days after the service of a Notice of Intent to Arbitrate, the other party shall serve a written response ("Response") specifying (A) any additional matters it intends to submit to arbitration relating to the Dispute, and (B) the nature of any relief it intends to seek in the arbitration. The responding party shall promptly thereafter file the Response with the arbitration organization that received the Notice of Intent and pay any required fees. In the event that the Pre-Approved Arbitrator identified by the party initiating a Notice of Intent to Arbitrate is unavailable to serve for whatever reason, the responding party shall in its Response identify an alternate Pre-Approved Arbitrator from <u>Schedule H</u> to hear the Dispute. The parties shall alternate identification of Pre-Approved Arbitrators no longer than

00980540

-23-

each ten (10) days until a Pre-Approved Arbitrator who is able to serve in the timeframes provided in this Agreement is identified.

(C)   <u>Arbitrators</u>. The Pre-Approved Arbitrators identified from <u>Schedule H</u> shall be the "Decider Arbitrator." Any Arbitration Proceedings shall take place exclusively before the single Decider Arbitrator. Any Decider Arbitrator shall be competent and professionally experienced in the matter being arbitrated. The parties further agree that no arbitrator shall be an officer, agent, employee, stockholder or contractor of any party or its affiliates, and nor shall any arbitrator be a member or descendent or spouse of a member or descendent of the Tribe. If no Pre-Approved Arbitrator can serve then the Decider Arbitrator to be appointed shall be selected by the arbitration organization that received the Notice of Intent. All arbitrators, no matter how designated or appointed, shall act as neutral arbitrators. All decisions, awards, orders and other rulings of the arbitrators, relief awarded, or other substantive or procedural matters ("Decisions") shall be made by only the duly-appointed Decider Arbitrator, shall be in writing signed by the Decider Arbitrator, and shall include the findings of fact and conclusions of law on which the Decision is based.

(D)   <u>Conduct of Arbitration</u>. After the Notice of Intent to Arbitrate has been delivered, arbitration shall be considered commenced as to all matters properly submitted under the foregoing provisions, and shall thereafter be prosecuted with diligence in accordance with the following provisions, unless the parties agree otherwise. The Decider Arbitrator shall apply the governing law specified herein, and shall follow such rules of discovery and evidence as the United States District Court for the Western District of Wisconsin would apply. Within sixty (60) days of commencement of the arbitration actions, and after receiving evidence and hearing witnesses, if any, the Decider Arbitrator shall render his or her award, accompanied by findings of fact and a statement of reasons for the decision.

(E)   <u>Standard of Review</u>. All Decisions rendered by the Decider Arbitrator shall be determined in light of the nature of the Dispute, the circumstances surrounding the Dispute, applicable laws, and the rights and interests of the parties, so as to do substantial justice to the parties. No order in Arbitration Proceedings may terminate this Agreement except upon (1) a determination that the Dispute on which the order is based constitutes a material breach of this Agreement, or (2) upon a determination of repeated defaults sufficient to indicate callous indifference to a party's obligations under this Agreement.

(F)   <u>Place of Arbitration</u>. All hearings and other proceedings in the arbitration shall be held at Superior, Wisconsin or Duluth, Minnesota, unless otherwise mutually agreed in writing by the parties.

(G)   <u>Relief Available</u>. With respect to the matters submitted to Arbitration Proceedings, the Decider Arbitrator shall have authority to:

1.     issue appropriate interlocutory orders to mitigate damage or prevent irreparable injury to a party; and

2.     render a final decision which:

00980540

a.      determines or declares the rights, duties, adequacy of performance, breach or liabilities of a party under the Agreement;

b.      orders a party to specifically perform its obligations under the Agreement to the extent allowable by applicable law;

c.      awards appropriate injunctive, declaratory or compensatory monetary relief for the benefit of a party; and/or

d.      contains such further relief and provisions as the arbitrators have jurisdiction and authority to grant.

The Decider Arbitrator shall not have jurisdiction or authority to assess special, consequential or punitive damages against either party. Except as inconsistent with the provisions of this Section 30, the arbitration shall be conducted in accord with the Commercial Rules of the American Arbitration Association then in effect.

(H)      Decision Binding; Enforcement. The Decision of the Decider Arbitrator shall become a "Final Decision" at the time rendered. All Final Decisions shall be conclusive and binding on the parties with respect to the matters decided, and shall be complied with by the parties. A party may enter a Final Decision and institute Judicial Proceedings for the sole purpose of enforcing a Final Decision in any tribunal specified in Section 19(f)(ii) above. In such Judicial Proceedings, neither party, without consent of the other party, shall be entitled to contend that the Final Decision should be vacated, modified or corrected and the parties hereby expressly waive all other rights and remedies that might otherwise be available in the Judicial Proceeding.

(ix)      Costs of Arbitration. All costs of arbitration, including the fees and expenses of the Decider Arbitrator, shall initially be borne equally by the parties, but ultimate responsibility for such costs shall be determined by the Decider Arbitrator in the course of his or her decision and/or award according to the extent to which each party prevailed on the issues subject to the arbitration. Each party shall bear the costs and expenses for the presentation of its case, including the fees of its attorneys and experts.

(x)      Survival of Remedy. Subsequent to any expiration or termination of this Agreement, this Section shall remain available to the parties with respect to Disputes arising out of or relating to this Agreement, whether such Dispute arose prior to the expiration or termination of the Agreement, for the longer of (A) one (1) year, or (B) the conclusion of any proceedings timely initiated pursuant to this Section 19(f)(ii).

Section 20.      Reinstatement.   This Agreement shall continue to be effective, or be reinstated, as the case may be, if at any time any amount received by the Lender in respect of the Secured Obligations is rescinded or must otherwise be restored or returned by the Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Debtor or upon the appointment of any intervenor or conservator of, or trustee or similar official for, Debtor or any substantial part of its assets, or otherwise, all as though such payments had not been made.

00980540

IN WITNESS WHEREOF, Debtor has caused this Security Agreement to be duly executed and delivered as of the date first above written.

**HUMMINGBIRD FUNDS, LLC**, a wholly-owned limited liability company of Lac Courte Oreilles Financial Services LLC, a tribally chartered limited liability company of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians, as Debtor

By:_____

Name: Dulcie Wolf

Title: Chair/Manager

Accepted and agreed to as of the date first above written above.

**DIMENSION CREDIT (CAYMAN), L.P.,**
an exempted limited partnership under the laws of the Cayman Islands, as Lender

By: Dimension Credit GP (Cayman), Ltd.,
    its general partner

By: ███████████████████████
Name: David Baylor
Title: Director

Accepted and agreed to as of the date first above
written above.

**DIMENSION CREDIT (CAYMAN), L.P.,**
an exempted limited partnership under the laws
of the Cayman Islands, as Lender

By: Dimension Credit GP (Cayman), Ltd.,
    its general partner

By:
Name: David Baylor
Title:  Director

**SCHEDULE A**

**LOCATIONS**

| Column 1 | Column 2 | Column 3 |
|---|---|---|
| **Name of debtor** (and state of organization and organizational registration number) | **Chief executive office** (and whether leased or owned, together with name of record owner of such location) | **Additional places of business and collateral locations** (and whether leased or owned, together with name of record owner of such location) |
| Hummingbird Funds, LLC, a wholly-owned limited liability company of Lac Courte Oreilles Financial Services LLC, a tribally chartered limited liability company of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians | PO LCO Box 1506 Hayward, WI 54843 | None |

**SCHEDULE B**

**OTHER NAMES**

| Column 1 | Column 2 | Column 3 |
|---|---|---|
| **NAME OF DEBTOR** | **PRIOR LEGAL NAMES** | **TRADE NAMES** |
| Hummingbird Funds, LLC | None. | Blue Trust Loans<br>Sonicpayday.com<br>247Greenstreet.com<br>Greenpicket.com<br>CashTransfercenters.com<br>PRLDirect.com<br>Zip19.com<br>CashTaxi.com<br>PayDayAvenue.com<br>Holapayday.com |

## SCHEDULE C

## REAL ESTATE LEGAL DESCRIPTIONS

| COLUMN 1 | COLUMN 2 |
|---|---|
| NAME OF DEBTOR | REAL ESTATE LEGAL DESCRIPTIONS |
| Hummingbird Funds, LLC | None. |

**SCHEDULE D**

**INVESTMENT PROPERTY AND DEPOSITS**

| COLUMN 1 | COLUMN 2 | COLUMN 3 |
|---|---|---|
| NAME OF DEBTOR | DESCRIPTION OF INVESTMENT PROPERTY | DESCRIPTION OF DEPOSITS |
| Hummingbird Funds, LLC | None. | |

**SCHEDULE E**

**COMMERCIAL TORT CLAIMS**

| COLUMN 1 | COLUMN 2 |
|---|---|
| NAME OF DEBTOR | DESCRIPTION OF COMMERCIAL TORT CLAIMS |
| Hummingbird Funds, LLC | None. |

**SCHEDULE F**

**LEASED EQUIPMENT**

| COLUMN 1 | COLUMN 2 |
|---|---|
| NAME OF DEBTOR | DESCRIPTION OF LEASED EQUIPMENT |
| Hummingbird Funds, LLC | None. |

## SCHEDULE G

## SUPPLEMENT TO SECURITY AGREEMENT

THIS SUPPLEMENT TO SECURITY AGREEMENT (this "Supplement") is dated as of this _____ day of _____, 20__, from Hummingbird Funds, LLC, a wholly-owned limited liability company of Lac Courte Oreilles Financial Services LLC, a tribally chartered limited liability company formed under the laws of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians ("Debtor"), to Dimension Credit (Cayman), L.P., a Cayman Islands exempted limited partnership (the "Lender").

## PRELIMINARY STATEMENTS

A. Debtor and the Lender are parties to that certain Security Agreement dated as of September 2, 2014 (such Security Agreement, as the same may be amended, restated, supplemented or otherwise modified from time to time, being hereinafter referred to as the "Security Agreement"). All capitalized terms used herein without definition shall have the same meanings herein as such terms are defined in the Security Agreement.

B. Pursuant to the Security Agreement, Debtor granted to the Lender, among other things, a continuing security interest in all Commercial Tort Claims.

C. Debtor has acquired a Commercial Tort Claim, and executes and delivers this Supplement to Security Agreement to confirm and assure the Lender's security interest therein.

NOW, THEREFORE, in consideration of the benefits accruing to Debtor, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. In order to secure payment of the Obligations, whether now existing or hereafter arising, Debtor does hereby unconditionally grants, assigns and pledges to the Lender a continuing lien on and security interest in the Commercial Tort Claim described below:

_____
_____
_____
_____

2. Schedule E (Commercial Tort Claims) to the Security Agreement is hereby amended to include reference to the Commercial Tort Claim referred to in Section 1 above. The Commercial Tort Claim described herein is in addition to, and not in substitution or replacement for, the Commercial Tort Claims heretofore described in and subject to the Security Agreement, and nothing contained herein shall in any manner impair the priority of the liens and security interests heretofore granted by Debtor in favor of the Lender under the Security Agreement.

3.      Debtor agrees to execute and deliver such further instruments and documents and do such further acts and things as the Lender may reasonably deem necessary or proper to carry out more effectively the purposes of this Supplement.

4.      No reference to this Supplement need be made in the Security Agreement or in any other document or instrument making reference to the Security Agreement, with any reference to the Security Agreement in any of such items to be deemed a reference to the Security Agreement as supplemented hereby. Debtor acknowledges that this Supplement shall be effective upon its execution and delivery by Debtor to the Lender, and it shall not be necessary for the Lender to execute this Supplement or any other acceptance hereof or otherwise to signify or express its acceptance hereof.

5.      This Supplement, and the rights and duties of the parties hereto, shall be construed and determined in accordance with the laws of the State of New York.

[signature page follows]

IN WITNESS WHEREOF, Debtor has caused this Supplement to be executed and delivered by its duly authorized officer as of the date first set forth above.

**Hummingbird Funds, LLC**, a wholly-owned limited liability company of Lac Courte Oreilles Financial Services LLC, a tribally chartered limited liability company of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians, as Debtor

By: _____

Name: _DULCIE WOLFE_____

Title: _MANAGER / CHAIR_____

[Signature Page to Supplement to Security Agreement]

## SCHEDULE H

### PRE-APPROVED ARBITRATORS

Robeli Anderson
Lawrence Baca
John Bickerman
Kristen Carpenter
Robert Clinton
Matthew L.M. Fletcher
Zeke Fletcher
Carla Fredericks
JoAnn Cook-Gasco
Carole Goldberg
B.J. Jones
Stacey Leeds
Bryan Newland
Carrie Newton Lyons
John Petoskey
Michael Petoskey
Frank Pommerscheim
Robert Porter
Angela Riley
Addie Rolnick
Wenona Singel
Jill Tompkins
Robert A. Williams

# EXHIBIT E

# PLEDGE AGREEMENT

THIS PLEDGE AGREEMENT (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement") is made and entered into as of September 2, 2014 by and between Lac Courte Oreilles Financial Services LLC, ("Pledgor") a wholly-owned limited liability company of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians (the "Tribe"), a federally recognized Indian tribe organized pursuant to Section 16 of the act of June 18, 1934 (48 Stat. 987)(25 U.S.C. § 476), as amended, and Dimension Credit (Cayman), L.P., an exempted limited partnership under the laws of the Cayman Islands ("Lender").  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement referred to below.

## W I T N E S S E T H:

WHEREAS, Hummingbird Funds, LLC, a sovereign instrumentality and tribal limited liability company wholly-owned by Pledgor ("Hummingbird"), as Borrower, Pledgor, as Guarantor, and Lender are parties to a Credit Agreement dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), pursuant to which Lender has agreed, subject to certain terms and conditions, to extend credit and make certain other financial accommodations available to Borrower;

WHEREAS, Pledgor owns all of the issued and outstanding Equity Interests of each Person set forth on Schedule I attached hereto opposite Pledgor's name (each, an "Issuer"); and

WHEREAS, as a condition to entering into the Credit Agreement with Hummingbird and Pledgor, Lender has required, among other things, that Pledgor shall have made the pledge and hypothecation contemplated by this Agreement.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Pledgor hereby agrees with Lender, as follows:

1. <u>Pledge</u>.  Pledgor hereby unconditionally pledges, assigns and hypothecates to the Lender, and unconditionally grants to Lender, a security interest in:

(a) the Equity Interests of each Issuer identified on <u>Schedule I</u> hereto held by Pledgor (the "Pledged Shares") and the certificates, if any, representing the Pledged Shares, and all equity dividends, cash dividends, cash, instruments, chattel paper and other rights, property or proceeds and products from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Pledged Shares;

(b) all additional Equity Interests of any Issuer at any time acquired by Pledgor in any manner, and the certificates representing such additional Equity Interests (and any such additional Equity Interests shall constitute part of the Pledged Shares under this Agreement), and all equity dividends, cash dividends, distributions, cash, instruments, chattel paper and other rights, property or proceeds and products from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares; and

(c)     all proceeds of any of the foregoing (the assets described in this Section 1 are collectively referred to as, the "Pledged Collateral").

2.     <u>Security for Obligations</u>.     This Agreement and all of the Pledged Collateral secure the prompt payment and performance when due of any and all Obligations, in each case whether now existing or hereafter arising (and whether arising before or after the filing of a petition in bankruptcy and including all interest accrued after the petition date), due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired (all of the indebtedness, obligations, liabilities, expenses and charges set forth in this Section 2 being referred to herein collectively as the "Secured Obligations").

3.     <u>Delivery of Pledged Collateral</u>.     All certificates or instruments representing or evidencing any of the Pledged Collateral shall be delivered to and held by Lender pursuant hereto and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed undated instruments of transfer or assignment in blank, all in form and substance satisfactory to Lender.  Lender shall have the right, at any time in its sole discretion following the occurrence of an Event of Default, to transfer to or to register in the name of Lender or any of its nominees any or all of the Pledged Collateral in order to exercise its rights and remedies hereunder.  In addition, Lender shall have the right to exchange certificates or instruments representing or evidencing any Pledged Collateral for certificates or instruments of smaller or larger denominations.

4.     <u>Representations and Warranties</u>.  In order to induce Lender to enter into this Agreement and for Lender to extend credit under the Credit Agreement, Pledgor represents and warrants that the following statements are true, correct and complete in all material respects as follows:

(a)     <u>Schedule I</u> hereto completely and accurately sets forth the number of Equity Interests of, and options or other rights to purchase or receive the issued and outstanding Equity Interests of each Issuer held by Pledgor as of the date hereof.  The Pledged Shares held by Pledgor constitute the percentage of the issued and outstanding Equity Interests of the each applicable Issuer set forth on <u>Schedule I</u>.  All of such Equity Interests owned by Pledgor are owned legally and beneficially by Pledgor as of the Closing Date and have been duly authorized and validly issued and are fully paid and nonassessable. As of the Closing Date, there are no outstanding warrants, options, subscriptions or other contractual arrangements for the purchase of any other Equity Interests or any securities convertible into Equity Interests of any Issuer, and there are no preemptive rights with respect to the Equity Interests of any Issuer.

(b)     No consent of any other party (including, without limitation, any creditor of Pledgor) and no consent, authorization, approval or other action by, and no notice to or filing with, any Governmental Authority or regulatory body is required either (i) for the pledge by Pledgor of the Pledged Collateral pursuant to this Agreement or for the execution, delivery or performance of this Agreement by Pledgor or (ii) for the exercise by Lender of the voting or other rights provided for in this Agreement or the remedies in respect of any of the Pledged Collateral pledged by Pledgor pursuant to this Agreement (except (A) as may be required in connection with such disposition by laws affecting the offering and sale of securities generally, (B) consents, authorizations and approvals already obtained as of the date hereof and (C) the filing of financing statements or other filings necessary to perfect the security interest granted hereby).

(c)     None of the Pledged Shares held by Pledgor constitutes "margin stock", as defined in Regulation U of the Board of Governors of the Federal Reserve System.

(d)     This Agreement is the legal, valid and binding obligation of Pledgor, enforceable against Pledgor in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or similar laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at law).

(e)     All information heretofore, herein or hereafter supplied to Lender by or on behalf of Pledgor with respect to the any of the Pledged Collateral is and will be accurate and complete in all material respects.

(f)     No Pledged Shares consisting of either (i) a membership interest in an Issuer that is a limited liability company or (ii) a partnership interest in an Issuer that is a partnership, in each case, provides by its terms that it is a "security" governed by Article 8 of the Uniform Commercial Code as in effect under the laws of any state having jurisdiction.

5.     <u>Further Assurances</u>.

(a)     Subject to the limitations set forth in Section 4.2. of the Credit Agreement, Pledgor will, from time to time, at Pledgor's expense, promptly execute and deliver all further instruments and documents and take all further action that may be reasonably necessary or desirable, or that Lender may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby, to enable Lender to exercise and enforce its rights and remedies hereunder with respect to any Pledged Collateral or to carry out the provisions and purposes hereof. Without limiting the generality of the foregoing, but subject to the limitations set forth in Section 4.2. of the Credit Agreement, Pledgor will: (i) execute and file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be reasonably necessary or desirable, or as Lender may reasonably request, in order to perfect and preserve the security interests granted or purported to be granted hereby under the laws of any applicable jurisdiction; (ii) appear in and defend any action or proceeding that may affect Pledgor's title to or Lender's security interest in the Pledged Collateral; and (iii) promptly after the purchase or other acquisition thereof, deliver to Lender all Pledged Shares hereunder.

(b)     Pledgor will, promptly upon request, provide to Lender all information and evidence it may reasonably request concerning the Pledged Collateral to enable Lender to enforce the provisions of this Agreement.

(c)     Pledgor will, promptly upon the purchase or acquisition of any additional Equity Interests of any Issuer and subject to the limitations and time periods (if any) prescribed in Section 4 of the Credit Agreement, deliver to Lender the certificates, if any, evidencing such Equity Interests as required by Section 3 above, together with a proxy substantially in the form attached hereto as <u>Exhibit A</u>, and a pledge amendment, duly executed by Pledgor, in substantially the form of <u>Exhibit B</u> hereto (a "Pledge Amendment"), in respect of the additional shares which are to be pledged pursuant to this Agreement. Pledgor hereby authorizes Lender to attach each Pledge Amendment to this Agreement and agrees that all shares listed on any Pledge Amendment delivered to Lender shall for all purposes hereunder be considered Pledged Collateral.

(d)     Pledgor shall not take any action to cause any membership interest or partnership interest comprising the Pledged Collateral to be or become a "security" within the meaning of, or to be governed by Article 8 of the Uniform Commercial Code as in effect under the laws of any state having jurisdiction and shall not cause or permit any Issuer to "opt in" or to take any other action seeking to establish any membership interest or partnership interest of the Pledged Collateral as a "security" or to become certificated.

6.      Voting Rights; Dividends; Etc.

(a)     So long as no Event of Default shall have occurred and is continuing:

(i)     Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Pledged Collateral or any part thereof for any purpose not inconsistent with the terms of this Agreement; provided, however, that Pledgor shall not exercise or refrain from exercising any such right if such action or inaction would have a material adverse effect on the security interest granted hereunder on the Pledged Collateral.

(ii)    (A) Any cash dividends and other cash distributions paid or payable with respect to any of the Pledged Collateral shall be paid to Pledgor, and (B) any and all instruments, chattel paper and other rights, property or proceeds and products (other than cash or checks) received, receivable or otherwise distributed in respect of, or in exchange for, any Pledged Collateral, shall be, and shall be forthwith, delivered to Lender to hold as Pledged Collateral.

(iii)   Lender shall execute and deliver (or cause to be executed and delivered) to Pledgor all such proxies and other instruments as Pledgor may reasonably request for the purpose of enabling Pledgor to exercise the voting and other rights which Pledgor is entitled to exercise pursuant to paragraph (i) above, and to receive the dividends which Pledgor is authorized to receive and retain pursuant to paragraph (ii) above.

(b)     Upon the occurrence and during the continuance of an Event of Default:

(i)     All rights of Pledgor to receive and retain any cash dividends and distributions, and to exercise the voting and other consensual rights which Pledgor would otherwise be entitled to exercise, shall automatically and immediately (without any action by any Person) cease to be effective (other than dividends and distributions which are permitted at all times pursuant to Section 8.12 of the Credit Agreement), and become vested in Lender, who shall thereupon have the sole right to exercise such voting and other consensual rights and the sole right to receive and hold as Pledged Collateral such dividends (and, apply them to payment of the Secured Obligations). In order to permit Lender to exercise the voting and other consensual rights which it may be entitled to exercise pursuant hereto and to receive all dividends and other distributions which it may be entitled to receive hereunder, (A) Pledgor shall promptly execute and deliver (or cause to be executed and delivered) to Lender all such proxies, dividend payment orders and other instruments as Lender may from time to time request, and (B) without limiting the effect of clause (A) above, Pledgor hereby grants to Lender an irrevocable proxy coupled with an interest to vote the Pledged Collateral and to exercise all other rights, powers, privileges and remedies to which a holder of the Pledged Collateral would be entitled (including giving or withholding written consents, calling special meetings and voting at such meetings), which proxy shall be effective,

-4-

automatically and without the necessity of any action (including any transfer of the Pledged Collateral on the record books of the issuer thereof) by any other Person (including the issuer of the Pledged Collateral or any officer or agent thereof), upon the occurrence and during the continuance of an Event of Default, and which proxy shall only terminate upon the payment in full in cash of the Secured Obligations (other than unasserted contingent indemnification obligations) and termination of the Loan Documents. In furtherance of the foregoing, Pledgor shall execute an irrevocable proxy substantially in the form attached hereto as <u>Exhibit A</u> (a "Proxy") in blank contemporaneously herewith.

(ii) All dividends which are received by Pledgor contrary to the provisions of this subsection 6(b) shall be received in trust for the benefit of Lender, shall be segregated from other funds of Pledgor and shall be forthwith paid over to Lender as Pledged Collateral, in the same form as so received (with any necessary endorsement).

7. <u>Transfers and Other Liens; Additional Shares</u>.

(a) Pledgor agrees that Pledgor will not (i) encumber, sell, assign (by operation of law or otherwise) (other than Liens permitted under Section 8.8 of the Credit Agreement) or otherwise dispose of (other than dispositions permitted under Section 8.10 of the Credit Agreement), or grant any option with respect to, any of the Pledged Collateral or (ii) enter into any other contractual obligations which could reasonably be expected to restrict or inhibit Lender's rights or ability to sell or otherwise dispose of the Pledged Collateral or any part thereof after the occurrence and during the continuance of an Event of Default.

(b) Pledgor agrees that it will (i) not cause any Issuer to issue any Equity Interests or other securities (including any warrants, options, subscriptions or other contractual arrangements for the purchase of Equity Interests or securities convertible into Equity Interests) in addition to or in substitution for the Pledged Shares unless such additional or substituted shares are issued solely to Pledgor and are pledged to Lender concurrent with such issuance and as provided herein, and (ii) deliver hereunder, immediately upon its acquisition (directly or indirectly) thereof, any additional written material representing any additional Pledged Collateral. Pledgor hereby authorizes Lender to modify this Agreement by unilaterally amending <u>Schedule I</u> to include such Equity Interests or other securities.

8. <u>Lender Appointed Attorney-in-Fact</u>. Pledgor hereby irrevocably appoints Lender as Pledgor's attorney-in-fact effective upon the occurrence and during the continuance of an Event of Default, with full authority in the place and stead of Pledgor and in the name of Pledgor, Lender or otherwise, from time to time in Lender's discretion to take any action (including completion and presentation of any proxy) and to execute any instrument that Lender may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, to (i) receive, indorse and collect all instruments made payable to Pledgor representing any dividend or other distribution in respect of the Pledged Collateral or any part thereof; (ii) exercise the voting and other consensual rights pertaining to the Pledged Collateral; and (iii) subject to and in accordance with the provisions of Section 11 hereof, sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Pledged Collateral as fully and completely as though Lender was the absolute owner thereof for all purposes, and to do, at Lender's option and Pledgor's expense, at any time or from time to time, all acts and things that Lender deems necessary to protect, preserve or realize upon the Pledged Collateral. Pledgor hereby ratifies

and approves all acts Lender may take pursuant to this Section 8. Except as specifically set forth in Section 10 hereof, neither Lender nor any Person designated by Lender shall be liable for any acts or omissions or for any error of judgment or mistake of fact or law other than those resulting from Lender's gross negligence or willful misconduct as determined by a final, non-appealable judgment of a court of competent jurisdiction. This power of attorney, being coupled with an interest, shall be irrevocable until all Secured Obligations shall have been paid in full in cash (other than unasserted contingent indemnification obligations) and the Loan Documents shall have been terminated.

9. _Lender May Perform_. If Pledgor fails to perform any agreement contained herein, upon the occurrence and during the continuance of an Event of Default, Lender may itself perform, or cause performance of, such agreement, and the expenses of Lender incurred in connection therewith shall be payable by Pledgor under Section 14 hereof, and be a part of the Secured Obligations.

10. _Limitation on Duty of Lender with Respect to the Pledged Collateral_. The powers conferred on Lender hereunder are solely to protect its interest in all of the Pledged Collateral and shall not impose any duty on it to exercise any such powers. Except for the safe custody of any Pledged Collateral in its possession and the accounting for monies actually received by it hereunder, Lender shall have no duty with respect to any Pledged Collateral. Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Pledged Collateral in its possession if such Pledged Collateral is accorded treatment that is substantially equivalent to that which Lender accords its own property, it being expressly agreed that Lender shall have no responsibility for (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Pledged Collateral, whether or not Lender has or is deemed to have knowledge of such matters, or (ii) taking any necessary steps to preserve rights against any parties with respect to any Pledged Collateral, but Lender may do so and all expenses incurred in connection therewith shall be payable by and for the sole account of Pledgor.

11. _Remedies upon Event of Default_. If any Event of Default shall have occurred and is continuing:

(a) Lender may exercise in respect of any of the Pledged Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party under the Uniform Commercial Code (the "UCC") in effect in the State of New York at that time, whether or not the UCC applies to the affected Pledged Collateral, and Lender may also, without notice except as expressly specified below, sell all of the Pledged Collateral pledged by Pledgor or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at any of Lender's offices or elsewhere, for cash, on credit, or for future delivery, at such price or prices and upon such other terms as Lender deems commercially reasonable. Pledgor acknowledges and agrees that such a private sale may result in prices and other terms which may be less favorable to the seller than if such sale were a public sale. Pledgor agrees that, to the extent notice of sale shall be required by law, at least ten (10) days' notice to Pledgor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. At any sale of any of the Pledged Collateral, if permitted by law, Lender may bid (which bid may be, in whole or in part, in the form of cancellation of indebtedness) for the purchase of such Pledged Collateral or any portion thereof. Lender shall not be obligated to make any sale of Pledged Collateral regardless of notice of sale having been given. Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed

therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Lender shall be under no obligation to delay a sale of any of the Pledged Collateral for the period of time necessary to permit the issuing corporation of such securities to register such securities for public sale under the Securities Act of 1933, as from time to time amended (the "Securities Act"), or under applicable state securities laws, even if the issuing corporation would agree to do so. To the extent permitted by law, Pledgor hereby specifically waives all rights of redemption, stay or appraisal which Pledgor has or may have under any law now existing or hereafter enacted.

(b)     All cash proceeds received by Lender in respect of any sale of, collection from, or other realization upon all or any part of the Pledged Collateral may, in the discretion of Lender, be held by Lender as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to Lender pursuant to Section 14 hereof) in whole or in part by Lender against all or any part of the Secured Obligations in such order as Lender shall elect. Any surplus of such cash or cash proceeds held by Lender and remaining after payment in full in cash of all the Secured Obligations (other than unasserted contingent indemnification obligations) shall be paid over to Pledgor or to whomsoever may be lawfully entitled to receive such surplus as required by law or as a court of competent jurisdiction may direct; provided, that, in the event that all of the conditions to the termination of this Agreement pursuant to Section 15 hereof shall not have been fulfilled, such balance shall be held and applied from time to time as provided in this subsection 11(b) until all such conditions shall have been fulfilled.

(c)     Pledgor recognizes that Lender may be unable to effect a public sale of all or part of the Pledged Collateral and may be compelled to resort to one or more private sales to a restricted group of purchasers who will be obligated to agree, among other things, to acquire such Pledged Collateral for their own account, for investment and not with a view to the distribution or resale thereof. Pledgor acknowledges that any such private sales may be at prices and on terms less favorable to the seller than if sold at public sales and agrees that such private sales shall be deemed to have been made in a commercially reasonable manner, and that Lender has no obligation to delay sale of any such Pledged Collateral for the period of time necessary to permit the issuer of such Pledged Collateral to register such Pledged Collateral for public sale under the Securities Act.

12.     <u>Remedies Cumulative</u>.  No failure on the part of Lender to exercise, and no delay in exercising and no course of dealing with respect to, any power, privilege or right under this Agreement or the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise by Lender of any power, privilege or right under this Agreement or the other Loan Documents preclude any other or further exercise thereof or the exercise of any other such power, privilege or right. The powers, privileges and rights in this Agreement and the other Loan Documents are cumulative and are not exclusive of any other remedies provided by law.

13.     <u>Application of Proceeds</u>.  Upon the occurrence and during the continuance of an Event of Default, the proceeds of any sale of, or other realization upon, all or any part of any Pledged Collateral shall be applied in accordance with Section 3.1 of the Credit Agreement.

14.     <u>Expenses</u>.  Pledgor shall promptly pay to Lender all reasonable and documented out-of-pocket costs and expenses of Lender in connection with protecting or perfecting

Lender's security interest in all of the Pledged Collateral or in connection with any matters contemplated by or arising out of this Agreement or any of the other Loan Documents.

15. <u>Termination of Security Interests; Release of Collateral</u>. Subject to Section 20 herein, upon payment in cash and performance in full of all Secured Obligations (other than unasserted contingent indemnification obligations) and termination of the Credit Agreement, the security interests shall automatically terminate and all rights to the Pledged Collateral shall automatically revert to Pledgor. Upon such termination of the security interests or release of any Pledged Collateral, Lender will, at the expense of Pledgor, and subject to Section 20 herein, execute and deliver to Pledgor such documents as Pledgor shall reasonably request to evidence the termination of the security interests or the release of such Pledged Collateral which has not yet theretofore been sold or otherwise applied or released, and shall return to Pledgor all Equity Interest certificates and proxies relating to or evidencing any of the Pledged Collateral. Such release shall be without recourse or warranty to Lender.

16. <u>Amendments, Waivers and Consents</u>. No amendment, modification, termination or waiver of any provision of this Agreement, or consent to any departure by Pledgor therefrom, shall in any event be effective without the written concurrence of Lender and Pledgor.

17. <u>Notices</u>. Except as otherwise specified herein, all notices hereunder shall be in writing (including, without limitation, notice by telecopy) and shall be given to the relevant party as set forth in Section 13.8 of the Credit Agreement.

18. <u>Continuing Security Interest; Successors and Assigns</u>. This Agreement shall create a continuing security interest in all of the Pledged Collateral and shall (i) remain in full force and effect until payment in cash and performance in full of the Secured Obligations (other than unasserted contingent indemnification obligations) and termination of the Credit Agreement, (ii) be binding upon Pledgor, Pledgor's successors and assigns, and (iii) inure, together with the rights and remedies of Lender hereunder, to the benefit of Lender and its successors and permitted assigns. Pledgor may not assign or transfer any of its interests or obligations hereunder without the prior consent of Lender, and any such prohibited assignment shall be absolutely void *ab initio*.

19. <u>Waiver</u>.

(a) In addition to any other waivers herein, Pledgor waives to the greatest extent it may lawfully do so, and agrees that it shall not at any time insist upon, plead or in any manner whatever claim or take the benefit or advantage of, any appraisal, valuation, stay, extension, marshalling of assets, redemption or similar law, or exemption, whether now or at any time hereafter in force, which may delay, prevent or otherwise affect the performance by Pledgor of its obligations under, or the enforcement by Lender of, this Agreement. Except as otherwise provided in this Agreement and the other Loan Documents, Pledgor hereby waives diligence, presentment and demand (whether for nonpayment or protest or of acceptance, maturity, extension of time, change in nature or form of the Secured Obligations, acceptance of further security, release of further security, composition or agreement arrived at as to the amount of, or the terms of, the Secured Obligations, notice of adverse change in any Issuer's or any other Person's financial condition or any other fact which might materially increase the risk to Pledgor) with respect to any

of the Secured Obligations or all other demands whatsoever and waives the benefit of all provisions of law which are or might be in conflict with the terms of this Agreement.

(b) If Lender may, under applicable law, proceed to realize its benefits under any of the Loan Documents giving such party a lien upon any Collateral, whether owned by any Issuer or by any other Person, either by judicial foreclosure or by non-judicial sale or enforcement, Lender may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of the rights and remedies of Lender under this Agreement.

20. <u>Reinstatement</u>. This Agreement shall continue to be effective, or be reinstated, as the case may be, if at any time any amount received by Lender in respect of the Secured Obligations is rescinded or must otherwise be restored or returned by Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Pledgor or any Issuer or upon the appointment of any intervenor or conservator of, or trustee or similar official for, Pledgor or any Issuer or any substantial part of its assets, or otherwise, all as though such payments had not been made.

21. <u>Severability</u>. The provisions of this Agreement are severable, and if any clause or provision shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision of this Agreement in any jurisdiction.

22. <u>Interpretation</u>. Time is of the essence of each provision of this Agreement of which time is an element. All terms not defined herein or in the Credit Agreement shall have the meanings set forth in the UCC, except where the context otherwise requires.

23. <u>Survival of Provisions</u>. All agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement, the Credit Agreement and the other Loan Documents, the making of the Loans thereunder and the execution and delivery of the Notes. Notwithstanding anything in this Agreement or implied by law to the contrary, the agreements, representations and warranties of Pledgor set forth herein shall terminate only upon payment in full in cash of the Secured Obligations (other than unasserted contingent indemnification obligations) and the Notes, and the termination of this Agreement.

24. <u>Statute of Limitations</u>. Pledgor hereby waives the right to plead any statute of limitations as a defense to any indebtedness or obligation hereunder or secured hereby to the full extent permitted by law.

25. [<u>Intentionally Omitted</u>.]

26. <u>Headings Descriptive</u>. The headings in this Agreement are for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

27. <u>Counterparts; Electronic Execution</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall together constitute one and the same agreement. Delivery of an executed counterpart of this

Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

28. <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>. This Agreement, and the rights and duties of the parties hereto, shall be construed and determined in accordance with the laws of New York. Pledgor hereby submits to the exclusive jurisdiction of the courts set forth in <u>Section 29</u> below for purposes of all legal proceedings arising out of or relating to this Agreement or the transactions contemplated hereby. Nothing in this Agreement shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Agreement in the courts of any jurisdiction. Pledgor irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum. PLEDGOR AND LENDER HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

29. <u>Limited Waiver of Sovereign Immunity</u>. Subject to the provisions hereof, Pledge, to the extent that Pledgor can avail itself of the sovereign immunity of the Tribe, grants a limited waiver of sovereign immunity to the extent set forth in Section 30 and limited herein, from suits, actions or arbitration proceedings and consents to suits, actions or arbitration proceedings arising under this Agreement, all in accordance with the terms and limitations herein. Pledgor hereby makes this limited waiver of sovereign immunity as follows:

(a) For the purpose of allowing Lender to take action necessary to enforce the provisions of this Agreement pursuant to the alternative dispute resolution procedures set forth in Section 30 below and to effect enforcement of any remedy granted herein. This limited waiver of sovereign immunity shall survive any attempt by a later Tribal government to revoke Pledgor's waiver of sovereign immunity or consents herein. Pledgor waives its sovereign immunity, if applicable, from a judgment or order and post judgment proceedings supplemental thereto consistent with the terms and provisions hereof.

(b) Subject to this Section 29, pursuant to its limited waiver, Pledgor expressly waives its immunity from suit and consents to be hailed into arbitration as provided and limited herein and/or to be sued in any of the following subject to the dispute resolution provisions of Section 30 herein and for the purpose of compelling arbitration or enforcing a Final Decision (in either instance, a "Judicial Proceeding"): the Lac Courte Oreilles Band of Lake Superior Chippewa Indians Tribal Court, the Wisconsin state court in closest geographic proximity to the Tribe, and the United States District Court for the Western District of Wisconsin and appellate courts therefrom for all three (3) jurisdictions. This waiver is granted solely as to Pledgor and to no other governmental or economic entity of the Tribe, and solely to the Lender or its successors or assigns relating to claims arising under this Agreement.

(c)     Pledgor agrees that it shall not plead or raise as a defense to any action brought by the Lender or its successors or assigns any right or claim of right to the requirement of exhaustion of Tribal court remedies, as the parties have expressly agreed, subject to Section 29(b) above. Pledgor hereby expressly waives any requirement which may exist for exhaustion of any remedies available in any Tribal forum prior to the commencement of any dispute, controversy, suit, action proceeding in any state or federal court even if any such Tribal forum would have concurrent jurisdiction over any such dispute, controversy, suit, action or proceeding but for such waiver, and any application of the abstention doctrine and any other law or interpretation thereof that might otherwise require, as a matter of law or comity, that resolution of any claim, controversy or dispute be heard first in a Tribal forum, whether such Tribal forum now exists or is hereinafter created.

(d)     The limited waiver of Pledgor's sovereign immunity granted herein does not include any waiver, either express or implied, to any third party, or constitute a waiver of any other governmental or economic entity of the Tribe.

(e)     Pledgor covenants and agrees that the clear, express and unequivocal limited waiver of sovereign immunity and other waivers contained herein are irrevocable for the duration of the waiver set forth in Section 29(f) below and agrees not to revoke or limit, in whole or in part, such waiver of sovereign immunity or other waivers contained herein or in any way attempt to revoke or limit, in whole or in part, such waiver of sovereign immunity or other waivers, as the case may be. In the event that Pledgor (i) revokes, limits, or attempts to revoke or limit the waivers granted herein, (ii) takes any action that is inconsistent with the waivers granted herein, or (iii) fails to submit to the jurisdiction of the Tribal, state or federal courts or arbitration tribunals as provided herein, the parties expressly recognize and agree that there remains no adequate remedy at law available to the parties and that they will be injured. In any such event, this waiver is limited to Pledgor's consent to arbitration proceedings and actions to compel arbitration and/or to enforce any awards or orders issuing from such arbitration proceedings that are sought solely in the forums set forth in Section 29(b) above.

(f) The limited waiver of sovereign immunity of Pledgor as provided for in this Section 29 shall expire at the conclusion of the longer of (i) one (1) year after the termination or expiration of this Agreement, or (ii) at the conclusion of any arbitration or litigation matter with respect to this Agreement pending at the termination or expiration of this Agreement.

30.     Arbitration.   All disputes, controversies or claims between the parties arising out of or relating to this Agreement, including without limitation any dispute, controversy or claim between the parties regarding the rights, duties, adequacy of performance, breach, or liabilities of a party under any provision of this Agreement or the validity or enforceability of this Agreement ("Dispute"), shall be resolved by binding arbitration conducted in accordance with the provisions of this Section ("Arbitration Proceedings") and per Pledgor's limited waiver of sovereign immunity contained in Section 29 above. If a party ("Complaining Party") concludes that the other party ("Responding Party") has failed to comply with, or is proposing to take action which is inconsistent or will breach any term or condition of this Agreement, and the informal efforts to resolve the Dispute as set forth in Section 30(a) below have been unsuccessful, the Complaining Party must give written notice to the Responding Party ("Notice of Dispute"), which specifies: (i) the nature of the Dispute; (ii) the corrective action

-11-

which must be taken to remove, or, where appropriate, to commence removal of, the Dispute, if the Dispute is susceptible to cure ("Corrective Action"); (iii) a reasonable time limit within which the Corrective Action must be taken, but in no instance less than thirty (30) days ("Time Limit"); and (iv) the amount of damages or losses asserted to have arisen from the Dispute. Except in the case of emergencies, no Arbitration Proceedings on a Dispute may be commenced by a party unless prior Notice of Dispute and opportunity to take Corrective Action have been given as provided in this Section. If, within the Time Limit, the Responding Party fails in the reasonable judgment of the Complaining Party to take substantial steps to make the Corrective Action provided for in the Notice of Dispute then, with respect to the Dispute, either party may initiate Arbitration Proceedings under Section 30 with respect to the asserted Dispute. Each party hereby agrees that this arbitration provision is valid and enforceable and therefore waives any defense or assertion to the contrary. Notwithstanding the foregoing, this Section 30 shall not apply to suits seeking injunctive relief or specific performance or any impleader action arising from any proceeding commenced by a third party that is related to this Agreement and nothing contained in this Section 30 shall prevent any party hereto from resorting to judicial process if injunctive or other equitable relief from a court is necessary to prevent injury to such party or its Affiliates. The use of arbitration procedures will not be construed under the doctrine of laches, waiver or estoppels to affect adversely the rights of any party hereto to assert any claim or defense. Notwithstanding the foregoing, this Section 30 shall not apply to suits seeking injunctive relief or specific performance or any impleader action arising from any proceeding commenced by a third party that is related to this Agreement and nothing contained in this Section 30 shall prevent any party hereto from resorting to judicial process if injunctive or other equitable relief from a court is necessary to prevent injury to such party or its Affiliates. The use of arbitration procedures will not be construed under the doctrine of laches, waiver or estoppels to affect adversely the rights of any party hereto to assert any claim or defense.

      (a)    <u>Negotiations/Mediation</u>. Before Arbitration Proceedings are commenced, the parties shall use their best efforts to settle the Dispute by negotiating with each other in good faith and, recognizing their mutual interests, attempting to reach a just and equitable solution satisfactory to both parties. Should the parties' good faith efforts to resolve a Dispute be unsuccessful, the parties agree that prior to resorting to arbitral avenues of relief, they may agree to engage a mutually-acceptable mediator to assist them in resolving the Dispute. If the parties do not reach a solution within a period of thirty (30) days from the date on which the Dispute was first asserted in writing, then the provisions in Section 30(b) below shall apply.

      (b)    <u>Binding Arbitration</u>. Subject to the requirements and limitations of Section 30(a), either party shall have the right to have the Dispute decided by Arbitration Proceedings in the manner provided in this Section 30(b).

      (i)    <u>Notice of Intent</u>. A party intending to demand arbitration shall first serve written notice of that intent ("Notice of Intent to Arbitrate") on the other party and shall promptly thereafter file the Notice of Intent to Arbitrate with the American Arbitration Association in accordance with the that organization's rules and pay any required fees. A Notice of Intent to Arbitrate shall specify: (A) the matters to be submitted to arbitration; (B) the nature of the relief to be sought in the arbitration; and (C) the name of the "Pre-Approved Arbitrator" desired to be selected by the party. The parties have established a list of pre-approved, mutually acceptable arbitrators, "Pre-Approved Arbitrators," whom either party may identify as the

decider for any Dispute under any arbitration organization's rules. The list of Pre-Approved Arbitrators is contained at Schedule J hereto.

(ii) <u>Response</u>. Within ten (10) days after the service of a Notice of Intent to Arbitrate, the other party shall serve a written response ("Response") specifying (A) any additional matters it intends to submit to arbitration relating to the Dispute, and (B) the nature of any relief it intends to seek in the arbitration. The responding party shall promptly thereafter file the Response with the arbitration organization that received the Notice of Intent and pay any required fees. In the event that the Pre-Approved Arbitrator identified by the party initiating a Notice of Intent to Arbitrate is unavailable to serve for whatever reason, the responding party shall in its Response identify an alternate Pre-Approved Arbitrator from Schedule J to hear the Dispute. The parties shall alternate identification of Pre-Approved Arbitrators no longer than each ten (10) days until a Pre-Approved Arbitrator who is able to serve in the timeframes provided in this Agreement is identified.

(iii) <u>Arbitrators</u>. The Pre-Approved Arbitrators identified from Schedule J shall be the "Decider Arbitrator." Any Arbitration Proceedings shall take place exclusively before the single Decider Arbitrator. Any Decider Arbitrator shall be competent and professionally experienced in the matter being arbitrated. The parties further agree that no arbitrator shall be an officer, agent, employee, stockholder or contractor of any party or its affiliates, and nor shall any arbitrator be a member or descendent or spouse of a member or descendent of the Tribe. If no Pre-Approved Arbitrator can serve then the Decider Arbitrator to be appointed shall be selected by the arbitration organization that received the Notice of Intent. All arbitrators, no matter how designated or appointed, shall act as neutral arbitrators. All decisions, awards, orders and other rulings of the arbitrators, relief awarded, or other substantive or procedural matters ("Decisions") shall be made by only the duly-appointed Decider Arbitrator, shall be in writing signed by the Decider Arbitrator, and shall include the findings of fact and conclusions of law on which the Decision is based.

(iv) <u>Conduct of Arbitration</u>. After the Notice of Intent to Arbitrate has been delivered, arbitration shall be considered commenced as to all matters properly submitted under the foregoing provisions, and shall thereafter be prosecuted with diligence in accordance with the following provisions, unless the parties agree otherwise. The Decider Arbitrator shall apply the governing law specified herein, and shall follow such rules of discovery and evidence as the United States District Court for the Western District of Wisconsin would apply. Within sixty (60) days of commencement of the arbitration actions, and after receiving evidence and hearing witnesses, if any, the Decider Arbitrator shall render his or her award, accompanied by findings of fact and a statement of reasons for the decision.

(v) <u>Standard of Review</u>. All Decisions rendered by the Decider Arbitrator shall be determined in light of the nature of the Dispute, the circumstances surrounding the Dispute, applicable laws, and the rights and interests of the parties, so as to do substantial justice to the parties. No order in Arbitration Proceedings may terminate this Agreement except upon (A) a determination that the Dispute on which the order is based constitutes a material breach of this Agreement, or (B) upon a determination of repeated defaults sufficient to indicate callous indifference to a party's obligations under this Agreement.

   (vi) <u>Place of Arbitration</u>. All hearings and other proceedings in the arbitration shall be held at Superior, Wisconsin or Duluth, Minnesota, unless otherwise mutually agreed in writing by the parties.

   (vii) <u>Relief Available</u>. With respect to the matters submitted to Arbitration Proceedings, the Decider Arbitrator shall have authority to:

    1. issue appropriate interlocutory orders to mitigate damage or prevent irreparable injury to a party; and

    2. render a final decision which:

     a. determines or declares the rights, duties, adequacy of performance, breach or liabilities of a party under the Agreement;

     b. orders a party to specifically perform its obligations under the Agreement to the extent allowable by applicable law;

     c. awards appropriate injunctive, declaratory or compensatory monetary relief for the benefit of a party; and/or

     d. contains such further relief and provisions as the arbitrators have jurisdiction and authority to grant.

The Decider Arbitrator shall not have jurisdiction or authority to assess special, consequential or punitive damages against either party. Except as inconsistent with the provisions of this Section 30, the arbitration shall be conducted in accord with the Commercial Rules of the American Arbitration Association then in effect.

   (viii) <u>Decision Binding; Enforcement</u>. The Decision of the Decider Arbitrator shall become a "Final Decision" at the time rendered. All Final Decisions shall be conclusive and binding on the parties with respect to the matters decided, and shall be complied with by the parties. A party may enter a Final Decision and institute Judicial Proceedings for the sole purpose of enforcing a Final Decision in any tribunal specified in Section 29(b) above. In such Judicial Proceedings, neither party, without consent of the other party, shall be entitled to contend that the Final Decision should be vacated, modified or corrected and the parties hereby expressly waive all other rights and remedies that might otherwise be available in the Judicial Proceeding.

   (ix) <u>Costs of Arbitration</u>. All costs of arbitration, including the fees and expenses of the Decider Arbitrator, shall initially be borne equally by the parties, but ultimate responsibility for such costs shall be determined by the Decider Arbitrator in the course of his or her decision and/or award according to the extent to which each party prevailed on the issues subject to the arbitration. Each party shall bear the costs and expenses for the presentation of its case, including the fees of its attorneys and experts.

(x) <u>Survival of Remedy</u>. Subsequent to any expiration or termination of this Agreement, this Section shall remain available to the parties with respect to Disputes arising out of or relating to this Agreement, whether such Dispute arose prior to the expiration or termination of the Agreement, for the longer of (i) one (1) year, or (ii) the conclusion of any proceedings timely initiated pursuant to this Section 30(b).

[signature pages follow]

IN WITNESS WHEREOF, Pledgor has caused this Agreement to be duly executed and delivered as of the day and year first above written.

**LAC COURTE OREILLES FINANCIAL SERVICES LLC,**
a wholly-owned limited liability company of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe organized pursuant to Section 16 of the act of June 18, 1934 (48 Stat. 987)(25 U.S.C. § 476), as amended

By: ███████████████████████

Name:  Lee Harden
Title:    Chairman

Accepted as of the day and year first above written:

**DIMENSION CREDIT (CAYMAN), L.P.,**
a Cayman Islands Exempted Limited
Partnership

By: Dimension Credit GP (Cayman), Ltd.,
    its general partner

By: _____
Name: David Baylor
Title:   Director

Accepted as of the day and year first above written:

**DIMENSION CREDIT (CAYMAN), L.P.,**
a Cayman Islands Exempted Limited
Partnership

By: Dimension Credit GP (Cayman), Ltd.,
    its general partner

By
Name: David Baylor
Title:   Director

**SCHEDULE I**
**TO PLEDGE AGREEMENT**

| Pledgor | Equity Issuer | Class of Equity Interest | Certificate No(s). (if applicable) | Par Value (if any) | Number of Equity Interests | Percentage of Equity Issuer's Equity Interests |
|---|---|---|---|---|---|---|
| Lac Courte Oreilles Financial Services LLC | Hummingbird Funds, LLC | LLC Interests | N/A | None | N/A | 100% |

# SCHEDULE J

## TO PLEDGE AGREEMENT

### PRE-APPROVED ARBITRATORS

Robeli Anderson
Lawrence Baca
John Bickerman
Kristen Carpenter
Robert Clinton
Matthew L.M. Fletcher
Zeke Fletcher
Carla Fredericks
JoAnn Cook-Gasco
Carole Goldberg
B.J. Jones
Stacey Leeds
Bryan Newland
Carrie Newton Lyons
John Petoskey
Michael Petoskey
Frank Pommerscheim
Robert Porter
Angela Riley
Addie Rolnick
Wenona Singel
Jill Tompkins
Robert A. Williams

**EXHIBIT A**

Irrevocable Proxy

The undersigned hereby appoints Dimension Credit (Cayman), L.P., an exempted limited partnership under the laws of the Cayman Islands ("Lender"), as Proxy pursuant to the terms of that certain Pledge Agreement dated September 2, 2014 by and between Lac Courte Oreilles Financial Services LLC, a wholly-owned limited liability company of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe organized pursuant to Section 16 of the act of June 18, 1934 (48 Stat. 987)(25 U.S.C. § 476), as amended, and Lender, with full power of substitution, and hereby authorizes Lender to represent and vote all of the equity interests of Hummingbird Funds, LLC, a sovereign instrumentality and tribal limited liability company of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe organized pursuant to Section 16 of the act of June 18, 1934 (48 Stat. 987)(25 U.S.C. § 476), as amended, held of record by the undersigned on the date of exercise hereof or at any meeting or at any other time chosen by Lender in its sole discretion.

Date: September 2, 2014

**LAC COURTE OREILLES FINANCIAL SERVICES LLC**,
a wholly-owned limited liability company of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe organized pursuant to Section 16 of the act of June 18, 1934 (48 Stat. 987)(25 U.S.C. § 476), as amended

By: _____

Name: Lou E. Harden

Title: Chairman, LCOFS

## EXHIBIT B

Pledge Amendment

This Pledge Amendment dated _____ ___, 20__ is delivered pursuant to Section 5(c) of the Pledge Agreement referred to below.  The undersigned hereby agrees that this Pledge Amendment may be attached to the Pledge Agreement, dated as of September 2, 2014, by and between Lac Courte Oreilles Financial Services LLC, a wholly-owned limited liability company of the Lac Courte Oreilles Band if Lake Superior Chippewa Indians, a federally recognized Indian tribe organized pursuant to Section 16 of the act of June 18, 1934 (48 Stat. 987)(25 U.S.C. § 476), as amended and Dimension Credit (Cayman), L.P., an exempted limited partnership under the laws of the Cayman Islands ("Lender") (as amended, restated, supplemented or otherwise modified from time to time, the "Pledge Agreement"; capitalized terms used herein without definition shall have the meaning set forth therein for such terms), and that the Equity Interests listed on this Pledge Amendment shall be deemed to be part of the Pledged Collateral and shall secure all Secured Obligations.

**LAC COURTE OREILLES FINANCIAL SERVICES LLC,**
a wholly-owned limited liability company of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe organized pursuant to Section 16 of the act of June 18, 1934 (48 Stat. 987)(25 U.S.C. § 476), as amended

Date:_____

By: _____
Name: _____
Title: _____

| Issuer | Class of Equity Interest | Certificate Number(s) (if any) | Par Value (if any) | Number of Equity Interests | Percentage of Equity Interest |
|--------|--------------------------|-------------------------------|---------------------|-----------------------------|-------------------------------|
|        |                          |                               |                     |                             |                               |
|        |                          |                               |                     |                             |                               |

# EXHIBIT F



Login



# **Blue Trust Loans** is transitioning to **eLoanWarehouse**!

Blue Trust Loans has revamped, improved, and developed an even faster and more convenient way to get your funds with eLoanWarehouse!

**Dear customer,**

If you have an open loan with us and need information on your existing loan, please contact us at 855-650-6641.

Thank you for contacting LCO Financial Services Home of Blue Trust Loans and eLoan Warehouse.

If you are interested in a new loan, please click the link below and fill out an application.

Go to eLoanWarehouse



 



Privacy Policy

📞 855 650 6641

© 2021 Hummingbird Funds, LLC,
All Rights Reserved.

P.O. Box 1754 · Hayward, WI 54843